EXHIBIT A

# STATE OF NORTH CAROLINA

_____CHEROKEE_____ County

| | |
|---|---|
| File No. | |

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name And Address Of Plaintiff 1*<br>BRIAN HOGAN et. al. | **GENERAL**<br>**CIVIL ACTION COVER SHEET**<br>☒ **INITIAL FILING**   ☐ **SUBSEQUENT FILING**<br>Rule 5(b), General Rules of Practice For Superior and District Courts |

*Name And Address Of Plaintiff 2*
H.H. HOGAN et. al.

*Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)*
DAVID A. WIJEWICKRAMA
95 DEPOT STREET

**VERSUS**

*Name Of Defendant 1*
CHEROKEE COUNTY et. al.

| | |
|---|---|
| WAYNESVILLE | NC   28786 |
| *Telephone No.*<br>828-452-5801 | *Cellular Telephone No.* |
| *NC Attorney Bar No.*<br>30694 | *Attorney E-Mail Address*<br>davidwije17@yahoo.com |

| | |
|---|---|
| *Summons Submitted* ☒ Yes ☐ No | ☒ Initial Appearance in Case    ☐ Change of Address |

*Name Of Defendant 2*

*Name Of Firm*
LAW OFFICE OF DAVID A. WIJEWICKRAMA, PLLC

*FAX No.*
828-454-1990

*Counsel for*
☒ All Plaintiffs    ☐ All Defendants    ☐ Only *(list party(ies) represented)*

| | |
|---|---|
| *Summons Submitted* ☐ Yes ☐ No | |

☒ Jury Demanded In Pleading
☒ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

## TYPE OF PLEADING

*(check all that apply)*
- ☐ Amend (AMND)
- ☐ Amended Answer/Reply (AMND-Response)
- ☐ Amended Complaint (AMND)
- ☐ Assess Costs (COST)
- ☐ Answer/Reply (ANSW-Response) *(see Note)*
- ☐ Change Venue (CHVN)
- ☒ Complaint (COMP)
- ☐ Confession Of Judgment (CNJF)
- ☐ Consent Order (CONS)
- ☐ Consolidate (CNSL)
- ☐ Contempt (CNTP)
- ☐ Continue (CNTN)
- ☐ Compel (CMPL)
- ☐ Counterclaim (CTCL) *Assess Court Costs*
- ☐ Crossclaim *(list on back)* (CRSS) *Assess Court Costs*
- ☐ Dismiss (DISM) *Assess Court Costs*
- ☐ Exempt/Waive Mediation (EXMD)
- ☐ Extend Statute Of Limitations, Rule 9 (ESOL)
- ☐ Extend Time For Complaint (EXCO)
- ☐ Failure To Join Necessary Party (FJNP)

*(check all that apply)*
- ☐ Failure To State A Claim (FASC)
- ☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
- ☐ Improper Venue/Division (IMVN)
- ☐ Including Attorney's Fees (ATTY)
- ☐ Intervene (INTR)
- ☐ Interplead (OTHR)
- ☐ Lack Of Jurisdiction (Person) (LJPN)
- ☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
- ☐ Modification Of Child Support In IV-D Actions (MSUP)
- ☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
- ☐ Petition To Sue As Indigent (OTHR)
- ☐ Rule 12 Motion In Lieu Of Answer (MDLA)
- ☐ Sanctions (SANC)
- ☐ Set Aside (OTHR)
- ☐ Show Cause (SHOW)
- ☐ Transfer (TRFR)
- ☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
- ☐ Vacate/Modify Judgment (VCMD)
- ☐ Withdraw As Counsel (WDCN)
- ☐ Other *(specify and list each separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

AOC-CV-751, Rev. 1/14
© 2014 Administrative Office of the Courts

(Over)

| | | |
|---|---|---|
| ☐ Administrative Appeal (ADMA) | ☐ Limited Driving Privilege - Out-Of-State | ☐ Product Liability (PROD) |
| ☐ Appointment Of Receiver (APRC) | Convictions (PLDP) | ☐ Real Property (RLPR) |
| ☐ Attachment/Garnishment (ATTC) | ☐ Medical Malpractice (MDML) | ☐ Specific Performance (SPPR) |
| ☐ Claim And Delivery (CLMD) | ☐ Minor Settlement (MSTL) | ☒ Other (specify and list each separately) |
| ☐ Collection On Account (ACCT) | ☐ Money Owed (MNYO) | 1983 claims and others |
| ☐ Condemnation (CNDM) | ☐ Negligence - Motor Vehicle (MVNG) | |
| ☐ Contract (CNTR) | ☒ Negligence - Other (NEGO) | |
| ☐ Discovery Scheduling Order (DSCH) | ☐ Motor Vehicle Lien G.S. 44A (MVLN) | |
| ☐ Injunction (INJU) | ☐ Possession Of Personal Property (POPP) | |

| Date | Signature Of Attorney/Party |
|---|---|
| 3/14/2018 | |

## FEES IN G.S. 7A-308 APPLY
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

## PRO HAC VICE FEES APPLY
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| No. | ☒ Additional Defendant(s)   ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| 2 | CHEROKEE COUNTY DEPARTMENT OF SOCIAL SERVICES | ☒ Yes ☐ No |
| 3 | SCOTT LINDSAY | ☒ Yes ☐ No |
| 4 | CINDY PALMER | ☒ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

Plaintiff(s) Against Whom Counterclaim Asserted

| | |
|---|---|
| | |
| | |
| | |

Defendant(s) Against Whom Crossclaim Asserted

| | |
|---|---|
| | |
| | |
| | |

STATE OF NORTH CAROLINA
COUNTY OF CHEROKEE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 18-CVS-_____

BRIAN HOGAN, both on his own behalf and
as representative of all unnamed class
members who are similarly situated;
BRIAN HOGAN, as parent and next friend of
H.H., both on her own behalf and as a
representative of all unnamed class members
who are similarly situated

        Plaintiffs,

    v.

CHEROKEE COUNTY;
CHEROKEE COUNTY DEPARTMENT OF
SOCIAL SERVICES;
SCOTT LINDSAY, in both his individual
capacity and his official capacity as attorney
for Cherokee County Department of Social
Services; CINDY PALMER, in both her
individual capacity and her official capacity as
Director of Cherokee County Department of
Social Services;
DSS SUPERVISOR DOE #1, both in his/her
individual capacity and his/her official
capacity as an employee of Cherokee County
Department of Social Services; and
DSS SOCIAL WORKER DOE #1, both in
his/her individual capacity and his/her official
capacity as an employee of Cherokee County
Department of Social Services;

        Defendants,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**
**(Petition for Class Certification)**
**(Jury Trial Demanded)**

---

NOW COME the Plaintiffs, by and through undersigned counsel, and allege the

following Claims for Relief seeking recovery of damages and for injuries incurred as a proximate

cause of the acts and omissions of Defendant pursuant to N.C.R. Civ. P. 1, 3, 4, 8, and 9, arising

1

from the conduct of the Defendants in their official and individual capacities, as described more particularly in this complaint:

## INTRODUCTION

1. This action arises from multiple events, transactions and occurrences referenced and described in this complaint, including unlawful Custody and Visitation Agreements (hereinafter "CVA"), unlawful Powers Of Attorney (hereinafter "POA") and other similarly substantive documents and agreements that remove a minor child from his/her proper custodial parent or court-appointed foster parent, as well as the impact of such agreements affecting the parent/child relationship of other persons and their children. Copies of representative CVAs are attached as Exhibit A; a copy of a representative POA is attached as Exhibit B.

2. Plaintiff Brian Hogan (hereinafter "Hogan" or "Plaintiff") brings this action for damages and a redress of harms suffered by himself, as well as the damages and harms suffered by all other members of a class of similarly-situated parents, who have been damaged and harmed as the result of like conduct by Defendant Cherokee County Department of Social Services (hereinafter "CCDSS"), their agents and employees, who are state actors as defined by law.

3. Hogan also brings this action as parent and next friend of H.H., his biological child who is a minor, for damages and redress of harms suffered by H.H., as well as the damages and harms suffered by all other members of a class of similarly-situated minor children who have had been damaged and harmed as the result of like conduct by Defendant CCDSS, their agents and employees, who are state actors as defined by law.

## PARTIES AND JURISDICTION

4. Plaintiff Hogan brings this action for redress of harms suffered himself as well as the harms suffered by all other members of a class of similarly situated parents, who have had been harmed as the result of like conduct by Defendant Cherokee County Department of Social Services (hereinafter "CCDSS"), their agents and employees, who are state actors as defined by law.

5. This action arises from a series of discrete events, transactions and occurrences referenced and described in this complaint, including the pattern and practice of CCDSS using unlawful CVAs and POAs and other similarly substantive agreements to remove minor children from their proper custodial parent, as well as the effects such agreements have on the parent/child relationship of other persons and their children.

6. The named Plaintiff is a citizen and resident of Cherokee County, North Carolina.

7. All other unnamed class members were, at the times of the events giving rise to this litigation, either citizens and residents of Cherokee County, North Carolina or, by the actions of the Defendants as more fully described below, had significant contact with Cherokee County, North Carolina.

8. Defendant Cherokee County (hereinafter "Cherokee County") is a political subdivision of the State of North Carolina, organized and governed by the laws of the State of North Carolina.

9. Defendant CCDSS is an agency organized under the laws of the State of North Carolina and operated pursuant to administrative regulations promulgated by the North Carolina Department of Health and Human Services; its activities and operations are carried out by agents and employees of Cherokee County.

10. Defendant Scott Lindsay (hereinafter "Lindsay") is and has been at all relevant times the Department of Social Services (hereinafter "DSS") attorney for Cherokee County, an agent and employee of Cherokee County and CCDSS.

11. Defendant Lindsay is a government actor as it relates to the allegations set forth herein.

12. Defendant Lindsay exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

13. Defendant Lindsay has been trained for over 18 years in the rules, regulations, policies and procedures of the Department of Social Services as promulgated by the NCDHHS and the associated laws of the state of North Carolina. Defendant Lindsay, as an agent of and policy maker for CCDSS, is statutorily obligated to act in the best interest of each minor child and to ensure each child's health and safety at all times when acting in regard to CCDSS or its duties. He is further obligated to follow all the laws of the State of North Carolina at all times.

14. Defendant Lindsay has been continuously employed as both the attorney for Cherokee County and CCDSS simultaneously for many years.

15. Defendant Cindy Palmer (hereinafter "Palmer") is the director of CCDSS and has been an agent or employee of Cherokee County at all relevant times. Defendant Palmer is a health and community worker.

16. Defendant Palmer has been Director of CCDSS for approximately two years and previously was the interim director. Her predecessors as Directors were agents or employees of Cherokee County at all relevant times, and were health and community workers for CCDSS.

17. Defendant Palmer holds a public office created by state statute whereby she exercises a position of power and discretion, as allowed by law as set forth in N.C. Gen. Stat. § 7B-100 *et. seq.*

18. Defendant Palmer was trained in the rules, regulations, policies and procedures of the Department of Social Services as promulgated by the NCDHHS and the associated laws of the state of North Carolina after assuming her responsibilities and duties.

19. Defendant Palmer exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

20. Defendant Palmer, as director of CCDSS, has both the authority and responsibility to set and oversee all policies and practices of CCDSS, including those complained of in this action.

21. As Director of CCDSS, Defendant Palmer had a duty of her office to, at all times, act in the best interest of each minor child upon whom CCDSS takes action.

22. Defendant Palmer is an official policy maker for Cherokee County.

23. Defendant Palmer is a public officer as defined by law.

24. Defendant CCDSS Supervisor Doe #1, and all other unnamed CCDSS supervisors, are and have been at all relevant times agents and employees of Cherokee County, whose positions of employment include the authority and responsibility to carry out the policies of Defendants Cherokee County, CCDSS, and Palmer. They also have the responsibility and authority to oversee the activities of CCDSS social workers. CCDSS Supervisor Doe #1 is and all other CCDSS Supervisors are health and community workers.

25. Defendant Social Worker Doe #1, and all other unnamed CCDSS social workers, are and have been at all relevant times agents and employees of Cherokee County, whose

positions of employment include the duty of carrying out the policies and practices of Defendants Cherokee County, CCDSS, Palmer, and Lindsay. Social Worker Doe #1 is and all other CCDSS Social Workers are health and community workers.

26. The defendant social workers and supervisors were state actors as it relates to the allegations as set forth herein.

27. The defendant social workers and supervisors exercised personal and professional deliberation, made decisions and exercised personal and professional judgment as set forth herein.

28. The identities of all Defendants who are or have been social workers, supervisors, directors, health and community workers, and others who took part in, were involved in, or had knowledge of the process of removing minor children from proper custodial parents without lawful authority and in derogation of the rights and privileges of those parents and minor children, have yet to be identified, and will be identified through discovery during both the class certification process and the merits of this action. Plaintiffs reserve their right to amend this Complaint to add those persons as Defendants to this case as they become known.

29. Each and every agent and employee of CCDSS, including each and every past and present social worker, supervisor, attorney, and director, is obligated to act, at all times, in the best interest of each minor child upon whom CCDSS takes any action.

30. Defendants' Lindsay and Palmer are citizens and residents of Cherokee County, North Carolina.

31. The unlawful acts and/or omissions which are the subject of this action took place in Cherokee County, North Carolina.

32. Venue is proper in the Cherokee County, North Carolina pursuant to N.C. Gen. Stat. §§ 1-77 and 1-82.

33. The amount in controversy exceeds $25,000.00, and therefore the Superior Court is the proper division of the General Court of Justice for trial pursuant to N.C. Gen. Stat. § 7A-243.

34. Defendants are not entitled to absolute, prosecutorial, or governmental immunity because, *inter alia*, the actions complained of herein were not undertaken during the process of prosecuting any claim of abuse, neglect, or dependency in a proceeding before the District Court of Cherokee County.

35. Alternatively, all of the Defendants and those yet to be known have waived any governmental immunity that may arguably apply, pursuant to N.C. Gen. Stat. § 153A-435 by the purchase of insurance and/or participation in the North Carolina Association of County Commissioners Risk Management Pool, which provides coverage for the acts and omissions alleged against the Defendants herein.

36. Each Claim for Relief against each Defendant is brought against that Defendant in both his/her individual and official capacities.

37. Each Defendant, both those known and yet to be identified through discovery in this action, committed the acts complained of herein while acting in both their individual and official capacities.

## FACTS RELEVANT TO PLAINTIFF HOGAN'S CLAIMS FOR RELIEF

38. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

39. Plaintiff Hogan is the biological father of a minor child, H.H., born January 16, 2006. They both reside in Cherokee County, North Carolina.

40. On or about September 14, 2015, CCDSS received a report of suspected neglect involving Hogan, H.H., and H.H.'s mother, Amanda Edmondson. Amanda Edmondson is a citizen and resident of Cherokee County, North Carolina.

41. CCDSS conducted an investigation into the report and ultimately filed a juvenile petition alleging abuse, neglect, and/or dependency of H.H. in 2015. This juvenile petition is contained within Cherokee County File Number 15-JA-73.

42. The District Court of Cherokee County ultimately rendered an order of adjudication and disposition on January 14, 2016, and said order was signed and entered on April 1, 2016.

43. The April 1, 2016 Order was entered by the Honorable Tessa Sellers, District Court Judge presiding, and placed custody of the minor child with Plaintiff Hogan. The decision to return H.H. to the custody of Hogan was entered after hearing with the consent of CCDSS and H.H.'s guardian ad litem. The April 1, 2016 order (hereinafter the "Judge Sellers Order") is attached as Exhibit C.

   a. During the course of the litigation arising from the Juvenile Petition filed in Cherokee County 15-JA-73 ("*In re H.H.*"), Hogan was represented by court-appointed counsel Melissa Jackson.

   b. CCDSS, Defendant Lindsay, and other Defendant social workers and health and community workers participated in and were parties to *In re H.H.*

44. Defendant Palmer was the director of CCDSS during the investigation and litigation of the juvenile action involving Hogan and H.H. She exercised full supervisory authority and had final authority over all decisions, policies, and actions of CCDSS and its employees during the investigation leading to the filing of *In re H.H.* and the subsequent juvenile court proceedings.

45. Further, Defendant Palmer was the director of CCDSS and exercised full supervisory authority and had final authority over all decisions, policies, and actions of CCDSS and its employees at all times relevant to the allegations contained within this Complaint.

46. Defendant Lindsay represented CCDSS during the proceedings of *In re H.H.*, and, upon information a belief, provided advice and guidance to CCDSS during the investigation leading to the filing of *In re H.H.*.

47. Further, Defendant Lindsay has represented CCDSS and provided advice and guidance to CCDSS regarding all its investigations and practices during all times relevant to the allegations contained within this Complaint.

48. On or about November 21, 2016, CCDSS again contacted Hogan regarding concerns involving Hogan and H.H. An agent of CCDSS requested that Hogan come to CCDSS's office.

49. Hogan attended a meeting at CCDSS's office. Present at this meeting were Hogan and Laurel Smith, a social worker for CCDSS.

50. During this meeting, CCDSS by and through its social worker Laurel Smith, requested that Plaintiff agree to and sign a CVA, which purportedly removed custody of H.H. from Plaintiff and placed physical and legal custody of the minor child with the minor child's paternal grandfather, Warren Hogan.

51. Warren Hogan (hereinafter "Grandfather") is the paternal grandfather of the minor child. Grandfather is a citizen and resident of Cherokee County, North Carolina.

52. Plaintiff Hogan has learning disabilities and is unable to adequately read and write.

53. CCDSS was aware of Hogan's disabilities at all relevant times.

54. CCDSS agents made a number of statements to Hogan at the time Hogan was presented with the CVA, which included:

   a. That this CVA was entered in lieu of court involvement;

   b. That Hogan would be subjected to adverse legal proceedings and other consequences if he did not sign the CVA;

   c. Other false threatening, and coercive statements, including, upon information and belief, that if Hogan did not acquiesce to the CVA:

      i. Your child will be adopted out and you will never see her again.

      ii. Your child will be placed in foster care and you won't see her.

      iii. Your child will be placed in a location where you will have little or no contact with her.

55. Plaintiff Hogan was not represented by counsel at the time of the November 21, 2016 meeting. His appointed counsel from *In re H.H.* had been released from further representation following entry of the Judge Sellers Order.

56. Plaintiff Hogan was neither advised nor given an opportunity to contact independent legal counsel when confronted with and unlawfully pressured to sign the unlawful CVA.

57. CCDSS never contacted Hogan's prior attorney regarding the meeting or the CVA.

58. Under the provisions of N.C. Gen. Stat. § 7B-100 *et seq.*, Plaintiff Hogan was entitled to counsel prior to any adversarial event that would result in him losing custody.

59. On November 21, 2016, Plaintiff Hogan, because of the fraud, coercion, and misrepresentations made to him by CCDSS and its agents and employees described herein, agreed to and signed the CVA purporting to remove H.H. from Hogan's custody and placing her in the custody of Grandfather. A true and accurate copy of the CVA is attached as Exhibit D.

60. Laurel Smith, who was a social worker for CCDSS at the time, effected this CVA at the direction of and with the approval of Defendants Lindsay and Palmer.

61. As a result of the Hogan CVA, H.H. was removed from Plaintiff's care, custody, and control and placed with the paternal grandfather in direct violation of the Judge Seller's Order.

62. As a result of the CVA and the unlawful conduct of CCDSS, its agents and employees, Hogan was not allowed to see, visit, care for, or otherwise interact with H.H. If Hogan and H.H. had any contact at all, it was *de minimis*, permitted no meaningful contact, and did not permit Hogan to exercise his rights as a parent to be a parent to his child.

63. On December 4, 2017, Plaintiff Hogan attempted to lawfully obtain his daughter H.H. by contacting the Cherokee County Sheriff's Office.

64. Notably, Cody Williams, a deputy of the Cherokee County Sheriff's Office, reviewed the Judge Sellers' Order and concluded that it was not a valid Court Order. On information and belief, Defendant Lindsay was either directly or indirectly involved in Deputy Williams reaching this decision.

65. On December 6, 2017, Plaintiff attempted to pick up the minor child from school. He had in his possession a certified true copy of the Judge Sellers Order.

66. School officials would not release the minor child to Plaintiff.

11

a. School officials contacted the Andrews Police Department and the paternal grandfather.

b. Paternal grandfather appeared with a copy of the unlawful CVA.

c. Officers prevented Plaintiff from retrieving the minor child upon the threat or arrest.

d. Upon information and belief, Defendant Lindsay was either directly or indirectly involved in enforcing the unlawful CVA, and denying Hogan access to and custody of H.H.

67. On December 7, 2017, attorney Melissa Jackson filed on Plaintiff's behalf a motion in Cherokee County 15-JA-73 to enforce the Judge Sellers Order.

68. On December 13, 2017, the Honorable Monica H. Leslie heard attorney Melissa Jackson's motion to enforce the Judge Sellers Order.

69. When asked by the Court what legal authority DSS had for the execution of the CVA, Defendant Lindsay admitted that there was, "none."

70. Defendant Lindsay further informed the Court, at that time, that he was aware of 20 of such agreements drafted by himself or at his direction.

a. At all relevant times, Defendant Lindsay was operating within the scope and authority of his position as the attorney for CCDSS.

b. At all relevant times, CCDSS, by and through its employees was aware of Defendant Lindsay's conduct. As a direct and proximate result of their deliberate indifference, CCDSS effected the loss and deprivations referenced in this complaint and the policy, pattern, and did nothing to object or intervene.

c. On at least one occasion, a CCDSS social worker, Katie Brown, inquired about whether the CVAs or substantively similar agreements were legal, and Defendant Lindsay assured her that such agreements were legal and enforceable.

d. Defendant Lindsay's conduct was grossly negligent, intentional, willful, and without legal authority and done with reckless disregard of the plaintiffs or their constitutionally protected rights.

71. Judge Leslie entered an Order on December 13, 2017 holding that the CVA was not a valid legal document, not enforceable or binding, is null and void, and the previous order entered by Judge Sellers was valid and full legal custody and control of H.H. was to be returned to Plaintiff Hogan.

72. After entering her order in regard to Hogan's CVA on December 13, 2017, Judge Leslie reported CCDSS and Defendant Lindsay to the N.C. Department of Health and Human Services (hereinafter "DHHS").

73. Following Judge Leslie's report to DHHS regarding CCDSS and Defendant Lindsay's actions, the DHHS became aware of the practice of entering into CVAs, POAs and other such agreements as used in Plaintiff's case.

74. DHHS advised in a December 20, 2017, letter to all county directors of social services that *"facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy."* A true and accurate copy of this letter is attached as Exhibit E.

75. As a proximate result of Defendants' conduct, Hogan suffered sadness, pain and emotional distress as:

a. Hogan was denied the opportunity to provide care, love, and affection to minor child.

b. H.H. lost the services, care, protection, and assistance of Hogan.

c. Hogan and H.H. lost society, companionship, comfort, guidance, kindly offices, and advice of each other.

76. Plaintiff Hogan's damages are more than $25,000.00.

**FACTS SPECIFIC TO UNNAMED CLASS MEMBERS' CLAIMS FOR RELIEF**

77. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

78. A CVA was used not only in Hogan's case, but also in numerous other cases by CCDSS with modifications being made as necessary to account for the individual circumstances of each child and the placement that CCDSS had chosen.

79. Upon information and belief:

a. The Hogan CVA was one of several that Ms. Smith and other agents and employees of CCDSS effected for CCDSS at Defendant Lindsay's direction and approval while employed by and acting on behalf of CCDSS as director, supervisor, social worker or similarly situated person.

b. At various times, these documents were referred to as "Custody and Visitation Agreements," "CVAs," "Custody Agreements," "Voluntary Placement Agreements," "VPAs," Powers of Attorney "POAs", or such similar terms.

c. Courtney Myers, who previously worked for the CCDSS for approximately three years, estimates that she or co-workers completed between 30 and 50 CVAs.

d. CVAs and POAs and other similar documents were regularly used as an option when Defendant Lindsay did not feel the case was "serious enough" for Court involvement.

e. Defendant Lindsay would send and receive the draft CVA to and from CCDSS social workers to input the particular factual information.

    i. For example, social workers Katie Brown, Laurel Smith, Joyce Bernier, and Courtney Myers, would receive the draft CVA from Defendant Lindsay and input the information applicable to a particular case (for example, the names of Plaintiff, grandfather, minor child, and minor child's date of birth), and send the draft CVA via email back to Defendant Lindsay for his approval.

    ii. All of the above-referenced social workers effected similar agreements only with the approval of Defendant Lindsay and/or their social worker supervisor and/or the Director of CCDSS.

    iii. All knowledge of Defendant Lindsay, as well as the social workers and supervisors, are imputed to the Director of CCDSS at relevant times.

f. These CVAs were sent to and from Defendant Lindsay's Cherokee County-provided and private email addresses since 1999.

g. Ms. Brown, as well as several other social workers, did question the legality and validity of the CVAs to both the Defendant Lindsay and CCDSS Directors over the years.

h. Defendant Lindsay and/or social worker supervisors and/or CCDSS Directors advised them that the use of CVAs was legal and permissible.

i. CCDSS entered into CVAs and/or POAs frequently.

j. Upon information and belief, CCDSS created, and induced parents to enter into dozens, if not more (possibly several hundred) CVA's, all of which were created, effected, and enforced by CCDSS, and its agents and employees including Defendant Lindsay.

k. No CVAs were done without the approval, guidance and participation of Defendant Lindsay and/or the Director of CCDSS.

l. Some of these agreements have been placed in closed court files in the Cherokee County Courthouse, by Defendant Lindsay or agents/employees of CCDSS. This placement was done at the direction of either a director, defendant Lindsay, CCDSS supervisor, or other employee with supervisory authority.

m. Defendant Palmer, the CCDSS Director, and persons who held the public office of Director of CCDSS prior to her are and were aware of the CVAs, POAs and similar documents and approved of them, both expressly and tacitly.

n. Use of the CVAs, POAs, and substantively similar agreements to remove minor children from their parents without court involvement was an official policy of CCDSS. Use of the CVAs, POAs, and substantively similar agreements to remove minor children from their parents without court involvement was an accepted custom and practice of CCDSS, known to its policy makers and accepted and encouraged by the policy makers.

o. On multiple occasions, the decision to proceed with a CVA was made in consultation and agreement between Defendant Palmer and CCDSS employees.

p. On multiple occasions, the decision to proceed with a CVA was made in consultation between Defendant Lindsay and CCDSS employees during case review, case staffing, or other times.

q. These agreements were used to achieve CCDSS's goal of removing minor children from lawful custody when they lacked sufficient evidence or legal basis to file a petition or seek non-secure custody of a minor child pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.,*

r. CVAs were used to interfere with parental relationships in cases in which CCDSS and Defendant Lindsay knew such interference was not legally justified. Moreover, CVAs and POAs and other similar documents were used to avoid judicial oversight into the activities of CCDSS. Further, CVAs and POAS and other similar documents were utilized to avoid scrutiny by the Court and parents' counsel.

s. CVAs were used to avoid, and in fact did result in, CCDSS not providing any follow-up care (including *inter alia* medical care) that CCDSS is required, pursuant to N.C. Gen. Stat. § 7B-100 *et seq.*, to provide children who are placed in an out-of-home placement.

80. In a separate action seeking a Declaratory Judgment, Judge Sellers, in open Court, entered an Order on February 28, 2018, finding *inter alia,* that all CVAs and like documents including POA's are void *ab initio*. A true and accurate copy of this Order is attached as Exhibit F.

81. After entering her order in regard to Hogan's CVA on December 13, 2017, Judge Leslie reported CCDSS and Defendant Lindsay to the N.C. Department of Health and Human Services (hereinafter "DHHS").

82. Following Judge Leslie's report to DHHS regarding CCDSS and Defendant Lindsay's actions, the DHHS became aware of the practice of entering into CVAs, POAs and other such agreements as used in Plaintiff's case.

83. DHHS advised in a December 20, 2017, letter to all county directors of social services that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy." A true and accurate copy of this letter is attached as Exhibit E.

## CLASS OF UNNAMED PLAINTIFFS

84. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

85. CCDSS has utilized CVAs, POAs or substantively similar agreements to unlawfully coerce parents into surrender of custody of their children without proper process or Court oversight for upwards of two decades.

   a. Upon information and belief, prior directors, prior supervisors, prior social workers, as well as others still working with CCDSS (including health care and community workers) have caused parents to sign CVAs, POAs, or substantively similar agreements without court involvement or oversight, thereby interfering with the parental relationship between that of parent and child, violating the constitutional and statutory rights of the parents and minor children.

b. The Defendants lacked a compelling governmental interest as it relates to the use of CVAs, POAs and similar documents in obtaining signatures from all class plaintiffs.

c. Neither Defendant Lindsay, nor Defendant Palmer, nor any CCDSS supervisor, nor CCDSS social worker, health or community worker (or their predecessors at times relevant) reviewed the placement as required by N.C. Gen. Stat. § 7B-100 *et. seq.,* or check on the health safety or welfare of any minor child removed pursuant to CVAs or substantively similar agreements or otherwise afford the requisite rights of the Plaintiffs.

d. Other plaintiffs' attorneys (representing respondent parents in abuse, neglect, dependency proceedings) similarly situated as Hogan's court appointed attorney, were never told about CVAs involving their clients or their client's minor children.

86. Defendants' actions caused Plaintiffs and Unnamed Class Members to be deprived of fundamental rights, particularly, a parental relationship with their biological children, in violation of substantive and procedure due process of the law and in violation of all Plaintiffs' equal protection rights.

87. The Defendants, collectively and individually, represented and carried out CCDSS policy and procedures and represented to all Plaintiffs they were acting in accordance with N.C. Gen. Stat. § 7B-100 *et. seq.*, when in fact they were anting contrary to law.

88. The Defendants' conduct was the result of the policy decisions of policy makers acting on behalf of Cherokee County.

89. Defendant Palmer and all other CCDSS Directors have the authority to set official policy, training, and directives including the use of the CVAs, POAs, and other substantively similar "agreements," and, in fact, did so.

90. Defendant Palmer and all other CCDSS Directors have the authority and responsibility to oversee the activities and behaviors of CCDSS employees and their agents, including the use of the CVAs, POAs and other substantively similar "agreements."

91. The use of the CVAs, POAs and other substantively similar "agreements" was an official custom, practice, and policy of CCDSS and Cherokee County.

92. The use of the CVAs, POAs and other substantively similar "agreements" were also the result of accepted customs, practices, and conduct by Cherokee County.

93. At no time after the removal of the Plaintiffs' children did Defendant Lindsay, Defendant Palmer, any CCDSS supervisor, CCDSS social worker or agent review the placement, as required by N.C. Gen. Stat. Chapter 7B, or check on the health, safety, or welfare of the minor children, nor did they provide the health-care services required by law.  In fact, CCDSS provided no follow-up services required by law for children placed out of the home.

94. The Defendants' conduct has harmed a class of persons, who are persons who were the parents of children, who were unlawfully coerced into signing a CVA, POA or substantively similar agreement ("Class Parents").

      i. Plaintiff Brian Hogan is member of this class.

      ii. Upon information and belief, at the time of this filing, there are in excess of 50 members of this class, one of whom is the named Plaintiff, Brian

Hogan. The remaining members of this class are currently unknown but will be ascertained through discovery.

   iii. Plaintiff Brian Hogan has a personal interest in the issues of law and fact in this case, including but not limited to:

     1. Being unlawfully coerced into surrendering custody of his minor child by CCDSS in violation of his constitutional rights.

     2. Other factual allegations, as set forth *supra*, and claims for relief, as set forth *infra*, all of which are incorporated by reference as though fully set forth herein.

   iv. These issues of fact and law in which Plaintiff Brian Hogan has a personal interest are common with the class.

   v. These common issues of fact and law predominate over issues affecting only individual class members.

   vi. With the total number of class members exceeding 50, the class is so numerous that it would be impracticable to bring all class members before the court.

   vii. Plaintiff Hogan will adequately represent the members of the class.

95. The Defendants' conduct has harmed a second class of persons, who are minor children who were unlawfully taken away from their parents by use of unlawful and coercive CVAs or substantively similar agreements ("Class Minors").

   i. H.H. is member of this class.

ii. Upon information and belief there are in excess of 50 members of this class, one of whom is H.H. The remaining members of this class are currently unknown but will be ascertained through discovery.

iii. H.H. has a personal interest in the issues of law and fact in this case, including but not limited to:

1. Being unlawfully taken from the lawful custody of her father by CCDSS in violation of his constitutional rights.

2. Other factual allegations, as set forth *supra*, and claims for relief, as set forth *infra*, all of which are incorporated by reference as though fully set forth herein.

iv. These issues of fact and law in which H.H. has a personal interest are common with the class.

v. These common issues of fact and law predominate over issues affecting only individual class members.

vi. With the total number of class members exceeding 50, the class is so numerous that it would be impracticable to bring all class members before the court.

vii. H.H. will adequately represent the members of the class.

viii. H.H. and the other Class Minors will be represented, upon Court approval, by a qualified Guardian Ad Litem as well as class counsel.

96. The Class Parents and Class Minors have been damaged by:

   a. Class Parents have not been allowed to parent, see, visit, care for, or otherwise interact with their children, unlawfully taken from them by use of the CVAs, POAs or other substantively similar agreements.

   b. Class Parents and Class Minors have endured suffering sadness, pain and emotional distress resulting from the use of the CVAs, POAs or other substantively similar agreements.

   c. Class Parents have been denied the opportunity to provide care, love, and affection to Class Minors .

   d. Class Minors have lost the services, care, protection, and assistance of Class Parents.

   e. Class Parents and Class Minors have both been deprived of and have endured lost society, companionship, comfort, guidance, kindly offices, and advice of each other.

   f. Class Minors have been deprived of medical and other types of care and assistance that CCDSS would have been required to provide under N.C. Gen. Stat. § 7B-100 *et seq.* had the Class Minors been removed from their homes pursuant to law.

97. The parental/familial relationships between Class Parents and Class Minors have been interrupted, damaged, harmed and or destroyed due to the conduct of the Defendant(s).

23

## CLAIMS FOR RELIEF

## COUNT I:  NEGLIGENCE (against Defendant Lindsay)

98. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

99. Defendant Lindsay has served as CCDSS attorney for a period in excess of 18 years.  At all times relevant, Defendant Lindsay was trained in the law as an attorney, licensed to practice law, in North Carolina as authorized by the North Carolina State Bar and specifically as it relates to being a lawyer for a North Carolina Department of Social Services.

