IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL ACTION NO.: 1:18-CV-96

BRIAN HOGAN, et al,

Plaintiffs,

v.

CHEROKEE COUNTY, et al.,

Defendant.

)
)
)
)
)
)
)
)
)
)

REDACTED
**PLAINTIFFS' OPPOSITION TO DEFENDANTS CHEROKEE COUNTY, CINDY PALMER, AND SCOTT LINDSAY IN HIS OFFICIAL CAPACITY ONLY' S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Brian Hogan and Joy McIver, as guardian *ad litem* for and next friend of H.H., pursuant to L.CvR. 7.1(c), respectfully submit this Memorandum of Law in Opposition to Motion for Summary Judgment filed by Cherokee County, Scott Lindsay in his official capacity, and Cindy Palmer in her individual and official capacities (Docs. 56, 59).

## INTRODUCTION

Just as the Defendants ignored the due process rights in and the requirements of Chapter 7B when they coerced Hogan into signing a CVA that unlawfully relinquished custody of his daughter, the Defendants have continued to pretend that Chapter 7B (and applicable DHHS policies and procedures) do not exist. Defendants disregard all of the due process provisions of applicable law and policy and move for summary judgment based on their contention that they did not violate Plaintiffs' rights. The law is clear: DSS employees cannot use a CVA to remove placement and custody of a child

- 1 -

from her biological parent[1]. Defendants' use of the CVA contravenes clearly established state and federal law and the Due Process Clause of the Fourteenth Amendment, and other constitutional protections enshrined in the Fourth and First Amendments.

Defendants attempt to avoid their separate liability with circular arguments that, if adopted, would leave no one liable for their egregious violations of Plaintiffs' rights. Lindsay admits that he created the CVAs, but claims he cannot be held liable because he is not a policymaker. Palmer admits that she was the policymaker, but she claims she cannot be held liable because she did not create the CVAs or participate in obtaining signatures on them. The County claims it cannot be liable because Palmer was acting outside of her authority as DSS Director. None of these arguments avail; the law is clear: All Defendants are liable under 42 U.S.C. § 1983 and *Monell* for violating Defendants' constitutional rights.[2] (Doc. 61.)

---

[1] Even absent the use of this purported "CVA" mechanism for deprivation, North Carolina Courts have long recognized the constitutional right of a parent to protect the fundamental constitutional right of parenting. E.g., *McIntyre v. McIntyre*, 341 N.C. 629, 634, 461 S.E.2d 745, 749 (1995). Accordingly, in order for a grandparent to obtain a custody placement, a proper process through the courts must be followed, and the grandparent must show the custodial parent to be unfit. *Eakett v. Eakett*, 157 N.C. App. 550, 553, 579 S.E.2d 486, 489 (2003)(citing *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054 (2000)). A*ccord, Wellons v. White,* 229 N.C. App. 164, 174, 748 S.E.2d 709, 717 (2013)("The requirement to show unfitness if a grandparent initiates a custody dispute is consistent with a parent's constitutionally protected right to the care, custody and control of the child.")(internal quotation marks and citation omitted). Under clearly established law, no exception exists for a DSS to ignore this right. *See generally, Oxendine v. Catawba County Dept. of Social Services,* 303 N.C. 699, 706, 281 S.E.2d 370, 374 (1981).

[2] While this response is primarily geared toward explaining why Defendants are not entitled to summary judgment, Plaintiffs have already filed a motion for summary judgment seeking judgment

## ARGUMENT

### I. DEFENDANTS' USE OF THE CVA VIOLATED HOGAN'S AND H.H.'S PROCEDURAL DUE PROCESS RIGHTS

Defendants' initial argument is that Hogan waived his procedural due process rights because Hogan consented to giving up custody of H.H. This argument fails both factually and legally: (1) Hogan did not voluntarily sign the CVA and (2) even if Hogan wished to give up custody of H.H., the Defendants, acting under color of state law, still violated Plaintiffs' constitutional rights.

#### A. Brian Hogan did not consent to losing custody of H.H. or to waiving his due process rights.

Defendants have the burden of proving the affirmative defense of consent, instead, Palmer and Lindsay both pled the 5th when asked about every denied allegation and all their affirmative defenses, and never provided a factual basis for their assertions. (CITE) *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *TecSec, Inc. v. Adobe Sys. Inc.*, 326 F. Supp. 3d 105, 109 (E.D. Va. 2018) (Defendant raising affirmative defense has the burden to put forth a factual basis supporting its affirmative defenses to survive summary judgment). They have not met that burden in this Motion.

Defendants obfuscate, asserting: "Brian [Hogan] candidly admitted that his signing the CVA simply memorialized his voluntarily placement of H.H. with Warren." (Doc. 59 at 9.) Defendants conveniently ignore Hogan's testimony that when he was

---

as a matter of law that Defendants are liable under 42 U.S.C. § 1983. Therefore, Plaintiffs adopt and incorporate by reference all parts of Docs. 60 and 61, as though fully set forth herein.

- 3 -

presented with the CVA, he was told, ████████████████████████████

█████████████████████████████████████ (emphasis added).  This

is not consent; this is coercion.