100. At all relevant times, Lindsay has improperly and without legal authority prepared CVAs, POAs and similar documents and obtained signatures from parents, either directly or indirectly, and made misrepresentations to accomplish the purpose of encouraging parents to sign the CVAs, POAs and similar documents for the purpose of removing children from the lawful parent/plaintiff's care, custody, and control.

101. Defendant Lindsay stated to the Court that he had personal knowledge of at least 20 CVAs.

102. Upon information and belief, Defendant Lindsay received, reviewed, and approved from other CCDSS workers dozens, if not hundreds, of CVAs, POAs or other similar documents during his tenure as staff attorney for CCDSS.

103. Upon information and belief, Defendant Lindsay improperly used his position to influence CCDSS to NOT file petitions in regard to abused, neglected, and dependent children of Cherokee County based on personal relationships he had with surrounding family members of either the parents or children.

24

104. Defendant Lindsay's conduct as set forth above was in violation of the Plaintiffs' constitutional rights.

105. Defendant Lindsay failed to render services and exercise the degree of care and or skill commonly applied and used by other DSS attorneys similarly trained with similar experience that a prudent reputable attorney representing a Department of Social Services would have used when dealing with the plaintiffs and similar circumstances as set forth herein.

106. Defendant Lindsay failed to exercise appropriate professional judgment and engaged in misconduct which is otherwise unreasonable under the circumstances as set forth herein.

107. As a proximate result of Lindsay's negligence, Plaintiffs have suffered damages as set forth and sought herein.

**COUNT II: NEGLIGENCE (against Palmer, Supervisors and Social Workers)**

108. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

109. At all times relevant to the transactions and occurrences or series of transactions or occurrences giving rise to the complaint, the Defendant Social Workers received the training required by the state to be social workers at the Cherokee Department of Social Services.

110. Upon information and belief, the use of CVAs and POAs and other similar documents by CCDSS was approved of by either official policy, unofficial custom, or constituted an official endorsed or accepted practice of CCDSS.

111. Chapter 7B of the General Statutes clearly states that it "shall be interpreted and construed so as to . . . provide procedures for the hearing of juvenile cases that assure

fairness and equity and that "*protect the constitutional rights of juveniles and parents . . .* ." N.C. Gen. Stat. § 7B-100(1) (emphasis added).

112. Upon information and belief, when Defendant Lindsay or the Director (at the relevant time) were questioned by social workers, they represented that the use of CVAs, POAs and other similar documents were lawful.

113. Upon information and belief, all Defendants received training from the North Carolina Department of Health and Human Services on the proper procedures for child removal pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.*

114. The Defendants acted with deliberate indifference to such training, the law, the rights of the plaintiffs, and in other ways yet to be discovered through discovery during both the class certification process and discovery on the merits.

115. Upon information and belief, there is a written manual promulgated by NCDHHS setting forth written instructions for county departments of social services on the proper and lawful methods to remove children from their homes pursuant to N.C. Gen. Stat. § 7B-100 *et seq.*

116. On multiple occasions, the CCDSS was audited by the NCDHHS as it related to their files involving the removal of minor children.

   a. Upon information and belief, the CVA and POA process were not discussed with or approved if by NCDHHS or the State of North Carolina.

   b. Upon information and belief, the CVA, POA and other similar documents were not shown or disclosed to the state inspectors.

c. Upon information and belief, the Defendants hid the CVAs, POAs and other similar documents and the process for obtaining CVAs from the state inspectors from NCDHHS.

117. Defendants negligently used the CVAs, POAs and other similar documents to deprive Plaintiffs of their children.

## COUNT III: GROSS NEGLIGENCE (against Lindsay, Palmer, Supervisors and Social Workers)

118. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

119. Defendants', by their conduct as described in this Complaint, acted in reckless disregard of, or wanton indifference to, the rights of the Plaintiffs.

120. Traditionally, gross negligence has been defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002) (quoting *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)).

121. Defendants' gross and utter failure to take care to follow the constitutional and statutory mandates regarding the removal of children from the home as described throughout this Complaint over a period of many years clearly demonstrates deliberate indifference to the rights of the Plaintiffs and constitutes willful and wanton conduct.

122. As a result of this gross failure to exercise its duty of care, Defendants' use of these CVAs and POAs proximately caused the injuries described in this Complaint.

123. As a result of Cherokee County's conduct, Plaintiffs have suffered damages in excess of $25,000.00.

124. As a direct or proximate result of Defendants' gross negligence, Plaintiffs have suffered damages in excess of $25,000.00.

### COUNT IV: NEGLIGENT MISREPRESENTATION (against Palmer, Lindsay, Supervisors and Social Workers)

125. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

126. Defendants made statements to Plaintiffs regarding the legality of the CVAs and the impact that signing a CVA would have on them and their children.

127. Defendants made, or caused to be made, material misrepresentations and/or misleading statements to Plaintiffs, as described above. These misrepresentations were made negligently, and without regard for their truth.

128. Defendants intended their misrepresentations to be relied upon by Plaintiffs, and Plaintiffs, in fact, reasonably relied on Defendants' representations in executing the CVAs, POAs or other similar documents.

129. Defendants failed to exercise reasonable care and competence in communicating the material facts to Plaintiffs.

130. Plaintiffs actually and reasonably relied upon the false information and/or material facts not disclosed by Defendants, and Plaintiffs' reliance was justifiable as, under the same or similar circumstances, a reasonable person or party, in the exercise of ordinary care for its own welfare would have either relied on the negligent misrepresentations or would not have discovered them.

131. Plaintiffs' reliance proximately caused them to incur damages.

132. As a result of Defendants' negligent misrepresentations, Plaintiffs have has incurred damages and such damages were proximately caused by

28

Defendants' conduct. These proximate injuries would not have occurred if Defendants had not made the omissions or misleading statements to Plaintiffs.

133. As a proximate result of Defendants' conduct, Plaintiffs have suffered damages in excess of $25,000.00.

## COUNT V: NEGLIGENT HIRING AND RETENTION (against Cherokee County)

134. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

135. Defendant Cherokee County owed a duty to its residents and citizens to ensure that its agents and employees acted pursuant to applicable constitutional and statutory mandates.

136. Defendant Cherokee County, either directly by its Board of Commissioners or its agents and employees bearing the authority and responsibility for doing so, had a duty to ensure that the director of social services discharged the director's duties pursuant to applicable constitutional and statutory mandates.

137. At all times relevant, Director Palmer did not have the requisite qualifications to be the Director of Cherokee County Social Services, as set out by the North Carolina Office of State Human Resources.

138. At all times relevant, Director Palmer did not have the training or experience to perform the duties required as a Director of Social Services in North Carolina.

139. Defendant Cherokee County, either directly by its Board of Commissioners or its agents and employees bearing the authority and responsibility for doing so, failed to adequately oversee Defendant Palmer and other Directors of Social Services.

140. The use of unlawful CVAs and POAs and other similar documents has been systemic in CCDSS for many years and over the tenures of multiple directors.

141. At no point during the time that the CVAs and POAs were being used to remove children from the custody of their parents did Defendant Cherokee County, either directly by its Board of Commissioners or its agents and employees bearing the authority and responsibility for doing so, properly determined that CCDSS was using the unlawful agreements and take appropriate steps to correct the unlawful policies and practices of CCDSS, and by so doing and so failing to act, established and caused the implementation of a unlawful and unconstitutional policy, causing harm and damages.

142. As a direct and proximate cause of Cherokee County's negligence, as set forth above, the Plaintiffs have, in fact, suffered damages.

143. Plaintiffs are entitled to recover damages in excess of $25,000.00 from Cherokee County.

## COUNT VI: GROSS NEGLIGENT HIRING AND RETENTION (against Cherokee County)

144. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

145. In addition, or in the alternative, Cherokee County was grossly negligent in its hiring and retention of Palmer. Traditionally, gross negligence has been defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002) (quoting *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)).

146. Defendant Cherokee County's gross and utter failure to make adequate inquiry into and respond appropriately to the unlawful conduct described throughout this Complaint over a period of many years was shows deliberate indifference to the rights of the Plaintiffs and constitutes willful and wanton conduct.

147. As a result of this gross failure to exercise its duty of care, Cherokee County's failure to discharge any DSS Director, including Defendant Palmer, who permitted the use of these CVAs and POAs proximately caused the injuries described in this Complaint.

148. Defendant Cherokee County was grossly negligent in its failure to properly oversee its Department of Social Services.

149. Further, Defendant Cherokee County was deliberately indifferent to the acts, actions or failures to act and to the rights to the named plaintiffs and class plaintiffs.

150. As a result of Cherokee County's conduct, Plaintiffs have suffered damages in excess of $25,000.00.

### COUNT VII:  NEGLIGENT SUPERVISION by Defendant Palmer

151. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

152. Chapter 7B of the General Statutes clearly states that it "shall be interpreted and construed so as to . . . provide procedures for the hearing of juvenile cases that assure fairness and equity and that *protect the constitutional rights of juveniles and parents . . . .*" N.C. Gen. Stat. § 7B-100(1) (emphasis added).

153. Defendant Palmer had a duty to ensure that she established policies for CCDSS that protected the constitutional rights of juveniles and parents.

154. Defendant Palmer had a duty to supervise the social workers, supervisors, attorney, and other employees of CCDDS to ensure that their actions did not violate the constitutional rights of juveniles and parents.

155. Defendant Palmer had a duty to establish protective services for juveniles alleged to be abused, neglected, or dependent.  N.C. Gen. Stat. § 7B-300.

156. Defendant Palmer had a duty to make a prompt and thorough assessment of a complaint that a juvenile within Cherokee County is abused, neglected, or dependent. N.C. Gen. Stat. § 7B-302(a).

157. By law, if in the course of this assessment, Director Palmer determined that removal of the juvenile from the child's home is necessary for the protection of the juvenile, the Director is required to "sign a petition seeking to invoke the jurisdiction of the court for the juvenile's protection." N.C. Gen. Stat. § 302(c).

158. Therefore, as final policy maker and final supervisor over all employees and agents of CCDSS, Defendant Palmer had a duty to ensure that the agents and employees of CCDSS acted pursuant to applicable constitutional and statutory mandates.

159. Defendant Palmer failed to exercise her supervisory authority and thereby breached these duties.

160. Defendant Palmer further failed to make any inquiry into and respond appropriately to the unlawful conduct described throughout this Complaint over a period of many years.

161. Defendant Palmer further failed to supervise her employees to ensure that a petition seeking to invoke the jurisdiction of the juvenile court was filed when removal of a juvenile from his/her hone was deemed appropriate for the juvenile's protection.

162. These failures on the part of Defendant Palmer to discharge her duties of care proximately caused the injuries described in this Complaint.

163. Plaintiffs are entitled to recover damages in excess of $25,000.00.

## COUNT VIII:  GROSS NEGLIGENT SUPERVISION (against Palmer)

164. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

165. In the alternative, Defendant Palmer's conduct was done in reckless disregard for the rights of the Plaintiffs. Traditionally, gross negligence has been defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002) (quoting *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)).

166. These gross failures on the part of Defendant Palmer to discharge her duties of care proximately caused the injuries described in this Complaint.

167. Defendant Palmer was grossly negligent in its failure to properly oversee the Department of Social Services.

168. As a result of Defendant Palmer's gross negligence, Plaintiffs are entitled to recover damages in excess of $25,000.00.

## COUNT IX:  ACTUAL FRAUD (against Lindsay, Palmer, Supervisors and Social Workers)

169.  Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

170. The statements Defendants made to Hogan and Unnamed Plaintiffs described above regarding the CVA or POA or other similar document were false, misleading, and material at the time they were made.

171. Defendants knew these statements were false at the time they were made.

172. The Defendants made these false statements with the intention that Plaintiffs would rely on these misrepresentations and sign the CVAs and/or POAs.

173. Plaintiffs did, in fact, rely on these false statements when they signed the CVAs and/or POAs.

174. No provision of law exists within the North Carolina General Statutes authorizing CCDSS to draft or otherwise effect the CVA or any substantively similar agreement.

175. The misrepresentations were made willfully and wantonly, and with intention of coercing and/or otherwise deceiving Plaintiffs into abandoning their rights as parents.

176. Defendants' false representations to Plaintiffs were reasonably calculated to deceive. Defendants' false representations were made with the intent to deceive and with the intent to be acted upon.

177. Plaintiffs were, in fact, deceived by Defendants' false representations and acted upon them.

178. Plaintiffs reasonably relied on Defendants' representations in signing the CVAs and/or POAs, as under the same or similar circumstances, a reasonable person, in the exercise of ordinary care for his own welfare would have relied on the false representations.

179. Defendants have acted intentionally and with malice toward Plaintiffs and/or in reckless disregard of Plaintiffs' rights.

180. The Defendants, at the times relevant, improperly billed either local, state, tribal or federal government funding sources while engaging in the CVA or POA process with the Plaintiff and those similarly situated Exhibit G.

181. Until discovery is conducted, the other Class Parents will not have sufficient information to provide more specific allegations, nor will they have reasonably been expected to discover the deception of CCDSS and its agents and employees.

182. Plaintiffs have suffered damages proximately caused by Defendants' false representations.

183. As a result of Defendants' deceit, fraud and fraudulent inducement, Plaintiffs are entitled to a judgment against Defendants for their damages, which are in excess of $25,000.00, plus attorneys' fees.

## COUNT X:  CONSTRUCTIVE FRAUD (against Lindsay, Palmer, Supervisors and Social Workers)

184. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

185. "A constructive fraud claim . . . is based on a confidential relationship rather than a specific misrepresentation. The very nature of constructive fraud defies specific and concise allegations and the particularity requirement may be met by alleging facts and circumstances '(1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678-79 (1981) (quoting *Rhodes v. Jones,* 232 N.C. 548-49, 61 S.E. 2d at 725 (1950)).

186. Upon information and belief, CCDSS and its agents and employees had a relationship of trust and confidence with Plaintiff Hogan and the other Class Parents prior to or during the course of obtaining the Class Parent's signatures on the CVAs, POAs or substantively similar agreements.

   a. In many instances, the Defendant(s) had prior working history involving the minor children and parents who signed the CVA or POA.

   b. In many instances, the Class Parents were in a position of mental, physical,

35

economic, or emotional vulnerability when they were coerced into giving up their children by and through the use of CCDSS's CVA or POA.

c. Upon information and belief, in many instances, the employee/agents of CCDSS when entering into these agreements told the plaintiff/parents, if they didn't sign the agreement, their children would be sent to foster care, possibly adopted, or removed from to a degree that the plaintiff would never have any kind of contact or ever see their children again.

d. Once the minor children were removed, there was no follow-up by CCDSS as to the health, well-being or care of the minor child.

e. There was no follow-up with the parent/plaintiffs to see if there had been any substantive changes in their life or if they had contact of any kind with the minor children.

187. CCDSS and its agents and employees used coercive assertions to Plaintiff Hogan and other Class Parents in order to obtain signatures on the CVAs, POAs or substantively similar agreements applicable to their children.

188. Plaintiff Hogan and other Class Parents relied on the position of trust and authority occupied by CCDSS its agents and employees when they acquiesced to Defendants' attempts to obtain their signatures on the CVAs, POAs or substantively similar agreements.

189. Plaintiff Hogan, other Class Parents, H.H., and Class Minors were injured as a proximate case of Defendants' conduct.

190. The Defendants at the times relevant unlawfully billed, either local, state, tribal or federal government funding sources while engaging in the CVA or POA process with the Plaintiff and those similarly situated.

191. Until discovery is conducted, the other Class Parents will not have sufficient information to provide more specific allegations, nor will they have reasonably been expected to discover the deception of CCDSS and its agents and employees.

192. Plaintiffs are entitled to recover damages for their injuries from the Defendants in an amount in excess of $25,000.00.

## COUNT XI: Deprivation of Rights 42 U.S.C. § 1983 – Palmer, Lindsay, and Unnamed CCDSS Social Workers and CCDSS Supervisors

193. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

194. Defendant Lindsay, Defendant Palmer, and other unnamed CCDSS Supervisors and CCDSS Social Workers (hereinafter "CCDSS employees") are "persons" as that term is used in 42 U.S.C. § 1983.

195. At all relevant times, CCDSS employees were acting under color of state law.

196. While CVAs were entered into in the course and scope of CCDSS's child welfare, family services, and child protective services efforts, the facilitation of these agreements fall outside the duties and responsibilities of CCDSS and Defendant Lindsay imposed by, inter alia, N.C. Gen. Stat. §§ 7B-108A, -108A(14), -108A(18) and other applicable statutes.

197. At no time after the removal of H.H. did Defendant Lindsay, Defendant Palmer, any CCDSS supervisor, or CCDSS social worker or health or community worker review the placement as required by N.C. Gen. Stat. § 7B-100 *et. seq.*, or check on the health, safety, or welfare of the minor child.

198. At all times relevant, Defendant Cherokee County delegated oversight, supervision, policies, and procedures of CCDSS to its directors, who act at the authorization of Cherokee County.

199. Pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.,* Defendant Cindy Palmer was at all times relevant to this complaint, and other directors before her at times referenced herein, the final policy maker with regard to all investigative and placement activities conducted by her staff, subordinates, attorney, and employees.

200. At the times relevant, Defendant Palmer and other directors similarly situated were acting under the color of state law in her and their individual and official capacity.

201. At the times relevant, the supervisors of CCDSS were acting under color of state law in their individual and official capacity.

202. At the times relevant, the social workers of CCDSS were acting under color of state law in their individual and official capacities.

203. At the times relevant, Defendant Lindsay was acting under color of state law in his individual and official capacities.

204. At the times relevant, unknown defendant directors, supervisors, and social workers, staff employees and health and community workers were engaged in conduct and activities in their individual and official capacities under the color of state law.

205. At the times relevant, the defendant directors, supervisors, social workers, staff employees, health and community workers and Defendant Lindsay were acting within the scope of their employment.

206. Plaintiffs have a constitutionally protected liberty interest and right to custody of H.H. *See e.g., Troxel v. Granville,* 530 U.S. 57, 65-66 (2000) ("The liberty interest at issue in

this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court."); *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401 (1923), ("[T]he 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'"); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534-535 (1925) ("[T]he 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control"; . . . "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Prince* v. *Massachusetts*, 321 U.S. 158 (1944), ("It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Wisconsin* v. *Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin* v. *Walcott*, 434 U.S. 246, 255 (1978) ("[T]he relationship between parent and child is constitutionally protected"); *Parham* v. *J. R.*, 442 U.S. 584, 602 (1979) (The United State Supreme Court's "jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. [Its] cases have consistently followed that course"); *Santosky* v. *Kramer*, 455 U.S. 745, 753 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); and *Troxel*, at 66 ("In light of . . . extensive precedent, it cannot now be

doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")

207. Parents have a right under the Constitution of the United States, the Constitution of North Carolina, and the laws of the United States and North Carolina to live with their children free from involvement of CCDSS, absent proof by clear, cogent and convincing evidence of abuse, neglect, or dependency being produced in a court of law.

208. Children have a right under the Constitution of the United States, the Constitution of North Carolina, and the laws of the United States and North Carolina to live with their parent or parents free from involvement of CCDSS, absent proof by clear, cogent and convincing evidence of abuse, neglect, or dependency being produced in a court of law.

209. Children and parents (the named Plaintiffs and class Plaintiffs) have the right to live together as a family without government interference.

210. The only way a social worker, agent or the Director of a DSS may lawfully remove a child under North Carolina law is by clear, cogent and convincing evidence based on allegations of abuse, neglect or dependency.

211. Only a Court Order, arising from due deliberation, duly signed by a Judge, and filed with the Court, can be used to interfere, interrupt or prevent the relationship between a parent and a child (the named Plaintiffs and class Plaintiffs).

212. No judicial authorization ever occurred for this or any other CVA as it relates to the allegations as set forth herein, which removed a child from their parent (the named Plaintiffs and class Plaintiffs).

213. Neither named Plaintiff nor any class Plaintiff was informed of the harm which would result from the execution of such documents as CVAs and POAs, and instead relied upon the representations of CCDSS and its agents and employees, who withheld such information, to the detriment of the named Plaintiff or class Plaintiff.

214. No emergency was ever alleged in a single CVA or POA or similar document.

215. No statement was ever alleged in a single CVA, POA or similar document, that a child was abused, neglected or dependent as defined and required by law.

216. No statement was ever alleged in a single CVA, POA or similar document, that a child was exposed to a substantial risk of bodily injury or harm.

217. No statement was ever alleged in a single CVA, POA or similar document, that a child would be removed from the jurisdiction of the Court.

218. No statement was ever alleged in a single CVA, POA or similar document, as it relates to a child being covered by the Indian Child Welfare Act, even when it was necessary to do so.

219. At the times relevant, the Defendants failed to represent the laws and facts, as set forth herein, to the plaintiff parents, accurately, during the process that resulted in the removal of the minor children from their parents (the plaintiffs).

220. At the times relevant, the Defendants, as set forth herein, lacked any legal right to remove these minor children from their parents.

221. At the times relevant, there existed no legal authority for the Defendants to remove the minor children from their parents.

222. At no time relevant to the allegations herein, did the Defendants ever attempt to establish or work a safety plan with these parents for these children after the CVA, POA or similar document was signed and the children were removed from their parents.

223. At the times relevant, none of these parents were ever noticed or provided a pre-deprivation hearing as required by North Carolina law or by any process otherwise due.

224. At no relevant time were Class Parents provided counsel as required by North Carolina law.

225. At no relevant time were Class Minors provided counsel, the appointment of a guardian *ad litem*, or an attorney for a guardian *ad litem* as required by North Carolina law.

226. The minor children plaintiffs in this case, individually and as a class, based on the allegations as set forth herein, make the following claims against the named defendants, their predecessors, successors and those yet to be known and or named through the discovery process.

227. At the times relevant, not one Plaintiff was ever allowed or provided a post-deprivation hearing as it relates to the allegations as set forth herein.

228. The conduct on behalf of the Defendants towards the Plaintiffs shocks the conscience and at no time relevant is supported in law or fact.

229. The right to parent one's child is enshrined in the Due Process Clause of the 14th Amendment to the Constitution of the United States and the Law of the Land Clause in Article I, Section 19 if the North Carolina Constitution.

230. The Defendants' conduct violated clearly established constitutional rights of the named Plaintiffs, class Plaintiffs, and those yet to be determined through discovery. These rights were clearly established at the time these violations occurred.

231. Defendants' actions deprived both Plaintiffs of their constitutional rights and violated their rights to both procedural and substantive due process.

232. The actions of the CCDSS employees resulted an unlawful seizure of H.H. in violation of the Fourth Amendment to the Constitution of the United States.

233. The actions of the CCDSS employees unlawfully deprived Hogan and H.H. of their respective freedom to associate with each other in violation of the First Amendment to the Constitution of the United States.

234. The actions of the CCDSS employees deprived Plaintiffs of procedural due process by interfering with their right to freedom of association in violation of his rights under the First Amendment to the Constitution of the United States.

235. The actions of the CCDSS employees deprived Plaintiffs of procedural due process by not providing a prompt and fair post-deprivation juridical review in violation of Plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States.

236. The actions of the CCDSS employees were made with deliberate indifference and deprived Plaintiffs of substantive due process in that they shock the conscience of the Court. The use of CVAs POAs and substantively similar agreements were intended to and did allow CCDSS and it agents and employees to evade judicial review of their coercive and unlawful action and separate parents from their children without lawful authority. These actions by the CCDSS employees violated Plaintiffs' rights to substantive due process in violation of the Fourteenth Amendment of the Constitution of the United States.

237. Defendants each engaged in conduct in furtherance of the object of this conspiracy and induced others to engage in conduct in furtherance of those conspiracies.

238. Defendants engaged in such conduct in bad faith and with intentionally, recklessly, and with callous disregard for, and deliberate indifference to Plaintiffs' rights.

239. As a direct and foreseeable consequence of this deprivation:

    a. Plaintiff Hogan and H.H. were separated in excess of 180 days. As a direct and foreseeable consequence of this conduct, Plaintiff Hogan and H.H. suffered pain and suffering, emotional trauma and distress, mental anguish, and Hogan was prevented from providing for the care, custody, and control of H.H. during a valuable and critical time of minor child's formative years.

    b. Class Parents and Class Minors suffered substantially similar injuries when they were separated for various periods of time.

240. The CVA was unlawful and obtained in violation of Hogan's federally and state law protected rights particularly those under the U.S. Constitution, North Carolina Constitution, and North Carolina General Statutes in many ways, including but not limited to:

    a. The agreement is not permitted by, did not comply with, and is contrary to the provisions of N.C. Gen. Stat. § 7B-100 *et. seq.,* of the North Carolina General Statutes because, *inter alia*:

        i. The agreement did not allow Plaintiff specified minimum visitation with the minor child, in violation of N.C. Gen. Stat. § 7B-905.1.

        ii. The agreement failed to follow the mandate of N.C. Gen. Stat. § 7B-507(a), which provides that any order placing or continuing the placement of a juvenile in the custody or placement responsibility of a county department of social services (whether it is an Order for nonsecure

custody, continued nonsecure custody, a dispositional Order, or a review Order):

1. Shall contain a finding the juvenile's removal or continuation in or return to the juvenile's home would be contrary to the juvenile's best interest;

2. Shall contain findings as to whether the county department of social services has made reasonable efforts to prevent or eliminate the need for placement of the juvenile, unless the court has previously determined that such efforts are not required and shall cease;

3. Shall contain findings as to whether a county department of social services should continue to make reasonable efforts to prevent or eliminate the need for placement of the juvenile;

4. Shall specify that the juvenile's placement and care the responsibility of the county department of social services and that the agency is to provide or arrange for the foster care or other placement of the juvenile; and

5. May provide for services or other efforts aimed at returning the juvenile to a safe home or at achieving another permanent plan for the juvenile.

iii. The agreement is unauthorized by N.C. Gen. Stat. § 7B-100 *et. seq.,* which does not authorize CCDSS to enter into private custody agreements,

powers of attorneys, file private custody actions, or take any actions regarding custody of a minor child without judicial action.

1. These CVAs and POAs are more similar to a private parental custody agreement than a custody order entered under the authority of N.C. Gen. Stat. § 7B-100 *et. seq.,*.

2. These CVAs and POAs, while similar to a private parental custody agreement, are not authorized under N.C. Gen. Stat § 50-13.1 *et seq.* or N.C. Gen. Stat § 50A-101 *et seq.*,

3. These CVAs and POAs, though appearing to be similar to a private parental custody agreement, are prohibited by law.

iv. Under N.C. Gen. Stat § 7B-905(b), a dispositional order under which a juvenile is removed from the custody of a parent, guardian, custodian, or caretaker shall direct that a review hearing (as required by N.C Gen. Stat § 7B-906) be held with 90 days from the date of the dispositional hearing.

v. It was not executed under the supervision of the District Court of Cherokee County, North Carolina, which possesses original and exclusive jurisdiction over all juveniles alleged to be abused, neglected, dependent, undisciplined, or delinquent within the County. *See* N.C. Gen. Stat. § 7B-200, 7B-1600, and 7B-1601.

vi. It was not executed under the supervision of the District Court of Cherokee County, North Carolina, which possesses original and exclusive jurisdiction over all child custody actions. *See* N.C. Gen. Stat. § 50A-201(b) and N.C. Gen. Stat § Chapter 50-13.1 *et seq.*,

vii. It was not reviewed by a court official or guardian ad litem for the minor child, and was not filed in the minor child's juvenile action court file (Cherokee County 15-JA-73).

viii. North Carolina District Court has the original and exclusive jurisdiction over all matters regarding all minor children within the state (excluding adoptions).

b. The CVA failed to follow the North Carolina Rules of Practice and Rules of Civil Procedure by *inter alia*:

i. It was not signed by a Judge or filed with the Cherokee County Clerk of Court's office.

ii. CCDSS did not file any motion, notice on for hearing, or in any other way bring before or otherwise seek court approval or oversight in entering into the CVAs as are material herein.

c. The execution of the CVA was lacking in any legal safeguards for the rights of Hogan or H.H. as required by N.C. Gen. Stat. § 7B-100 *et. seq.,* and the Constitutions of the United States and the State of North Carolina.

d. CCDSS and its employees and agents were aware of Judge Sellers' Order entered during *In re H.H.* (entered with the consent of CCDSS), which had already established the court's jurisdiction over H.H., Hogan, and resolved the issue of H.H.'s custody.

e. The CVA contained no provisions to revoke or otherwise modify the terms contained therein and contained no provision to allow judicial review or ratification at any time.

f. The CVA was used to deprive Hogan and the child of the right to procedural due process and substantive due process.

g. Other ways that shall be ascertained through discovery and proven at trial.

241. Defendants represented to Plaintiffs and Plaintiffs in reasonable reliance on Defendants' representations believed the CVAs and POAs were binding legal documents with the same force and effect as an order of the Court, based on the representations of CCDSS.

242. The CVA was drafted and formatted in such a manner as to resemble a Court Order.

243. Defendant Palmer and others who were in the position to establish and promulgate the policies and official practices of CCDSS were aware of, approved, and directed the use of the CVA and substantively similar "agreements."

244. Defendant Lindsay drafted multiple CVAs and POAs involving many parents and children over the course of multiple years.

a. The CVAs were prepared, propagated, and produced by CCDSS based upon Defendant Lindsay's advice, drafting, and/or counsel. The CVA was designed to be a bilateral "agreement" requiring the signatures of both the parents and the recipient adults.

b. Upon information and belief, Defendant Lindsay, Defendant Palmer, CCDSS and or Cherokee County are in possession of electronic copies of many, if not all, of the CVAs and POAs and substantively similar agreements utilized by the Defendants in their official policy, practice, and custom of using unlawful coercion and "agreements" to coerce parents into "surrendering" custody of their minor children in derogation of the parents' rights and privileges under the Constitutions of the United States and North Carolina.

i. All named and unnamed social workers and social worker supervisors were agents, employees, servants, and health and community workers of Cherokee County and CCDSS, and CCDSS is liable for their tortious actions particularly in light of the deliberate indifference of Cherokee county, CCDSS, its employees, its agents and other defendants yet to be determined through the discovery process.

ii. CCDSS, its director and policy makers are liable for the direct activity and actions of the DSS and it officials and employees through their individual acts and actions, as well as the policies and *de facto* policies.

iii. These unlawful "agreements" were crafted and utilized to unlawfully take minor children from the custody of their parents with the knowledge and approval of the CCDSS director or Defendant Lindsay or both.

c. In addition to the CVAs, Defendant Lindsay and Defendant Palmer and prior directors unlawfully utilized what they described as "Powers of Attorney" ("POA") to also remove children from the custody of their parents.

i. A POA was used to unilaterally remove a child from the custody of a parent without court oversight or approval.

ii. Use of a POA to remove a child from his/her parent violated same rights as the use of a CVA.

iii. Upon information and belief, CCDSS and its agents and employees made material misrepresentations to parents to induce them to sign POAs.

iv. Upon information and belief, parents executed POAs acting in reliance on the false statements of CCDSS and its agents and employees.

49

245. The named defendants combined, confederated, and agreed to act in conformity with their unlawful patterns, customs, and policies. Each member of the conspiracy shared the same conspiratorial objective to deprive the Plaintiffs of their federally protected rights resulting in the harm and damages that the plaintiffs have incurred.

246. As a result of Defendants' conduct, Plaintiffs have been damaged in excess of $25,000.00.

## COUNT XII: Deprivation of Rights 42 U.S.C. § 1983 Cherokee County and CCDSS (*Monnell v. Dep't of Social Services*, 436 U.S. 658)

247. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

248. CCDSS is a department of Cherokee County. Cherokee County is governed by a Board of Commissioners, who have oversight over all county programs and departments.

249. The Director of CCDSS, pursuant to N.C. Gen. Stat. § 7B-100 *et. seq.*, is the final policymaker for all policies and procedures established to govern the operations and activities of CCDSS, a power granted to the Director by Cherokee County.

250. Defendant Palmer is the current Director of CCDSS.

251. The named Defendants, as well as unnamed and other as yet unknown supervisors, directors, policymakers, and other responsible individuals are "persons" as defined pursuant to 42 U.S.C. §1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny.

252. Defendant Lindsay was at the relevant times simultaneously the attorney contracted and hired to represent CCDSS in juvenile court proceedings as well as the attorney for Cherokee County. Defendant Lindsay was also an advisor to employees of CCDSS, including its directors. Defendant Lindsay was also a policymaker for CCDSS.

253. Defendants Lindsay and Palmer established as official policy or custom the use of CVAs, POAs or substantively similar agreements to coerce parents to surrender custody of their children in violation of their rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States (*see* Count 1, supra).

254. The fundamental right to familial relations is constitutionally protected.

255. Cherokee County, by and through its final policy maker, maintained a policy, custom, or pattern of practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques by CCDSS social workers and other CCDSS employees and Defendant Lindsay.

256. Cherokee County further demonstrated deliberate indifference to the unlawful, unconstitutional, and unconscionable actions of their delegated policymakers, and further failed to adequately train, supervise, or discipline the Defendants as set forth herein in connection with protecting and ensuring the constitutional rights of the Plaintiffs and minor children.

257. Because the County Commissioners of Cherokee County and/or the Director of CCDSS and/or Defendant Scott Lindsay were the final policy makers during the past 19 years, their acts or omissions during that time constituted the policy, custom, or pattern and practice of CCDSS.