Hogan initially left H.H. with neighbors (not his father, Warren as implied by

Defendants, ███████████████████ while he went to Asheville to care for his sick

wife.  (Doc. 59 at 9.) Yet the Defendants attempt to somehow equate leaving a child

with a neighbor for some period of time as seeking social services assistance that

culminated in his executing a document that purports to permanently and irrevocably

transfer legal and physical custody of H.H. to her grandfather forever.[3]  Defendants'

insinuations that Hogan wanted to eternally surrender custody of H.H. have no factual

support, and Hogan's deposition says the opposite.

Hogan faced an unavoidable Hobson's choice, believing that he had a virtual gun

to his head and that if he did not sign the CVA, he would lose custody of H.H. and

never see her again.  (Doc. 61-9 at 6) ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████Although Hogan admits that he signed the CVA, he signed it under

---

[3] The CVA was not a private agreement between two adults. It was an illegal process used by a government agency cloaked with lawful authority, misusing their authority, and leveraging their position as a government actor, to obtain a signature that purported to unlawfully facilitated the transfer of H.H. This was not a Safety Plan that Hogan could revoke; this was drafted by DSS as a permanent transfer document that DSS represented was conveyed as having a legally binding and permanent effect.

circumstances that, as a matter of law, cannot be deemed voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) ("if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then…the [Supreme Court has found the] consent invalid."). As a result of the unlawful procedure and the duress he suffered, Hogan's purported "consent was not his own 'essentially free and unconstrained choice' because his 'will ha[d] been . . . overborne and his capacity for self-determination critically impaired.'" *United States v. Watson*, 423 U.S. 411, 411–12 (1976) (quoting *Schneckloth*, 412 U.S. at 225). Hogan was given no information about his right to a hearing under Chapter 7B or other social services available to his family. Hogan had only two choices – sign the CVA or DSS would take H.H. from him immediately and he would never see her again.

Here, at best for the Defendants, the threats resulted in "'[o]rderly submission to [officials] who, in effect, represented to the defendant that they had the authority to [do what they claimed the right to do], against his will if necessary, was not such consent as constituted an understanding, intentional, and voluntary waiver by the [Plaintiff] of his fundamental rights under the… Constitution.'" *Bumper v. North Carolina,* 391 U.S. 543, 550 n. 14 (1968) (quoting *United States v. Elliott*, 210 F.Supp. 357, 360 (D. Mass. 1962)).

Clearly, Hogan's execution of the CVA ████████████████████

████████████████████████████████████████████████ was not consensual.

His signature was obtained by coercion and misrepresentations.

> B. Hogan Was Entitled to Due Process Under Chapter 7B, Regardless of Whether He Consented to Give Up Custody of H.H (which is denied).

Defendants improperly argue that "consent extinguishes constitutional procedural safeguards." (Doc. 59 at 9.) However, consent is irrelevant in the context of Chapter 7B, which requires that a parent have certain due process protections, even if he wants to give up custody of his child. Defendants were required to give him all the protections afforded by Chapter 7B, through the constitutional procedures and policies established by DHHS. Because they failed to do so, they violated Plaintiffs' rights. (Doc. 61.)

None of the cases Defendants cited support their argument that Hogan waived his procedural due process rights consider the rights and safeguards he would have been afforded by Chapter 7B and applicable NCDHHS policies, protocols and procedures, which is the cornerstone for parents' and children's due process rights in DSS proceedings.[4] Defendants never cite to Chapter 7B until page 17 of their Brief, and only then in passing regarding Lindsay's role at DSS. Defendants also completely ignore the latest pronouncement from the North Carolina Supreme Court regarding the right of a father to parent his child.

---

[4] A copy of the relevant DHHS policies are submitted as Exhibits. *See* Beerman Aff. and accompanying exhibits. ████████████████
████████████████

In *In the Matter of E.B.*, 847 S.E.2d 666, 2020 WL 5742600 (N.C. Sept. 25, 2020), the North Carolina Supreme Court held that DSS's failure to follow the procedures set forth in Chapter 7B were a *per se* violation of the father's constitutional rights. The father did not know about his daughter, Ella until DSS contacted him, but he immediately expressed interest in being a father and entered into an out-of-home family service agreement with DSS. After paternity was established, the court held multiple permanency planning and review hearings and entered various orders imposing requirements on the father before he could be reunited with Ella. The father did not comply with all of the trial court's orders, but persisted in seeking visitation with Ella, and the Court terminated his parental rights. *Id.* at 670

The father appealed, arguing that the trial court lacked subject-matter to terminate his parental rights because DSS never filed a petition seeking to have Ella declared an abused or neglected child. The Supreme Court agreed, finding that the requirements that DSS and the trial court imposed on the father were meaningless.

> DSS's failure to file such a petition deprived the trial court of the legal authority to demand that respondent demonstrate his parenting abilities to the trial court's own satisfaction prior to taking Ella into his own custody, care, and control. It also deprived the trial court of the legal authority to dictate when, where, and how frequently respondent would be permitted to interact with his child. These requirements and restrictions had no binding legal effect, but the trial court treated them as preconditions respondent needed to satisfy, and parameters he needed to comply with, in order to exercise his constitutional parental rights. … Until the trial court entered an order granting custody of Ella to DSS and taking custody away from her father on some legally cognizable ground, DSS and the trial court's desire to further Ella's best interests, however well-intentioned,

- 7 -

provided no justification for interfering with respondent's exercise of his constitutional prerogatives as Ella's parent.