258. As the final policymaker for CCDSS, the County Commissioners of Cherokee County and/or the Director of CCDSS and/or Defendant Lindsay created, promulgated, and maintained the following polices, customs, or patters and practices which deprived all class plaintiffs, including Plaintiff Hogan and H.H., of their constitutionally protected rights by:

a. Failing to properly train and supervise CCDSS social workers and employees with regard to their duties not to (1) fabricate purportedly legal documents, (2) coerce signatures from plaintiffs whereby they gave up their right to parent, (3) separate a parent from a child, (4) remove a child from his/her family, (5) conceal the CVA process from NCDHSS auditors. (6) intentionally and recklessly failed to follow the procedures as set forth in N.C. Gen. Stat. § 7B-100 *et. seq.*, (7) ignore the policies and guidelines as set forth by NCDHHS as it relates to safety plans, removal procedures, maintaining contact between parents and children, providing a reunification plan for parents and children and following up on placement of the minor children to ensure their safety, health and essential needs are being adequately met. Upon information and belief the defendants made factually inaccurate statements to the affected minor children.

b. Encouraging, promoting and condoning CCDSS social workers to (1) fabricate purportedly legal documents, (2) coerce signatures from plaintiffs whereby they gave up their right to parent, (3) separate a parent from a child, (4) remove a child from his/her family, (5) conceal the CVA, POA and similar processes from NCDHSS auditors. (6) intentionally and recklessly failed to follow the procedures as set forth in N.C. Gen. Stat. § 7B-100 *et. seq.*, (7) ignore the policies and guidelines as set forth by NCDHHS as it relates to safety plans, removal procedures, maintaining contact between parents and children, providing a reunification plan for parents and children and following up on placement of the minor children to ensure their safety, health and essential needs are being

adequately met; (8) fostering a climate of impunity for engaging in such unconstitutional conduct.

c. Creating, promulgating, and maintain a policy, custom, or pattern of practice of failing to follow the law as set forth in N.C. Gen. Stat. § 7B-100 *et. seq.,* the policies, procedures and guidelines as set forth by NCDHHS and other behaviors, conduct or practices to be learned through discovery and proved at trial.

259. The wrongful acts and omissions that deprived Plaintiff Hogan of custody of his child and his right to parent occurred pursuant to Cherokee County and CCDSS's policies, customs, patterns, practices and conduct.

260. The policies, practices, customs and patterns of conduct of CCDSS and that of Cherokee County were the direct and proximate cause of all class plaintiffs, including Hogan, being unable to act as a parent to his child, associate with his child or enjoy his constitutionally protected rights accordingly.

## COUNT XIII: 42 U.S.C. § 1983 - Violation of Equal Protection

261. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

262. The Defendants only utilized the practice of coercing parents into signing CVAs, POAs or substantively similar agreements in some cases. In others, CCDSS elected to file petitions in accordance with N.C. Gen. Stat. § 7B-100 *et. seq.,* of the North Carolina General Statutes.

263. There is no rational basis for the arbitrary and capricious decision to afford the protections of due process to some individuals while ignoring them for others.

264. Therefore, the decision to utilize the CVAs, POAs and similar agreements against one group of people and not others is in violation of the Equal Protection Clause of the Fourteenth Amendment to United States Constitution.

265. Therefore, each Class Parent and Class Minor that was harmed by use of the CVAs or substantively similar agreements was also denied equal protection under the law.

266. Upon information and belief, the CCDSS Director or Defendant Lindsay were the ultimate determiner/authority as it related to which plaintiff and child were coerced to use the CVA and POA processes and which families were allowed their constitutionally protected rights.

267. As a result of Defendants' conduct, Plaintiffs have suffered damages in excess of $25,000.00.

<u>**COUNT XIV: Respondeat Superior**</u>

268. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

269. Liability for the tortuous conduct and constitutional violations by the Defendants in their individual and professional capacity are imputed to Cherokee County, a governmental subdivision of the state of North Carolina, by operation of the doctrine of respondeat superior.

270. The conduct of Defendants Palmer, Lindsay, and all unnamed prior DSS directors, DSS Supervisors and DSS Social Workers, in their individual and official capacities, was within the scope of their employment with Cherokee County government and CCDSS and in the furtherance of Cherokee County and CCDSS.

271. The defendants owed a statutory duty to the plaintiffs to follow state law, act consistent

with state polices, and not act in ways so as to infringe upon the rights and privileges of parents and minor children under the Constitutions of the United States and the State of North Carolina.

272. Defendants Palmer, Lindsay, and all unnamed prior DSS directors, DSS Supervisors and DSS Social Workers breached that duty when by presenting the CVA to Plaintiffs coercing them to sign.

273. Defendants Palmer, Lindsay, and all unnamed prior DSS directors, DSS Supervisors and DSS Social Workers breached that duty when by presenting CVAs, POAs and substantively similar agreements to Class Parents and coercing them to sign.

274. The use of the unlawful CVAs, POAs and substantively similar agreements interrupted, interfered with, and destroyed the parental relationship and bond of that between Hogan and H.H. as well as between other Class Parents and Class Minors, and caused irreparable harm, emotional distress, mental anguish and damages yet to be determined.

275. All named and unnamed plaintiffs suffered damage and irreparable harm by the acts, conduct and results of the defendants in that their families were torn apart, the relationship between their siblings, parents and family were damaged or destroyed resulting in emotional trauma, pain and suffering.

276. Plaintiffs are entitled to recover damages from Defendants in excess of $25,000.00.

## COUNT XV: Civil Obstruction of Justice

277. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

278. Defendants intentionally, willfully, and maliciously engaged in an unlawful pattern of conduct by coercing Class Parents into signing CVAs or substantively similar agreements.

279. Defendants further used the CVAs or substantively similar agreements to avoid judicial supervision and oversight of their unlawful activities and to deny the right of the plaintiffs to access to justice and the right to open courts.

280. Defendants thereby obstructed the administration of public and legal justice by means of their unlawful actions as described throughout this Complaint.

281. Further, despite being under a statutory mandate to preserve all records of child protective services cases, CCDSS, its agents, and employees destroyed or knowingly permitted the destruction of records pertaining to child protective services cases, including case file containing copies of CVAs, POAs, and substantively similar agreements. This destruction has hindered, obstructed, and delayed the ability of counsel to identify the victims of CCDSS's wrongdoing, and file this action.

282. Class Parents and Class Minors were harmed by the unlawful actions taken by the Defendants in their attempt to obstruct justice as set forth elsewhere in the Complaint.

283. As a result of Defendants' conduct, Plaintiffs are entitled to recover damages in excess of $25,000.00.

**COUNT XVI: Violations Under the North Carolina Constitution**

284. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

285. The Fourteenth Amendment to the Constitution of the United States provides that no person shall be "deprive[d] . . . of life, liberty, or property, without due process of law . . . ." Article I, Section 19 of the North Carolina Constitution states that "[n]o person shall be . . . or in any manner deprived of his life, liberty, or property, but by the law of the land."

286. In *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000), the United States Supreme Court held that "[i]n light of . . . extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."

287. To ensure that all parents enjoy the protections of due process in any case where DSS seeks to remove a child from his or her parent, the North Carolina General Assembly has enacted N.C. Gen. Stat. § 7B-100 *et. seq.,* of the North Carolina General Statutes to govern all proceedings in which a juvenile is alleged to be abused, neglected, or dependent.

288. It is beyond dispute that one of the fundamental rights enjoyed by all parents under the United States Constitution is the right to raise their children without government interference. *See e.g. Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) ("The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court."); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), ("[T]he 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925), ("[T]he 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control" ; . . . "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Prince v. Massachusetts*, 321 U.S. 158 (1944), ("It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose

primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (The United State Supreme Court's "jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. [Its] cases have consistently followed that course"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); and *Troxel*, at 66 ("In light of . . . extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")

289. The same protection is extended to the people of North Carolina by Article 1, Section 19 of the North Carolina Constitution and is fundamentally required under Article I, section 35 of the North Carolina Constitution.

290. The term "law of the land" as used in Article I, Section 19 of the North Carolina Constitution means the general law, the law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. It means the regular course of the administration of justice through the courts of competent jurisdiction, after the manner of such courts. Procedure must be consistent with the fundamental principles of

liberty and justice. *State v. Chesson*, 228 N.C. 259, 45 S.E.2d 563 (1947), *writ dismissed*, 334 U.S. 806, 68 S. Ct. 1185, 92 L. Ed. 1739 (1948). *See also, Eason v. Spence*, 232 N.C. 579, 61 S.E.2d 717 (1950). Among other things, "the law of the land" or "due process of law" imports both notice and the opportunity to be heard before a competent tribunal. *Parker v. Stewart*, 29 N.C. App. 747, 225 S.E.2d 632 (1976); *Utica Mut. Ins. Co. v. Johnson*, 41 N.C. App. 299, 254 S.E.2d 643 (1979).

291. Moreover, the North Carolina "Supreme Court has held that the term 'law of the land,' as used in Article I, Section 19 of the North Carolina Constitution, is synonymous with 'due process of law' as that term is applied under the Fourteenth Amendment to the United States Constitution. *In re Petition of Smith*, 82 N.C. App. 107, 109, 345 S.E.2d 423, 425 (1986) (quoting *In re Moore*, 289 N.C. 95, 221 S.E. 2d 307 (1976)). *Also see State v. Smith*, 90 N.C. App. 161, 368 S.E.2d 33 (1988), *aff'd*, 323 N.C. 703, 374 S.E.2d 866, *cert. denied*, 490 U.S. 1100, 109 S. Ct. 2453, 104 L. Ed. 2d 1007 (1989); and *McNeill v. Harnett County*, 327 N.C. 552, 398 S.E.2d 475 (1990).

292. The General Assembly has clearly states that the DSS Code "shall be interpreted and construed so as to . . . provide procedures for the hearing of juvenile cases that assure fairness and equity and that *protect the constitutional rights of juveniles and parents . . . .*" N.C. Gen. Stat. § 7B-100(1) (emphasis added).

293. Complying with the DSS Code by the State and CCDSS is the means by which the constitutional rights described above are protected.

294. There is no provision of law permitting the use of extrajudicial CVAs to obtain the voluntary surrender of parental custody.

295. Therefore, the use of CVAs, POAs, and other substantively similar documents and agreements by each and every Defendant violated the rights of Plaintiff Hogan and the Class Parents held under Article I, Section 19 of the North Carolina Constitution.

296. As a result of Defendants' violations of the North Carolina Constitution, Plaintiffs have suffered damages in excess of $25,000.00.

<u>COUNT XVII: Punitive Damages and Attorney's Fees</u>

297. Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

298. Defendants, in each claim for relief, by their actions as set forth in this Complaint, have acted intentionally, willfully, wantonly, and maliciously in causing the injuries complained of.

299. By their intentional, willful, wanton, and malicious behavior, Defendants have caused injuries to Class Parents as set forth elsewhere in this Complaint, including:

    a. Violating their rights under the Constitutions of the United States and North Carolina;

    b. Defrauding them;

    c. Obstructing justice and denying them access to juvenile court;

    d. Damage to the safety, well-being, mental health, and familial cohesiveness of the Class Parents, Class Minors, and all affected families of Cherokee County, North Carolina, including the plaintiff Hogan who was separated from H.H. for a period in excess of 180 days.

    e. As a direct and foreseeable consequence of Defendants' conduct, Plaintiff Hogan and the Class Parents suffered pain and suffering, mental anguish, emotional

trauma and distress, and were prevented from providing for the care, custody, and control of their minor children during valuable and critical times of minor children's formative years.

    f. As a direct and foreseeable consequence of Defendants' conduct, the H.H. and Class Minors suffered pain and suffering, mental anguish, emotional trauma and distress from being removed from their parents.

300. The intentional, willful, wanton, malicious and oppressive conduct of the defendant are the proximate cause of injuries sustained by the Plaintiffs. As a result, the Class Parents and Plaintiff Hogan are entitled to punitive damages.

301. Plaintiffs are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988(b) and other applicable federal and state statutes covering the allegations as set forth herein.

WHEREFORE the Plaintiffs pray the Court and demand judgment:

1. For an order certifying the proposed class, and any subclasses the Court finds to be necessary, pursuant to N.C.R. Civ. P. 23, designating the Plaintiff Hogan as the named representative of the Class Parents, designating H.H. as the named representative of the Class Minors, and designating the undersigned as class counsel;

2. For an award to named Plaintiffs and class Plaintiffs for damages, including but not limited to pain and suffering, nominal, compensatory, consequential, punitive and other such damage, as well as interest thereon for some or all, in an amount proven to be determined at trial, duly entitled to the named and class plaintiffs and class based upon the claims and allegations as set forth within this Complaint with pre and post judgment interest;

3. For Damages in excess of $25,000 per claim to each plaintiff as allowed by law with pre and post judgment interest.

4. For prejudgment and post-judgment interest as allowed by law.

5. For an award of attorney's fees and costs as allowable by all applicable laws;

6. For a trial by jury; and

7. For such other and further relief as the Court may deem just and proper.

THIS the 14th day of March, 2018.


_____
David A. Wijewickrama
N.C. State Bar No.: 30694
Law Office of David A. Wijewickrama, PLLC
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801
Fax:    828-454-1990

*Attorney for Plaintiff Hogan*
*and Class Parents*


_____
Melissa Jackson
N.C. State Bar No.:
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801

*Attorney for Plaintiff Hogan*
*and Class Parents*


_____
Ron Moore
N.C. State Bar No.:  9619
Post Office Box 18402
Asheville, NC 28814
Phone: (828) 777-1812
Fax: (828) 253-2717

*Attorney for Plaintiff H.H.*
*and Class Minors*


_____
D. Brandon Christian
N.C. State Bar No.: 39579
2962 Brookcrossing Drive
Fayetteville, NC 28306
Phone :(910) 750-2265

*Attorney for Plaintiff H.H.*
*and Class Minors*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served defendants and their counsel in the foregoing matter with a copy of <u>Plaintiff's complaint</u> by:

_X_     Depositing it in the United States Postal Service in a properly addressed envelope with adequate postage attached thereto.

      OR

_X_     Sending by facsimile transmittal for receipt by 5:00 p.m. Eastern Time on a regular business day, as evidenced by a facsimile receipt confirmation.

      OR

_X_     Leaving it at his or her office with a responsible partner or employee.

      OR

_____     Depositing a copy hereof with a nationally recognized overnight courier service, for overnight delivery, addressed to the attorney for each.

      OR

_X_     Service by personal delivery in conformity with the North Carolina Rules of Civil Procedure, Rule 5.

TO:

| | | |
|---|---|---|
| Cherokee County<br>c/o Maria Haas<br>75 Peachtree Street<br>Murphy, NC 28906 | Cherokee County Social Services &<br>Defendant Cindy Palmer<br>4800 W. Highway 64<br>Murphy, NC 28906 | Defendant Scott Lindsay<br>616 Lake Shore Drive<br>Murphy, NC, 28906 |
| Sean Perrin<br>WBD, LLP<br>One Wells Fargo Center<br>301 S. College St. Suite 3500<br>Charlotte, NC 28211 | Patrick Flanagan<br>CSH<br>2907 Providence Road<br>Suite 200<br>Charlotte, NC 28202 | |

This the 14th day of February, 2018

_____

David A. Wijewickrama,
Bar # 30694
Attorney for Plaintiffs
95 Depot Street
Waynesville, NC 28786
P: 828.452.5801
F: 828.454.1990



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DIVISION OF SOCIAL SERVICES
### CHILD WELFARE SERVICES

ROY COOPER
GOVERNOR

MANDY COHEN, MD, MPH
SECRETARY

WAYNE E. BLACK
DIRECTOR

December 20, 2017

DEAR COUNTY DIRECTORS OF SOCIAL SERVICES

SUBJECT: URGENT: POLICY AND PRACTICE ALERT: PRIVATE CUSTODY AGREEMENTS

It has come to our attention that child welfare staff in some county Departments of Social Services may be facilitating the completion of private custody agreements between the parent(s) of children involved in Child Protective Services and other family members or other individuals, without the oversight of the Court. Counties thought to be facilitating such agreements have been contacted directly. This letter is a reminder that facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy.

NCGS 108A-14(a)(11) provides that a director of social services has the duty and responsibility to "assess reports of child abuse and neglect and to take appropriate action to protect such children pursuant to the Child Abuse Reporting Law, Article 3 of Chapter 7B of the General Statutes." Article 3 of Chapter 7B of the General Statutes and DHHS policy set forth the duties and responsibilities of county Departments of Social Services related to the placement and custody of children involved in Child Protective Services. The use of agency resources to facilitate private custody agreements without the oversight of the Court does not fall within the provision of Child Protective Services, and is therefore beyond the scope of a County Department of Social Services' duties and responsibilities.

As a reminder, the goal of Child Protective Services is to support and improve parental/caregiver abilities to assure a safe and nurturing home for each child. In-Home Services engages families in the planning process while producing better outcomes of safety, permanence, and well-being for children, and encourages families to develop a support network that can assist them in planning for coping with future challenges.

If you have questions, please consult with your agency attorney or contact your Children's Program Representative.

Sincerely,

Lisa T. Cauley
Deputy Director

CWS-50-2017



STATE OF NORTH CAROLINA
CHEROKEE COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
18 CVD 0046

MICHAEL MATHIEU )
    Plaintiff, )
         )   **ORDER**
Vs. )
         )
SHALEES GREENLEE )
    Defendant, )
         )

THIS MATTER coming on to be heard before the undersigned judge of the district court at the session of civil district court in Cherokee County on February 28, 2018 on Defendant Greenlee's motions, the Court heard from the parties thru their attorneys.

IT APPEARING TO THE COURT that both parties are present; the Plaintiff is represented by Zeyland McKinney and the Defendant is represented by David A. Wijewickrama, Ron Moore, D. Brandon Christian, and Melissa Jackson, and as to the following the Court so Orders:

1. As to the Defendant's motion for Complete recordation, and by consent of the plaintiff, the Court finds in the interest of justice, that a complete recordation is granted.

2. All subpoenas properly filed and served and no motions to quash were filed by any witnesses pursuant to the NCRCP.

3. As to the Defendant's motion to open this hearing to the public, and by consent of the plaintiff, the Court finds a compelling interest of justice that this matter shall be open to the public and to the media and is so Ordered.

PLAINTIFF'S EXHIBIT
F

1

4. As to the Defendant's motion to sequester witnesses, and by consent of the plaintiff, the Court finds a compelling interest of justice that the witnesses shall be sequestered both prior to and after their testimony and as such, is so Ordered.

5. As to the Defendant's motion to request a 2.1 Judge from the Chief Justice of the North Carolina Supreme Court, and by consent of the plaintiff, the Court finds, upon compelling testimony and facts as set forth within the Declaratory judgment ordered this day, that this request should be made, and is so Ordered.

6. Upon hearing testimony and reviewing the documents *in camera* as requested by a validly issued subpoena by the defendant to witnesses David Hughes, Cindy Palmer and Scott Lindsay, in their Official Capacities, in compliance with the NCRCP, as to the motion for a protective Order, the Court finds, upon testimony regarding the CVAs that:

   a. The CVAs are void *aba initio* and that it is in the best interest of this minor child and any other minor children involved in any CVAs, that Defense Counsel be granted access to any and all information under the subpoena regarding any CVAs in existence or those yet to be discovered, which were created or in the possession of Cherokee County Department of Social Services, their employees or agents or Attorney Scott Lindsay.

   b. The Court further Orders that Defense Counsel shall be allowed to have a verbatim copy of any and all documents including but not limited to any records of any kind involving any CVAs, kept by or in the possession of Cherokee County Municipal Government, Cherokee County DSS or Attorney Scott Lindsay in any requested format. This shall include but not

be limited to, the entire file, unredacted, unedited and unaltered in form or content.

   c. Exact details of said CVAs shall not be allowed to be disclosed pending further Order of this Court.

   d. Defense Counsel shall be allowed to provide information to mental health providers and counselors for any children or parents and shall be allowed to have access to any mental health records or resulting reports arising from any children or biological parents involved in any CVAs.

   e. There exist no other means or way at this time for Defense Counsel to obtain this information other by this Court Order.

   f. Defense Counsel shall be allowed to share any information obtained with subsequent counsel involved with a 2.1 Court if so appointed and Ordered.

7. Counsel for the Defense shall be allowed to use all exhibits, documents, evidence and information from today's proceeding, including that covered by and thru a protective order signed in this case for and in any subsequent, motions or legal actions in either state or Federal Court and shall be allowed to share said information with affiliated counsel as well as Attorney Sean Perrin and Attorney Patrick Flannigan and their respective firms, staff and insurance carriers.

## CONCLUSIONS OF LAW

1. The Court has personal and subject matter jurisdiction over the parties and subject matter as set out within these pleadings.

2. This Order is in the best interest of the minor child.

3. All necessary parties were present and represented by counsel.

4. The Court incorporates by reference the above findings as if fully set forth herein.

5. The Court upon hearing arguments and evidence concludes that the matters involving the CVA's presented to the Court as part of the Declaratory Judgment Claim present complex issues of law and fact and involve an unknown but extremely large number of potential litigants. Therefore, the Court concludes that severance of all matters involving the Declaratory Judgment claim from the above captioned custody case is necessary and appropriate for the proper administration of justice.

**IT IS HERBY ORDERED ADJUDGED AND DECREED** that:

1. The aforestated are made a binding Order of this Court.

2. The Court incorporates within this Order by reference the above findings and conclusions as if fully set forth herein.

3. The Court hereby severs all matters involving the Declaratory Judgment claim and the resulting names and information provided to the Court by Attorney Lindsay and the CCDSS from the above captioned custody case for use by the defense counsel in subsequent actions in state or federal court.

This the 28th day of February, 2018

Tessa Sellers, Honorable Judge Presiding

4

STATE OF NORTH CAROLINA    )    IN THE GENERAL COURT OF JUSTICE
                              )    DISTRICT COURT DIVISION
COUNTY OF CHEROKEE COUNTY    )    FILE NO.: 18-CVD-0046

---

|  |  |
|---|---|
| MICHAEL MATHIEU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    PROCEEDINGS |
| | ) |
| SHALEES GREENLEE, | ) |
| | ) |
| Defendant. | ) |

---

        On Wednesday, February 28, 2018, commencing at 9:28 a.m., the above-captioned Proceedings were taken in the General Court of Justice, District Court Division, Cherokee County, North Carolina, before the Honorable Tessa Shelton Sellers, Judge Presiding, and was attended by Counsel as follows:

APPEARANCES:

        ZEYLAND G. MCKINNEY, JR., ESQ.
        McKinney Law Firm PA
        23 Valley River Avenue
        Murphy, North Carolina  28906
        on behalf of the Plaintiff

        DAVID A. WIJEWICKRAMA, ESQ.
        MELISSA JACKSON, ESQ.
        BRANDON CHRISTIAN, ESQ.
        95 Depot Street
        Waynesville, North Carolina  28786
        on behalf of the Defendant

        RON MOORE, ESQ.
        P.O. Box 18402
        Asheville, North Carolina  28804
        on behalf of the Defendant

(Appearances continue)



| | Page 2 |
|---|---|

APPEARANCES CONTINUED:
    DAVID D. MOORE, ESQ.
    559 West Main Street
    Sylva, North Carolina 28779
    on behalf of Cherokee County DSS

    C. CALEB DECKER, ESQ.
    61 North Market Street
    Asheville, North Carolina 28801
    on behalf of David C. Roberts

REPORTED BY: Mai-Beth Ketch, CVR-M, CCR
           ASHEVILLE REPORTING SERVICE

Page 3

1  (Document TL1361)

2  INDEX

3  Proceedings . . . . . . . . . . . . . . . . 5

4  WITNESS: MICHAEL MATHIEU

5  Direct Examination By Mr. McKinney . . . . . . 30

6  Cross-Examination By Ms. Jackson . . . . . . . 45

7  Redirect Examination By Mr. McKinney . . . . . 57

8  WITNESS: SHEILA ANN MATHIEU

9  Direct Examination By Mr. McKinney . . . . . . 58

10 Cross-Examination By Ms. Jackson . . . . . . . 67

11 WITNESS: SHALEES MARIE GREENLEE

12 Direct Examination By Ms. Jackson . . . . . . 74

13 Cross-Examination By Mr. McKinney . . . . . . 99

14 Redirect Examination By Ms. Jackson . . . . . 109

15 WITNESS: DAVID HUGHES

16 Direct Examination By Ms. Jackson . . . . . . 112

17 Cross-Examination By Mr. McKinney . . . . . . 140

18 Redirect Examination By Ms. Jackson . . . . . 143

19 Recross-Examination By Mr. McKinney . . . . . 147

20 Re-redirect Examination By Ms. Jackson . . . . 149

21 WITNESS: CINDY PALMER

22 Direct Examination By Mr. Ron Moore . . . . . 157

23 Cross-Examination By Mr. McKinney . . . . . . 186

25 (Index Continues)

Page 4

1  INDEX CONTINUED:

2  WITNESS: RONNIE SCOTT LINDSAY

3  Direct Examination By Mr. Ron Moore . . . . . 189

4  Certificate of Notary . . . . . . . . . . . . 205

5  EXHIBITS:           MARKED   ADMITTED

6  Plaintiff's Exhibit No. 1    39     41

7  Plaintiff's Exhibit No. 2    39     41

8  Defendant's Exhibit No. 1    92     94

9  Defendant's Exhibit No. 2   145    ----

10 Defendant's Exhibit No. 3   147    ----

11 Defendant's Exhibit No. 4   167    186

Page 5

1           P R O C E E D I N G S

2  FEBRUARY 28, 2018         9:28 A.M.

3  (BEFORE THE HONORABLE TESSA SHELTON SELLERS)

4  BY THE COURT:

5      All right, Madam Clerk, this would be

6  18-CVD-0046, Michael Mathieu versus Shalees

7  Greenlee. Is there anything before we

8  proceed?

9  BY MR. WIJEWICKRAMA:

10     Your Honor, if it Please the Court, if I could

11 go out of order with Mr. McKinney's consent,

12 we have a few motions for the Court's

13 consideration today that were timely filed.

14 The first one is for a complete recordation by

15 a court reporter. We have our court reporter

16 present. We also have a motion for

17 sequestration of the witnesses both before and

18 after testimony. We also have a motion to

19 permit video-recording of the witnesses'

20 testimony. We also have a motion for

21 designation under 2.1, Judge, and a motion for

22 a protective order. Your Honor, if it Please

23 the Court, we would request that the Court

24 allow a complete recordation of this matter,

25 as I believe we will need to make use of this

1    at a later date, the findings of this hearing.
2    Representing Ms. Shalees Greenlee today are
3    myself, David Wijewackrama, from the Haywood
4    Country bar. I'll let everyone else introduce
5    themselves.
6  BY MS. JACKSON:
7    I'm Melissa Jackson.
8  BY MR. CHRISTIAN:
9    Your Honor, I'm Brandon Christian. I'm
10    Cumberland County bar. And with the Court's
11    permission, I'm making a limited appearance
12    for this hearing in this case today only.
13  BY THE COURT:
14    Yes, sir.
15  BY MR. CHRISTIAN:
16    Thank you, Your Honor.
17  BY MR. RON MOORE:
18    Your Honor, Ron Moore from Buncombe County.
19  BY MR. WIJEWICKRAMA:
20    Your Honor, if it Please the Court, I have a
21    proposed order for the Court's consideration
22    at the end of today, if I may approach.
23  BY THE COURT:
24    You may.
25  BY MR. WIJEWICKRAMA:

1    Your Honor, if it Please the Court, Mr.
2    McKinney was kind enough prior to today's
3    hearing to file a reply to our motions and to
4    consent to all of the motions, and we are
5    grateful to him for his kindness.
6    Specifically, Mr. McKinney stated in his
7    response that the defendant has no objection
8    as it relates to Motions 2 through 7 to the
9    Court entering an order making declaration for
10    complete recordation, for permitting witness
11    testimony, requiring sequestration, granting a
12    protective order, and for designation of this
13    case as exceptional if the Court deemed fit.
14    Your Honor, as a road map for today, we
15    provided Mr. McKinney with a memorandum of
16    law, we also sent a copy to the Court. If it
17    Please the Court, before we get into the
18    substance of Mr. McKinney's complaint, we wish
19    to proceed on the declaratory judgment portion
20    by consent which we believe will have direct
21    bearing on the Court's rulings in the
22    underlying complaint.
23  BY THE COURT:
24    Mr. McKinney, any response?
25  BY MR. MCKINNEY:

1    I did file a response to their motions, and I
2    don't have any objection as Mr. Wijewackrama
3    said to what I've delineated, but I think
4    there's a problem with proceeding with this
5    matter if the Court designates this case as an
6    exceptional case. I don't think -- first of
7    all, I question whether or not the custody
8    action itself can be designated an exceptional
9    case. That's not what I'm consenting to.
10    What I'm consenting to is I have no problem
11    with the Court designating this an exceptional
12    case or whoever is supposed to under the
13    statute. I've been in a number of business
14    court cases, but I've never been in an
15    exceptional case. But I think it's the chief
16    justice that may have to designate it. It is
17    in business court cases. I've been in a
18    number of those cases. I think that if the
19    chief justice designates it an exceptional
20    case, then it has to go before another judge.
21    That judge can hear it. You're outside the
22    county. If it's a jury matter, it has to be
23    heard in this county, but I think you can hear
24    motions outside the county. But if that's
25    what they're asking for with respect to the --

1  BY THE COURT:
2    I agree with you. I can't make the
3    designation.
4  BY MR. MCKINNEY:
5    Right.
6  BY THE COURT:
7    I can make a recommendation to Judge Walker or
8    to Judge Coward who then make their
9    recommendation to the chief justice ---
10  BY MR. MCKINNEY:
11    Right.
12  BY THE COURT:
13    --- in order for that to happen.
14  BY MR. MCKINNEY:
15    Right. But my point is, Your Honor, with
16    respect to the custody agreement that was
17    entered into by the parties, if he's asking
18    for a declaratory judgment and he's asking for
19    a designation of that as an exceptional case,
20    I don't think we can hear anything with
21    respect to that today. And what I'm willing
22    to stipulate to for the purposes of this
23    custody action -- I'm willing to stipulate
24    that the custody agreement is not an order of
25    the Court, that it has no legal force or

1 effect as an order of the Court. But I think
2 the Court is going to have to take evidence --
3 I don't know if you have to take evidence, but
4 -- there seems to be some willingness to argue
5 that whatever status quo is created by this
6 agreement that the Court should consider that.
7 And if that's where they're coming from, then
8 I think that's something that Your Honor is
9 going to have to look at once you determine
10 the circumstances surrounding the execution of
11 that agreement. And my argument to the Court
12 on that point would be it really doesn't
13 matter. It doesn't matter whether there was -
14 - there was fraud in the execution of the
15 agreement. It doesn't matter whether there
16 was -- whether there was coercion. For
17 purposes my action, what I'm saying to the
18 Court is the status quo for a year has been
19 that this child has been in this location,
20 it's doing fine, and we don't want the child
21 drug around and upset until we can have a full
22 hearing on the merits. That's my position.
23 But I'm not going to get involved in whether
24 there was fraud, whether there was coercion.
25 There's no reason for me to do that. I don't

1 think there's any reason really, Your Honor,
2 for the Court to do that because I am
3 consenting and stipulating that that agreement
4 does not have the effect of a court order.
5 I'll let somebody smarter than me decide
6 whether or not it was outside 7B and whether
7 it was improper and so forth. All I'm
8 interested in is keeping this child safe.
9 BY THE COURT:
10    Can I see parties at the bench?
11 BY MR. WIJEWICKRAMA:
12    Your Honor, if I may also ---
13 BY THE COURT:
14    May I see the parties at the bench?
15 BY MR. WIJEWICKRAMA:
16    Sorry.
17 (BENCH CONFERENCE)
18 BY MR. WIJEWICKRAMA:
19    Your Honor, if it Please the Court, if I may
20    be heard on one issue?
21 BY THE COURT:
22    Yes, sir.
23 BY MR. WIJEWICKRAMA:
24    I made a clerical error when filing my
25    response to pleadings, and I apologize to the

1    Court for that. I put the declaratory
2    judgment action under the motions section as
3    opposed to the counterclaim. I've spoken to
4    Mr. McKinney, and consents to me being allowed
5    to consider this as -- present this as a
6    counterclaim, waives his to answer as such. I
7    did also want to say that I agree with
8    everything that Mr. McKinney said, and I
9    apologize if I misstated it earlier. We would
10   only ask that the court consider the request
11   for a 2.1 at the end of today's hearing. The
12   last thing I would like to ask the Court is
13   that based on the fact that there is no jury
14   present, I know that we're limited to the four
15   corners of the document. But since we're also
16   looking for some information that's been
17   subpoenaed and we're also trying to prepare
18   for the declaratory judgment, should the Court
19   grant it, we may ask some questions outside
20   the four corners of the initial complaint.
21 BY THE COURT:
22    Do you have any response, Mr. McKinney?
23 BY MR. MCKINNEY:
24    I have no objection to that, Your Honor.
25 BY THE COURT:

1    All right, based on the preliminary matters
2    that are before the Court, the Court will
3    allow, since the parties have stipulated so,
4    to complete recordation. The Court will grant
5    the sequestration motion. The Court will also
6    grant the protective order and present.
7    However, the Court will hold that -- any
8    ruling on the motion for a 2.1 judge until the
9    end of the evidence today. And so who would
10   be the first witness to be called?
11 BY MR. MCKINNEY:
12    Michael Mathieu, Your Honor.
13 BY MR. DAVID MOORE:
14    Your Honor, there was a motion to quash filed
15    on behalf of the Department of Social
16    Services, and we are not a party to this
17    action. I ---
18 BY THE COURT:
19    I don't have a motion to quash.
20 BY MR. WIJEWICKRAMA:
21    We have not received any motions.
22 BY MR. DAVID MOORE:
23    Okay.
24 BY THE COURT:
25    I don't have it in the file, Mr. Moore.