*Id.* at 671-72, The Court concluded: "DSS's and the trial court's actions repeatedly infringed upon respondent's constitutional parental rights." *Id.* at 670.

Defendants' citations to cases from other jurisdictions cannot overcome this North Carolina Supreme Court precedent. In addition, those cases are readily distinguishable because they involved parents who had gone through an established legal process (consistent with constitutional protections) to give up custody of their children, so there could be no due process violation. *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008) ("[N]ot even the Smiths argue that they involuntarily consented to enter into the plan. Rather, they only argue that they were not allowed to recover their children after the Safety Plan had been initiated despite their best efforts."); *Dupuy v. Samuels*, 465 F.3d 757, 761-63 (7th Cir. 2006) (a safety plan, "**which involves restrictions short of removal of a child**" could not violate constitutional rights because it was not the product of coercion and did not involve fundamental rights.) (emphasis added). The CVA, which purported to remove H.H. permanently, implicated fundamental rights making *Dupuy* completely inapplicable[5]

---

[5] The *Dupuy* Court juxtaposed the sort of threat DSS could make with those it cannot by citing to *Doe v. Heck*, 327 F.3d 492, 524-25 (7th Cir. 2003), "which held, as far as bears on this case, that a state agency violated the Constitution by threatening parents with removing their child from their custody if they did not have their attorney call the agency within 24 hours. **But it was a threat the agency had no right to make**. . . . . The case nicely illustrates the line between a lawful threat and duress." *Id.* at 763 (7th Cir. 2006) (emphasis added). Here, the threat to give H.H. to the state and never let Hogan see her again was not one that DSS could make. *See* Doc. 61-13 at 4,14)

- 8 -

(emphasis added). *See also* Pls'. Ex. 31 to Lindsay Dep.

*Weller v. Dep't of Social Services for City of Baltimore*, 901 F.2d 387 (4th Cir. 1990) actually helps Plaintiffs, not the Defendants. There, a DSS in Maryland had taken custody of plaintiff's child on an emergency basis, based on allegations of abuse, and placed him with a grandmother. Plaintiff admitted that he attended a hearing on the DSS petition, so his claim for procedural due process was dismissed as to that proceeding. *Id* at 393. However, Plaintiff also complained that he was denied a hearing when custody of his child was transferred to the child's mother. The Court did not dismiss that claim, finding that "such allegations, if proven, would rise to the level of a due process violation." *Id.* The action was remanded to the district court for additional factual findings because, "proof that defendants deprived Weller of the custody of Matthew without a hearing—either prior to the transfer of custody or promptly after an emergency transfer of custody—would show a due process violation, for which appropriate relief may be granted." *Id.* at 395.

Here, it is not merely the taking H.H. from Hogan's custody that is the constitutional violation; it is doing so without due process of law that violates the constitutional rights of a father and his daughter. As explained more fully in Plaintiffs' Summary Judgment Brief (Doc. 61-13), the requirements of Chapter 7B and applicable DHHS policies and procedures, which describes with particularity the due process of law mandated where DSS employees want to take custody of a child from the child's

- 9 -

parents, are mandatory.[6]  Defendants completely flouted Chapter 7B and applicable DHHS policies by not filing any petitions or providing a hearing to Plaintiffs. Defendants used the CVA to deprive Plaintiffs of North Carolina's statutory mechanisms for ensuring constitutionally adequate due process, violating Plaintiffs' procedural due process rights as a matter of law.  (Doc. 61-13 at 7-13)

      C.     The *Parrat-Hudson* Doctrine does not defeat Plaintiff's due process claim.

Defendants' arguments regarding the *Parrat-Hudson* doctrine are an absurd tautology that grossly misstate the doctrine.  Essentially, Defendants argue that Hogan's nine state law tort claims provide a meaningful post-deprivation remedy, therefore defeating Plaintiffs' procedural due process claim.

First, *Weller* expressly rejects this argument.

> We are not faced with a situation like that in *Parratt v. Taylor*,[7] 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), in which the Supreme Court held that procedural due process concerns implicated by the deprivation of an inmate's $23.50 hobby kit were satisfied by the availability of a post-deprivation tort remedy. The liberty interest implicated in this case is of far greater import, and we find a state tort remedy particularly inappropriate here.

*Weller,* 901 F.2d at 394.  Therefore, the state tort claims are clearly not sufficient to remedy the due process violation alleged in this action.

---

[6] *See generally* N.C. Gen. Stat. § 7B-100(1) ("This Subchapter shall be interpreted and construed so as to . . . provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents.")

[7] The fact that the Defendants cite a case to this Court and then ignore its clear holdings is at best poor advocacy, at worst it constitutes deliberate omission of controlling authority from the Court, to mislead the Court.