1  BY MR. DAVID MOORE:
2      Okay.
3  BY THE COURT:
4      So is there -- I have the initial complaint,
5  Judge Leslie's ex parte order, the response by
6  Mr. Wijewackrama with the counterclaim, and
7  then Mr. McKinney's reply.
8  BY MR. DAVID MOORE:
9      All right.
10 BY MR. LINDSAY:
11     I'm not party either, but I have certain
12 documents subpoenaed from me.  I received that .
13 yesterday morning.  It's kind of difficult to
14 get all this stuff that was asked for
15 together.  So I have some stuff, but probably
16 not all of this stuff.
17 BY THE COURT:
18     Okay.
19 BY MR. MCKINNEY:
20     Your Honor, I would just note that the
21 subpoenas were sent to me -- copies of the
22 subpoenas were sent to me on February 2nd.
23 BY MR. WIJEWICKRAMA:
24     Your Honor, if it Please the Court ---
25 BY THE COURT:

1      I'm listening.
2  BY MR. WIJEWICKRAMA:
3      Your Honor, Mr. Moore and I had a conversation
4  in good faith, and he did relate to me he was
5  at the School of Government at a program, and
6  he said he intended to request a protective
7  order, and I understood that to be the case.
8  Regardless of whether the motion was timely
9  filed, I think -- well, I can't speak for Mr.
10 McKinney, but I believe everyone agrees that
11 there should be a protective order.  And I
12 would like the Court to note that in the order
13 that is presented to the Court, there is a
14 language for a protective order to keep the
15 CPA documents sealed.  The reason I did that,
16 Your Honor, is because I hadn't gotten a
17 chance to catch up with Mr. Moore to see if
18 one was sent over, but I did put one in this
19 morning when I was preparing this order.  And
20 in all candor, Mr. Moore and I did have an
21 understanding.  I did talk to co-counsel about
22 making sure there would be a protective order.
23
24 BY MR. DAVID MOORE:
25     And whether or not there's a written one that

1  has made its way to the Court or not, I would
2  be making an oral motion pursuant to Rule 45
3  today because the juvenile code does in fact
4  protect the confidentiality of certain
5  records.  And we can -- and I will provide a
6  protective order that I would use normally for
7  production of juvenile records which allows
8  for the redaction of certain information.
9  Because we had not been heard yet on that and
10 because there's not an entered protective
11 order, those documents are not going to be
12 available from the witnesses who were
13 subpoenaed today because of that.  And I
14 apologize if there was a misunderstanding
15 because that was not my -- we're not a party
16 to this action.  So we're in an unusual spot
17 here.  There are also witnesses who have been
18 subpoenaed from the Department of Social
19 Services.  I'm here on behalf of the
20 department and the witnesses in their official
21 capacities, and I obviously can't participate
22 on what may be relevant or may not be relevant
23 documents that I might believe -- so I -- I'm
24 hand strung in what I can do other than
25 provide a protective order and then we will

1  have documents provided for this hearing.
2  BY MR. WIJEWICKRAMA:
3      Your Honor, I do have to agree.  However,
4  while we did consent to a protective order
5  being entered, I did subpoena these documents.
6  And while I agree with Mr. Moore, 7B applies
7  to parties, and we issued this subpoena under
8  the North Carolina rules of civil procedure,
9  Rule 45.  And we did ask that they produce --
10 that they bring these documents so that the
11 Court could review these documents in camera.
12 BY MR. DAVID MOORE:
13     We can have those documents.  I mean, that's -
14 - that's -- we have the file here -- and we've
15 got the file here.  It's just not been
16 redacted is my point, that -- with reporters'
17 names and -- it's not been, has it?  The
18 redactions have occurred.  So the file is
19 present in order to be reviewed in camera by
20 the Court, but it also does fall out, to Mr.
21 Wijewickrama's point, outside of Chapter 7B
22 which raises the entire different level of
23 confidentiality for purposes of a private
24 custody action.  I -- it was my understanding
25 and impression that we were going to deal with

1     the confidentiality issue today because I'm
2     not a party, and I can not -- I don't have any
3     formal role here. I can't sit here and
4     object.
5 BY MR. WIJEWICKRAMA:
6     Your Honor, Mr. Moore and his client are the
7     same as Apple or IBM or Microsoft. If they
8     are subpoenaed to produce documents, they are
9     to produce the documents for the Court to
10     review under the -- and this subpoena was
11     signed by Your Honor, by a judge, and it was -
12     --
13 BY THE COURT:
14     And the documents are here.
15 BY MR. WIJEWICKRAMA:
16     Yes.
17 BY THE COURT:
18     I think Mr. Moore is just wanting the record
19     to reflect that there is the additional layer
20     of the protective order in which he is
21     requesting on behalf of the fact that they're
22     juvenile records.
23 BY MR. WIJEWICKRAMA:
24     I agree and that's in the order.
25 BY THE COURT:

1     Correct?
2 BY MR. DAVID MOORE:
3     That's correct.
4 BY THE COURT:
5     So ordered.
6 BY MR. DAVID MOORE:
7     Thank you.
8 BY MR. WIJEWICKRAMA:
9     Thank you. Would Your Honor like to do the
10     consent order right now?
11 BY THE COURT:
12     Mr. Decker?
13 BY MR. WIJEWICKRAMA:
14     There is one other issue that we have to deal
15     with before we get started, and I'll let Ms.
16     Jackson and Mr. Decker ---
17 BY MR. DECKER:
18     Oh, I thought he was about to bring something
19     else up. Your Honor, I've been retained to
20     represent Mr. David Roberts ---
21 BY THE COURT:
22     Yes, sir.
23 BY MR. DECKER:
24     --- who is the legal father.
25 BY THE COURT:

1     Yes, sir.
2 BY MR. DECKER:
3     There is now evidence that he is not the
4     biological father, and I believe that, one, he
5     wishes to be removed as a party as he is not
6     the biological father, and I think there is
7     some paperwork in the mix of all this
8     loveliness that will legitimate the biological
9     father.
10 BY THE COURT:
11     Okay.
12 BY MR. DECKER:
13     So I've spoken with him, told him what to
14     expect. He understands and he is here and for
15     the record waives any requirement of notice to
16     any further hearings and would ask to be, I
17     guess, excused as a party to this hearing.
18 BY THE COURT:
19     So -- Mr. Decker, so that I am clear ---
20 BY MR. DECKER:
21     Yes.
22 BY THE COURT:
23     --- you represent David Cody Roberts ---
24 BY MR. DECKER:
25     Yes.

1 BY THE COURT:
2     --- who has been noted as the legal father ---
3 BY MR. DECKER:
4     Yes.
5 BY THE COURT:
6     --- of this juvenile that is part of this
7     custody action?
8 BY MR. DECKER:
9     Yes.
10 BY THE COURT:
11     And you have indicated to the Court, which was
12     a question of the Court when the Court read
13     the pleadings last night, that there is
14     evidence to which indicates that he is not the
15     father -- the biological father of the minor
16     child?
17 BY MR. DECKER:
18     Yes.
19 BY THE COURT:
20     Would that be in the form of a DNA test?
21 BY MR. DECKER:
22     Yes, Your Honor.
23 BY THE COURT:
24     And there will be evidence of such DNA test?
25 BY MR. DECKER:

1    Well, I can't really forecast the learned
2    minds in this room's actions.  I would assume
3    that, yes, there is going to be ---
4  BY THE COURT:
5    And he now waives any other ---
6  BY MR. DECKER:
7    Yes.
8  BY THE COURT:
9    --- right that he may have to this child ---
10 BY MR. DECKER:
11   Yes.
12 BY THE COURT:
13   --- or to be a part of this proceeding?
14 BY MR. DECKER:
15   That is correct.
16 BY MR. MCKINNEY:
17   Your Honor, we would stipulate to that.
18 BY THE COURT:
19   Thank you, Mr. McKinney.
20 BY MR. DECKER:
21   And with that being said, I would -- even
22   though I'm sure this is going to be a whole
23   lot of fun to watch, but I would ask to be
24   excused, Your Honor.
25 BY THE COURT:

1    Have a lovely afternoon, Mr. Decker.
2  BY MR. DECKER:
3    Thank you.
4  BY THE COURT:
5    Always a pleasure.  Mr. Roberts, you're free
6    to go, sir.
7  BY MR. ROBERTS:
8    Thank you.  You have a good day.
9  BY THE COURT:
10   Now, before we go on for just a moment, Mr.
11   Lindsay, you indicated that you were just
12   served with a subpoena; is that correct?
13 BY MR. LINDSAY:
14   Yesterday morning, Your Honor.
15 BY THE COURT:
16   And that you do not have documentation with
17   you?
18 BY MR. LINDSAY:
19   I have some, Your Honor.
20 BY THE COURT:
21   I show that you were also served with a
22   subpoena on February 5th; is that correct?
23 BY MR. LINDSAY:
24   That was, as I recall, the documentation that
25   was in the possession of the Department of

1    Social Services in which I have not had access
2    to any of those records or the Department
3    since January 10th.  I've not produced any of
4    that.
5  BY THE COURT:
6    All right, well, we will take it as it comes.
7    Do the parties have lists of proposed
8    witnesses?  If not, I suggest that they write
9    them out now.
10 BY MR. MCKINNEY:
11   Your Honor, can we approach?
12 BY THE COURT:
13   You may.
14 (BENCH CONFERENCE)
15 BY THE COURT:
16   Ladies and gentleman, it's my understanding
17   the parties are going to review medical
18   records that were subpoenaed in this
19   particular case.  We'll be at ease for about
20   20 minutes.
21 BY MR. MCKINNEY:
22   Thank you, Your Honor.
23 (OFF THE RECORD)
24 BY MR. DAVID MOORE:
25   Your Honor, if I may approach, I do have your

1    protective order proposed, and I have shown
2    counsel now.
3  BY MR. WIJEWICKRAMA:
4    We consent on the record, Your Honor, on
5    behalf of the defense.
6  BY MR. WIJEWICKRAMA:
7    I don't have any objection.
8  BY THE COURT:
9    All right.
10 BY MR. DAVID MOORE:
11   If I may approach?
12 BY THE COURT:
13   You may.  Thank you, Mr. Moore.
14 BY MR. DAVID MOORE:
15   Do I need to file it, or are you going to just
16   leave it here?
17 BY THE COURT:
18   I'll just leave it here.  That's fine, Mr.
19   Moore.
20 BY MR. WIJEWICKRAMA:
21   Your Honor, if it Please the Court, there was
22   one issue earlier that we need to clarify
23   before we start calling the witness list.
24 BY THE COURT:
25   What?

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@asheville reporting.com

1  BY MR. WIJEWICKRAMA:
2      Your Honor, in speaking with Mr. Lindsay
3  earlier and him speaking with the Court, I did
4  need to make an issue of clarification. It is
5  true that we did issue a second subpoena that
6  Judge Kris Earwood signed on 2-28. That list
7  which he received yesterday requested
8  information regarding his continuing education
9  and travel records. However, Your Honor, Mr.
10  Lindsay has been in possession of the subpoena
11  since February 5th for him to produce for the
12  Court to review all CVAs or emails or
13  documents in his possession involving any of
14  the CVAs that he may have knowledge or
15  possession of. While I respect the fact that
16  Mr. Lindsay has been the county attorney for
17  four years, the state bar does require him to
18  keep possession of his records for six years.
19  And what we were asking for were the records
20  that would have been kept off site or at his
21  residence or at another location. And I
22  understand that he does not have access to the
23  documents at the Department of Social
24  Services. What I was asking for in this
25  subpoena, which Your Honor signed on February

1  5th which Mr. Lindsay was served on February
2  5th, I wanted to know what documentation Mr.
3  Lindsay had personal possession of either at
4  his former office, on any computer that he may
5  have access to or possess, or his residence.
6  BY THE COURT:
7      And I understand that, and I ---
8  BY MR. LINDSAY:
9      If it Please the Court, I have CVAs that I
10  have -- I think I have approximately 30. I
11  have those. And I don't have access to the
12  county email.
13  BY THE COURT:
14      And what I said earlier on the record is we'll
15  take it as it comes.
16  BY MR. WIJEWICKRAMA:
17      Thank you, Your Honor.
18  BY THE COURT:
19      But right now it's too premature for us to
20  make any decisions on any of that.
21  BY MR. WIJEWICKRAMA:
22      Thank you, Your Honor.
23  BY THE COURT:
24      So we'll see where that road leads us later,
25  if anywhere.

1  BY MR. WIJEWICKRAMA:
2      I just wanted to -- yes, Your Honor.
3  BY THE COURT:
4      All right, are we ready to proceed with
5  evidence?
6  BY MR. MCKINNEY:
7      Yes, Your Honor.
8  BY THE COURT:
9      All right, I'm going to go through a list of
10  potential witnesses. If I call your name, you
11  are to go to the grand jury room. I believe
12  that bailiffs have set that up for all the
13  witnesses. It is a complete sequestering of
14  the witnesses. When you are in here to
15  testify, you are not to discuss your testimony
16  or any questions that may have been asked of
17  you in front of any of the other witnesses.
18  What happens in the courtroom stays in the
19  courtroom, so to speak. Do I make myself
20  clear? If I call your name, other than the
21  parties who are allowed to remain, you will
22  need to leave the courtroom. David Cody
23  Roberts has left. He no longer wishes to be a
24  part. Scott Lindsay, David Hughes, Cindy
25  Palmer. Is it Sheila, Mr. McKinney? Sheila

1  Mathieu?
2  BY MR. MCKINNEY:
3      Yes, Your Honor.
4  BY THE COURT:
5      And Larry Brazil. The other two witnesses
6  that I have on the list are both parties to
7  the action which would be Shalees Greenlee and
8  Michael Mathieu.
9  BY MS. JACKSON:
10      And, Your Honor, as well I need to make one
11  addition to that list, Ms. Melissa Thrasher
12  or Melissa Heron. She has shown up, and she
13  potentially may be called. So in the
14  abundance of caution, I would add her, Your
15  Honor.
16  BY THE COURT:
17      Melissa Thrasher, are you in the courtroom?
18  Ma'am, I'm going to ask you to step out also.
19  Any other additions to the list?
20  BY MS. JACKSON:
21      No, Your Honor.
22  BY THE COURT:
23      All right, Mr. McKinney, you may call your
24  first witness.
25  BY MR. MCKINNEY:

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com

1  We call Michael Mathieu.
2  BY THE COURT:
3      All right, Mr. Mathieu, if you will, come
4  around and be sworn.  Mr. McKinney, the
5  witness is with you.
6      MICHAEL MATHIEU, being duly sworn to tell the
7  truth, the whole truth, and nothing but the truth
8  of his own knowledge concerning the within matter,
9  testified as follows:
10 DIRECT EXAMINATION BY MR. MCKINNEY:
11 Q    Would you please state your name?
12 A    Michael Mathieu.
13 Q    Michael, where do you live?
14 A    Murphy, North Carolina or here.
15 Q    How old are you?
16 A    Twenty-seven.
17 Q    How long have you lived in Murphy?
18 A    About all my life.
19 Q    Are you presently employed?
20 A    Yes, sir.
21 Q    How are you employed?
22 A    I work at Murphy Medical Center ---
23 Q    How long have you been employed there?
24 A    For about almost five months.
25 Q    What do you do?

1  A    I work in the nursing home.
2  Q    What sort of employment did you have before
3  that?
4  A    I was working at Brother's Restaurant for
5  about almost a year.
6  Q    What did you do at Brother's Restaurant?
7  A    I was a cook.
8  Q    Do you know Shalees Greenlee?
9  A    Yes, sir.
10 Q    How do you know her?
11 A    We used to date.
12 Q    And do you have a child with Shalees Greenlee?
13 A    Yes, sir.
14 Q    What is the name and age of that child?
15 A    Alana Roberts, and her age is a year old --
16 almost two.
17 Q    Was she born on July the 5th, 2016?
18 A    Yes, sir.
19 Q    At the time that Alana was born, were there
20 any complications with her -- with her birth
21 and Shalees' pregnancy?
22 A    Yes, sir.
23 Q    Can you tell the Court about that?
24 A    I know that while Shalees was pregnant with
25 her, she had overdosed two times, and Alana

1  was going through withdrawals.
2  BY THE COURT:
3      I'm sorry, I didn't hear what you said.  Alana
4  was born what?
5  BY THE WITNESS:
6      With withdrawals.
7  DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
8  Q    And was she -- did she in fact receive
9  morphine treatment for those withdrawals
10 before she was released from the hospital when
11 she was born?
12 A    I believe so.
13 Q    And where was the child -- where did you all
14 take the child after the child was born?
15 A    I was out of town working at the time.  So I'm
16 not sure where Shalees had taken her.
17 Q    Where were you working?
18 A    I was working for an employer in Florida.  So
19 I was out of town most of the time.
20 Q    Okay, and when you got back in town, did you
21 go see your child?
22 A    Yes, I got a call saying that Shalees was
23 willing to sign her rights over to me
24 temporary at the time.
25 Q    Who did you get that call from?

1  A    From my mom.
2  Q    And who is your mother?
3  A    Sheila Mathieu.
4  Q    And, Michael, where are you living right now?
5  A    At 410 Hiawassee Street in Murphy.
6  Q    And is that your mother's residence?
7  A    Yes, sir.
8  Q    How long have you been living with your
9  mother?
10 A    This -- well, I did have my own place with my
11 ex-girlfriend.  We were living together, and
12 we broke up.  So I moved back in with my mom.
13 So about -- probably it's been two years.
14 Q    And who else resides there besides you,
15 Michael?
16 A    My father and my sister.
17 Q    What is your father's name?
18 A    Michael Mathieu.
19 Q    And what does he do?
20 A    He works for Amos Refrigeration.
21 Q    And how long has he worked for Amos
22 Refrigeration?
23 A    Probably ten-plus years.
24 Q    And who is your sister?
25 A    Heather Mathieu.

1  Q  And how old is she?
2  A  She is 18 -- 18.
3  Q  And once you got that phone call about
4     assuming temporary custody of the child, did
5     you go get the child?
6  A  Yes, sir.
7  Q  And where was the child when you went to pick
8     her up?
9  A  She was in daycare.
10 Q  And what daycare was she in?
11 A  It was -- I don't know the name, but it was in
12    Peachtree.
13 Q  And have you had your daughter since that
14    time?
15 A  Yes.
16 Q  And have you provided care for your daughter
17    since that time?
18 A  Yes, sir.
19 Q  Have you lived continuously with your mother
20    during that period of time?
21 A  Yes, sir.
22 Q  And can you tell me what sort of things that
23    you do for your child?
24 A  I feed her, bathe her, buy her anything she
25    needs, diapers, wipes.  I take her to the

1     park, play with her, just anything she wants.
2  Q  Have you received any financial support at all
3     from Shalees Greenlee for the child?
4  A  I think she gave me like $20 one time.
5  Q  And, Michael, has there been a DNA test done
6     to determine parentage of the child?
7  A  Yes, sir.
8  Q  And what were the results of that DNA test?
9  A  That I was 99.9 percent the father.
10 Q  And do you want custody of your daughter?
11 A  Yes, sir.
12 Q  Does your daughter have any health problems at
13    the present time, Michael?
14 A  I think she's fine right now.  She's got
15    allergies, but ---
16 Q  Who takes her to the doctor?
17 A  Me or my mom.
18 Q  Michael, when -- after you went to pick your
19    daughter up at the daycare, did you have any
20    involvement with respect to that child with
21    the Department of Social Services here in
22    Cherokee County?
23 A  What do you mean?
24 Q  Well, at some point in time, did you talk to
25    Shalees about who was going to have custody of

1     the child?
2  A  Yeah, she told me she wanted to sign her over
3     to me.
4  Q  Okay, when did she tell you that?
5  A  Alana was probably almost three months old.
6  Q  And did you meet with any of the workers from
7     the Department of Social Services about your
8     daughter?
9  A  Yes, sir.
10 Q  When did you do that?
11 A  It was probably right after I talked to
12    Shalees.  I went there and signed the papers
13    of the custody.
14 Q  Okay, and ---
15 BY THE COURT:
16    Can we stop for just a moment, Mr. McKinney?
17    Can you put a time frame on when he picked her
18    up at the daycare so that I've got some
19    clarification when he came back in town and he
20    actually ---
21 BY MR. MCKINNEY:
22    Okay.
23 DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
24 Q  How old was your daughter when you picked her
25    up at the daycare?

1  A  She was about three months old.
2  Q  Now, you had seen your daughter prior to that
3     time; hadn't you?
4  A  Yes, sir.
5  Q  Had you seen her -- how many times had you
6     seen her between the time she was born and the
7     time you picked her up at the daycare?
8  A  Well, before I got full custody of her, I had
9     temporary custody.  So I was -- I was on and
10    off.  Shalees would have her and then I would
11    have her after.
12 Q  Well, let me restate the question, Michael.
13    During the first three months of your child's
14    life, how much time did you spend with her?
15 A  Probably half -- a month and a half of three
16    months.
17 Q  Now, after you picked her up at the daycare
18    then, did Shalees Greenlee continue to visit
19    with her?
20 A  Maybe once or twice.
21 Q  Before you met with DSS?
22 A  Yes.
23 Q  And this meeting that you had with DSS, who
24    told you to go to DSS?
25 A  I think Shalees had called my mom because I

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                      ars@ashevillereporting.com

1  was out of town. And then when I got in town,
2  I went to DSS to sign papers for full custody.
3  Q  But who told you to go to the DSS building to
4  sign these custody papers?
5  A  My mom called me and told me.
6  Q  All right, and when you got to the DSS
7  building, tell me what happened.
8  A  I was talking to a lady who had the custody
9  papers, and Shalees had already signed them.
10  She told me I signed them and I have full
11  custody of her.
12  Q  And do you know who that woman was?
13  A  I don't remember her name.
14  Q  But Shalees had already signed the papers when
15  you arrived there?
16  A  Yes, sir.
17  Q  And did you talk to Shalees about why she was
18  doing what she was doing?
19  A  She -- Shalees told me that it was best for
20  Alana to be with me. That was pretty much it.
21  Q  Now, did you also sign a temporary
22  guardianship agreement with respect to Alana
23  Lilly Roberts?
24  A  I'm not sure if I did or not. I don't
25  remember.

1  (PLAINTIFF'S EXHIBIT NO. 1 MARKED)
2  DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
3  Q  Michael, I'm going to show you first
4  Plaintiff's Exhibit No. 1 and ask you if you
5  recognize that? You can look at each page of
6  it. (Tenders)
7  A  (Upon review) Yes, sir, I remember this.
8  Q  Okay, and what is that?
9  A  This is the custody and visitation agreement.
10  Q  And did you sign that before a notary public?
11  A  This is where I signed at Social Services.
12  (PLAINTIFF'S EXHIBIT NO. 2 MARKED)
13  DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
14  Q  Okay, and I want to hand you what's been
15  marked Plaintiff's Exhibit No. 2 and ask you
16  if you recognize that. (Tenders)
17  A  (Upon review) Yes, sir, that's the temporary
18  agreement.
19  Q  Now, do you remember where you signed the
20  temporary agreement?
21  A  I think there was a notary expressly --
22  somebody was a notarizer.
23  Q  How did you get this document, Plaintiff's
24  Exhibit No. 2? How did it come into your
25  hands?

1  A  I think that's the paper that Shalees brought.
2  Q  Shalees brought this to you?
3  A  Yeah, we went to a notary or -- yeah,
4  expressly to sign it.
5  Q  Juanita Hampton, do you know her?
6  A  That was the Social Worker, I believe. That's
7  her name -- or was that the -- I'm sorry,
8  that's the notarizer?
9  Q  Uh-huh. (Affirmative) And you signed it on
10  October the 6th, 2016?
11  A  Yes, sir.
12  Q  What was your understanding of why you were
13  signing Plaintiff's Exhibit No. 2?
14  A  She was giving me temporary custody.
15  Q  Okay, is that what she told you?
16  A  Yes.
17  Q  Okay, and what was your understanding of why
18  you were signing Plaintiff's Exhibit No. 1?
19  A  This was -- I was getting full custody of her.
20  Q  Okay, and at the time ---
21  BY MR. MCKINNEY:
22  Your Honor, we would move to admit Plaintiff's
23  Exhibits 1 and 2 into evidence.
24  BY THE COURT:
25  Any objection?

1  BY MS. JACKSON:
2  No objection.
3  BY THE COURT:
4  So admitted.
5  (PLAINTIFF'S EXHIBIT NOS. 1 AND 2 ADMITTED)
6  DIRECT EXAMINATION RESUMED BY MR. MCKINNEY:
7  Q  Michael, when you signed these two documents
8  here, Plaintiff's Exhibit 1 and 2, were you
9  represented by an attorney?
10  A  No, sir.
11  Q  So you weren't represented by an attorney when
12  you signed the temporary guardianship
13  agreement; is that correct?
14  A  Correct.
15  Q  And you weren't represented by an attorney
16  when you signed the custody agreement?
17  A  Correct.
18  Q  Do you know whether or not Shalees Greenlee
19  was represented by an attorney at the time she
20  signed those documents?
21  A  I'm not sure if she was or not.
22  Q  Other than the representation made by the DSS
23  worker at the Cherokee County Department of
24  Social Services to the effect that that
25  document was giving you full custody of your

11 (Pages 38 to 41)

1    daughter, did any other employees or workers
2    with the Cherokee County Department of Social
3    Services make any sort of representations to
4    you with respect to that Plaintiff's Exhibit
5    No. 1?
6  A  No.
7  Q  Did any workers or employees of the Cherokee
8    County Department of Social Services make any
9    representations to you with respect to
10    Plaintiff's Exhibit No. 2 ---
11  A  No.
12  Q  --- the temporary guardianship agreement?
13  A  No.
14  Q  Did you ever meet with Mr. Scott Lindsay, the
15    Cherokee County Department of Social Services
16    attorney?
17  A  No.
18  Q  Did you ever speak with him?
19  A  No.
20  Q  Did your mother have more contact with the
21    Cherokee County Department of Social Services
22    than you did?
23  A  I think we had about the same.  She was with
24    me.
25  Q  She went with you that day to the -- to meet

1    with the people ---
2  A  Yes, sir.
3  Q  --- at the Cherokee County Department of
4    Social Services?
5  A  Yes, sir.
6  Q  Was it your understanding when you signed
7    Plaintiff's Exhibit No. 1 that you were going
8    to have custody of your daughter until she was
9    18?
10  A  Yes, sir.
11  Q  And in the past three months, have you had
12    contact with Shalees Greenlee?
13  A  No, sir.
14  Q  And why did you file this complaint and this
15    action?
16  A  File what?  What do you mean?
17  Q  Why did you file this action to get custody of
18    your daughter?
19  A  Because Shalees came to my house and took
20    Alana, just walked out the door with her as
21    she was visiting her.
22  Q  And did she tell you that she wasn't going to
23    bring her back?
24  A  Right, yes, she did.
25  Q  And did you finally get her back?

1  A  Yes, sir.
2  Q  How did you get her back?
3  A  I came to you and got an ex parte to go get
4    her back.
5  Q  Had you been allowing Shalees to visit with
6    the child since that custody agreement,
7    Plaintiff's Exhibit No. 1 -- since the two of
8    you executed that agreement?
9  A  Yes, sir.
10  Q  And how much visitation had Shalees exercise
11    during that period of time?
12  A  Anytime she asked me to come visit, I would
13    let her.  Sometimes we would be sitting there
14    waiting for her to show up, and she would
15    never show up.  Sometimes she would, and she
16    would be at my house for maybe an hour max and
17    that was it.  So she would probably come maybe
18    once every two weeks.
19  Q  Do you have a problem with this Court awarding
20    Shalees with some supervised visitation with
21    the child?
22  A  I don't have a problem with supervised
23    visitation.
24  Q  And do you have safety concerns for the child
25    if visitation is not supervised?

1  A  Yes, sir.
2  Q  And what would that pertain to?
3  A  Shalees has a bad drug habit that I don't want
4    Alana around.
5  Q  Does she have some associations with other
6    people that would present in your opinion a
7    safety danger to your child?
8  A  Yes, sir, just about everybody she hangs
9    around.
10  BY MR. MCKINNEY:
11    I believe that would be all my questions for
12    this witness at this time, Your Honor.
13  BY THE COURT:
14    Those are the questions you have, Mr.
15    McKinney.  Cross-examination.
16  BY MS. JACKSON:
17    Thank you, Your Honor.
18  CROSS-EXAMINATION BY MS. JACKSON:
19  Q  Mr. Mathieu, were you present when Alana was
20    born?
21  A  No, ma'am.
22  Q  Tell me about that situation.
23  A  I was working out of town and at the same time
24    I wasn't sure if she was mine or not.
25  Q  What was your initial belief when Alana was

12 (Pages 42 to 45)

1    born?

2  A   What do you mean?

3  Q   Did you think that she was yours, or what type

4    of efforts did you make?

5  A   I didn't think she was mine. I was told that

6    she was with other people while we were

7    together and made me people that the baby

8    wasn't mine.

9  Q   Okay, and did you originally want to sign your

10    rights away to Shalees?

11  A   Thinking that it wasn't my baby, I didn't know

12    if I had any rights to it.

13  Q   Did you indicate to her several times via

14    Facebook message and text message that the

15    child was not yours and that you wanted to

16    sign your rights away to her?

17  A   I don't believe so.

18  Q   So you never told her that in Facebook

19    messages and text messages?

20  A   That I wanted to sign my rights over to a baby

21    that wasn't mine? I don't know why I would do

22    that.

23  Q   When did you determine or when did you make

24    efforts to determine whether or not Alana was

25    your biological child?

1  A   Shalees had messaged me wanting to do a DNA

2    test, so I agreed to it.

3  Q   Do you know when that was done?

4  A   Alana was probably a couple of weeks old.

5  Q   When did you consistently start seeing Alana

6    or Alana (different pronunciation)?

7  A   After the DNA papers came back.

8  Q   Okay, and how old was she at that time?

9  A   Probably a month old.

10  Q   And tell me about what type schedule at that

11    point -- as far as Alana goes, what type of

12    schedule were keeping with her?

13  A   Well, I was still working out of town. So she

14    was Shalees, and then sometimes Shalees would

15    drop her off with my grandma or my mom.

16  Q   And when you were working out of town, where

17    you were working? Do you recall?

18  A   We were working all over, Miami, Alabama, just

19    different places.

20  Q   And when you were doing that, for time periods

21    would you be gone?

22  A   It could be up to three or four weeks at a

23    time.

24  Q   And when did that work schedule change?

25  A   I worked there for about eight months. So

1    when I would come in town, I would see Alana

2    because I knew at the time she was mine after

3    the papers came back. So I would probably

4    keep her for a few days until I went back out

5    of town.

6  Q   So during that first eight months of Alana's

7    life when you were working out of town, how

8    often do you recall that you saw her?

9  A   I mean, after she signed the temporary rights,

10    she was at my house until we went to full

11    custody.

12  Q   So how often would you see her when you were

13    working out of town?

14  A   When I was in town. When I was in town. So I

15    would be in town for probably a week at a

16    time.

17  Q   Okay, and then you would go back for three to

18    four weeks?

19  A   Not always. Sometimes it would be a week or

20    two weeks. It could be up to four weeks, but

21    not always.

22  Q   And during that period of time, who was caring

23    for Alana?

24  A   My mom.

25  Q   And you currently live with your mom?

1  A   Yes, ma'am.

2  Q   Where do you work now? Did you say at Murphy

3    Medical?

4  A   Yes, ma'am.

5  Q   Does your mom provide most of the medical

6    treatment for Alana and bring her to most

7    doctor appointments?

8  A   It's probably an even split. We both bring

9    her.

10  Q   Do you have any history of drug use in the

11    last two years?

12  A   Yes, I used to smoke.

13  Q   Smoke what?

14  A   Marijuana.

15  Q   When you say used to, when did that end?

16  A   Probably almost a year ago.

17  Q   Do you take any pills, suboxone, anything of

18    that nature?

19  A   No, ma'am.

20  Q   Have you ever?

21  A   Yes.

22  Q   When did you quit taking suboxone?

23  A   I haven't done anything in the past year.

24  Q   Now, during the period of time where you and

25    your mother were keeping Alana, Shalees did

13 (Pages 46 to 49)

## Page 50

1   make active efforts to see her through your
2   mother; didn't she?
3   A   Yes.
4   Q   So Shalees was still trying to see Alana?
5   A   Yes.
6   Q   And visit with her?
7   A   Yes.
8   Q   And did she do that?
9   A   Sometimes.
10  Q   How often would you say that she visited with
11      her?
12  A   Maybe once every two weeks. Sometimes she
13      wouldn't even show up when she wanted -- when
14      she asked to come visit.
15  Q   When these documents were signed -- or rather
16      the CVA -- so the second one that was signed
17      at the department, who did you speak with when
18      that was signed?
19  A   I'm not sure of the lady's name that had the
20      custody papers. I don't remember her name,
21      but she was about the only one I talked to.
22  Q   When you went to DSS, did you go back into an
23      office, or did you sign it out in the lobby?
24      Tell me about that.
25  A   We went into the office. I think it was the

## Page 51

1   lady's office that had the papers.
2   Q   And do you -- do you recall who the lady was?
3   A   I don't remember her name.
4   Q   Okay, and was anybody else present when you
5       signed it?
6   A   My mom.
7   Q   Anybody else?
8   A   No.
9   Q   Was there a notary present?
10  A   She -- we signed the papers, and then she
11      walked out with the papers. I'm not sure what
12      she did with them. She could have went to a
13      notary, but I'm not sure if she had or not.
14  Q   Did you provide your ID to anybody that day?
15  A   Yes, ma'am.
16  Q   Are you a licensed driver?
17  A   I have a licensed.
18  Q   So you are licensed to drive right now?
19  A   I think my licenses are suspended at the
20      moment.
21  Q   Do you know why it's a suspended?
22  A   About three years ago, I got a -- I was
23      drinking and driving.
24  Q   Okay, so you have a prior DWI conviction?
25  A   Yes, ma'am.

## Page 52

1   Q   So what type of ID were you able to provide
2       there a the department? Was it like a state
3       issued ID or a driver's license?
4   A   It was an old driver's license.
5   Q   So it was an old driver's license?
6   A   Yes, that was the only identification I had.
7   Q   So it wasn't a valid driver's license?
8   A   No.
9   Q   And did you -- when that was notarized; was it
10      notarized in front of you or you gave it to
11      somebody and they took it away?
12  A   Right.
13  Q   So you gave it to somebody, they took it away,
14      and then they brought it back and it was
15      notarized?
16  A   I guess.
17  Q   But it wasn't done in front of you?
18  A   No.
19  BY MS. JACKSON:
20      Your Honor, if I may approach?
21  BY THE COURT:
22      You may. Do you want the ----
23  BY MS. JACKSON:
24      I do, Your Honor.
25  CROSS-EXAMINATION RESUMED BY MS. JACKSON:

## Page 53

1   Q   And just to clarify, I'm going to show you
2       what has been marked previously as Plaintiff's
3       Exhibit 1. And you see here where it looks as
4       though you signed and this was stamped? Was
5       that done in front of a notary? (Tenders)
6   A   (Upon review) Is that the notary?
7   Q   Uh-huh. (Affirmative)
8   A   Okay, it probably was.
9   Q   Well, do you ----
10  A   It was.
11  Q   Do you remember that ----
12  A   It was.
13  Q   --- or was that taken away ----
14  A   Yes.
15  Q   ---- and done?
16  A   No, that was definitely stamped right in front
17      of me, sorry.
18  Q   That's okay. I just wanted to clarify. Now -
19      - so during the period of time you said that
20      Shalees was making active efforts through your
21      mom to see Alana; is that correct?
22  A   Yes.
23  Q   Okay, and at that time, you were working out
24      of town, so your mother was the primary
25      caregiver?