- 10 -

The fact that Hogan was able to reclaim H.H. was a matter of pure happenstance. It was not the Defendants (e.g. the state) who provided the post-deprivation hearing – Hogan's counsel provided her services pro bono. Requiring Hogan to seek, initiate, pursue, and obtain the "remedy" cannot possibly be a meaningful post-deprivation remedy under *Parrat-Hudson,* which requires **the state** to provide the post-deprivation remedy.

## II. DEFENDANTS SHOWED "DELIBERATE INDIFFERENCE" TO PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS.

It appears that the parties agree that the proper overall standard for assessing a substantive due process violation is the "shocks the conscience" standard. (Doc. 59 at 12.) However, the parties disagree about the level of culpability that must be shown to establish conscience-shocking conduct. Defendants erroneously contend that the appropriate standard is "intent to harm." However, "the intent-to-harm standard most clearly applies 'in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation.'" *Dean v. McKinney*, No. 19-1383, 2020 U.S. App. LEXIS 31415, at *10 (4th Cir. Oct. 2, 2020); *see also Radecki v. Barela*, 146 F.3d 1227, 1230 (10th Cir. 1998) (intent-to-harm standard applies to "situations involving law enforcement and governmental workers deployed in emergency situations."). But the situation involving H.H. was not immediate, imminent, exigent, fluid, or rapidly evolving; quite the opposite -- H.H. was allegedly left with a trusted adult Hogan believed was responsible. (Doc. 59 at 12.) There is no evidence in the

- 11 -

record that H.H.'s life was in danger or that she was subjected to conditions risking substantial injury to her. There is no evidence in the record that emergency action was needed. In fact, ███████████████████████████████████████████████████████

███████████████████████████████ There was time for cool deliberation, and Defendants calculated and deliberately chose to employ the unlawful CVA.

The appropriate standard for a substantive due process violation here is deliberate indifference. *See Dean*, No. 19-1383, 2020 U.S. App. LEXIS 31415, at *11-12 (citing *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) ("Liability for deliberate indifference rests upon the luxury of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. Thus, when a [government employee] is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims . . . .") (internal citations, brackets, and quotation marks omitted for ease of reading). Therefore, the question for the Court raised by the Defendants' Motion is whether there is sufficient evidence in the record, viewed in the light most favorable to the Plaintiffs, from which a reasonable jury could find that the Defendants were deliberately indifferent to Hogan's and H.H.'s constitutional rights. Deliberate indifference connotes more than mere negligence, but

- 12 -

rather a reckless disregard for the rights of Hogan and H.H. that a constitutional violation was likely. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). The evidence show that Defendants' flagrant and frequent use of the CVA process constitutes deliberate indifference.

## III. PALMER CANNOT DEFEAT LIABILITY BY ASSERTING THAT SHE HAD NO PERSONAL INVOLVEMENT IN THE HOGAN CVA.

Defendants contend that the claims against Palmer should be dismissed because she had no personal involvement in the Hogan CVA. Not so. ██████████

████████████████████████████████████████████████████

███████████████████████████ Palmer was the Director of Social Services for Cherokee County in November 2016, when Hogan signed the CVA. (Doc. 1-1 at 112-13) In total, she had worked at the Cherokee County DSS for approximately 17 years as of November 2016. (Doc. 1-1 at 113) After becoming director, Palmer received additional training in law, policy, and procedure governing DSS. (*Id.*; ████

████) Palmer knew or should have known that the use of CVAs violated Plaintiffs' due process rights.

Palmer and Lindsay have been indicted for her actions in connection with the use of the CVAs. When Plaintiffs' counsel attempted to depose her, Palmer invoked her Fifth Amendment rights in response to numerous questions[8]. (Doc. 61-11.) Plaintiffs

---

[8] This Court should make adverse inferences as to her and Lindsay's testimony when they asserted the 5th Amendment. *Baxter v. Palmigiano*, 425 U.S. 308, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976) ("The

are entitled to an adverse inference as to that testimony. (Doc. 61-11.) In particular, those adverse inferences establish that Palmer acted with deliberate indifference to the rights of juveniles. (Doc. 61-11) During her deposition, Palmer invoked her Fifth Amendment rights in response to all the questions regarding each and every allegation of her Answer and her affirmative defenses. Specifically she was asked about each and every denial in her answer, and whether each denial was now deemed admitted, at which time, she specifically reasserted her Fifth Amendment privilege. Furthermore, when questioned regarding the truthfulness or applicability of each and every affirmative defense, Palmer repeatedly invoked her Fifth Amendment privilege. Accordingly, Palmer has now admitted all the allegations against her via adverse inference and waived all of her affirmative defenses, including, consent. ▮▮▮▮▮▮

▮▮▮▮

What is lacking in the record is any evidence from which a reasonable jury could conclude that Palmer was **not** the moving forces behind the use of the CVA, which