1  A    Right.

2  Q    Okay, at what time did you become the primary

3       caregiver of Alana?

4  A    I quit working out of town, and that's when I

5       went to Brother's and that's when I was in

6       town all the time.

7  Q    When did you start working at Brother's?

8  A    It was last year.  Probably the beginning of

9       last year.

10 Q    So the beginning of 2017?

11 A    Yes.

12 Q    And how long did you work there?

13 A    For about -- about a year.

14 Q    And why did your employment cease?

15 A    We were slow on business there.  The

16      restaurant was kind of slow on business.

17 Q    And now after the agreement, the one that I

18      showed you there, was signed at DSS, Shalees

19      continued to try to see Alana; didn't she?

20 A    There was a long period of time, maybe three

21      or four months where she went without trying

22      to see her or anything.

23 Q    Didn't she consistently message you through

24      the month of November trying to see Alana and

25      confused about what she had signed?

1  A    The reason that sometimes I would not let her

2       come visit is because she had just gotten out

3       of jail and I knew she was bad off doing drugs

4       and stuff.  And in the papers, it says it was

5       up to me whether I let her visit or not if I

6       knew she was high.

7  Q    So she did try to see her during November?

8  A    Right.

9  Q    Okay, so after these documents were signed,

10      she continued to try to see the child?

11 A    Not continuously, no.

12 Q    Did you tell her that she should have read the

13      papers more carefully?

14 A    Yes.

15 Q    So you completely understood what the papers

16      said?

17 A    Right.

18 Q    Okay, and you weren't there when she signed

19      these papers; correct?

20 A    Correct.

21 Q    Do you know under what situation or under what

22      circumstances she signed the documents?

23 A    I wasn't there when she signed them, so I

24      don't know.

25 Q    Have you guys talked about that?

1  A    She did tell me she was willingly wanting to

2       sign the papers to give her rights over.

3  Q    Did she continue -- or did she tell you that

4       she wanted to continue to be able to see Alana

5       on a regular basis?

6  A    Not a regular basis, but she would like to

7       visit every now and then.

8  Q    So you indicated to Mr. McKinney that you

9       don't have any problem with Shalees having

10      visitation?

11 A    Supervised visitation.

12 Q    And when you say supervised, who would be an

13      appropriate supervisor?

14 A    Me or my mom.

15 Q    Okay, what about somebody in Shalees' family?

16 A    No.

17 Q    What about her grandmother?

18 A    No.

19 Q    Why?

20 A    I don't know them, and I don't trust any of

21      them.

22 Q    At one point, didn't Alana live with her

23      mother Melissa for a period of time?

24 A    Maybe the first couple of weeks she was born

25      before we got the DNA.

1  Q    So she didn't live there at any other prior

2       time?

3  A    Not that I know of.

4  BY MS. JACKSON:

5       I don't have anything further.

6  BY THE COURT:

7       Any followup, Mr. McKinney?

8  REDIRECT EXAMINATION BY MR. MCKINNEY:

9  Q    Mr. Mathieu, after you signed those documents

10      at the Department of Social Services, did you

11      ever get any visits from any social workers at

12      the Cherokee County Department of Social

13      Services?

14 A    No, sir.

15 Q    Did they contact you in any way?  Did any

16      employees for the Cherokee County Department

17      of Social Services contact you after that

18      Plaintiff's Exhibit No. 1 was signed?

19 A    No, sir.

20 Q    Has your daughter received any services

21      whatsoever from the Cherokee County Department

22      of Social Services since Plaintiff's Exhibit

23      No. 1 was signed?

24 A    No, sir.

25 BY MR. MCKINNEY:

1      That would be all my questions.
2 BY MS. JACKSON:
3      No followup.
4 BY THE COURT:
5      Thank you, Mr. Mathieu. You may step down.
6      Mr. McKinney, your next witness.
7 BY MR. McKINNEY:
8      We call Sheila Mathieu, Your Honor.
9 BY THE COURT:
10      Sheriff, if you will, go get Ms. Mathieu for
11      us. Thank you.
12      SHEILA ANN MATHIEU, being duly sworn to tell
13 the truth, the whole truth, and nothing but the
14 truth of her own knowledge concerning the within
15 matter, testified as follows:
16 DIRECT EXAMINATION BY MR. McKINNEY:
17 Q   Please state your full name.
18 A   Sheila Ann Mathieu.
19 Q   And where do you live?
20 A   On 14 Hiawassee Street here in Murphy.
21 Q   And you know Michael Mathieu?
22 A   I do. He's my son.
23 Q   And do you know Alana Roberts?
24 A   I do. She's my granddaughter.
25 Q   And, Ms. Mathieu, can you tell me what sort of

---

1 relationship that Michael has with Alana?
2 A   A father-daughter relationship, a very good
3    one. He's a good dad.
4 Q   Have you assisted Michael in caring for Alana?
5 A   I do. They live in my home.
6 Q   How long have they lived in your home?
7 A   She was there off and on when she was first
8    born. And then when he got her in November of
9    2016, she's been there since then.
10 Q   And can you tell me what care that Michael has
11    given to the child since she came to live with
12    you?
13 A   I mean, the responsibility of a father. He
14    works and provides for her, like her diapers
15    and her food and stuff like that she needs and
16    clothes.
17 Q   Does he help feed her?
18 A   Oh, yeah.
19 Q   Does he help bathe her?
20 A   Yes.
21 Q   Does he take her to the doctor on occasion
22    when she has doctor's appointments?
23 A   Yeah, on the days that he's off work, he will
24    take her.
25 Q   How has Michael been doing the past two years?

---

1 A   Good.
2 Q   Does he go to work on a regular basis at
3    Murphy Medical Center?
4 A   He does.
5 Q   Let's go back to November -- October and
6    November of 2016. What contact, Ms. Mathieu,
7    did you have with the Cherokee County
8    Department of Social Services with respect to
9    your granddaughter during that period of time?
10 A   I had contact with one of the social workers
11    that in the beginning wasn't very good.
12    Shalees was trying to let us have visitation
13    with Alana when she had custody with her, and
14    her mom, I guess -- I guess from my
15    understanding the mom had custody as far as
16    Social Services was concerned, but Shalees was
17    trying to place her with us, and there was a
18    conflict between her and her mom. I don't
19    know if the social worker was related to them
20    or what the deal was with them, but she didn't
21    want Shalees placing Alana with us. And we
22    did have Alana one time on visitation, and
23    Shalees said for us to keep her. But her mom
24    kept calling wanting Alana back, and then the
25    social worker called me and said that we had

---

1 to take Alana back. And I said, "But Shalees
2 is the mom, and she said that she could stay
3 here with us." I even called the magistrate,
4 and the magistrate said I didn't have to, but
5 the social worker said I did.
6 Q   The social worker -- and who was the social
7    worker?
8 A   I don't know how to say the name. Jeryl,
9    something like that.
10 Q   And what -- so the child came to live with
11    you?
12 A   Yes.
13 Q   And ---
14 A   So -- now, they -- the same social worker
15    called and said that Shalees had agreed to
16    sign over custody to my son and that the
17    paperwork was, you know, drawn up and
18    everything, that he needed to come and sign
19    the paperwork.
20 Q   And did she tell you who had drawn the
21    paperwork up?
22 A   I don't recall that she said exactly who drew
23    it up.
24 Q   Okay, but anyway it was -- it was an employee
25    of the Department of Social Services?

---

828-254-9230     ASHEVILLE REPORTING SERVICE     800-357-5007
ars@ashevillereporting.com

1  A    Yes.

2  Q    And did you go with your son to the Cherokee

3       County Department of Social Services to sign

4       the custody agreement?

5  A    I did.

6  Q    And can you tell me what happened when you got

7       there?

8  A    It was the same social worker that was there

9       to have him sign the papers and the notary,

10      and the social worker told me that she tried

11      to talk Shalees out of signing the papers.

12  Q   Did she tell you why she tried to talk her out

13      of signing the papers?

14  A   She didn't say why.  She just said she tried

15      to talk her out of it which irritated me, but

16      I was happy that it was being done.

17  Q   And what did she -- well, did the social

18      worker make any representations about what

19      that agreement meant to you?

20  A   She -- I mean, she had us read it before he

21      signed it.

22  Q   Did she -- did she say anything about the

23      agreement to you other than she told Shalees

24      not to sign it?

25  A   Huh-uh. (Negative)  She didn't say nothing --

1       she didn't say nothing else to us about it

2      that I recall.

3  Q    And once your son signed the agreement, what

4      was your understanding about the effect of the

5      agreement?

6  A    That he was -- she was placed in his custody

7      and that it -- from what the papers said, it

8      was up to him when -- when Shalees called and

9      wanted to come see Alana and -- and if he

10      suspected any kind of alcohol or drugs in her

11      system, he could tell her no.

12  Q   Okay, so he was more or less appointed the

13      gatekeeper?

14  A   Right.

15  Q   And after the agreement was signed, did

16      Shalees come visit with the child?

17  A   Yes.

18  Q   And how frequently did she visit the child

19      from the time the agreement was signed until

20      now?

21  A   In the beginning, she was -- she was there

22      usually about once a week.  That was in

23      November.  I know at Christmastime she asked

24      if she could take Alana with her, and my son

25      told her no.  He didn't want her in the car

1       with her, not until she was -- from our

2      understanding, she was still abusing drugs.

3      So he didn't want her alone with her or, you

4      know, in the car.  But he told her, "You're

5      welcome to stay here to visit with her," which

6      she did.

7  Q    And did you -- have you continued to allow her

8      to visit with the child at your home?

9  A   Yes.

10  Q   In a supervised setting?

11  A   Yes.

12  Q   Have there been any problems?

13  A   I even allowed Cody to come in one time.

14  Q   And who is Cody?

15  A   Cody was her husband -- is her husband.  He's

16      the one that's on the birth certificate.

17  Q   And have you ever made any attempt to keep her

18      from her child?

19  A   No.

20  Q   Do you want your granddaughter to be safe?

21  A   Yes.

22  Q   And does your granddaughter have any health

23      problems now?

24  A   Not nothing that she's been diagnosed with.

25      We were told in the beginning that because of

1       the withdrawals that she was born with that

2      she could have problems later, that she could

3      have anger issues.  I don't see anything right

4      now out of the context of almost a two-year-

5      old.  She, you know, can be that way, but ---

6  Q    Seems to be happy?

7  A   She's very happy.

8  Q   Is she well-adjusted?

9  A   Yes.

10  Q   Does she enjoy the environment she's in?

11  A   Oh, yeah.

12  Q   Does she enjoy seeing or being with her daddy?

13  A   Oh, she loves her daddy.

14  Q   Does she enjoy seeing her mama?

15  A   Yeah, I mean, I don't -- I don't know that she

16      knows that it's her mom.

17  Q   Do you -- do you work?

18  A   Yes.

19  Q   Does Alana go to daycare?

20  A   Yes.

21  Q   Where does she go to daycare?

22  A   Southwestern over by Save-A-Lot.

23  Q   And tell me what days of the week she goes to

24      daycare and what the hours are there.

25  A   The days can depend.  Usually, when Michael is

17 (Pages 62 to 65)

## Page 66

```
 1    at home, he keeps her at home.  So it's
 2    usually the days that he's at work she'll go
 3    to daycare.
 4  Q  So Michael provides full-time care for her
 5    when he's off work; is that correct?
 6  A  Yes.
 7  Q  What are your concerns, Ms. Mathieu, about
 8    allowing Shalees Greenlee to visit with the
 9    child in an unsupervised setting?
10  A  I don't like it.
11  Q  What are your concerns?
12  A  I'm just concerned about her welfare, about
13    her safety.
14  Q  Why?
15  A  Because Shalees doesn't have a very good
16    reputation with her other three kids not being
17    with her with her abusing drugs.  She's in and
18    out of jail.
19  Q  And you're concerned about that?
20  A  Yes.
21  BY MR. MCKINNEY:
22    That would be all my questions for this
23    witness, Your Honor.
24  BY THE COURT:
25    Cross-examination.
```

## Page 67

```
 1  BY MS. JACKSON:
 2    Yes, thank you, Your Honor.
 3  CROSS-EXAMINATION BY MS. JACKSON:
 4  Q  Good morning, Ms. Mathieu.
 5  A  Good morning.
 6  Q  You indicated that when you went to the
 7    department and that document was signed -- did
 8    you speak -- do you know who the social worker
 9    is that you spoke to?
10  A  Jeryl.
11  Q  Was it Jeryl?
12  A  Yeah.
13  Q  Okay, and was that a female social worker?
14  A  Yes.
15  Q  Was anybody else there?
16  A  Tho notary, and it seems like somebody else,
17    but I'm not sure.
18  Q  Were the documents signed and then brought out
19    of the room, or how was it done?  Can you
20    explain that?
21  A  What do you mean signed and brought back out
22    of the room?
23  Q  When you went there and your son signed the
24    documents, did they ever take the documents
25    out of the room and bring them back in, or did
```

## Page 68

```
 1    everybody just stay in the room?
 2  A  I think so.  I don't recall.
 3  Q  Okay, was there an attorney present or anybody
 4    else that you know has any legal experience?
 5  A  I don't know.  I said there was the social
 6    worker, the notary, and somebody else, I
 7    think, was in the room, but I'm not sure who
 8    it was.
 9  Q  Was it a male or female?
10  A  I don't remember.
11  Q  When you signed this, what did they indicate
12    to you you were signing?
13  A  I didn't sign ---
14  Q  Or when he signed it, I'm sorry.  When your
15    son signed it, did they indicate to him what
16    he was signing?
17  A  That it was custody papers.
18  Q  Had your son talked to an attorney about this?
19  A  No.
20  Q  Had you?
21  A  No.
22  Q  Did they give you -- or tell you or advise you
23    to talk to an attorney about this?
24  A  No.
25  Q  So after your son signed this, was it your
```

## Page 69

```
 1    understanding and, if you know, his
 2    understanding that this was a legal, binding
 3    document?
 4  A  Yes.
 5  Q  So when -- like for example, when Shalees
 6    wanted to take Alana for Christmas, you didn't
 7    -- your son didn't let her; is that correct?
 8  Q  Right.
 9  Q  Because he had custody with this document?
10  A  Right.
11  Q  That at the time he thought was binding and
12    legal?
13  A  Yes, ma'am.
14  Q  And you indicated that after it was signed
15    that Shalees did make efforts to come and try
16    to continue to see Alana?
17  A  In the beginning, she would come about once a
18    week.  Then I think some time after he had
19    told her know, she did quit for a little
20    while.
21  Q  After he had told her no?
22  A  Uh-huh.  (Affirmative)
23  Q  You indicated during your testimony that when
24    Alana was born that there were some issues
25    with withdrawals?
```

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@asheville reporting.com

1 A Uh-huh. (Affirmative)
2 Q What did the medical -- or what did they tell
3    you about that or ---
4 A It was -- she had went to a doctor's
5    appointment, and the doctor had told me that
6    there was medicine that she had to be on when
7    she was in the hospital because of
8    withdrawals.
9 Q Do you know when that was when the doctor told
10    you that?
11 A I mean, she was like two months old.
12 Q Okay, it was -- it was fairly early?
13 A Oh, yeah.
14 Q And they had told you that there could be some
15    issues as she got older?
16 A Yes.
17 Q Once these documents were signed -- or that
18    one document there was signed, did anybody
19    from DSS do any followup on the medical
20    condition of Alana?
21 A Not that I -- to us they didn't.
22 Q Did anybody ever contact you?
23 A No.
24 Q Did any workers ever contact your son? Do you
25    know?

1 A Not that I know of.
2 Q Did anybody ever come out to your house?
3 A No.
4 Q When this document was signed -- before it was
5    signed, did a social worker come out and do a
6    home study of your house?
7 A No.
8 Q Do you know if they came out and did a home
9    study or did any type of testing on your son,
10    drug testing, anything of that nature?
11 A Not that I know of.
12 Q Do you know if they did any investigation on
13    your son or on you?
14 A No.
15 Q Did anybody ever come into your house?
16 A No.
17 Q Did you ever talk to DSS about the withdrawal
18    symptoms or anything of that nature?
19 A No.
20 Q Did anybody ever tell you any information
21    about that?
22 A From DSS?
23 Q Uh-huh. (Affirmative)
24 A No.
25 BY MS. JACKSON:

1    If I could have one second, Your Honor.
2 BY THE COURT:
3    You may.
4 CROSS-EXAMINATION RESUMED BY MS. JACKSON:
5 Q So when you went to DSS with your son, you
6    were present when he signed the document?
7 A Yes.
8 BY MS. JACKSON:
9    Your Honor, if I may approach?
10 BY THE COURT:
11    You may.
12 CROSS-EXAMINATION RESUMED BY MS. JACKSON:
13 Q I'm going to point out to you Plaintiff's
14    Exhibit 1, I believe. Is that the document
15    that you remember your son signing? (Tenders)
16 A (Upon review) Yes.
17 Q And you indicated that you did not recall if
18    there was an attorney in the room?
19 A The person -- other person that was in there I
20    don't I -- I don't know if there was an
21    attorney or not.
22 Q And originally it sounds like you were keeping
23    Alana some when your son was working out of
24    town? He said he was working out of town and
25    that you would keep her for months at a

1    time -- well, not for months, but while he was
2    out of town. Does that sound right?
3 A He was out of town a whole lot when we first
4    got her. He quit and came back home to stay.
5    But yes, I did have her.
6 Q And during that time that you had her, did
7    anybody ever come out to your house?
8 A No.
9 Q Did anybody ever -- or did anybody from the
10    Department of Social Services ever make any
11    inquiry of you as to whether or not you did
12    any illegal substances?
13 A No.
14 BY MS. JACKSON:
15    Nothing further, Your Honor.
16 BY THE COURT:
17    Okay. Mr. McKinney?
18 BY MR. MCKINNEY:
19    I don't have any other questions, Your Honor.
20 BY THE COURT:
21    Thank you, Ms. Mathieu.
22 BY THE WITNESS:
23    Thank you.
24 BY THE COURT:
25    You may step down. Ms. Mathieu, you will have

1    to step back out from the room.
2  BY THE WITNESS:
3    Okay.
4  BY THE COURT:
5    And remember you're not to discuss your
6    testimony with anyone outside the room.  Thank
7    you.  Your next witness.
8  BY MR. MCKINNEY:
9    That would be our evidence for the purposes of
10   the temporary hearing, Your Honor.
11 BY THE COURT:
12   That's your evidence, okay.  All right.
13 BY MS. JACKSON:
14   We call Shalees Greenlee.
15   SHALEES GREENLEE, being duly sworn to tell the
16 truth, the whole truth, and nothing but the truth
17 of her own knowledge concerning the within matter,
18 testified as follows:
19 DIRECT EXAMINATION BY MS. JACKSON:
20 Q   Could you please state your full name for the
21     Court?
22 A   Shalees Marie Greenlee.
23 Q   And, Shalees, do you know the gentleman seated
24     over here, Mr. Mathieu?
25 A   Yes.

1  Q   And how do you know him?
2  A   He's my child's father.
3  Q   And when you say your child, are you referring
4      to -- is it Alana or Alana (different
5      pronunciation)?
6  A   It's Alana.
7  Q   Alan, okay, sorry.  And what is Alana's date
8      of birth?
9  A   July 5, 2016.
10 BY THE COURT:
11     I'm going to have to ask you to speak up just
12     a little bit, Ms. Greenlee.
13 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
14 Q   And when you first had Alana or -- yeah,
15     Alana, were there some issues with withdrawal
16     and things of that nature?
17 A   Yes.
18 Q   Tell me about that.
19 A   She did go through withdrawal after I had her.
20     When I was pregnant with her, Dr. Holder sent
21     me to Chattanooga.  And they put me on
22     medication, and they were weaning me off of
23     opiates.
24 Q   Did you have an opiate problem when you became
25     pregnant with her?

1  A   Yes, ma'am.
2  Q   So you had to go, it sounds like, to a special
3      doctor?
4  A   Yes.
5  Q   And did you do that?
6  A   Yes.
7  Q   And did you follow the medical advice?
8  A   Yes.
9  Q   And when Alana was born, was there a test on
10     her meconium?
11 A   Yes, ma'am.
12 Q   Was that positive or negative?
13 A   Negative.
14 Q   And although it was negative, did she still
15     exhibit signs of withdrawal?
16 A   Yes.
17 Q   How was that treated?
18 A   With neonatal morphine.
19 Q   Do you know how long she received neonatal --
20     or -- is it called neonatal morphine?
21 A   Yeah.
22 Q   Okay, do you know how long she received that?
23 A   I think it was two and a half weeks.
24 Q   And when they exhibit signs of withdrawal,
25     were you there in the hospital with her?

1  A   Yes.
2  Q   Okay, tell me about that.
3  A   I was released before she was, but they gave
4      me -- they asked me if I wanted to stay, and
5      they gave me a room so I could stay with her -
6      - stay with her the whole time.
7  Q   So you were there at the hospital with her the
8      entire time?
9  A   Yes.
10 Q   And what were her withdrawal symptoms?
11 A   She sometimes would eat and then she would
12     puke and that was it.
13 Q   And how did you deal with that?
14 A   The hospital did.
15 Q   But you were there providing care?
16 A   Yes.
17 Q   Did the Department of Social Services become
18     involved in your case from that point?
19 A   Not at the very beginning.
20 Q   Okay, tell me when they first became involved.
21 A   It was four days before we were released.
22 Q   When you say we, do you mean Alana?
23 A   Yes.
24 Q   So what was the initial contact?
25 A   I'm sorry?

| | | |
|---|---|---|
| 1 | Q | What was the initial contact that you had with |
| 2 | | the department? |
| 3 | A | They just showed up and knocked on the door |
| 4 | | and said that they were there to open a case. |
| 5 | Q | Okay, and when you say they, who showed up? |
| 6 | A | Katie and Diana. |
| 7 | Q | Would that be Katie Brown and Diana Garrett? |
| 8 | A | Yes. |
| 9 | Q | Okay, and at that time, what were you told? |
| 10 | A | They didn't really tell me much of anything, |
| 11 | | just that she showed some signs of withdrawal |
| 12 | | so they came. That's about it. |
| 13 | Q | And at that time, do you know if -- from your |
| 14 | | own knowledge, do you know if the department |
| 15 | | opened a case? Did you start having to do |
| 16 | | things? |
| 17 | A | They opened a case, and I didn't hear from |
| 18 | | them until the day me and Alana left the |
| 19 | | hospital. |
| 20 | Q | Were you allowed to leave the hospital with |
| 21 | | Alana? |
| 22 | A | Yes, ma'am. |
| 23 | Q | And where did you go? |
| 24 | A | I went to my mom's. |
| 25 | Q | And who is your mother? |

| | | |
|---|---|---|
| 1 | A | Melissa (inaudible). |
| 2 | Q | And I know you've heard some testimony about |
| 3 | | David Cody Roberts. Is his name on the birth |
| 4 | | certificate? |
| 5 | A | Yes, ma'am. |
| 6 | Q | And were you married to him at the time? |
| 7 | A | Yes, ma'am. |
| 8 | Q | And have you since done DNA testing? |
| 9 | A | Yes, ma'am. |
| 10 | Q | And have -- what are the results of that? |
| 11 | A | That Michael is the father. |
| 12 | Q | After you left the hospital, when was the |
| 13 | | first contact that Mr. Mathieu had with the |
| 14 | | child? |
| 15 | A | It was after we did the DNA test. I tried to |
| 16 | | get a hold of him and call him, and he would |
| 17 | | never reply. So I ended up having to message |
| 18 | | his mom. And he told me he wanted DNA |
| 19 | | testing, and I tried to get in touch with him |
| 20 | | over and over again to get him to do the DNA |
| 21 | | testing. I ended up going to buy the DNA test |
| 22 | | myself and brought it to his house so he could |
| 23 | | do it. And then after he did that, he started |
| 24 | | to, you  know --- |
| 25 | Q | Do you know how soon that was after Alana was |

| | | |
|---|---|---|
| 1 | | born? |
| 2 | A | It was about -- I want to say two and a half |
| 3 | | months after she was born. |
| 4 | Q | And I may have forgotten to ask you, what is |
| 5 | | Alana's date of birth? |
| 6 | A | July 5, 2016. |
| 7 | Q | So you said about two and a half months after |
| 8 | | the DNA test was completed? |
| 9 | A | Uh-huh. (Affirmative) |
| 10 | Q | And what was the contact with Mr. Mathieu at |
| 11 | | that point between Mr. Mathieu and Alana? |
| 12 | A | Before or after the DNA? |
| 13 | Q | After the DNA test. |
| 14 | A | I think he seen her like twice after the DNA |
| 15 | | test. He worked out of town a lot. |
| 16 | Q | And during that first two and a half months |
| 17 | | that you left the hospital, was there any -- |
| 18 | | what was going on with the Department of |
| 19 | | Social Services? |
| 20 | A | I had to do a drug test every week. |
| 21 | Q | How many drug tests -- well, let me ask: How |
| 22 | | many drug test you know -- if -- if you know, |
| 23 | | how many did you take? |
| 24 | A | Maybe five or six. |
| 25 | Q | And out of those five or six, do you know how |

| | | |
|---|---|---|
| 1 | | many you failed? |
| 2 | A | One. |
| 3 | Q | And was that the first drug test? When was |
| 4 | | that failed? |
| 5 | A | It was the day I left the hospital with Alana. |
| 6 | Q | So all the subsequent drug tests, they were |
| 7 | | negative? |
| 8 | A | Yes, ma'am. |
| 9 | Q | What was the department's involvement with you |
| 10 | | specifically after you left the hospital? How |
| 11 | | often did you see them? |
| 12 | A | Maybe once a month. |
| 13 | Q | And what would that contact be, and where |
| 14 | | would that be? |
| 15 | A | I think I went into the office most of the |
| 16 | | time. I think I --.they came to my mom's |
| 17 | | house like twice. |
| 18 | Q | And at that time were you living with your |
| 19 | | mother? |
| 20 | A | Yes. |
| 21 | Q | And did you have a case worker? |
| 22 | A | Katie was the case worker in the beginning. |
| 23 | Q | You say in the beginning. How long was she |
| 24 | | the case worker? |
| 25 | A | She was the case worker -- I want to say like |

21 (Pages 78 to 81)

1     the first three months.

2  Q  And at some point that changed?

3  A  Uh-huh.  (Affirmative)

4  Q  And who became your case worker?

5  A  Jeryl.

6  Q  What else did the department have you do

7     during that period of time after Alana was

8     born?  You said you had to take some drug

9     tests?

10  A  Uh-huh.  (Affirmative)

11  Q  Was there anything else that you had to do?

12  A  Not really.

13  Q  At some point, did the department call you in

14     and talk to you about signing some papers?

15  A  Yes.

16  Q  Do you know when that was?

17  A  I can't remember the exact date.

18  BY MS. JACKSON:

19     Your Honor, if I may approach?

20  BY THE COURT:

21     You may.

22  DIRECT EXAMINATION RESUMED BY MS. JACKSON:

23  Q  I'm going to hand you what's been marked as

24     Plaintiff's Exhibit 1.  Do you recall -- well,

25     does that document look familiar to you?

1     (Tenders)

2  A  (Upon review)  Yes.

3  Q  Was there a time before you signed this

4     document that you were asked to sign it?

5  A  Yes.

6  Q  When was that?

7  A  I had went and made an appointment with Katie

8     to speak with her, and I went in to talk to

9     her about the case and why it wasn't

10     progressing and everything.  And she pulled

11     out the paper and told me that I could sign

12     that paper and give custody to whomever I

13     wanted and that would end the -- or it

14     wouldn't end the case.  She said that it would

15     just give like them medical -- to be able to

16     take her to doctor's appointments and -- taxes

17     and such.

18  Q  And that document that she asked you to sign

19     on that occasion, is it the same document that

20     I've showed you here, Plaintiff's Exhibit 1?

21  A  Yes.

22  Q  And at that time, did you agree to sign it?

23  A  No.

24  Q  Why?

25  A  Because I didn't want to.  I didn't want

1     anyone to have my child.  I wanted to have my

2     child.

3  Q  So you were wanting to work a case plan; you

4     were wanting to get custody?

5  A  Yes.

6  Q  Were you making efforts in your case plan?

7  A  Yes.

8  Q  Were you working?

9  A  I don't think I was working at the time.

10  Q  Were you making efforts to?

11  A  Yes.

12  Q  I'm kind of jumping around, but are you

13     currently working?

14  A  I am.

15  Q  And where are you working?

16  A  Burger King.

17  Q  How long have you been working at Burger King.

18  A  A month and a half, I think.

19  Q  I'm going back.  So Katie asks you to sign

20     this, and you tell her no?

21  A  Yes.

22  Q  Do you know around when that was?

23  A  I want to say August maybe -- like the end of

24     August, the end of September.

25  Q  So about two months after Alana was born?

1  A  Yes.

2  Q  What happened when you refused to sign it?

3  A  She started asking me if -- she told me that

4     she would start letting me take Alana and

5     stuff, but I left the -- I left her there and

6     nothing ever happened.

7  Q  At that time, you said that she would starting

8     you take Alana.  What does that mean?

9  A  She was placed with my mom when I went to

10     jail.

11  Q  Okay, when did you go to jail?

12  A  I think it was in September,

13  Q  So when you went to jail, did you give your

14     mother kinship placement?

15  A  Katie came to the jail and wrote out the

16     paper, and she said it was kinship.

17  Q  And when you got out of jail, were you able to

18     revoke that paperwork?

19  A  She told me I could, but they didn't let me.

20  Q  So from September, it sounds like, in 2016,

21     Alana was placed with your mother?

22  A  Uh-huh.  (Affirmative)

23  Q  When did that change?

24  A  October.

25  Q  And how did that change?

1 A   I had contacted Michael because there was some
2     issues about him getting to see her and stuff
3     with my mom.
4 Q   Was your mother letting him see her?
5 A   She was, yes.
6 Q   Well, what were the issues?
7 A   He wanted more visitation than what he was
8     getting.
9 Q   Okay, so you contacted Michael, and then what?
10 A  I told him in order -- I told him that we
11    could do some kind of custody agreement to
12    where he would have some kind of rights to her
13    so no one else could say anything about him
14    getting to see her.
15 Q  And did you hear Michael testify about --
16    something about a Quick Lube?
17 A  Yeah.
18 Q  Explain that.
19 A  It's the Express Lube.  There's a notary there
20    that's ---
21 Q  So you did some type of agreement there at the
22    Express Lube?
23 A  Uh-huh.  (Affirmative)
24 Q  Okay, what happened after that?
25 A  She went to stay with them -- or Michael and

1     Sheila.  I think he was going out of town
2     still at that time, but I was going to -- I
3     actually went and got her two weekends.  So I
4     was getting her on the weekends.
5 Q   And when did that change?
6 A   When he quit his job.
7 Q   And then he came home?
8 A   Uh-huh.  (Affirmative)
9 Q   And what changed?
10 A  I'm not sure.  He just -- supposed -- from
11    what I understand, his ex-girlfriend was in
12    the picture, so I wasn't supposed to be.
13 Q  So at that time, you weren't able to see her
14    as much?
15 A  Uh-huh.  (Affirmative)
16 Q  Now, I've shown you what's been marked as
17    Plaintiff's Exhibit 1.
18 A  Uh-huh.  (Affirmative)
19 Q  Do you recall under what circumstances that
20    you signed that?
21 A  Yes, I do.
22 Q  Tell me about that.
23 A  I had talked to Michael, and I told him -- so
24    he could have -- see her like as much I could
25    -- I told him that I'm going to sign -- we'll

1     give you custody if you promise me that we can
2     split -- that you won't keep her from me.
3 Q   Okay, and did somebody come to your house?
4 A   Yes.
5 Q   Who?
6 A   David and Jeryl and a notary.
7 Q   When you say David ---
8 BY THE COURT:
9     I'm sorry, you said David and Jeryl and who?
10 BY THE WITNESS:
11    The notary.
12 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
13 Q  When you say David, David who?
14 A  Hughes.
15 Q  And what time of day was that?
16 A  It was like -- maybe like 4:00.
17 Q  And he came to your house?
18 A  Well, he came -- we was at Cody's house that
19    day.
20 Q  And what happened?
21 A  He just walked in, handed me the paperwork,
22    and we signed it.
23 Q  Did you read it?
24 A  I did read it.
25 Q  Did you understand it?

1 A   I did understand it.  I asked David if me
2     signing this paperwork -- if it was going to -
3     - if anything was going to change if he was
4     going to continue to let me do visitation and
5     all this stuff, and he said that it would be
6     discussed with me and Michael.
7 Q   What else did he tell you when you signed
8     this?
9 A   That my case -- there would no longer be case.
10    The case would be closed.
11 Q  Did he tell you anything else?  Did he tell
12    you that you would -- that you wouldn't have
13    to take any more drug screens?
14 A  Yes.
15 Q  And that you wouldn't have to go to court?
16 A  Yes.
17 Q  Was it your understanding that you would still
18    get to see Alana?
19 A  Yes.
20 Q  Have you ever been -- let me ask:  What is
21    your highest level of education?
22 A  I graduated high school and I took some
23    college classes.
24 Q  Did you have an attorney when you signed that?
25 A  No.