---

prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a civil cause."); *see also In re Grand Jury Subpoena*, 836 F.2d 1468, 1472 (4th Cir. 1988) *Cascade Capital, LLC v. DRS Processing LLC*, No. 3:17-cv-00470-RJC-DSC, 2019 U.S. Dist. LEXIS 183816, at *11 (W.D.N.C. Oct. 23, 2019); *Evans v. Capps*, No. 7:15-CV-252-BO, 2018 WL 5291864, at *5 (E.D.N.C. Aug. 3, 2018), *report and recommendation adopted*, No. 7:15-CV-252-BO, 2018 WL 4635025 (E.D.N.C. Sept. 27, 2018*), aff'd*, 765 Fed. Appx. 44 (4th Cir. 2019) (holding that in the civil context, a party's invocation of the Fifth Amendment privilege may be used against him, "even if that silence is an exercise of his constitutional privilege against self-incrimination," striking summary judgment declaration, and granting summary judgment).

violated Hogan and H.H.'s rights, and that she evidenced a reckless disregard, e.g., a deliberate indifference to the violation of rights.[9]

## IV. CHEROKEE COUNTY IS LIABLE TO HOGAN AND H.H. UNDER *MONELL*

The use of the CVA and the unconstitutional behaviors associated with its use was an official policy, practice, and custom of Defendant Cherokee County giving rise to its liability. Plaintiffs discussed the necessary components for *Monell v. Dep't of Soc.Servs.*, 436 U.S. 658, (1978) liability in their summary judgment brief (Doc. 61-13), which is incorporated by reference.

### A. Cherokee County Is Liable For Palmer's Actions as a Policymaker.

Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights "under color" of state law. 42 U.S.C. § 1983. Anyone whose conduct is "fairly attributable to the State" can be sued as a state actor

---

[9] The cases Defendants cite in support of their lack-of-involvement argument are readily distinguishable. In *Smith v. Cleveland County*, 2011 WL 3861396 at * 4 (W.D.N.C. 2011) (unpublished), the social worker used a lawful practice, a voluntary temporary safety agreement, to take children. *Id.* at 10. The *Monell* claim in *Smith* was premised on municipal liability by ratification of unconstitutional acts, not by implementation of an unconstitutional policy. *Id.* at 11. The Court found that a lack of evidence showing the involvement of the director. In contrast, here, Plaintiffs have shown that the use of CVA was not an isolated occurrence, but represented the implementation of a facially unconstitutional policy, making *Smith* inapplicable.

*Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) involved a prisoner suing the state superintendent of prisons for denial of medical care while in a local jail. The court dismissed the action, holding "[i]t is conceded that Vinnedge alleged no facts indicating Gibbs' personal involvement in the denial of medical care. No allegation has been made, let alone factually supported, however liberally we construe the complaint, that Gibbs had any personal connection with any denial of medical care whoever may have been responsible to furnish it, the local Sheriff or the detectives." *Id.* at 928. Unlike here, plaintiff's claim was not based on an unconstitutional policy. Had Gibbs promulgated a policy to deny inmates medical care, then he would have been liable under § 1983.

- 15 -

under § 1983. *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The determination of whether an individual can be considered a final policymaker is made in light of state law. *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). Here, Defendants agree that Palmer was the policymaker for DSS. (Doc. 59 at 16-17.) Testimony from former DSS personnel establishes that Lindsay began using CVAs[10] in lieu of DSS court proceedings sometime around 2007. (Doc. 1-1 at 121.) CVAs were used to avoid court involvement in cases to permanently move children from their parents to another person. (Doc. 1-1 at 103.) The decision to use a CVA in a given case was made during DSS staff meetings, when particular cases would be discussed between the social worker, a supervisor, and Lindsay. (Doc. 1-1 at 103.) ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

Palmer was statutorily and structurally responsible for establishing and maintaining social services policies for Cherokee County in November 2016. During her tenure, the illegal use of CVAs to remove children from their parents, which violates the constitutional rights of parents and children, was a policy of Cherokee County for

---

[10] ████████████████████████████████████████████████████
███████████████████████

which they are all liable.  The unconstitutional policy culminated in the use of a CVA

to remove H.H. from Hogan's custody in violation of North Carolina law and the Due

Process Clause of the Fourteenth Amendment. *See id.*  This theory of liability is based

upon the affirmative act of the County's policymaker (Palmer) to create or to permit a

policy to be established that directly violated the rights of the Plaintiffs.

Defendants have asserted that County cannot be liable because Palmer did not

have the authority to implement the CVA policy. (Doc. 59 at 19-21.) Defendants argue

that because Palmer implemented an illegal policy, she was acting outside of the scope

of her policy making authority.  Adopting Defendant's theory would create an absurd

result whereby a county is always immune from liability for an unconstitutional policy.

No law authorizes local government actors deliberately and maliciously to implement

unconstitutional policies on its behalf.[11]  *See generally Butz v. Economou*, 438 U.S.

478, 495, 98 S. Ct. 2894, 2905 (1978)(a government official may not with impunity

ignore the limitations which the controlling law has placed on that official's powers;

---

[11] *Cf.,* **Error! Main Document Only.***Evans v. Chalmers*, 703 F.3d 636, 656–67 (4th Cir.2012)(Even under state law claims a governmental entity or official defendant may be held liable where the official acts wantonly or with malice or corruption or outside the scope of his official duties); *Shupe v. Baur*, No. 7:14-CV-56-F, 2015 WL 2193794, at *8 (E.D.N.C. May 11, 2015)("A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *In re Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 890–91.)  *See also,* **Error! Main Document Only.***Kline v. Cleveland Cty.*, No. 1:19-CV-00197-MOC-WCM, 2020 WL 1692348, at *9 (W.D.N.C. Apr. 7, 2020)("Because Plaintiffs' Amended Complaint alleged facts supporting the legal conclusion that the employees acted with malice, the employees' motion to dismiss based on Public Official Immunity is denied.").