## Page 90

1  Q   Did anybody inform you or advise you that you
2      should talk to an attorney before you signed
3      that?
4  A   No.
5  Q   Was it your understanding or were you told
6      that that was a legally binding document?
7  A   Yes.
8  Q   And was it your understanding after you signed
9      that that it was binding?
10 A   Yes.
11 Q   And after that, did you actually make efforts
12     to see Alana?
13 A   I did.
14 Q   And because of that document, you were not
15     able to see her?
16 A   Yes.
17 Q   Did anybody tell you from the department -- or
18     Mr. Hughes rather tell you anything about how
19     you could terminate that agreement, if you
20     could?
21 A   Yes, I actually called him because I tried to
22     visit -- continue visitation with my child
23     because before we signed the document I was
24     getting her on the weekends.  So that's what I
25     expected.  And when he denied me that, I

## Page 91

1      called David, and I said, "You know, he's not
2      doing what we agreed to."  And he said that I
3      would have to go to court to do something
4      about the document.
5  Q   During this entire time, from the time Alana
6      was born, did you ever enter a courtroom?
7  A   No.
8  Q   Was court ever involved?
9  A   No.
10 Q   Was anything filed where you had to come to
11     court?
12 A   No.
13 Q   Did you ever see a judge?
14 A   No.
15 Q   To your knowledge, was anything ever filed
16     with a clerk?
17 A   No.
18 Q   How many times would you say that you made
19     efforts to see Alana and were not able to
20     because of that document?
21 A   A lot.
22 Q   At some point, did you give up?
23 A   I did.
24 Q   Why?
25 A   Well, I had continuously tried, and there

## Page 92

1      would always be some excuse -- sometimes there
2      would be an excuse or a reason I couldn't.
3      And the last time -- one of the times I tried
4      to talk to him, he told me that he did not
5      want me confusing her that he -- I could not
6      longer visit and he blocked me.
7  Q   When you say he blocked you, what does that
8      mean?
9  A   From messaging him.
10 Q   So you weren't even able to contact him?
11 A   No.
12 Q   Did you love your daughter?
13 A   I do.
14 Q   Do you want to continue to be able to see your
15     daughter?
16 A   I do.
17 Q   At some point, do you want joint custody of
18     your daughter?
19 A   I do.
20 Q   If you had to take a drug screen today, would
21     it be clean?
22 A   It would.
23 Q   And you said that you're working.  How long
24     have you been working?
25 A   Almost two months -- a month and a half.

## Page 93

1  BY MS. JACKSON:
2      Your Honor, if I may approach?
3  BY THE COURT:
4      You may.
5  (DEFENDANT'S EXHIBIT NO. 1 MARKED)
6  DIRECT EXAMINATION RESUMED BY MS. JACKSON:
7  Q   I'm going to hand you what's been marked as
8      Defendant's Exhibit 1 for identification
9      purposes.  Do you recognize that document?
10     (Tenders)
11 A   (Upon review)  Yes.
12 Q   And what do you recognize that to be?
13 A   My check stub.
14 Q   And is that a check stub from the job that you
15     just testified about at Burger King?
16 A   Yes, ma'am.
17 BY MS. JACKSON:
18     Your Honor, I would move to introduce
19     Defendant's 1.
20 BY THE COURT:
21     Any objection?
22 BY MR. MCKINNEY:
23     No objection, Your Honor.
24 BY THE COURT:
25     So admitted.

## Page 94

1  (DEFENDANT'S EXHIBIT NO. 1 ADMITTED)
2  DIRECT EXAMINATION RESUMED BY MS. JACKSON:
3  Q   And you said you had been working there for a
4      little bit over a month?
5  A   Uh-huh.  (Affirmative)
6  Q   That you could pass a drug screen?
7  A   Yes.
8  Q   Right now, do you have housing?
9  A   I live with my grandma.
10 Q   Okay, and tell me about that situation?
11 A   It's just me and her.
12 Q   What's your grandmother's name?
13 A   Pam Patterson.
14 Q   And hold old is Mrs. Patterson?
15 A   Like late fifties.
16 Q   And what type of home does she live in?
17 A   She lives in -- what do you mean?
18 Q   Well, like is a trailer, a house, how many
19     bedrooms?
20 A   It's a house.  It's a two-bedroom.
21 Q   Where is it located?
22 A   It's on -- out towards Ranger.
23 Q   Is it clean and appropriate?
24 A   Yes.
25 Q   Does your grandmother -- and I'm not trying to

## Page 95

1      be rude, but does your grandmother have -- is
2      she on probation?
3  A   No.
4  Q   Does she have a history of drug use?
5  A   No.
6  Q   Domestic violence?
7  A   No.
8  Q   Anything of that nature?
9  A   No.
10 Q   Are you currently with David Cody Roberts?
11 A   No.
12 Q   So you're living there with your grandmother?
13 A   Yes.
14 Q   Does anybody else live there?
15 A   No.
16 Q   Are you licensed at this time?
17 A   I'm not licensed, but I just got my tickets
18     taken care of.  And I did go to DMV, and they
19     said it's going to be $120 to get it.
20 Q   So you got all of your tickets taken care of?
21 A   Yes.
22 Q   Two weeks ago?
23 A   Yes.
24 Q   And were those seatbelt tickets that you had
25     not paid?

## Page 96

1  A   Yes.
2  Q   And so you are eligible for reinstatement?
3  A   Yes, ma'am.
4  Q   And do you know when that's going to happen?
5  A   My next paycheck.
6  Q   Right now, how do you get around?
7  A   I have a car.
8  Q   Who drives you though?
9  A   My grandma.
10 Q   To the best of your knowledge, after this
11     document was signed, did DSS make any efforts
12     to follow up with or have any contact with
13     Alana?
14 A   Not that I know of.
15 Q   After this was signed, did they make any
16     contact with you?
17 A   No.
18 Q   After this was signed, did they make any
19     efforts to provide any services to you?
20 A   No.
21 Q   Earlier you indicated that after this was
22     signed, at some point you were blocked by
23     Michael.  Do you remember when that was?
24 A   I think it was after Christmas.  I think it
25     was after Christmas of 2016.

## Page 97

1  Q   How many visits have -- or how many times have
2      you seen Alana in the last six months?
3  A   I was going to see her -- I got to see for two
4      months every weekend -- every Friday.
5  Q   Did you ever get to have any overnights with
6      her after this was signed?
7  A   No.
8  Q   Did you ever get to take her home for holidays
9      after this was signed?
10 A   No.
11 Q   Did you ever get to bring her to any of your
12     family outings or gatherings or vacations
13     after this was signed?
14 A   No.
15 Q   When you see Alana, does she recognize you?
16 A   Uh-huh.  (Affirmative)
17 Q   What does she call you?
18 A   She doesn't call me anything.
19 Q   What are you asking the Court to do today as
20     far as you getting to see Alana?
21 A   I just want to start with something, a couple
22     of days.  Even if it's supervised, that's fine
23     with me.
24 Q   So you just want to be able to see her?
25 A   Yes.

## Page 98

1   Q    And hopefully progress into seeing her more
2        and more?
3   A    Yes.
4   Q    How did you feel after you weren't able to see
5        her and after you had been blocked? How did
6        that make you feel, not getting to see her?
7   A    It hurt my feelings. I was really upset about
8        it actually.
9   Q    Now, you indicated that you called the
10       department at least on one occasion about this
11       agreement that you had signed, and you were
12       told you have to go to court?
13   A    Yes.
14   Q    At that time, did you have the money to hire
15       an attorney?
16   A    I did not.
17   Q    Did you have the money to go to court?
18   A    I did not.
19   Q    Does anybody in your family have the money to
20       do that?
21   A    No.
22   BY MS. JACKSON:
23       I don't have anything else, Your Honor.
24   BY THE COURT:
25       Mr. McKinney.

## Page 99

1   CROSS-EXAMINATION BY MR. MCKINNEY:
2   Q    Ms. Greenlee, you signed Plaintiff's Exhibit
3       No. 1 of your own free will; didn't you?
4   A    Yeah.
5   Q    And you signed Plaintiff's Exhibit No. 2 of
6       your own free will; didn't you?
7   A    Yes, sir.
8   Q    And you knew that you were turning over
9       custody of the child to Michael Mathieu;
10       didn't you?
11   A    I wouldn't say that. I mean, I was turning
12       over custody. I knew that we made an
13       agreement to -- that she would reside with him
14       and we split weeks.
15   Q    Can you read?
16   A    I can.
17   Q    Did you read Plaintiff's Exhibit No. 1 before
18       you signed it?
19   A    I did.
20   Q    Do you know that it says that he's got custody
21       of the child until the child is 18?
22   A    Yes.
23   Q    But you're saying you have this oral agreement
24       with him that you thought superceded the
25       written agreement; is that right?

## Page 100

1   A    Well, I spoke to David when he produced the
2       paperwork to me. He told me that the
3       visitation could be -- the visitation or
4       whatever we decided was to be discussed
5       between us.
6   Q    He said you and Michael would have to work out
7       the terms of the visitation?
8   A    Uh-huh. (Affirmative)
9   Q    And did he tell you what would happen in the
10       event you all couldn't work out the terms of
11       the visitation?
12   A    That we would have to go to court.
13   Q    Okay, that's where we are now. The temporary
14       guardianship agreement, Plaintiff's Exhibit
15       No. 2, how did you come into possession of
16       that document?
17   A    I think that I printed it off actually.
18   Q    From where?
19   A    From home.
20   Q    Okay, how did you know to do that?
21   A    Well, I spoke with Michael's mom. We
22       discussed at first that we were going to do
23       some kind of custody agreement with -- for
24       Michael between us. And Michael told me that
25       -- to find a paper and that he would sign it,

## Page 101

1       and so I found it online.
2   Q    And so you met, you went to the Express Lube
3       for whatever -- where there was a notary, and
4       you got that notarized?
5   A    Yes, sir.
6   Q    The child has been primarily with Michael
7       since about three months after it was born; is
8       that correct?
9   A    I wouldn't say three months. Since about --
10       she was almost four months old.
11   Q    Okay, since that time, she has been in
12       Michael's custody and he has been the primary
13       caregiver; is that correct?
14   A    His mom takes care of her really.
15   Q    Well, Michael takes care of her too; doesn't
16       he?
17   A    (Shrugged shoulders)
18   Q    How frequently have you visited with the child
19       since Michael became the primary caregiver?
20   A    As much as I could.
21   Q    Well, was it once a week, once a month?
22   A    I was told once a week, every Friday depending
23       on if his days off changed.
24   Q    Were there times when you indicated to Michael
25       that you wanted to visit, but for whatever

1    reason you couldn't exercise the visit?
2  A  Yes.
3  Q  And, Ms. Greenlee, you indicated earlier that
4     during your pregnancy you -- you told Dr.
5     Holder -- and I may be wrong about what I'm
6     saying, but, if I am, you'll correct me. You
7     told Dr. Holder that you were using narcotics;
8     is that right?
9  A  In the beginning of my pregnancy, I did.
10 Q  Okay, did you tell him that, or did he do a
11    blood test and determine that?
12 A  I told him that.
13 Q  Okay, and did you tell him what you were
14    using?
15 A  Opiates.
16 Q  Okay, what kind of opiates?
17 A  Roxy, it just depends on what it was. It
18    really didn't matter, I guess.
19 Q  Okay, well, was it -- was it oxycodone?
20 A  Sometimes.
21 Q  Okay, did you have a prescription for that?
22 A  Huh-uh. (Negative)
23 Q  Did you use hydrocodone?
24 A  No.
25 Q  Have you ever used any hydrocodone?

1  A  Huh-uh. (Negative)
2  Q  You're absolutely certain about it?
3  A  Before my pregnancy?
4  Q  Yes.
5  A  Yeah, I'm pretty certain.
6  Q  Okay, during your pregnancy, did you use any
7     hydrocodone?
8  A  Yes, I was prescribed it.
9  Q  Okay, and who prescribed it for you?
10 A  Chattanooga, the -- the high risk hospital in
11    Chattanooga.
12 Q  Okay, and did they prescribe that for you to
13    wean you off the oxycodone?
14 A  Yes.
15 Q  And what dosage did they tell you take of
16    that?
17 A  I think it was five milligrams -- or it was
18    three a day, five milligrams.
19 Q  Okay, and that helped you with ---
20 BY THE COURT:
21    Did you say three a day, five milligrams?
22 BY THE WITNESS:
23    Yes.
24 CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:
25 Q  And that helped you with withdrawals?

1  A  Yes.
2  Q  And, Ms. Greenlee, did you continue to take
3     that down to the time the child was born?
4  A  I did not.
5  Q  When did you stop taking the hydrocodone?
6  A  When my car had broke down and I couldn't make
7     it to my doctor's appointment.
8  Q  And how -- how far before the child was born
9     was that?
10 A  Maybe five months.
11 Q  So you hadn't taken any hydrocodone in five
12    months before the child was born; is that
13    right?
14 A  Uh-huh. (Affirmative)
15 Q  And you say you don't have any problem with
16    your visitation being supervised at this
17    point?
18 A  No.
19 Q  Ms. Greenlee, would you be willing to make
20    your visitation with the child contingent on
21    passing a five panel hair and urine drug
22    screen ---
23 A  Yes.
24 Q  --- to be administered by a laboratory on the
25    federal registry?

1  A  Sure.
2  Q  You would do that?
3  A  Yeah.
4  Q  Okay, and where are you living right now?
5  A  With my grandma.
6  Q  And how long have you been living there?
7  A  Since I -- for about almost a month I would
8     say, since I started working.
9  Q  Who else lives there?
10 A  Just me and my grandma.
11 Q  Okay, Ms. Greenlee, prior to this pregnancy,
12    have you had any previous involvement with the
13    Cherokee County Department of Social Services?
14 A  Yes.
15 Q  Okay, and how long ago was that?
16 A  2014.
17 Q  And what was the occasion for you to be
18    involved with the Department of Social
19    Services at that point in time?
20 A  For a drug test, I guess. Allegations of drug
21    use.
22 Q  And did -- did you take drug tests at that
23    time?
24 A  I did.
25 Q  And did you fail?

1  A  I did.
2  Q  And where were those drug tests administered?
3  A  The Health Department.
4  Q  Here in Cherokee County?
5  A  Yes.
6  Q  Okay, did you have other children at that
7     time?
8  A  I did.
9  Q  And were they removed from your care?
10 A  Yes.
11 Q  And how old are they?
12 A  Two, one, and five months, I think.
13 Q  Did you ever have any discussions with any
14    attorney with -- from the Cherokee County
15    Department of Social Services about this
16    matter?
17 A  Can you repeat that, I'm sorry?
18 Q  Okay, did you ever talk with the Cherokee
19    County Department of Social Services' attorney
20    about that custody agreement you signed?
21 A  I don't think so.
22 Q  Do you know who prepared that Plaintiff's
23    Exhibit No. 1, the custody agreement?
24 A  To my knowledge, it was David Hughes.
25 Q  Okay, and how do you -- why do you think it

1     was David Hughes?
2  A  Because that's what he told me.
3  Q  He told you that he prepared it?
4  A  He -- when we -- when he told me about the
5     paperwork, he told me that he was going to fix
6     -- get the paperwork together and he would,
7     you know ---
8  Q  Okay, how -- how much time elapsed between the
9     time he told you that and the time you signed
10    the agreement?
11 A  Maybe a week.
12 Q  From the time that you were contacted about
13    your pregnancy by the Cherokee County
14    Department of Social Services until the child
15    was born, were you offered any services by the
16    Cherokee County Department of Social Services?
17 A  I don't think so.
18 Q  After the child was born, were you offered any
19    services by the Cherokee County Department of
20    Social Services?
21 A  No.
22 Q  Did anyone discuss the need with you for drug
23    rehab?
24 A  No.
25 Q  Did you take any drug screens for the Cherokee

1     Department of Social Services after the child
2     was born?
3  A  I did.
4  Q  And what were the results of those drug
5     screens?
6  A  My first one the day I got out of the hospital
7     was dirty, but the rest them were clean.
8  Q  And what did you test positive for?
9  A  I can not remember what it was.
10 Q  Was it hydrocodone?
11 A  It might have been.
12 Q  Your daughter is being well taken care of;
13    isn't she?
14 A  I wouldn't know.
15 Q  Well, when you would exercise your visits at
16    Michael's where he was living with his mother,
17    was the child being taken well -- taken good
18    care of?
19 A  I mean, I guess. They weren't really around
20    when I was in there. They would just sit on
21    the couch there. I don't know.
22 Q  Well, did your daughter seem to be happy
23    there?
24 A  Yeah.
25 Q  She was safe?

1  A  As far as I seen.
2  Q  Well-fed?
3  A  As far as I seen.
4  Q  Taken to the doctor when she was sick?
5  A  I do not know.
6  BY MR. MCKINNEY:
7     That would be all my questions, Your Honor.
8  BY THE COURT:
9     Followup?
10 REDIRECT EXAMINATION BY MS. JACKSON:
11 Q  Ms. Greenlee, would you have signed that
12    agreement, Plaintiff's -- or Plaintiff's
13    Exhibit 1, if you knew that you were not going
14    to be able to get visitation with Alana?
15 A  No.
16 Q  Did you go to law school?
17 A  No.
18 Q  Do you understand -- do you understand legal
19    terminology?
20 A  No.
21 Q  Did anybody tell you to talk to an attorney
22    before you signed that?
23 A  No.
24 Q  At any time, did you talk to anybody at the
25    department about the fact that they may file a

## Page 110

1       petition to go to court?
2   A   No.
3   Q   So nobody ever talked to you about that?
4   A   I don't think so.
5   Q   When you signed that agreement, Plaintiff's
6       Exhibit 1, were you told by Mr. Hughes that
7       this would keep you out of court?
8   A   Yes.
9   BY MS. JACKSON:
10      I don't have anything else, Your Honor.
11  BY THE COURT:
12      Any followup?
13  BY MR. MCKINNEY:
14      I don't have any further questions, Your
15      Honor.
16  BY THE COURT:
17      Ms. Greenlee, you may step down.  If I may see
18      counsel at the bench just for a second.
19  (BENCH CONFERENCE)
20  BY THE COURT:
21      So, ladies and gentlemen, we'll be at ease for
22      just a few minutes.
23  (OFF THE RECORD)
24  BY THE COURT:
25      Are you ready to call your next witness?

## Page 111

1   BY MS. JACKSON:
2       I am.  Your Honor, I'm going to briefly recall
3       Ms. Shaless Greenlee.
4   BY THE COURT:
5       All right.
6   BY MS. JACKSON:
7       Just for one followup.
8   BY THE COURT:
9       Mr. McKinney, do you wish for she -- for her
10      to be re-sworn?
11  BY MR. MCKINNEY:
12      No, Your Honor.
13  BY THE COURT:
14      Ms. Greenlee, come on around for me.  I will
15      advise you that you remain under oath.
16  REDIRECT EXAMINATION RESUMED BY MS. JACKSON:
17  Q   Ms. Greenlee, I just had one followup question
18      for you.  To your knowledge, did DSS or the
19      Department of Social Services here in Cherokee
20      County ever make any efforts to reunify you
21      with your daughter?
22  A   No, ma'am.
23  BY MS. JACKSON:
24      I don't have anything else, Your Honor.
25  BY MR. MCKINNEY:

## Page 112

1       I don't have any further questions.
2   BY THE COURT:
3       Ms. Greenlee, you may step down.
4   BY MS. JACKSON:
5       Your Honor, the next witness would be David
6       Hughes.
7   BY THE COURT:
8       All right, Sheriff, if you will, bring Mr.
9       Hughes in for us, please.  Mr. Mathieu, you
10      can come back around if you want to sit at the
11      table with Mr. McKinney.
12  (OFF THE RECORD)
13  BY THE COURT:
14      Come on around, Mr. Hughes.
15      DAVID HUGHES, being duly sworn to tell the
16  truth, the whole truth, and nothing but the truth
17  of his own knowledge concerning the within matter,
18  testified as follows:
19  DIRECT EXAMINATION BY MS. JACKSON:
20  Q   Good afternoon, Mr. Hughes.  Would you please
21      state your full name for the Court?
22  A   David Allen Hughes.
23  Q   And, Mr. Hughes, how are you currently
24      employed?
25  A   Cherokee County Department of Social Services.

## Page 113

1   Q   And how long have you been employed with the
2       department?
3   A   Going on seven years.
4   Q   And what -- in what capacity are you employed
5       there currently?
6   A   I'm the Child Protective Service Unit
7       supervisor.
8   Q   How long have you been the supervisor?
9   A   This year will be two years.
10  Q   Do you recall when you became the supervisor?
11  A   Yes.
12  Q   When was that?
13  A   It was in September of '16.
14  Q   And you said you've been employed there total
15      for seven years?
16  A   Going on seven years.
17  Q   Going on seven years, okay.  So for the five
18      years prior to September 2016, in what -- what
19      was your status there?
20  A   I was a social worker.
21  Q   A social worker.  What is your educational
22      background?
23  A   I have a bachelor's degree in business
24      administration.
25  Q   And is that a four-year degree?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com

1 A   Yes.

2 Q   As part of your work at the department, do you

3     regularly go to any type of training or in-

4     services?

5 A   Yes.

6 Q   Can you tell me about that?

7 A   Well, we have certain courses that the state

8     requires that we have.  I think it's maybe 24

9     hours minimal continuing education each year.

10    At the office, I have a list of all the

11    courses and classes that I've attended, but I

12    don't have them with me.

13 Q   Okay, have you kept that current?

14 A   Yes.

15 Q   Okay, and have you always kept that current in

16    your seven years of employment?

17 A   Yes.

18 Q   And are those trainings -- do you go to those?

19    Are they at the department?

20 A   Usually we go to them, but -- occasionally, if

21    it's some type of short training, it might be

22    at the department, but -- but they're usually

23    held in Asheville or Charlotte.

24 Q   Are you familiar with the case involving

25    Shalees Greenlee and her daughter Alana?

1 A   Yes.

2 Q   Do you recall when you first began working on

3     that specific case?

4 A   Well, I was -- I was not directly involved

5     with the case initially -- at initiation

6     because there was another social worker that

7     worked that case.

8 Q   And do you know who that was?

9 A   That was Social Worker Katie Johnson.

10 Q   Do you recall what, if any, involvement that

11    you had in the case?

12 A   On that particular report?

13 Q   Correct.

14 A   Some.  I mean, not everything.

15 Q   Can you tell me what you recall?

16 A   I remember that there were -- a child was born

17    and we had received a report, and I think

18    there were ongoing substance abuse issues.

19 Q   And do you recall if you worked any with Ms.

20    Greenlee, or would that have been somebody

21    else?

22 A   Well, during -- during that particular report

23    -- report, it would have been Social Worker

24    Johnson.

25 Q   Do you recall ---

1 BY MS. JACKSON:

2     Your Honor, if I may approach the witness?

3 BY THE COURT:

4     You may.

5 DIRECT EXAMINATION RESUMED BY MS. JACKSON:

6 Q   I'm going to hand you what's been previously

7     marked as Plaintiff's Exhibit 1.  Do you

8     recognize that document?  (Tenders)

9 A   (Upon review)  Yes.

10 Q   What -- what is that document called at the

11    department?

12 A   Custody and visitation agreement or commonly

13    referred to by you all as a CVA.

14 Q   Okay, so exactly what it says there at the

15    top?

16 A   Yes.

17 Q   Do you remember when the first time is that

18    you saw one of those agreements?

19 A   I don't remember exactly.

20 Q   Can you estimate?

21 A   Years ago.

22 Q   When you say years -- I'm going to try to

23    narrow it down just a little bit -- would you

24    say five years ago or more than that?

25 A   Probably five years ago.

1 Q   Okay, and when you first saw one of those, do

2     you remember how that came about?

3 A   I don't remember the first time I was exposed

4     to one of these, how it came about.  I do know

5     that, you know, there have been -- they've

6     been used in the agency over the years.

7 Q   Okay, did you ever draft one of these?

8 A   I have, and then usually in the cases that --

9     that we use them, once the -- the changes were

10    made, then -- then our attorney would look the

11    -- the form over.  Sometimes he created them.

12 Q   Do you know who originally created that?

13    Because they all -- all the ones that I've

14    seen seem to sort of have the same format.  Do

15    you know who originally created the document?

16 A   I do not know.

17 Q   But you did not originally create it?

18 A   No.

19 Q   So you said the cases that would use them,

20    what did that mean?

21 A   Well, it wasn't something that was used on a

22    regular basis.  Sometimes there were cases

23    that involved grandparents having a temporary

24    custody of a child and -- or another family

25    member, and sometimes they were just done to

1 set it up so that the other family member
2 would have permanent custody, or so we thought
3 at the time, without having court involvement.
4 Q    Were they typically cases that you would have
5     a report on already, or how did that work?
6 A    Usually.
7 Q    Okay, when you say usually, were there ones
8     that that was not the case?
9 A    There have -- there has been one in particular
10    that I know.
11 Q   And under what circumstances do you know would
12    that be done?
13 A   Like a case that did not involve court, I
14    mean, where there was not a case?  Is that
15    what you're asking?
16 Q   Yes.
17 A   We had a family approach us on one particular
18    occasion where the uncle had been granted
19    custody of the child, and the family no longer
20    had room for the child in their home.  And in
21    fact, it turned out that the uncle had allowed
22    the child to live with the -- with the
23    grandparent.  The grandparent died and they
24    came to us and asked us if there was something
25    that we could do to help them, that they were

1 -- due to the situation where the family no
2 longer had room for this child, they wanted to
3 transfer custody to another adult sibling, an
4 aunt, and so it was created on that occasion.
5 Q    Okay, and so that was done without a report?
6 A    Right.
7 Q    Okay, and under whose authority do you recall
8     that that was done?
9 A    Well, that -- that particular one, the family
10    came to DSS and asked us about what they could
11    do.  We -- we referred them to attorneys.
12    They said, "We don't have the money to pay an
13    attorney.  We just paid for the funeral
14    expense of our father.  Is there anything that
15    ya'll can do to help us?"  Our attorney at the
16    time, Scott Lindsay, and I met with the family
17    on that particular day and ---
18 Q   Okay, and do you remember who -- who put the
19    details in that or who drafted that one?
20 A   I'm pretty sure that Scott did.
21 Q   Was there a template for these that you would
22    just go in and fill out?
23 A   Well, I would say yes, but the template might
24    be one that you had just saved, and you went
25    in and change things.

1 Q    So like from a previous case?
2 A    Right.
3 Q    And you indicated that these were used
4     oftentimes to go to grandparents or family
5     members.  Were these ever used to transfer
6     custody to a non-family member?
7 A    It's possible.
8 Q    I know I've already sort of touched on this,
9     but were these cases that were staffed on a
10    regular basis where these would be used?
11 A   Probably.
12 Q   So I guess what I'm trying to figure out is:
13    Whose decision was it ultimately whether or
14    not to use one of these?
15 A   Well, it would be -- it would be a discussion
16    held between the social worker, the
17    supervisor, the attorney, and the -- and many
18    times the family, you know, were all, you
19    know, in on the discussion.
20 Q   So I guess what I'm asking -- if there had
21    been a report within the department and you
22    were working with, let's say, a mother, how
23    would you determine on which cases it was
24    appropriate to use one of these?
25 A   Most cases were -- were cases that probably

1 would not have ended up in -- in -- I say
2 most.  A lot of the cases would not have ended
3 up in court, and it was at the request of the
4 family to -- to help them place the child in -
5 - somewhere that was safe and that -- so that
6 the -- whether it be grandparents or family
7 members had a right to be able to obtain
8 medical care, enroll them in school, and do
9 things such as that.
10 Q   After these were completed, were there ever
11    any -- was there ever any followup?  So after
12    a CVA was signed, all the parties signed it,
13    was the case closed?
14 A   Usually it's closed soon afterwards.
15 Q   So let's say a month later, would DSS still be
16    involved or doing any followup?
17 A   Usually by that time the case would have been
18    closed.
19 Q   So the signing of the CVA closed the case?
20 A   Usually.
21 Q   When you say usually, what does that mean?
22 A   Unless there happened to be other children
23    that were -- that were not placed in that CVA
24    and the case was maintained opened to deal
25    with that situation.

1  Q   Were -- how many of these would you say that
2      you have completed in -- during your time at
3      the department?
4  A   Maybe three as a social worker, you know.
5  Q   Okay, and how many do you think, and if you
6      know, were completed at the department while
7      you've been there whether or not you may have
8      been directly or not directly involved?
9  A   Probably somewhere in the neighborhood of 20
10     or low twenties.  Somewhere between probably
11     20 and 24.
12 Q   And when these were completed, did all of them
13     -- did all of them have to be approved by
14     Scott Lindsay, the attorney?
15 A   I do know that on occasion there was a couple
16     that he seemed to not be aware of because he
17     had made mention to me later that he did not
18     have a copy of a certain one.  So I feel like
19     that there were some that -- that were done
20     without his knowledge.
21 Q   How did the department keep track of these?
22 A   Well, honestly, we didn't keep track of them.
23     I mean, they were done, they were put in each
24     file, and -- and they were there, but we
25     didn't keep a running tally of how many had

1      been done.
2  Q   Were they saved to a computer or anything of
3      that nature, like a list of these?
4  A   They were saved probably until the point that
5      that particular template was used again, and
6      then it was cleared.  They were -- they were
7      put in the -- in the case file.
8  Q   What about ones like the case where you said
9      there was not a current case file, that a
10     family just came to you?  Do you recall what
11     was done with that particular one?
12 A   That particular file was located in our file
13     room, and it was -- and it was put in that
14     file.
15 Q   Okay, so you did make a file on that?
16 A   Yeah.
17 Q   Okay.  When these cases were staffed, who
18     would be in the staffings?
19 A   It would usually be the -- the supervisor, the
20     social worker -- well, maybe all the social
21     workers might be -- you know, we have a group
22     staffing every -- every week.  So it's more
23     than likely that it was probably taken care of
24     during those staff meetings because Scott
25     Lindsay would be in attendance to our group

1      staffings as well.
2  Q   So he would be present when these were
3      discussed?
4  A   Yes.
5  Q   When you did these, because I know the
6      department has particular ways of coding and
7      billing, how would the case be closed?  How
8      would it be closed out with the state?
9  A   Well, it may have been the services provided.
10     It depends on what all -- what all took place
11     during the course of the case, you know, if we
12     have made referrals for assessments, we've
13     done drug screens.  Many things come into play
14     other than just that CVA.
15 Q   And when you would have the staffings, was the
16     director typically there?
17 A   Typically, no.
18 Q   But Mr. Lindsay was?
19 A   In -- on most occasions.
20 Q   Are you aware -- when these were done, were
21     they ever emailed to Mr. Lindsay for his
22     approval?
23 A   They probably were for him to look over and
24     make any changes.
25 Q   On these specific cases, why would the

1      department not file a petition?
2  A   Well, for example, in the -- in this
3      particular case of Alana Roberts, Shalees had
4      asked for something to be done.  She wanted to
5      assign custody over to Michael Mathieu.
6  Q   You indicated in the beginning that you -- or
7      during the beginning of your testimony rather
8      that you do typically 24 hours of training a
9      year?
10 A   Uh-huh.  (Affirmative)
11 Q   During any of that training, did they ever
12     discuss or talk about doing private custody
13     agreements or CVAs?
14 A   No.
15 Q   Did any of the training ever indicate that
16     that was a proper method of closing a case?
17 A   No.
18 Q   Did you ever question doing these or question
19     whether or not they were proper?
20 A   Well, I'm not an attorney.  I figured this is
21     a legal form.  We had an attorney, and that's
22     -- I just don't feel like that's my role.
23 Q   Okay, so as far as you knew, these were
24     proper?
25 A   They had been used at the agency before I came

32  (Pages 122 to 125)

1   to the agency. So I didn't -- I didn't really
2   see that there was a problem.
3 Q So when you said that the ones that you were
4   aware of are probably somewhere between 20 to
5   24 -- so that would be since your time with
6   the agency?
7 A Well, no, I think that's how many we have been
8   able to locate that has been done.
9 Q Okay. Do you know when those date back?
10 A For probably about ten years.
11 Q In the specific case that we're here about
12   today, Shalees Greenlee, did you along with
13   the social workers go to Ms. Greenlee's
14   residence?
15 A Yes.
16 Q Can you tell me about that?
17 A A social worker and myself, and we also took a
18   notary with us -- we took it out and went over
19   it, and she said that's what she wanted to do.
20   She signed it. It was notarized. We took it
21   back and put it in the file once it was signed
22   by the -- by the father.
23 Q And did -- did you give her the impression or
24   tell her that that was a legally binding
25   document?

1 A I don't know what all the discussion was that
2   day. We informed her that it was taking care
3   of what she wanted, that it was a custody and
4   visitation agreement. We went over it, and
5   she signed it.
6 Q And on that day, did she question you about
7   whether or not she would continue to have
8   visitation?
9 A Yes, and visitation was addressed in there, if
10   I'm not mistaken.
11 BY MS. JACKSON:
12   And, Your Honor, if I may briefly approach?
13 BY THE COURT:
14   You may.
15 BY MS. JACKSON:
16   If I may approach, Your Honor, I'm sorry.
17 DIRECT EXAMINATION RESUMED BY MS. JACKSON:
18 Q If can point you to No. 2, the only visitation
19   that Ms. Greenlee was allowed in fact at
20   the placement's discretion; would that be
21   correct? (Tenders)
22 A (Upon review) I think that's correct.
23 Q So in fact she -- she hypothetically didn't
24   have any visitation?
25 A Well, it says that she shall have the right to

1   visitation with her children at reasonable
2   times and for reasonable length of time. We
3   kind of leave it up to where it's up to them
4   to work it out.
5 Q So if the placement provided doesn't want to
6   allow visitation, then they don't have to?
7 A Well, I guess it's not set up on specific
8   dates, specific time for each week.
9 Q At some point after this was signed in
10   November of 2016, did Ms. Greenlee contact you
11   in regards to the fact that she was not
12   getting visitation?
13 A Yes.
14 Q And what did you tell her?
15 A I don't remember exactly what I told her. I
16   just remember her calling about that. You
17   know, I just -- I can't remember the
18   conversation exactly.
19 Q So do you recall that she was concerned --
20   that she still wanted to see Alana and wasn't
21   being allowed to
22 A Yes.
23 Q So she was making efforts to continue to see
24   her?
25 A Yes.

1 Q Do you recall if you told her that she would
2   have to go to court?
3 A I don't remember the conversation exactly, I'm
4   sorry.
5 Q Were any of these ever signed by a judge? Do
6   you know?
7 A Not -- not that I'm aware of.
8 Q Were any of them ever filed at the clerk's
9   office?
10 A There was one that we -- we did file, and I
11   remember talking to the clerk of court's
12   office about it. And they informed me that --
13   that it couldn't be file-stamped. It would
14   just be basically there. It wasn't something
15   that they were accustomed to doing.
16 Q Why was that specific one filed with the
17   clerk's office?
18 A Because somebody had asked us if -- if it
19   would be filed there, and I told them that
20   typically they were not filed there, that they
21   were just in the file at DSS office and I
22   would look into the process of filing it in
23   the clerk's office.
24 Q So in this specific case with Ms. Greenlee,
25   did you tell her that if this was signed, she

33 (Pages 126 to 129)

## Page 130

1    wouldn't have to do anymore drug screens?