- 17 -

"if they are accountable when they stray beyond the plain limits of their statutory authority, it would be incongruous to hold that they may nevertheless willfully or knowingly violate constitutional rights without fear of liability").

Adopting the Defendants' theory would mean that when a single person has policy making authority for a County, the county could not be held liable for that unconstitutional policy. District precedent clearly holds otherwise. *Cf. Wilcoxson v. Buncombe County*, 129 F. Supp. 3d 308, 315 (W.D.N.C. 2014) (Like a county sheriff in North Carolina has over county law enforcement policy, the DSS Director has the final authority over all social services policies for the County.)

The same rationale applies here. When Cherokee County appointed Palmer as director, it conferred her with the authority to create County policies. She implemented and permitted the implementation of an unconstitutional and illegal policy, the use of CVAs. That policy resulted in the violation of Hogan and H.H.'s rights. The County, under *Monell*, is the moving force behind that deprivation because Palmer had the power to establish County social services policies. The fact that the policy was illegal cannot protect the County from liability.

The Defendants' cited cases do not support their arguments. *Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 543 (D. Conn. 2006) states that "[w]hen a plaintiff's theory of municipal liability is based on showing that a **single action** by a municipal employee caused the constitutional injury, rather than showing that a formally adopted

- 18 -

or ratified municipal policy caused the injury, a plaintiff must demonstrate that the official had final policymaking authority for the particular subject matter involved." (emphasis added). In *Doe*, the mayor of the city was accused of sexually assaulting individuals, and the plaintiffs alleged that because the Mayor was the final policymaker of Waterbury in the areas of law enforcement, safety, and social issues, "when he acted, it was as if Waterbury acted." *Id.* at 544. The court rejected this argument because the Mayor's action did not involve a purpose associated with his role. *Id.* at 546. This is a clearly distinguishable case because (1) the implementation of the CVA process as a policy was not a single action; (2) Palmer established the CVA policy for a purpose associated with a the functions of her role as director and not for her personal gratification; and (3) the individual decision to rape someone is so far afield from the conduct undertaken here that any type of comparison is absurd.

Like *Doe, Danielson v. Huether*, 355 F. Supp. 3d 849 (D.S.D. 2018) also fails to help Defendants. This case merely held that a city could not be liable for the Mayor assaulting an individual. *Id.* at 873. Assaulting someone is so far outside the realm of a Mayor's municipal responsibilities that it is inconceivable that such conduct could be the official policy of the municipality.

*Miller v. City of E. Orange*, 509 F. Supp. 2d 452 (D.N.J. 2007) is also inapposite. In *Miller*, the police chief was accused of perjury. *Id.* at 457. The Court found that "municipal liability under § 1983 attaches where -- and only where -- a deliberate

choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. Here Plaintiffs have presented evidence that the use of CVAs was an official policy of the County as established by Palmer. (Doc. 61-13 at 17-20)

The fact that 39 CVAs were used in 2016 and 2017 alone establishes that the use of CVAs was a social services policy of Cherokee County under Palmer. The defendants are trying to flee from Palmer's authority now, but they cannot[12]. State law empowers the DSS Director with the power to set social services policies. Investigating allegations of abuse, neglect, and dependency of juveniles and utilizing procedures to remove those juveniles from their parents falls squarely within social services policies for which Palmer was responsible as director. Accordingly, under *Doe*, the County is liable. 453 F. Supp. 2d at 546.

B.   The County Deliberately Failed to Exercise Its Oversight Authority.

Under *Monell*, municipal liability may attach where a policymaker acquiesces in longstanding practice that constitutes "standard operating procedure" of local government. That is the case here. Plaintiffs incorporate by reference their arguments on this issue from their summary judgment brief. (Doc. 61-13 at 21-22.)

C.   The use of CVAs was a widespread and persistent practice so as to constitute a custom or usage with the force of law.

---

[12] Palmer remains employed by Cherokee County as business manager of DSS.

A county is liable under the condonation doctrine "if municipal policymakers fail 'to put a stop to[,] or correct[,] a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). As discussed in Plaintiffs' summary judgment brief, Plaintiffs have established *Monell* liability by condonation. (Doc. 61 at 22-24.)