2 A   I think we probably told her that the case

3     would be closed.

4 Q   And that there wouldn't be any court

5     involvement?

6 A   Yes.

7 Q   And that there would be no chance that the

8     child would go to foster care?

9 A   I don't -- I don't know that that was the

10    extent of the discussion, but (pause) ---

11 Q   Do you know why there isn't a minimum

12    visitation put into those CVAs?

13 A   No.

14 Q   Was she ever advised to speak with an

15    attorney?  Do you know?

16 A   She was.

17 Q   You did tell her to talk to an attorney?

18 A   We talked with her one time and -- and when

19    she was first asking about signing over

20    custody to Michael, we advised that she

21    probably should talk to an attorney.

22 Q   And why did you advise her of that?

23 A   Well, that's just usually what we do.

24 Q   Because signing custody is a pretty big deal?

25 A   Sure.

## Page 131

1 Q   In this specific case -- it's been cleared up

2     now, but at the time, Michael Mathieu was not

3     the legal father; is that correct?

4 A   There was always some discrepancy about who

5     the father was.

6 Q   Who was the legal father?  Who was on the

7     birth certificate?

8 A   I think Cody Roberts was on the birth

9     certificate.

10 Q   When this was signed, was there any

11    communication with him?

12 A   To the best of my knowledge, I think he was

13    there when it was signed by Shalees.  I can't

14    remember, but he -- he did -- Cody will play a

15    role -- he will be active for a while and then

16    -- and then you won't see him for a while.

17    He's -- he's in and out.  So you never -- you

18    never really knew what the relationship was

19    going to be like from one month till to the

20    next.

21 Q   So at the time this was signed to Michael

22    Mathieu, the department did not know who the

23    actual father of the child was?

24 A   It was just based on what the birth

25    certificate said, you know.

## Page 132

1 Q   So at that time, you thought it was David Cody

2     Roberts?

3 A   Well, at some point along the way, I think

4     that Shalees had indicated that -- that

5     Michael was the father.

6 Q   Do you know if the department ever did any DNA

7     testing or anything of that nature?

8 A   I don't think it was done by the department.

9     It was talked about, but I don't think that it

10    was ever done.

11 Q   Since David Cody Roberts was on the birth

12    certificate, did you have him sign anything?

13 A   I don't think that he signed this CVA.

14 Q   When the child was placed through the CVA with

15    Mr. Mathieu, was there any home study done?

16 A   I would have to look at the documentation and

17    see.  I don't -- I don't know right off hand.

18 Q   Was there any drug testing on Mr. Mathieu?

19 A   I don't know if a drug test was done.  I do

20    remember seeing somewhere in the notes that

21    Katie Johnson had done background checks and

22    RIL checks on, I think, he and his parents.

23 Q   So looking at the broader picture, when these

24    CVAs were used, were there typically home

25    studies done on where these children were

## Page 133

1     being placed?

2 A   Usually they were because in many times there

3     was already a -- a kinship placement or a -- a

4     temporary parental safety agreement in place,

5     and that's where the children were already

6     staying.

7 Q   And when these were used, was there ever -- I

8     know that we kind of touched on it, but was

9     there ever any followup?

10 A   After the case was closed, no.

11 Q   So for example, like if there was a child that

12    was meth addicted that was taken from the

13    hospital and placed via a CVA, was there any

14    followup because of medical reasons?

15 A   No.  Once the case was closed, there was no

16    followup.

17 Q   Why did the department not follow up?

18 A   Well, once -- once our case is closed, we --

19    we work with open cases.

20 Q   So is this a way to close cases fast?

21 A   I wouldn't say that.  I think that most of

22    these agreements were done in what we thought

23    was the best interest of the child at the

24    time.

25 Q   Do you know if anybody at the department ever

1    questioned the legality of these?
2  A  Not while I've been there.
3  Q  Did you ever talk directly with Mr. Lindsey
4     about these?
5  A  Usually just when we were doing one, I mean
6     (pause) ----
7  Q  And would he approve of them?
8  A  Yes.
9  Q  Did you rely on his legal advice?
10 A  Yes.
11 Q  Did you think that what you were doing was in
12    the best interest?
13 A  Yes.
14 Q  When was the first time that you discovered
15    that these were not in fact binding documents?
16 A  Well, I -- I knew all along that they were not
17    recorded in the clerk's office.  So probably
18    from as far back from when we -- when I was
19    first exposed to one.  I knew that they were
20    not filed, but -- as far as legally binding,
21    you know, both -- both parties I should say,
22    all the parents that signed it -- that usually
23    constitutes that you know what you're signing
24    and you're agreeing to it.  So until, I guess,
25    this lawsuit and everything started coming

1    about, I guess that's when we really -- it
2    came to light about the -- the legality part
3    of it.
4  Q  After these CVAs are signed and the files are
5     closed, where were the files placed?
6  A  In our file room at DSS.
7  Q  Other than that one occasion when Ms. Greenlee
8     tried to get in contact with you about
9     visitation, did you have any contact with her,
10    Alana, or Mr. Mathieu after this document was
11    signed?
12 A  No.  I mean, occasionally I might run in to
13    Shalees somewhere in the community or here at
14    the courthouse or something, but -- but not on
15    DSS business.
16 Q  When you would specifically do one of these,
17    would you present it to Mr. Lindsay?
18 A  Yeah.
19 Q  And would he approve of it?
20 A  Well, he would -- he would look over them and
21    make any changes that he felt like were
22    necessary.
23 Q  Was there ever one that was presented to him
24    that he disapproved of?
25 A  Not that I'm aware of.

1  Q  Did he ever tell you how -- or did you ever
2     tell people when they signed these how they
3     could terminate them?
4  A  No.
5  Q  How DSS maintain their files?
6  A  I'm not sure what you're asking.
7  Q  After a case is closed, what happens with the
8     file?
9  A  The social worker completes all the
10    appropriate paperwork, turns it in to the
11    supervisor.  The supervisor goes through it to
12    verify that everything is in the file that's
13    supposed to be.  The case is closed out
14    through the state, and the file is then filed
15    away in our file room.
16 Q  After -- probably the same thing -- but after
17    these were signed, were there any more
18    services provided to the parents?
19 A  If the case was closed, no.
20 Q  Do you have electronic filing, or is it all
21    paper filing still?
22 A  It's still paper.
23 BY MS. JACKSON:
24    If I could have one moment, Your Honor?
25 DIRECT EXAMINATION RESUMED BY MS. JACKSON:

1  Q  Do you know how long the department maintains
2     their files -- or keeps them rather?
3  A  I think that they just stay on, you know,
4     until the state decides that you might be able
5     to purge them, but I've -- we talked about
6     that recently, and I think that you pretty
7     much have to keep CPS files.
8  Q  You indicated earlier in your testimony that
9     you thought that there was somewhere around 20
10    to 24 of these; is that right?
11 A  Yes.
12 Q  How did the department determine that?
13 A  We have gone through the files.
14 Q  Were you present when Mr. Lindsay stated in
15    open court that he brought 30 of these with
16    him today?
17 A  I heard that.
18 Q  Were you aware of that?
19 A  No.
20 Q  Do you know if they're the same ones that you
21    have?
22 A  I would assume that they -- that they make up
23    the same number that we have been able to
24    locate in the files.
25 Q  But have you talked to him about that

1    directly?
2  A  No.
3  Q  In regards to the specific case on hand,
4     Shalees Greenlee, the child in that case, that
5     child was born with some dependency; would
6     that be correct?
7  A  That would be correct.
8  Q  Is it typical in a case like that to close it
9     with no followup?
10 A  Well, we worked with the family for -- from
11    probably July till November.  So once the
12    child was in what we felt like was a safe
13    place, that's when the case was closed.
14 BY MS. JACKSON:
15    I don't have anything further, Your Honor.
16 BY THE COURT:
17    All right, it's -- would this be a good place
18    to break before you start cross-examination?
19 BY MR. MCKINNEY:
20    (Affirmative nod)
21 BY THE COURT:
22    All right, we'll be at ease for our lunch
23    break until 2:15.
24 (OFF THE RECORD)
25 BY THE COURT:

1     Sheriff, if we'll find Mr. Hughes, I believe
2     Mr. Hughes was on the stand, David Hughes.
3     You did have questions for cross-examination
4     or no?  Wait just a second, Sheriff.  Mr.
5     McKinney is hesitating for a moment.  Do you
6     have any questions?
7  BY MR. MCKINNEY:
8     I'm just trying to think about where we were.
9  BY MS. JACKSON:
10    I had just quit.
11 BY THE COURT:
12    He had just ---
13 BY MR. MCKINNEY:
14    Yes.
15 BY THE COURT:
16    She had just finished.
17 BY MR. MCKINNEY:
18    I have a couple of questions for him.
19 BY THE COURT:
20    Okay, bring Mr. Hughes in, please.  Mr.
21    Hughes, you remain under oath.
22 BY THE WITNESS:
23    Okay, thank you.
24 BY THE COURT:
25    You may have a seat.

1  CROSS-EXAMINATION BY MR. MCKINNEY:
2  Q  Mr. Hughes, as a part of the DSS investigation
3     related to the complaint in this case, did the
4     Department of Social Services require Shalees
5     Greenlee to submit to any drug screens?
6  A  I'm certain that we did.
7  Q  Could you ---
8  A  I would have to verify in the file, but -- but
9     I think that we did.
10 Q  Could you do that and, if you could, let me
11    know what the results of those tests were?
12 A  And I assume that you're talking about the
13    latest report that involved when the -- where
14    the CVA came out of?
15 Q  Yes, sir.
16 A  Okay, I have found where we have made three
17    separate referrals on three dates, but I only
18    see the drug screen results on two dates.  The
19    first one was on 7-25, 2016.  It was negative
20    for all substances.  The one on July 14, 2016,
21    was positive for oxycodone.  However, I do
22    believe that she had a prescription for that.
23 Q  Do you know who that prescription was from?
24 A  I think Dr. Holder.
25 Q  Do you know what Dr. Holder was treating her

1     for?
2  A  I just assumed that he was her OB doctor.
3  Q  Do you have a record of any other drug screens
4     that she was administered?
5  A  Not in this particular case file.  I do in
6     other case files.
7  Q  And had the Cherokee County Department of
8     Social Services previously removed children
9     from Shalees Greenlee's care?
10 A  We had placed the children in kinship care
11    several times previous to this.
12 Q  Were there civil custody agreements used --
13    and I'm calling Plaintiff's Exhibit No. 1 --
14    that's what I'll refer to by as a civil
15    custody agreement.
16 BY THE COURT:
17    You mean the CVA?
18 BY MR. MCKINNEY:
19    Yes, CVA.
20 CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:
21 Q  Were there CVAs used in those cases?
22 A  No, there were not.
23 BY MR. MCKINNEY:
24    That will be all my questions, Your Honor.
25    Well, wait, I have one more question.

## Page 142

1 CROSS-EXAMINATION RESUMED BY MR. MCKINNEY:
2 Q Mr. Hughes, when the Department of Social
3 Services closed this case -- okay, when you
4 folks closed this case, were you required to
5 file a form with the people in Raleigh ---
6 A No.
7 Q --- indicating that the case had been closed?
8 A Well, I say no. In our system, one of the
9 clerks codes that the system is closed on a
10 particular date. So that indirectly does go
11 to Raleigh at some point in time.
12 Q Is there a reason given when they code it? Is
13 there a reason given for why the case was
14 closed?
15 A It is -- it is noted as how the case was
16 staffed. Like if it were staffed as a
17 substantiation or a -- or services need or a
18 services provided, we have different codes for
19 each one of those. So it is noted in that
20 manner.
21 Q And how was this case closed?
22 A It was staffed as services needed, but it was
23 placed into case management after that. So we
24 didn't close the case completely until the
25 case management -- that -- during the case

## Page 143

1 management file was when the CVA was created.
2 So it was done during the in-home service.
3 BY MR. MCKINNEY:
4 That will be all my questions.
5 BY MS. JACKSON:
6 Just a few more, Your Honor.
7 REDIRECT EXAMINATION BY MS. JACKSON:
8 Q You indicated earlier that you do training
9 yearly, 24 hours. Did any of the trainings
10 that you ever -- that you ever attended
11 provide you with any way to remove a child out
12 of the home other than what was contained
13 within Chapter 70?
14 A No.
15 Q And when we talked earlier, you testified
16 about what efforts were made to locate files
17 of the CVAs. What efforts were made, just
18 physical inspection?
19 A Yes.
20 Q Anything else?
21 A No, we've -- we've just gone through the file
22 room.
23 Q And are all the files in the file room?
24 A Yes.
25 Q Are there missing files?

## Page 144

1 A It appears that there are some missing files.
2 Q Do you know how many?
3 A No.
4 Q Do you know from what years?
5 A No. I do know that there was some from 2009
6 because that -- that just came up one day when
7 we were in the file room.
8 Q How did you discover that there were missing
9 files?
10 A We had a -- we had a list of cases, and we
11 were using that list to cross-reference and
12 check.
13 Q And we talked earlier about staffings of these
14 CVAs. Was Cindy Palmer ever present or did
15 you ever discus the CVAs with her?
16 A She was not present when we staffed these, and
17 I'm not sure that she was ever notified when
18 one was being done. We consulted with our
19 attorney.
20 Q And I know that you had received a subpoena,
21 and you were served with that subpoena on
22 February 5th; is that correct?
23 A I've had it a while.
24 BY MS. JACKSON:
25 Your Honor, if I may approach?

## Page 145

1 (DEFENDANT'S EXHIBIT NO. 2 MARKED)
2 REDIRECT EXAMINATION RESUMED BY MS. JACKSON:
3 Q I'm going to hand you what's been marked as
4 Defendant's 2 for identification purposes. Is
5 that -- or do you recognize that rather?
6 (Tenders)
7 A (Upon review) Yes.
8 Q And is that the subpoena with which you were
9 served?
10 A Yes.
11 Q And that was served on February 5th?
12 A I guess.
13 Q Or early February?
14 A Yeah.
15 Q And there was a list of documents that you
16 were asked to bring?
17 A Yes.
18 Q Did you bring those documents?
19 A Yes.
20 BY MS. JACKSON:
21 Your Honor, at this time, I would ask that
22 those documents be turned over to the Court
23 for an inspection -- or for an in camera
24 inspection.
25 BY THE COURT:

1    Okay, do you have any response?
2  BY MR. MCKINNEY:
3    I don't know what he brought, Judge.  So I
4    don't know whether I consent or object.  Mr.
5    Hughes, what documents did you bring to court
6    pursuant to the subpoena?
7  BY THE WITNESS:
8    I have the entire case files from all of our
9    involvement with Shalees Greenlee and her
10    children.
11  BY THE COURT:
12    On the three children that there were prior
13    CPS history and on Alana ---
14  BY THE WITNESS:
15    Yes.
16  BY THE COURT:
17    --- the child that's subject to this ---
18  BY THE WITNESS:
19    Yes, that's correct.
20  BY THE COURT:
21    Okay, so basically the Department of Social
22    Services records on those four juveniles.
23  BY MR. MCKINNEY:
24    I don't think I have a dog in that fight.
25  BY THE COURT:

1    And we already have a protective order in
2    place.  So then the Court can make an in
3    camera inspection.
4  (DEFENDANT'S EXHIBIT NO. 3 MARKED)
5  BY MS. JACKSON:
6    Your Honor, I don't have anything else.
7  RECROSS-EXAMINATION BY MR. MCKINNEY:
8  Q    Mr. Hughes, with respect to the Department of
9    Social Services files, are those files put on
10    microfiche?
11  A    The CPS files are not.
12  Q    So the files that you say are missing, those
13    files don't exist anywhere else; is that what
14    you're telling the Court?
15  A    That's what I'm saying.
16  Q    Okay, what documents that DSS has possession
17    of -- what documents are microfilmed?
18  A    I think they do -- I don't work in that
19    department, but I think they do things for
20    food stamps and Medicaid.
21  Q    Do you know why the CPS files are not
22    microfiched?
23  A    Well, the state is in the process of working
24    out what is referred to as NC FAST where
25    everything will become digital.

1  Q    Online?
2  A    Yes.
3  Q    Accessible?
4  A    Yeah, it's -- it's in the process of being put
5    in place now.  So many counties are at
6    different times becoming active, and ours is
7    not scheduled until near the end of the year,
8    and it possibly could even be put off past
9    then.
10  Q    When you all transfer information -- this
11    particular case here, when you all transfer
12    information interoffice, is that done through
13    a network?
14  A    No, it's just -- I mean, there -- there can be
15    emails from -- from a social worker to a
16    supervisor, but we tend to copy any email and
17    put it in the file because we -- we have to
18    clear out our emails periodically as our --
19    you know, as it gets full.
20  Q    I did a bad job asking that question.
21  A    Okay.
22  Q    Are your computers at the Department of Social
23    Services networked?  Do you understand what I
24    mean by that?
25  A    I'm not sure what you're wanting out of this.

1    So -- I mean, we're all tied together, but
2    (pause) ---
3  Q    You're all tied together, and you can access
4    Katie Johnson's files and Katie Johnson can
5    access your files?
6  A    No, no.
7  Q    Okay, why not?
8  A    It's not set up that way.
9  Q    So you're not networked?
10  A    We're not -- we're not networked, if that's
11    what you're asking.
12  Q    Okay.  All right, so nobody in the Department
13    of Social Services can access your working
14    files except for you?
15  A    Correct.
16  BY MR. MCKINNEY:
17    That will be all my questions.
18  RE-REDIRECT EXAMINATION BY MS. JACKSON:
19  Q    So does the department use a file sharing
20    system?
21  A    We have recently set up to where the
22    supervisor can look at documentation from the
23    other social workers, but that has just been
24    recently set up, and that's all that we have
25    access to.  Now, once the NC FAST system goes

1      on live, then we will be networking and have

2      access to basically anybody within the state.

3  Q  And do you use like any type of corporation or

4      program where the DSS files are downloaded to

5      -- to like a hard drive or something?

6  A  No.

7  Q  So it's just a paper file?

8  A  Yeah, it's just a paper file.

9  Q  Has there been any other effort to locate the

10     missing files?

11  A  We have looked in the file room.  We have

12     looked in all the offices.  We've tried to

13     turn up those -- those missing files, but --

14     but we haven't been able to find any.

15  Q  Is there any indication that those files were

16     kept at Mr. Lindsay's home office or office

17     here in town?

18  A  No.

19  Q  You've never been provided that information?

20  A  I've never been provided that information, and

21     I've never known any files to leave the office

22     with the exception of coming to court.

23  Q  So you've never known Mr. Lindsay to have to

24     leave the office to go get files from his home

25     office or from his office located in Murphy?

1  A  No, I'm not aware of that.

2  BY MS. JACKSON:

3     Okay.

4  BY MR. MCKINNEY:

5     I don't have any other questions.  Thank you,

6     Mr. Hughes.

7  BY THE COURT:

8     All right, Mr. Hughes, if you will, hand over

9     the file so I can ---

10  BY THE WITNESS:

11     Can I ask something about the -- the reporter

12     letters are still in the files.  We have

13     removed the reporter page from the reports,

14     but the letters that go out to the reporters

15     are still in the files.  So (pause) ---

16  BY MR. DAVID MOORE:

17     I think we would simply ask the Court that if

18     you deem that as a document that should be

19     produced that we would have the opportunity to

20     redact the reporter information.

21  BY THE COURT:

22     That's -- I mean, I'm the only one that's

23     going to see it.

24  BY THE WITNESS:

25     Oh, okay, okay.

1  BY MS. JACKSON:

2     I've actually marked those for identification

3     purposes.

4  BY THE COURT:

5     Why don't we make that a collective exhibit?

6  BY MS. JACKSON:

7     If I may approach?

8  BY THE WITNESS:

9     Okay, here's both.

10  BY MR. RON MOORE:

11     Is it the one child, the child we're here on,

12     and the other three all together in the other

13     file?

14  BY THE WITNESS:

15     I think the thinner file is for Alana, and the

16     other is for the other three.

17  BY MR. RON MOORE:

18     Your Honor, we call Cindy Palmer.

19  BY THE COURT:

20     All right.

21  BY MR. DAVID MOORE:

22     Your Honor, I'm going to -- I don't know what

23     grounds I've got here.  I'm not a party.  But

24     she is the director of Department of Social

25     Services.  She (inaudible) her official

1     capacity.  I'm not sure how her testimony is

2     relevant to a private custody action here.  I

3     understand Mr. Hughes' and the documents that

4     he was asked to produce.  So it is my concern

5     at this point in time -- it is not -- it's

6     obvious that there is -- there is other

7     litigation either pending or going to happen

8     with regard to the CVAs.  My concern is that

9     this is essentially turned into a discovery

10     deposition without the Department of Social

11     Services being able to defend itself or

12     represent itself.  So that's my objection to

13     Ms. Palmer and her testimony at this time.

14  BY THE COURT:

15     Response?

16  BY MR. RON MOORE:

17     Judge, I don't believe he has any standing to

18     object.  She's been subpoenaed as a witness.

19     He's not a party.  She's not a party.  She's

20     got a subpoena to bring some documents that

21     relate to what we just talked about, and we've

22     now found some documents are missing -- that

23     some files are missing.  So we're entitled to

24     explore things like that.  We also are asking

25     the Court to declare these unconstitutional or

1    illegal, the CVAs in this case, and I'm
2    entitled to explore what she knows about it,
3    what the policy is, what the procedure is, and
4    so I think she's a relevant witness.
5  BY MR. DAVID MOORE:
6    I just want to clarify the Department of
7    Social Services is not a party, correct
8  BY MR. RON MOORE:
9    You had a chance to be a party, but you chose
10    not to because you didn't -- you didn't go
11    file a petition in front of the Court.  You
12    should have been a party.  This -- yes, you're
13    not a party, that's correct.
14  BY MR. DAVID MOORE:
15    I'm not represented by counsel.
16  BY MR. RON MOORE:
17    Nor were the -- Ms. Greenlee or Mathieu or any
18    of the other people.
19  BY MR. DAVID MOORE:
20    I'm not able to cross-examine, correct?
21  BY MR. RON MOORE:
22    You're not a party.
23  BY MR. DAVID MOORE:
24    Okay.
25  BY MR. RON MOORE:

1    You have no standing to object to a witness.
2  BY THE COURT:
3    However, Mr. McKinney's client is a party.  So
4    I'm going to ask Mr. McKinney.  Just hang
5    tight, Mr. Moore.  Do you have a response?
6  BY MR. MCKINNEY:
7    Your Honor, my client finds himself having to
8    pay my law firm to come into court to try to
9    retain custody of the child that he thought he
10    had custody of under a document that had been
11    presented to him by the Cherokee County
12    Department of Social Services, and I think the
13    Court ought to hear why my client is in this
14    situation and why Your Honor is having to do
15    this now under these circumstances.
16  BY THE COURT:
17    Can I see all the attorneys at the bench?
18  (BENCH CONFERENCE)
19  BY MR. DAVID MOORE:
20    Your Honor, am I allowed up there, or are you
21    just chatting with these parties?  Because I
22    hear me being mentioned.
23  BY THE COURT:
24    I'm going to put what we said at the bench on
25    the record.  The Court is going to allow Ms.

1    Palmer to be called for the limited purpose --
2    I indicated at the bench this is not a fishing
3    expedition.  The Court has had the opportunity
4    to review the file.  There has not been a
5    motion to quash the file.  There has not been
6    a notice entered by an attorney on Ms.
7    Palmer's behalf.  There is a valid subpoena
8    subpoenaing her to court.  So I will allow her
9    to be called.
10  BY MR. DAVID MOORE:
11    That's fine, Your Honor.  I just -- I do want
12    it noted for the record that we are not a
13    party to the action.
14  BY THE COURT:
15    Absolutely.
16  BY MR. DAVID MOORE:
17    And we do not have the -- whether I had filed
18    a motion to quash or not, I would not have the
19    opportunity to cross-examine or to examine any
20    witnesses or to ---
21  BY THE COURT:
22    However, you are not Ms. Palmer's personal
23    attorney.
24  BY MR. DAVID MOORE:
25    I understand I'm not her personal attorney.

1    I'm here on behalf of the Department of Social
2    Services.
3  BY THE COURT:
4    I knew that.
5  BY MR. DAVID MOORE:
6    I just needed that as part of the record since
7    we are recording.
8  BY THE COURT:
9    Yes.
10  BY MR. DAVID MOORE:
11    Thank you.
12  BY THE COURT:
13    Ms. Palmer, please.
14    CINDY PALMER, being duly sworn to tell the
15    truth, the whole truth, and nothing but the truth
16    of her own knowledge concerning the within matter,
17    testified as follows:
18  DIRECT EXAMINATION BY MR. MOORE:
19  Q   Ms. Palmer, my name is Ron Moore.  Would you
20    state your name and where you work for the
21    record, please?
22  A   Cindy Palmer.  I work at the Department of
23    Social Services.
24  Q   And in what capacity?
25  A   Director.

1    Q    How long have you been director?

2    A    How long?

3    Q    Yes, ma'am.

4    A    Two and a half years.

5    Q    And prior to that?

6    A    I started in 1998 with the department.

7    Q    As a social worker?

8    A    I did, income maintenance and then social work

9         and then business officer.

10   Q    And so you worked there for 19 years -- almost

11        20 years, two and a half as director?  Did

12        that include interim director time also?

13   A    No, I was interim director for about nine

14        months prior to that.

15   Q    All right, and could you just tell us your

16        educational background?

17   A    I have a bachelor's in business

18        administration.

19   Q    Any post graduate?

20   A    No.

21   Q    All right, and I believe that -- I'm sure

22        you're familiar with 7B in the statutes and

23        the authority that a director has, that

24        basically you decide in cases how you proceed,

25        you have obligations under the law if you get

1         a report of abuse, neglect, or dependency, you

2         have to look into it, and then you have to

3         decide whether to close the case or whether

4         you proceed with the case, whether you open a

5         case, whether you file a petition, etcetera?

6    A    Yes, sir.

7    Q    All right, and I assume that you have to go

8         get training on a regular basis on terms of

9         what the law requires, if there are any

10        changes in the laws or things like that?

11   A    Yes, sir.

12   Q    And also your social worker supervisors have

13        to do a certain amount each year?

14   A    Correct.

15   Q    Do you receive training on issues in the law

16        such as how you're able to remove children

17        from their homes, what situations?

18   A    Yes.

19   Q    And is that a seminar -- have you been to some

20        seminars, or do you do it on webinar or

21        download things on the computer?  How do you

22        do that?

23   A    There are trainings that are required within

24        the first year, and it's part of those

25        trainings.  So there's only one training if

1         they have changes in policy.

2    Q    Okay, did it require training -- it required

3         training for you to become director the first

4         year also, I would assume; is that right?

5    A    There is.

6    Q    Different training?

7    A    Yes.

8    Q    All right, have you had training on the types

9         of methods that you can use to take children

10        out of the home?

11   A    I have had legal basics -- it's been a few

12        years -- when I became a social worker.  I've

13        also had legal basics for directors.  They

14        didn't drill down specifically to that

15        information.

16   Q    Now, you got there in 1998.  What time frame

17        were you a social worker?

18   A    I was a social worker for -- are you looking

19        for dates or a period?

20   Q    Roughly.

21   A    About two, two and a half years.

22   Q    And were CVAs being used then when you were a

23        social worker?

24   A    Not that I recall.

25   Q    So about what year was that?

1    A    2007, 2008.

2    Q    Right now the state also mandates training for

3         your workers, and they go and learn the same

4         types of things that you have.  Do you share

5         information that you learn at these things

6         since obviously everybody can't go at the same

7         time?

8    A    We do share information.  If they -- if

9         there's new policy that comes about, we try to

10        get everybody into that training.  But the

11        other training is required within the first

12        year.

13   Q    Does your lawyer give you training at DSS?  Do

14        they tell you about new trends or what the law

15        is?

16   A    Yes.

17   Q    Do you have some kind of staff trainings, or

18        how do you do that?

19   A    We -- we try to schedule those certain times

20        based on what -- if new policy was coming out.

21        We don't have a set schedule for that, if

22        that's what you're asking.

23   Q    No.  Do you have records for the seminars that

24        everybody takes each year?  Do you have to

25        keep records?

41 (Pages 158 to 161)

1 A    Yes, sir.

2 Q    Now, with regard to the training for your

3      lawyer, they have specialty training.  Social

4      worker attorneys have a group, the Institute

5      of Government, give seminars.  Do you keep

6      records for the ---

7 A    I do not specifically keep records of those.

8 Q    Did the DSS attorney in this case, Mr. Lindsay

9      -- did he turn in vouchers asking for

10     reimbursement for travel to seminars and

11     payment of these?

12 A    He would not turn those in directly to me, but

13     would have turned them in to the finance

14     office.

15 Q    Okay, so would that be paid by the county or

16     by the Department of Social Services?

17 A    They -- if it was a Social Services event, it

18     would come out of our budget, so out of our --

19     ---

20 Q    You turn it in the same place; they just

21     allocate it to whichever budget that ---

22 A    Correct.

23 Q    Okay, thank you.  And of course going back to

24     the authority of the director, basically all your

25     DHHS puts out manuals that outlines all your

1      duties and your responsibilities kind of like

2      what we talked about earlier, and so can you --

3      - can you walk us through -- and let's take --

4      are you familiar with the Greenlee case, the

5      one we're here on today?

6 A    Yes.

7 Q    Could you walk us through how you would

8      respond in a case like that?  You first get a

9      call -- I think we've heard testimony the gist

10     of which was here's a baby in the hospital

11     that may have some symptoms of being addicted

12     to drugs.  What does the Cherokee Department

13     of Social Services do in a case like that?

14 A    We would send a worker out that will talk to

15     the family members if the child is of age.  Of

16     course if it's a baby in a hospital, they

17     would not be, but -- you know, talk to all the

18     parties involved.  We would then make a

19     decision as to whether or not that child was

20     safe to remain in that home.  If not, we would

21     contact our attorney who would then contact a

22     judge to attempt to get a non-secure custody

23     order.

24 Q    All right, and in this particular case, have

25     you reviewed the file?

1 A    I have not specifically reviewed this file,

2      no.  I have looked at pieces of it, but not

3      the entire file.

4 Q    We know no petition was ever filed.  And are

5      you familiar with the custody agreements that

6      were involved in this case?  There were a

7      couple of them.

8 A    Yes, sir.

9 Q    Have you reviewed it enough to know why a

10     petition was not filed?

11 A    Not specifically as to why a petition was not

12     filed.  I do know that Ms. Greenlee had asked

13     for this agreement to be signed.

14 Q    All right, I have -- I have some portion of

15     the file that, since we represent Ms.

16     Greenlee, was provided.  And I want to show

17     you -- it's a portion of it -- I think it's

18     eight pages -- and it's entitled, "In-Home

19     Family Services Agreement."  When do you use

20     those, in what scenario?

21 A    Once the -- if -- if we substantiate the case,

22     it gets moved to in-home services, and at that

23     point they create those in-home service

24     agreements with the families in order to

25     correct the issues that caused our

1      involvement.

2 BY MR. RON MOORE:

3      Okay.  Judge, are we on 4?  Did you mark that

4      3?

5 BY THE COURT:

6      Yes, sir.

7 BY MR. RON MOORE:

8      Okay, thank you.

9 (DEFENDANT'S EXHIBIT NO. 4 MARKED)

10 BY MR. RON MOORE:

11     May I approach, Your Honor?

12 BY THE COURT:

13     You may.

14 DIRECT EXAMINATION RESUMED BY MR. MOORE:

15 Q    Let me show you what I've marked as

16     Plaintiff's -- or Defendant's Exhibit 4.  I'll

17     just ask you to look at it.  Does that look

18     like your in-home service agreement that you

19     use?  (Tenders)

20 A    (Upon review) Yes, sir.

21 Q    And it's dated 10-14, 2016.  Do you see that

22     on the top corner?

23 A    Yes.

24 Q    And this is an eight-page document?  It's all

25     part of the in-home family services agreement;

1 is that right?

2 A   Uh-huh.  (Affirmative)

3 Q   All right, now, can you look at that and just

4       tell me what -- this is the front page.  So

5       what is -- what is happening here?  You have

6       Alana Roberts, the baby, and the birth date.

7       You have Ms. Greenlee and Mr. Roberts.  Of

8       course, Mr. Roberts was on the birth

9       certificate; are you aware of that?

10 A   Yes.

11 Q   Okay, there hadn't been a DNA test at that

12       point, or maybe that was about the time that

13       it was going on.  But Cody Roberts was

14       actually on the birth certificate, and then

15       Kathy Rogers apparently was the grandmother

16       that was helping with the baby; I assume

17       that's why she's listed?

18 A   She would have been involved in the

19       development of this plan.

20 Q   Okay, and as -- then your social worker is Ms.

21       Johnson?

22 A   Uh-huh.  (Affirmative)

23 Q   And so she writes, I guess, notes, "family

24       strengths and resources, strong relationship

25       and support, communication, sense of humor,

1 housing, transportation, support from extended

2       family; Cody and Shalees love their children."

3       Do you recognize that to be in Ms. -- I guess

4       Ms. Johnson's handwriting?

5 A   Yes.

6 Q   Okay, and then looking over -- and again some

7       of this says that they were going to have

8       urine tests and, you know, they've admitted to

9       using pills and stuff.  So you were, I guess,

10       coming to some agreement or -- I don't know

11       what you call it -- trying to get them to

12       straighten up their act?

13 A   Uh-huh.  (Affirmative)

14 Q   And so they're going to seek to get

15       employment.  But then you look over on Page --

16       I believe it's Page 5, and it talks about what

17       services are being provided, Medicaid, food

18       stamps -- is that WIC or ---

19 A   WIC, yes.

20 Q   Daycare, drug screens, kinship placement, case

21       management.  So case management, what does

22       that -- what does that entail?

23 A   It's the in-home services which is -- once

24       they're substantiated and they go into in-home

25       services, that is considered case management.

1 Q   Okay, and so is -- is that services that are

2       being provided?  You've actually got the child

3       on Medicaid and you're -- is that what that

4       means?

5 A   Uh-huh.  (Affirmative)

6 Q   All right, so then you -- you guys note -- or

7       Ms. Johnson noted, "Mr. Mathieu is the

8       biological father but has no custody rights.