D.   The County was deliberately indifferent to the rights of Hogan and H.H. by failing to train.[13]

As an alternative theory of 42 U.S.C. § 1983 liability, Plaintiffs alleged deliberate indifference displayed in the failure to train. *Connick v. Thompson*, 563 U.S. 51, 91, 131 S. Ct. 1350, 1377 (2011)("failure to provide training may be so egregious that, even without notice of prior constitutional violations, the failure 'could properly be characterized as deliberate indifference to constitutional rights")(citing *City of Canton v. Harris*, 489 U.S. 378, 390, n. 10, 109 S.Ct. 1197, 1205, n.10 (1989); *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 537 (E.D. Va. 2015)(although a stringent standard, a plaintiff  establishes governmental deliberate indifference liability for failure to train, where  policymakers were aware of, and acquiesced in, or established a policy or a pattern of constitutional violations and based on a supervisory power's failure to train its employees concerning an obvious constitutional duty that the particular employees are certain to face, causing governmental employees to violate the

---

[13] Plaintiffs did not discuss failure to train in their Motion for Partial Summary Judgment (Doc. 61-13) because a genuine issue of material fact exists to determine whether Palmer, as policy maker over DSS failed to provide adequate training as to establish deliberate indifference.

plaintiff's rights); *Brown v. Mitchell*, 308 F. Supp. 2d 682, 702–03 (E.D. Va. 2004) "The imposition of supervisory liability on a failure to train theory is a more specific formulation of the *Monell* 'official policy or custom' inquiry wherein the official 'policy or custom' is the training program (or lack thereof).")(citing *Spell v. McDaniel*, 824 F.2d 1380, 1389–90 (4th Cir.1987).

The County, through Palmer as policy maker, is liable for failing to train her employees to avoid using CVAs that violate the constitutional rights of parents and children. It is undisputed that CVA use is widespread not a single or isolated incident. (*See* Docs. 61-13 at 22-24; 61-6 at 34-36; 61-10 at 18-19) Palmer, having the responsibility under North Carolina law to oversee DSS, failed to ensure that her social workers were adequately trained to use CVAs, and had Palmer ensured proper training, the CVAs would never have been used.

## V. THE SOVEREIGN IMMUNITY EXCLUSION IN THE INSURANCE POLICY DOES NOT BAR PLAINTIFFS' CLAIMS

A governmental entity waives sovereign immunity by purchasing liability insurance. N.C. Gen. Stat. § 153A-435(a). Defendants admit that they have purchased insurance, but argue that it does not cover Plaintiffs' claims because there is a sovereign immunity exclusion in the General Liability ("GL") and Public Officials Liability ("POL") coverage forms. (Doc. 59 at 23-25.) Although the cases cited by Defendants upheld sovereign immunity exclusions similar to the one at issue here (Doc. 59 at 24-25), those cases considered the exclusion in isolation, as opposed to reviewing the

totality of the policy to determine if the application of the exclusion would render the insurance illusory.

As an initial matter, Defendants do <u>not</u> have sovereign immunity for all the claims asserted in Plaintiffs' complaint. Sovereign immunity applies to the negligence claims, but <u>not</u> to the constitutional claims against Defendants. Federal courts have long held that municipalities and other local government units are <u>not</u> entitled to immunity and may be sued directly for monetary, declaratory, or injunctive relief pursuant to 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 & n.54 (1978); *Hunter v. Town of Mocksville*, 877 F.3d 538, 553 (4th Cir. 2018). Thus, the policy's sovereign immunity exclusion is irrelevant to Plaintiffs' claims under 42 U.S.C. § 1983 or other claims for constitutional violations because Defendants have no sovereign immunity for those claims in the first place.

Plaintiffs agree that Defendants can raise the defense of sovereign immunity as to the *negligence* claims. However, whether the sovereign immunity exclusion in the policy applies is a completely separate inquiry. Exclusions in both the GL and POL policies purport to exclude coverage for any claim for which the County may assert government immunity under North Carolina law. (Doc. 59-10, p. 6; Doc. 59-11, p. 4.) Those provisions are exclusions, which must be construed narrowly, with ambiguities being construed in favor of coverage. *N.C. Farm Bureau Mut. Ins. Co. v. Stox,* 330 N.C. 697, 702, 412 S.E.2d 318, 321 (1992). This is a broad and ambiguous exclusion,

particularly when considered vis-à-vis the comprehensive coverage provisions for Defendants' acts. (Doc. 59-10, p. 2) ("The Pool will pay on behalf of a Covered Person any Damages the Covered person becomes legally obligated to pay because of an occurrence that occurs during the Contract Period."); (Doc. 59-11, p. 2) ("The Pool will pay on behalf of a Covered Person any Damages the Covered Person becomes legally obligated to pay because of a Public Officials Wrongful Act that occurs during the Contract Period.")  In *Fulford v. Jenkins*, 195 N.C. App. 402, 672 S.E.2d 759 (2009), the North Carolina Court of Appeals held that a plaintiff could proceed with negligence claims against a DSS because an exclusion in defendants' insurance policy took away most of the coverage the insured had bought.

> Were we to adopt Defendants' interpretation of the policy, we would have to assume that Duplin County intended to purchase an insurance policy that provided it almost no coverage. … <u>Because Duplin County is a governmental entity and political subdivision of the State,</u> [citations omitted], <u>if the policy exempts Duplin County from coverage for all of its governmental functions, it is uncertain what acts by Duplin County *would* be covered by the policy.</u> The vast majority of actions for which Duplin County could face liability are those performed in its official capacity as a political subdivision of this State. It is thus "unclear how the contracting parties could have had any meaningful meeting of the minds as to what services were and were not excluded" if the policy as written was not intended to cover the official acts of Duplin County.