9       Shalees signed a temporary guardianship

10       agreement for Alana.  Alana currently with

11       Michael and his family."  So this is dated 10-

12       14.  And there was testimony earlier, I think,

13       when Mr. Mathieu testified ---

14 BY MR. RON MOORE:

15       Your Honor, do we have Exhibits 1 and 2?

16 BY THE COURT:

17       The clerk has the exhibits.

18 BY MR. RON MOORE:

19       Okay, thank you.

20 DIRECT EXAMINATION RESUMED BY MR. MOORE:

21 Q   So looking at Plaintiff's Exhibit 2, you see

22       that there was a temporary guardianship

23       agreement.  Do you see that?  (Tenders)

24 A   (Upon review)  Yes, sir.

25 Q   And again, you weren't here, but the gist of

1 it was apparently Ms. Greenlee found it on the

2       internet, and she and Mr. Mathieu went to

3       Quick Lube or somewhere and got a notary to

4       execute it.  So that was on the 6th of

5       October.  So the document I've asked you about

6       what we've been talking about, Defendant's

7       Exhibit 4, that's dated eight days later, 10-

8       14.  And under the services you're providing,

9       you note, "What will happen if the child

10       safety is no longer assured?  The department

11       will file a juvenile petition and take case to

12       juvenile court."  And then at the end, it

13       says, "Under what circumstances will the

14       agency and services" -- "end services and

15       close the case?  When the case plan has been

16       successfully completed and no safety concerns

17       exist regarding Alana being in the physical

18       area of Cody and Shalees."  So they've agreed

19       to share custody.  Eight days later, your

20       report says you will file a juvenile petition

21       and -- and then six weeks later, people from

22       your office go to the -- or have Shalees come

23       to the Department of Social -- no, they go to

24       Shalees' house and have her sign a CVA.  Now,

25       any idea why you didn't file a petition in

1　　this case?
2　A　It was my understanding that Ms. Greenlee at
3　　that point had asked for the CVA. She wanted
4　　to sign over custody to Mr. Mathieu.
5　Q　Okay, well, now, here's a baby that's in
6　　distress clearly because it was born into the
7　　world with some -- apparently some problems
8　　with drug abuse. I mean, isn't that the kind
9　　of case that Social Services designed to help?
10　A　Yes, sir.
11　Q　So, again, why would you let her give the
12　　child to somebody who may not have any ability
13　　to help a kid like that?
14　A　I was not specifically involved in that
15　　conversation. So I can not attest to what Ms.
16　　Johnson's thinking was on that case.
17　Q　Nobody has talked about it since this came to
18　　light?
19　A　Well, we've talked about the fact that -- Ms.
20　　Johnson is no longer in the agency. So we --
21　　I have not specifically talked to her about
22　　it, no.
23　Q　All right, well, let's talk about the CVAs.
24　　Can you tell us what you know about the use of
25　　CVAs at the Cherokee County Department of

1　　Social Services?
2　A　More specifically? I'm not sure what you're
3　　asking.
4　Q　When was the first time you ever heard of one?
5　A　The first time I ever recall hearing of one
6　　was December 6, 2017, when I received a call
7　　from Mr. Lindsay about a similar agreement.
8　Q　That was when Ms. Jackson had called Mr.
9　　Lindsay because she had come upon one in this
10　　case?
11　A　Not this case, no.
12　Q　No, actually Hogan case?
13　A　Yes.
14　Q　Now, you were familiar with the Hogan case?
15　A　Was I at the time or am I now?
16　Q　No, were you -- you had had some contact with
17　　the Hogan case?
18　A　I had not had contact with the Hogan case as
19　　of December 6th, no.
20　Q　When Judge Sellers signed an order giving Mr.
21　　Hogan ---
22　BY THE COURT:
23　　Move on.
24　DIRECT EXAMINATION RESUMED BY MR. MOORE:
25　Q　Going back to the -- so you didn't know

1　　anything about any CVAs prior to December?
2　A　Not that I recall, no.
3　Q　Do you ever sit in on the staff meetings?
4　A　I do occasionally. I had not been sitting in
5　　on them as of late ---
6　Q　Mr. Lindsay was here earlier this morning.
7　　He'll be here shortly. I think I heard him
8　　say that he had found 30 CVAs that he's
9　　prepared to, I guess, turn over in response to
10　　a subpoena. How many have the Department of
11　　Social Services found?
12　A　That have been executed? I can't say
13　　specifically, but -- it depend on whether
14　　you're looking at actual cases or if you're
15　　looking at children. There's about 25 that
16　　have been executed that I have located.
17　Q　And again, can you help me distinguish between
18　　children and ---
19　A　Well, there are some that involve more than
20　　one child. So I don't know if his number is,
21　　you know, specific between children.
22　Q　The ones you've found, each child has their
23　　own CVA; is that what you're saying?
24　A　No, not always.
25　Q　So you're saying you don't know if he's

1　　counting the family CVA or if he's counting
2　　the child?
3　A　Correct.
4　Q　Okay. All right, so after -- after the CVA
5　　came to light in the Hogan case, the State
6　　Department of Health and Human Services was
7　　notified, and I believe you got a letter?
8　A　Yes, sir.
9　Q　And subsequently, they indicated that they
10　　were going to investigate. And what, if
11　　anything, were you directed to do in terms of
12　　trying to get information for them?
13　A　I received a list from the state of cases for
14　　the past ten years, and I and my staff had
15　　gone through all of those cases and attempted
16　　to locate any CVAs that are involved.
17　Q　And that's where you came up with the number
18　　that --- ꞏ
19　A　Yes, sir.
20　Q　Now, there was never any discussion amongst
21　　your social workers asking you about whether
22　　they should be using CVAs?
23　A　Not that I recall.
24　Q　So you had never heard of CVAs until December?
25　A　Correct.

## Page 174

1  Q  How could 20 or 30 be executed and you not

2      know anything about it?

3  A  Well, a lot of them were even before I became

4      director, and they don't come to me with every

5      case.  I -- I don't handle or see or discuss

6      every case with them.

7  Q  Now, in order to get paid in cases, you have

8      some kind of billing code, is that correct ---

9  A  Uh-huh.  (Affirmative)

10  Q  --- which pot of money that your refund comes

11      out or whatever?  How would you code a CVA?

12  A  We don't code -- coding is based on what

13      service they're providing, like 210 is

14      investigation, 215 is case management.  So we

15      have different funding sources that go along

16      with those.

17  Q  So, again, in this case, it would have been a

18      215.  So it was -- what did you say, in-homes?

19  A  In-home services.

20  Q  Home service?

21  A  Yes, case management and home services.

22  Q  All right, have any of your social workers

23      talked to you about the use of CVAs since

24      December?

25  A  We've had some discussions about them, yes.

## Page 175

1  Q  Did Mr. Lindsay ever tell you how they got

2      started with those there?

3  A  Yes, he said that he received the agreement

4      from some workshop or training that he went to

5      many years ago.

6  Q  And did -- did you find out the procedure that

7      he used?  Because apparently he created a

8      template that your -- your folks could fill in

9      the names and the dates of birth and he would

10      review them.

11  A  Yes.

12  Q  Is that basically the procedure?

13  A  Yes.

14  Q  And you had never heard of that either?

15  A  No.

16  Q  Now, Mr. Lindsay was the attorney for Social

17      Services as well as the county.  Did he have

18      an office in Social Services' space?

19  A  Yes, sir.

20  Q  Did he have a Social Services computer?

21  A  Yes, sir.

22  Q  Did he ever do work at home that you know

23      about, exchanging information?

24  A  Not that I'm aware of.

25  Q  So your workers -- well, have you since found

## Page 176

1      out that your workers would email these to him

2      sometimes for his approval?

3  A  Yes.

4  Q  Do you know whether all that was done when he

5      was in the Social Service building or was he

6      in the county building or was he at home or

7      did he have an office?

8  A  I would imagine a lot of it was done during

9      the day where he would have either been at his

10      office at Department of Social Services or in

11      the courthouse office.

12  Q  Is the courthouse office -- is that the county

13      attorney office?

14  A  Yes.

15  Q  Now, did he also have a computer that belonged

16      to the Department of Social Services?

17  A  That belonged to the county.

18  Q  Okay, assigned to Social Services?

19  A  Well, he used it for both.  He didn't have

20      separate computers.

21  Q  Okay, and where was that located?

22  A  It was a laptop, and he carried it back and

23      forth.

24  Q  So he carried it home and may have worked on

25      it from there also?

## Page 177

1  A  (Affirmative nod)

2  Q  Okay, so he had no computer at home, just --

3      okay.

4  A  I have no idea.

5  Q  All right.  Okay, did -- in your search for

6      trying to find the CVAs, were you able to look

7      into the information on his computer?

8  A  Our county IT has.

9  Q  Okay, and did -- how many did they find on his

10      computer?

11  A  I don't have that information.

12  Q  Okay, what ---

13  A  He had sent me the ones that he had drafts of,

14      and we found a lot of them -- the drafts in

15      his office that were printed that had not been

16      signed.

17  Q  Were those the ones yet to be used, or were

18      those just copies of the ones that were

19      actually signed?

20  A  Copies of ones that were actually signed.

21  Q  But then you were able to go into the file and

22      find ---

23  A  The signed copy, correct.

24  Q  In every case?

25  A  Not every case.  Some cases, there was a draft

1    copy, but it may have been a POA that was

2    signed and not actually a CVA, power of

3    attorney.

4  Q   Do you provide power of attorneys for people

5    to sign? I'm just curious.

6  A   Mr. Lindsay did.

7  Q   All right. Now, in this particular case --

8    and let me just say Mr. Mathieu presented

9    himself very well today, as did Ms. Greenlee.

10    What type of assessment would be done in a

11    case like this where you had a case open where

12    Ms. Greenlee had done, I think, the temporary

13    placement agreement? You file says you're

14    thinking about filing a petition if there's

15    any problems, and then she wants to sign --

16    or she wants to give him custody ---

17  BY THE COURT:

18    Mr. Moore, I'm sorry, can you ask a question?

19  BY MR. RON MOORE:

20    Yes, ma'am.

21  BY THE COURT:

22    I mean just ask a question.

23  BY MR. RON MOORE:

24    Sure.

25  BY THE COURT:

1    Get to the heart of it ---

2  BY MR. RON MOORE:

3    Sure.

4  BY THE COURT:

5    --- for me, please.

6  BY MR. RON MOORE:

7    Sure. Give me a moment. I lost ---

8  DIRECT EXAMINATION RESUMED BY MR. MOORE:

9  Q   Oh, in a situation like that, what would --

10    what would the Department of Social Services

11    do in order to make sure that the custody

12    agreement that she was signing was -- or had

13    the child going to a good environment?

14  A   If we do -- if we do the actual placement,

15    then we go into the home to do a kinship study

16    -- kinship assessment where we go and look at

17    the house and do background checks on the

18    family members.

19  Q   There was testimony earlier today that there

20    wasn't any type of stuff like that in this

21    case done.

22  A   In this case, there probably was not since the

23    CVA was signed rather than us placing the

24    child with someone else.

25  Q   So even though you created the CVA, you don't

1    do any kind of background to see if you're

2    sending the child to a good place?

3  A   Best practice would be yes, we would.

4  Q   Yes, you would look at it?

5  A   We would do background checks, yes.

6  Q   And what about -- how do you deal with

7    offering services when you place a child into

8    a new family environment, you know, whether

9    it's medical or whether it's food stamps?

10  A   If we do the kinship assessment or the way it

11    was done with the CVA?

12  Q   Well, again, you placed the child via the CVA.

13  A   If we do a kinship placement, then we go into

14    the home and do the checks. I'm not -- I'm

15    not sure I understand what you're asking.

16  Q   Well, it would appear in this case that the

17    CVA was executed and Mr. Mathieu or Ms.

18    Greenlee or the juvenile never heard from

19    Social Services again, and I'm asking you --

20    there apparently is no vehicle for you to

21    follow up, is that correct, when you use a

22    CVA?

23  A   Not with the CVAs. If we do a kinship

24    placement, then we continue to work with that

25    parent who the child was removed from to

1    complete the assessments or whatever they have

2    put in -- in this agreement.

3  Q   Can you tell me in a situation like this case

4    where the mother is asking to place the child

5    with the father -- the biological father, why

6    you wouldn't do a kinship placement there so

7    you could provide services?

8  A   Provide services to ---

9  Q   The child or new family. I mean, you have a

10    child that is a baby with drug problems at the

11    time she is born.

12  A   The best example that I can give is if -- if

13    someone is arrested and that -- that person

14    calls Grandma or biological dad or whoever to

15    come and get that child. They have that right

16    to make that placement without our

17    involvement. That's kind of what Ms. Greenlee

18    did. She made that decision to place the

19    child with the biological father.

20  Q   But you did get involved?

21  A   Well, we were involved, yes.

22  Q   And again ---

23  A   We did not force her to make that.

24  Q   Right, but you had a case file on the baby,

25    knowing the baby had issues. So why wouldn't

1  you say, "Well, let's do a kinship placement
2  so we can provide services to that client or
3  child"?
4  A  Typically, that -- that is what we do.
5  Q  Well, you've got 20-some CVAs, and in each of
6  those you wouldn't have provided any services;
7  would you?
8  A  There were no services provided when the CVA
9  was signed.
10 Q  So, again, can you tell me why that would not
11  -- would not have been the better practice to
12  -- let's do a kinship agreement?
13 A  Looking back, it was -- it is the better
14  practice, but we were acting upon what our
15  attorney said to do in a situation where Ms.
16  Greenlee wanted to voluntarily allow the child
17  to go to its biological father.
18 Q  And when you have a case like where -- like in
19  this case where you have a legal father who's
20  on the birth certificate and a biological
21  father who has not been legitimized at the
22  time, how do you handle that? I mean, what's
23  -- you know, Mr. Roberts was not asked to sign
24  the CVA, and he's, under North Carolina law,
25  the legal father. So why was he not involved?

1  Why didn't you seek the help to legitimize ---
2  A  Again, I wasn't involved in those
3  conversations, so I don't -- I can't answer
4  that question.
5  Q  So, again, these kinds of things aren't talked
6  about at staff meetings?
7  A  They may have been, but I -- I wasn't
8  necessarily at that staff meeting. Sometimes
9  they are just discussed one-on-one between the
10  supervisor and the social worker and not
11  actually in a staff meeting.
12 Q  Now, when DSS came in after this case raised
13  its head in December, did they do an
14  investigation?
15 A  DHHS?
16 Q  Yes, ma'am.
17 A  They have sent me the list of cases to go
18  through, and I have sent them the information
19  that I have. So they're in the process of an
20  investigation, but they're not -- that has not
21  been completed.
22 Q  Does DSS come in and do random audits?
23 A  They do.
24 Q  Well ---
25 A  Well, audits is not the right term, but ---

1  Q  Were there -- were there -- anything they
2  could look at to see that CVAs were being used
3  in cases? Is there any kind of list or code
4  or anything? Or did they just happen to have
5  an open file that had one in it and discovered
6  it?
7  A  They would have just needed to open a file to
8  see one in it.
9  Q  And when you got the letter from DHHS saying
10  that this is against policy and law, what did
11  you do?
12 A  I told the social workers -- I had already
13  told the social workers not to be using that
14  agreement.
15 Q  And did you have discussion with Mr. Lindsay?
16 A  Yes.
17 Q  And what did he say about using it?
18 A  He said as far as he's concerned that he
19  thinks they are legal agreements.
20 Q  Now, have you reviewed the cases that you have
21  found? Have you looked in the cases to see --
22  --
23 A  I have looked in them. I haven't, per se,
24  reviewed them because I haven't had time, but
25  (pause) ---

1  Q  There has been some discussion. Apparently,
2  some of the folks who worked there in the past
3  indicate that maybe cases that were weak or
4  you didn't have enough information to ---
5  BY THE COURT:
6  Mr. Moore, I'm going to ask you to move on to
7  what we have here before us today.
8  BY MR. RON MOORE:
9  Okay. May I have just a moment, Your Honor?
10  That's all, Your Honor. Thank you, ma'am.
11 BY MR. MCKINNEY:
12  Mr. Moore, I don't know if you offered those
13  documents that were shown into evidence or
14  not.
15 BY MR. RON MOORE:
16  I have not, but I would. I don't think we've
17  offered -- State's Exhibit 3 ---
18 BY THE COURT:
19  Four.
20 BY MR. RON MOORE:
21  Four, sorry.
22 BY THE COURT:
23  So you are asking it to be admitted into
24  evidence?
25 BY MR. RON MOORE:

1     Yes, ma'am.

2 BY THE COURT:

3     Any objection?

4 BY MR. MCKINNEY:

5     No objection, Your Honor.

6 BY THE COURT:

7     So admitted.

8 (DEFENDANT'S EXHIBIT NO. 4 ADMITTED)

9 CROSS-EXAMINATION BY MR. MCKINNEY:

10 Q  Ms. Palmer, after you were informed by the

11    state department in Raleigh that these

12    documents that the Cherokee County Department

13    of Social Services had been using were not

14    legally binding documents, did you notify --

15    did your department notify my client, Michael

16    Mathieu, of such fact?

17 A  We have not notified anyone at this point.

18 Q  And when did you find out that a CVA had been

19    used to close the Alana Roberts file?

20 A  I don't specifically remember the date, but

21    Ms. Greenlee came into the office to talk

22    about it after she had been contacted by Ms.

23    Jackson. And that was the date that we had

24    the discussion with her, and I found out that

25    it had been executed in this case.

---

1 Q  Was that -- was that December?

2 A  It would have been late December.

3 BY MR. MCKINNEY:

4     I don't have any further questions, Your

5    Honor.

6 BY THE COURT:

7     Mr. Moore.

8 BY MR. RON MOORE:

9     Nothing further.

10 BY THE COURT:

11    Thank you, Ms. Palmer. You may step down.

12 BY MR. RON MOORE:

13    Scott Lindsay, Your Honor.

14 BY THE COURT:

15    Sheriff, if you will, bring Mr. Lindsay in.

16    Before we proceed with Mr. Lindsay's

17    testimony, we'll take about a five-minute

18    break.

19 BY MR. RON MOORE:

20    Thank you, Your Honor.

21 (OFF THE RECORD)

22 BY THE COURT:

23    I'm ready when you're ready.

24 BY MR. RON MOORE:

25    Yes, ma'am. Judge, one bit of housekeeping.

---

1    I asked Mr. Moore -- Ms. Palmer, I think, was

2    supposed to bring a list of names and -- Mr.

3    Moore indicates on a flash drive that he's

4    going to print off a copy and provide the

5    Court -- I'll get that on the record.

6 BY MR. DAVID MOORE:

7    We will tender those to the Court after the

8    Court has signed that protective order for the

9    in camera ---

10 BY THE COURT:

11    And it's already -- it's already been signed.

12 BY MR. DAVID MOORE:

13    We'll provide this to the Court, thank you.

14 BY THE COURT:

15    Thank you, Mr. Moore.

16 BY MR. RON MOORE:

17    And now we call Mr. Lindsay, Your Honor.

18 BY THE COURT:

19    All right, before Mr. Lindsay takes the stand,

20    I want to speak with counsel at the bench.

21    Just -- Mr. Lindsay, just have a seat for just

22    a moment.

23 (BENCH CONFERENCE)

24    SCOTT LINDSAY, being duly sworn to tell the

25    truth, the whole truth, and nothing but the truth

---

1 of his own knowledge concerning the within matter,

2 testified as follows:

3 DIRECT EXAMINATION BY MR. MOORE:

4 Q  Would you state your name for ---

5 A  My full name is Ronnie Scott Lindsay.

6 Q  Mr. Lindsay, you were served a subpoena, and I

7    believe you brought some documents to provide

8    the Court concerning some CVAs that you -- you

9    found? Could you describe what you have

10    brought before the Court?

11 A  Approximately 30 custody visitation

12    agreements. They're all blank. They're --

13    none of them are signed. They're just what I

14    had.

15 Q  Were those copies of some that have been

16    signed?

17 A  I have no copies that have been signed.

18 Q  No, I'm saying: Were those copies of some

19    that were actually signed? Is that what

20    you're saying?

21 A  I believe so, yes.

22 Q  All right, and what time period?

23 A  They would have been from July 1, 2014,

24    through -- I'm not sure of the last date, but

25    my last date at DSS was January 10, 2018.

---

1   There are none in here that were done in 2018.
2   The last one would have been done in late
3   2017.
4   BY MR. RON MOORE:
5       And, Judge, we would ask the Court to take
6   possession of those since they're -- they're
7   the CVAs from -- that he has found. I don't
8   know if we should mark the exhibit -- I'll put
9   in here ---
10  BY MR. MCKINNEY:
11      I have no objection.
12  BY THE COURT:
13      No objection? Since I -- this would be also
14  included into what I'll make an in camera
15  inspection on, I'm just going to include it in
16  Defendant's No. 3.
17  BY MR. RON MOORE:
18      Thank you, Your Honor.
19  DIRECT EXAMINATION RESUMED BY MR. MOORE:
20  Q   And, Mr. Lindsay, could you for the record
21      state your place of employment prior to
22      January the 10th, 2018?
23  A   From July 1, 2014, through January 10, 2018, I
24      was full-time county attorney with duties
25      assigned to represent the Department of Social

1       Services.
2   Q   And prior to that, you had worked part-time on
3       retainer on contract?
4   A   I was on retainer for the county and hourly
5       for the Department of Social Services.
6   Q   In what time period did you do DSS work?
7   A   I'm not sure of the exact date, but it was
8       either late -- well, 1999, early 2000s.
9   Q   And turning your attention to -- and in this
10      case, we're talking about the Greenlee case.
11      Do you have some familiarity with that case?
12  A   Only that there's an agreement. I don't know
13      the parties or the individuals involved in it.
14  Q   All right, could you explain for us how the
15      CVA came into being at the Cherokee County
16      Department of Social Services?
17  A   Looking at it, it appears that it was drafted
18      by a social worker supervisor. It was -- the
19      normal course was they would have sent that to
20      me to review and make changes if necessary.
21      After that, I didn't see the agreements again.
22  Q   It would be sent to you by email?
23  A   For the -- yes.
24  Q   Is that a DSS email that ---
25  A   It was a county email system.

1   Q   So you just had one address?
2   A   Yes.
3   Q   But you were also full-time county attorney?
4   A   Yes.
5   Q   Now, what is the origin of the CVA agreement?
6       I mean not -- how did you develop it or -- you
7       developed it, I take it?
8   A   Yeah, I was at a CLE and -- I'm not sure what
9       the date was, but it would have been 2010 or
10      2007, perhaps earlier. I just got a form or a
11      copy from another attorney, and we started
12      using that -- or I started using that. And at
13      some point -- and that's what point -
14      - it was -- I gave the form or the form was
15      taken by a supervisor or someone at DSS
16      because -- they had the form themselves
17      because at some point they started sending
18      forms to me with names and dates and --
19      already filled in.
20  Q   And like -- in a case like the one in this
21      case, the Greenlee one, was there some
22      discussion that you would have with the social
23      workers or supervisors or anybody about this?
24  A   On some of them I did, yes.
25  Q   Who would you talk to?

1   A   Whoever the supervisor was at that time.
2       Sometimes a social worker, but -- on this --
3       on this particular case, I -- if I would have
4       spoke to anybody, I would have spoke, I think,
5       with David Hughes who was the -- I don't know
6       if he was a supervisor at that time or not,
7       but I would have spoke to him.
8   Q   What about Ms. Palmer? Did you have
9       conversations with her about the CVAs?
10  A   Only two. Not this one.
11  BY MR. DAVID MOORE:
12      I'm not sure where attorney-client privilege
13      comes in. At some point in time, somebody is
14      going to have to make an objection with his --
15      as the attorney for the department, whether or
16      not Ms. Palmer was the director at the time or
17      not -- I don't know when and where, but I just
18      had to say something for this proceeding.
19  BY THE WITNESS:
20      I did not have any discussion with Ms. Palmer
21      on this agreement.
22  DIRECT EXAMINATION RESUMED BY MR. MOORE:
23  Q   But to others ---
24  BY THE COURT:
25      Move on.

1  BY THE WITNESS:
2      Yes.
3  BY THE COURT:
4      Move on.
5  DIRECT EXAMINATION RESUMED BY MR. MOORE:
6  Q   Now, did you at some point or different times
7      -- did you give, for lack of a better word,
8      education about how to handle these CVAs or
9      how to address people who wanted them or how
10     to effectuate them?
11 A   To whom?  To ---
12 Q   To the people that worked with you.
13 A   I don't have -- I don't have a recollection of
14     a specific gathering of people where we
15     talked.  We did talk at some point in CPS
16     staffings which took place usually on a weekly
17     basis, most of which I attended, some which I
18     did not.  Sometimes the information came that
19     the folks didn't want to sign or had
20     questions.  My advice was they needed to
21     contact an attorney.  I would not speak with
22     them.  I could not speak with them or advise
23     them.  They needed to get an attorney if they
24     had questions.
25 Q   Now, in the Greenlee case, there was a baby

1      who had been born with symptoms of being
2      addicted to drugs, and DSS opened a case and
3      there was some indication in the file that
4      there might be a petition filed.  Ms. Greenlee
5      had done a custody ---
6  BY THE COURT:
7      Ask a question, please, Mr. Moore.
8  DIRECT EXAMINATION RESUMED BY MR. MOORE:
9  Q   Why in a case like the Greenlee case would the
10     department not file a petition?
11 A   I don't know.
12 BY MR. DAVID MOORE:
13     I don't when ---
14 BY THE COURT:
15     Okay.
16 BY MR. DAVID MOORE:
17     I am -- on behalf of the department, I'm
18     involving attorney-client privilege in this
19     specific case with this individual.
20 BY THE COURT:
21     I need to see counsel at the bench.  Mr.
22     Lindsay, step down.  No, I want to see you in
23     chambers.
24 BY THE WITNESS:
25     Does that mean I can stay?

1  (OFF THE RECORD)
2  BY THE COURT:
3      After conferring with counsel in chambers, I
4      will put on the record the Court has in the
5      Court's possession the documents that Mr.
6      Lindsay was asked by subpoena to bring for the
7      Court to look at for in camera review as well
8      as the documents that were provided by Mr.
9      Hughes from the Department of Social Services.
10     The Court informed counsel that we would
11     continue the questioning with Mr. Lindsay in
12     specifics to the case before the Court today
13     and no other proposition.  Are there any
14     further questions, Mr. Moore?
15 BY MR. RON MOORE:
16     I have one question, Your Honor.
17 BY THE COURT:
18     Yes, sir.
19 DIRECT EXAMINATION RESUMED BY MR. MOORE:
20 Q   The CVAs that you brought today and turned in
21     to the judge, did that file include the CVA in
22     the Greenlee case?
23 A   It does.
24 Q   Where did you find that?
25 A   It was -- the form, it was on my computer.

1  Q   Personal computer?
2  A   Yeah.
3  Q   Sir?
4  A   The county computer which I was assigned was
5      subsequently -- I am in the process of
6      purchasing from the county, but it's there.
7  BY MR. RON MOORE:
8      Thank you, sir.  No further questions, Your
9      Honor.
10 BY THE COURT:
11     Mr. McKinney, do you have questions?
12 BY MR. MCKINNEY:
13     I have no questions.
14 BY THE COURT:
15     All right, Mr. Lindsay, you may step down.  Do
16     you have any other questions?
17 BY MR. RON MOORE:
18     No, ma'am.
19 BY THE COURT:
20     Any further evidence, Mr. Moore?
21 BY MR. RON MOORE:
22     No, ma'am.
23 BY THE COURT:
24     Any further evidence, rebuttal?
25 BY MR. MCKINNEY:

1    No, Your Honor.
2   BY THE COURT:
3       I have a number of documents that I'm going to
4   have to make an in camera inspection of.
5   Procedure for time purposes, if you all will
6   approach.
7   (BENCH CONFERENCE)
8   BY THE COURT:
9       All right, we're going to be at ease until
10   about 4:30 so that the Court can review any
11   documentation that's been presented.
12   BY MR. RON MOORE:
13       Judge, Ms. Jackson went to see if she could
14   make a copy of the list of ---
15   BY THE COURT:
16       That fine.  Somebody can bring it to me in
17   chambers.
18   BY MR. RON MOORE:
19       Thank you, Your Honor.
20   BY MR. DAVID MOORE:
21       Your Honor, unless you need me any further,
22   may I be excused?
23   BY THE COURT:
24       You may.  Mr. Moore, will there be somebody
25   here for these records?

1   BY MR. RON MOORE:
2       Which ---
3   BY THE COURT:
4       DSS records that I have.
5   BY MR. RON MOORE:
6       What about ---
7   BY THE COURT:
8       Well, I'm going to make an in camera
9   inspection of these in the back.
10   BY MR. RON MOORE:
11       We need to get ---
12   BY MR. WIJEWICKRAMA:
13       Your Honor, we have one other issue.  Your
14   Honor, if we're on the record, may we please
15   be allowed to dismiss the witnesses?
16   BY THE COURT:
17       You may.
18   BY MR. WIJEWICKRAMA:
19       Thank you.
20   (OFF THE RECORD)
21   BY MR. MCKINNEY:
22       Your Honor, the parties have entered into a
23   temporary custody arrangement in this case by
24   memorandum of judgment.  The parties have
25   signed it along with counsels.  The substance

1    of the agreement is Plaintiff shall have
2   temporary custody of the minor child, Alana
3   Roberts, subject to temporary visitation
4   rights of the defendant for seven hours each
5   Sunday for the next three months.  The
6   defendant's visitation shall be supervised by
7   the defendant's grandmother at the home of the
8   grandmother.  This matter shall be reviewed at
9   the next session of district court after June
10   1, 2018.  All the defendant's visitation under
11   this order is contingent on the defendant
12   submitting to a five-panel urine and hair drug
13   screen and the results being negative for the
14   presence of illegal drugs for drugs for which
15   the defendant does not have a prescription.
16   The parties waive child custody mediation.
17   The defendant shall submit to the drug test
18   within seven days of the execution of this
19   memorandum of judgment at Alpha Drug Testing
20   in Blairsville, Georgia.  The test shall be
21   paid for by the plaintiff, and the results
22   shall be sent to counsel for the plaintiff and
23   the defendant.  That's the substance of that -
24   ---
25   BY MS. JACKSON:

1       That is correct, Your Honor.  I have signed.
2   My client has signed as well.
3   BY THE COURT:
4       And, Mr. McKinney, you and your client have
5   signed as well?
6   BY MR. MCKINNEY:
7       Yes.
8   BY THE COURT:
9       And Mr. McKinney, will you be typing this up
10   into a formal ---
11   BY MR. MCKINNEY:
12       Yes, Your Honor.
13   BY THE COURT:
14       --- judgment to present back to Ms. Jackson --
15   BY MR. MCKINNEY:
16   BY MR. MCKINNEY:
17       Yes, Your Honor.
18   BY THE COURT:
19       --- in reference to this case?
20   BY MR. MCKINNEY:
21       I will.
22   BY THE COURT:
23       Ms. Jackson, I believe that that only leaves
24   left for the Court to make the determination
25   in the declaratory judgment ---

1 BY MS. JACKSON:

2     Correct, Your Honor.

3 BY THE COURT:

4     --- as well as the issue for the designation

5     of a 2.1 judge?

6 BY MS. JACKSON:

7     That is correct, Your Honor.

8 BY THE COURT:

9     At present, the Court is going to take both of

10     those matters under advisement and will be

11     presenting an order to the parties.

12 BY MS. JACKSON:

13     Do you want to hear arguments?

14 BY THE COURT:

15     Does anyone want to hear -- does anyone want

16     to put anything in particular on the record in

17     reference to those matters?

18 BY MR. RON MOORE:

19     I don't think so.

20 BY THE COURT:

21     After -- after the Court had the opportunity

22     for about a 45-minute break to review

23     Defendant's No. 3, I did not get the

24     opportunity to review all of those records

25     within its entirety. Therefore, the Court

1     feels that it would be premature to make a

2     decision on either one of those matters.

3     There's a number of documents within

4     Defendant's No. 3 that has information that

5     can't be provided to the parties because it

6     will need to be redacted under the protective

7     order and under statute, as well as there were

8     a number of proposed CVAs that Attorney Scott

9     Lindsay presented to the Court today due to

10     subpoena, and the Court needs to make further

11     inquiry of the documentation that was

12     presented here today before making a final

13     judgment in reference to those two particular

14     prongs that are still outstanding as

15     counterclaims. Anything further for the

16     parties?

17 BY MS. JACKSON:

18     Your Honor, my only other request would be --

19     or a question rather to the Court: Is a copy

20     of those CVAs going to be provided to counsel?

21 BY THE COURT:

22     The clerk is in the -- the clerk is making

23     copies of those right now. It is my

24     understanding that Mr. Lindsay complied with

25     the subpoena today. So those will be

1     presented here shortly.

2 BY MS. JACKSON:

3     Thank you, Your Honor. You're going to take

4     that under advisement on those?

5 BY THE COURT:

6     No, this is the other one.

7 BY MS. JACKSON:

8     Okay, okay.

9 BY MR. MCKINNEY:

10     Thank you, Your Honor.

11 BY THE COURT:

12     This was the preliminary order. Mr. Mathieu.

13 BY MR. MATHIEU:

14     Yes?

15 BY THE COURT:

16     Good luck to you, sir.

17 BY MR. MATHIEU:

18     Thank you, Your Honor, I appreciate it.

19 BY THE COURT:

20     Ms. Greenlee ---

21 BY MS. JACKSON:

22     Your Honor, Ms. Greenlee only had one ride and

23     that ride was not able to stay. So she had to

24     step out.

25 (PROCEEDINGS WERE CONCLUDED AT 5:08 P.M.)

205

CERTIFICATE

    I, Mai-Beth Ketch, CVR-M, CCR, Court Reporter

and Notary Public, do hereby certify that the

foregoing is an accurate transcript, taken by me

and transcribed under my supervision.

    I further certify that I am not financially

interested in the outcome of this action, a

relative, employee, attorney or counsel of any of

the parties, nor am I a relative or employee of

such attorney or counsel.

    This is the 7th day of March, 2018.

_____

MAI-BETH KETCH, CVR-M, CCR

Notary Public No.: 19981410006

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230