*Id.* at 409, 672 S.E.2d at 763 (emphasis added).

Likewise, here, a comprehensive exclusion for all claims to which Cherokee County and its agents could claim governmental immunity renders the policy meaningless.   The County elected to purchase a policy that has broad coverage

- 24 -

provisions, which waives Defendants' immunity. (Docs. 59-10, 59-11.) But that same policy has an equally broad exclusion that purports to disclaim coverage for any claim for which the Defendants have sovereign immunity. The circular nature of this transaction leads to a zero-sum result: The Defendants had immunity; they waived their immunity by purchasing insurance; they regained their immunity because the insurance policy they bought excludes coverage for claims for which they already had immunity. The County could have purchased no insurance and be entitled to assert sovereign immunity as a defense to Plaintiffs' negligence claims, thereby putting it in exactly the same position it is in after having purchased insurance. Courts have rejected similar attempts by insurers to write a policy, then put in broad exclusions that render the coverage illusory. *See e.g.*, *Alliance Mut. Ins. Co. v. Dove*, 214 N.C. App. 481, 488, 714 S.E.2d 782, 787 (2011) ("[T]o adopt the plaintiff's very broad reading of the exclusion clause would result in the exclusion clause swallowing up the whole of the commercial liability policy, and render any coverage contained therein illusory."); *Holcomb v. United State Fire Ins. Co.*, 52 N.C. App. 474, 482, 279 S.E. 50, 55-56 (1981) ("[W]e have extreme difficulty endorsing broad, general exclusions which seek to render illusory narrow and specific provisions of coverage.")

Defendants purport to provide "the entire insurance policy" to the Court (*id.* at 23, n.7), but they omitted the pages listing the premiums that Cherokee County paid to

the Pool the coverage.[14]

This Court should find that the sovereign immunity exclusion is too broad and ambiguous to be enforceable and interpret the policy in favor of coverage for the negligence claims. As a result, Defendants have waived their governmental immunity by the purchase of insurance and their motion for summary judgment on this basis must be denied.

## CONCLUSION

Defendants' motion for summary judgment should be denied.

Respectfully submitted, this the 29th day of October, 2020.

/s/David A. Wijewickrama
David A. Wijewickrama
N.C. State Bar No.: 30694
Law Office of David A. Wijewickrama, PLLC
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801
Fax:   828-454-1990
*Attorney for Brian Hogan*

/s/ Melissa Jackson
Melissa Jackson
N.C. State Bar No.: 34013
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801
*Attorney for Brian Hogan*

/s/ Ronald L. Moore
Ronald L. Moore
N.C. Bar No.: 9619
P.O. Box 18402
Asheville, NC 28814
Phone: (828) 777-1812
Fax: (828) 253-2717

*Attorney for H.H.*

/s/ D. Brandon Christian
D. Brandon Christian
N.C. State Bar No.: 39579
P.O. Box 2917
Fayetteville, NC 28302
Phone :(910) 750-2265
*Attorney for H.H.*

---

[14] A certified copy of the 2016-17 policy shows that the County paid $215,999.00 for this policy. (Plt. Ex. 1 to this Opp. at 3.)  The sovereign immunity exclusion is not unique to the POL and CGL forms; it appears in every liability coverage form. (*Id.* at 74, 75, 90, 93, 94, 128, 130, 144, 146, 160, 162, 172, 173, 184, 185.)  If the exclusion is applied in the manner that Defendants advocate, then the County's $215,000 premium bought it nothing because it already had immunity by operation of law.

- 26 -

## CERTIFICATE OF SERVICE

This is to certify that on October 29, 2020, a copy of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the Clerk of Court using CM/ECF system, which will send notification to all counsel having made appearances in the case as follows:

Patrick Houghton Flanagan
Cranfill, Sumner & Hartzog, L.L.P.
2907 Providence Road
Suite 200
P.O. Box 30787
Charlotte, NC 28230
704-940-3419
704-332-9994 (fax)
phf@cshlaw.com
*Attorney for Defendant Scott Lindsey*
*in his individual capacity*

John L. Kubis, Jr
Teague Campbell Dennis & Gorham, LLP
22 South Pack Square, Suite 800
Asheville, NC 28801
828-254-4515
828-254-4516 (fax)
jkubis@teaguecampbell.com

*Attorney for Defendant Cindy Palmer*
*in her individual capacity*

Sean F. Perrin
Womble Bond Dickinson (US) LLP
301 South College St., Suite 3500
Charlotte, NC 28202
704 331-4992
704 338-7814 (fax)
sean.perrin@wbd-us.com

*Attorney for Defendants Cherokee County,*
*Cherokee County DSS, Scott Lindsey in his*
*official capacity, and Cindy Palmer in her*
*official capacity*

/s/ D. Brandon Christian
D. Brandon Christian
N.C. Bar. No. 39579
Post Office Box 2917
Fayetteville, NC 28302
Telephone: (910) 750-2265
Email: brandon.christian@ncleag.com

*Attorneys for Plaintiff H.H. and Class Minors*

- 27 -