**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:18-cv-00096-MR-WCM**

| | |
|---|---|
| **BRIAN HOGAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | <u>**MEMORANDUM OF**</u> |
| ) | <u>**DECISION AND ORDER**</u> |
| **CHEROKEE COUNTY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on "Cherokee County, Scott Lindsay in His Official Capacity, and Cindy Palmer in Her Official and Individual Capacities' Motion for Summary Judgment" [Doc. 56]; "Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability" [Doc. 60], [Doc. 61 (sealed)]; and "Defendant Scott Lindsay's Motion for Summary Judgment" [Doc. 62].

## I.    PROCEDURAL BACKGROUND

On March 14, 2018, Plaintiff Brian Hogan ("Plaintiff Hogan" or "Hogan") filed this action in the Superior Court of Cherokee County, North Carolina, on behalf of himself and his minor daughter, H.H., (the "Plaintiffs) against Defendant Cherokee County (the "County"); Defendant Scott Lindsay ("Defendant Lindsay"), in both his individual capacity and his official capacity

as the Cherokee County Attorney and attorney for Cherokee County Department of Social Services ("DSS"); and Cindy Palmer ("Defendant Palmer"), in both her individual capacity and her official capacity director of Cherokee County DSS. [Doc. 1-1 at 4] (collectively "the Defendants").[1] On April 13, 2018, the Defendants removed the case to this Court pursuant to 28 U.S.C. § 1444(b). [Doc. 1].

This action arises out of the Defendants' use of an out-of-court agreement that resulted in the removal of Plaintiff H.H. from the custody of her father, Plaintiff Brian Hogan, without a court order. [Doc. 1-1 at 5]. Following a ruling on a partial motion to dismiss filed by the Defendants Cherokee County and Palmer and Lindsay in their official capacities [Doc. 22], the following claims remain in this lawsuit:

- Claims of negligence and gross negligence against Defendants Lindsay and Palmer in their official and individual capacities (Counts I, II, and III);

---

[1] Plaintiff Hogan also filed the action on behalf of unnamed class members who are similarly situated and against Cherokee County DSS, "DSS Supervisor Doe #1," and "DSS Social Worker #1." However, these class members are no longer part of this lawsuit, and the Doe Defendants have not been identified. [Doc. 22 at 7; Doc. 33 at 5–8; Doc. 86 at 1–2].

2

- Claims of negligent misrepresentation against Defendants Lindsay and Palmer in their official and individual capacities (Count IV);

- Claims of negligent and grossly negligent hiring and retention against the County (Counts V and VI);

- Claims of negligent and grossly negligent supervision against Defendant Palmer in her official and individual capacities (Counts VII and VIII);

- Claims of actual fraud against Defendants Lindsay and Palmer in their official and individual capacities (Count IX);

- Claims of constructive fraud against Defendants Lindsay and Palmer in their individual capacities (Count X);

- Claims for deprivation of rights under 42 U.S.C. § 1983 against Defendants Lindsay and Palmer in their official and individual capacities (Count XI);

- Claims for deprivation of rights under 42 U.S.C. § 1983 (Monell[2] liability) against the County (Count XII);

---

[2] Monell v. Dep't of Social Servs., 436 U.S. 658, 694-95 (1978) (holding that a local government may be sued for an injury inflicted by the government's employees or agents where the government's custom or policy is the "moving force of the constitutional violation").

3

- Claims for violation of the Equal Protection Clause under 42 U.S.C. § 1983 against Defendants Lindsay and Palmer in their individual capacities (Count XIII);

- State law claims against the County for multiple actions of the County's employees under a theory of respondeat superior (Count XIV);

- Claims for civil obstruction of justice against all the Defendants (Count XV);

- Claims for violations of the North Carolina Constitution against Defendants Palmer and Lindsay in their individual capacities (Count XVI); and

- Claims for punitive damages against Defendants Palmer and Lindsay in their individual capacities (Count XVII).

[Doc. 1-1 at 24-61; Doc. 22 at 7-8].

The Defendants now move for summary judgment with respect to a number of these claims. [Doc. 56, Doc. 62]. The Plaintiffs, in turn, move for summary judgment on their § 1983 claims for due process violations against the Defendants. [Doc. 61 (sealed)]. These motions have been fully briefed and are now ripe for review.

4

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (emphasis in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)).  In ruling on a motion for summary judgment, the Court does not make credibility determinations or weigh the evidence. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016).  "Regardless of whether he may

ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue exists. Id.

Where, as here, the parties have filed cross-motions for summary judgment on some of the issues, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations and citation omitted). In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020). In doing so, however, the Court may only consider admissible evidence. Fed. R. Civ. P. 56; Evans v. Techs Applications Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

6

## III.  FACTUAL BACKGROUND

This factual recitation is presented for the purposes of addressing the Defendants' Motions for Summary Judgment.  Accordingly, the facts are presented in the light most favorable to the Plaintiffs.

Cherokee County is a political subdivision of North Carolina.  [Doc. 1-1 at 6; Doc. 23 at 2].  At all times relevant to this action, Defendant Palmer was the Cherokee County DSS director, and Defendant Lindsay was the Cherokee County Attorney as well as attorney for Cherokee County DSS. [Doc. 1-1 at 7; Doc. 23 at 3; Doc. 59-3 at 6, 28].  At all times relevant to this action, Plaintiff Brian Hogan, his wife Amanda Edmondson ("Edmondson"), and Hogan's minor daughter H.H. were residents of Cherokee County. [Brian Hogan Dep., Doc. 59-3 at 13, 15].

On September 14, 2015, after receiving a report of neglect regarding H.H., Cherokee County DSS filed a juvenile petition alleging that H.H. was abused, neglected, and dependent.  [Doc. 1-1 at 11; Doc. 59 at 3].[3]  After an investigation, North Carolina District Judge Tessa Sellers entered an order on April 1, 2016, placing H.H. back in Plaintiff Hogan's custody (the "2016 Custody Order"). [Doc. 8-3 at 3-4 (sealed document)].

---

[3] Although the Defendants do not admit these facts in their Answers, the Defendants do recite these facts with a citation to the Complaint in their Motions for Summary Judgment. Therefore, the Court takes these facts as undisputed.

7

In the fall of 2016, Edmondson had a heart attack and was hospitalized in Asheville, North Carolina. [Doc. 59-3 at 13; Doc. 66-1 at 2]. Plaintiff Hogan arranged to leave H.H. with neighbors because he could not care for H.H. while he was in Asheville with Edmondson. [Doc. 59-3 at 6, 13]. While H.H. was staying with the neighbors, her school made a report to DSS about a concern with H.H.'s care. [Brian Hogan Dep., Doc. 66-1 (sealed document)]. In November 2016, DSS worker Laurel Smith called Plaintiff Hogan, who was in Asheville, and told him that he had 24 hours to get back to Murphy to "sign papers to give [H.H.] to someone in [his] family or they were going to give her to the State and [he] would never see her again." [Id. at 13, 15]. Plaintiff Hogan asked his father, Warren Hogan ("Warren"), if he "would keep [H.H.] until [Edmondson] could get out of the hospital." [Id. at 4].

Plaintiff Hogan returned to Murphy and met with Laurel Smith, Warren, David Hughes, and a few other people whom he did not know. [Doc. 59-3 at 10-11]. Neither Defendant Palmer nor Defendant Lindsay was present for this meeting. [Doc. 59-3 at 26, 28]. Plaintiff Hogan was handed a Custody and Visitation Agreement ("CVA") and was told that if he did not sign it, H.H. would be "giv[en] to the State and [he would] never see her." [Id. at 15]. Hogan was not represented by counsel at this meeting and had not contacted an attorney about the situation. [Id.]. He signed the CVA, which

8

purported to give custody to Warren, and returned to Asheville to be with Edmondson for the next three and a half months. [Id. at 16].

Warren would not allow Plaintiff Hogan to talk to H.H. while H.H. was in his "custody." [Id. at 19]. Hogan had some concerns about whether Warren was a suitable caregiver and H.H.'s safety while she was living with Warren. These concerns stemmed, in part, from issues relating to Warren's purported involvement with "the Mexican Drug Cartel" and "selling pills." [Id. at 9, 29]. After he got back to Murphy from Asheville, Hogan contacted DSS about how to get H.H. back and was informed that he needed to have a stable job and a stable home. [Id. at 23]. Hogan contacted DSS again after he had done everything that was asked of him but was told to get H.H. back he would have to "take them and Warren to court." [Id.].

On December 4, 2017, Hogan attempted to "lawfully obtain" H.H., but this was denied. [Doc. 1-1 at 14; Doc. 59 at 4]. Hogan also attempted to pick H.H. up from school, but the school would not allow him to do so. [Doc. 59-3 at 19]. Hogan then contacted the attorney who represented him in the 2016 custody case, Melissa Jackson ("Jackson"). [Id. at 17].

On December 7, 2017, Jackson filed a motion on Plaintiff Hogan's behalf to enforce the 2016 Custody Order. [Brown Affidavit, Doc. 61-2[4]; see Doc. 59 at 4; Doc. 59-3 at 17]. On December 13, 2017, North Carolina District Court Judge Monica H. Leslie heard the motion regarding custody of H.H. [Doc. 11 at 7; Doc. 16 at 11; Doc. 61-3 at 1 (sealed)]. Prior to the hearing, Judge Leslie met with Jackson, David Moore, Defendant Lindsay, and David Brown. In the meeting, Defendant Lindsey stated that he had knowledge of "at least 20" CVAs like the one in this case. [Doc. 61-3 at 1].[5] When asked on what legal authority he relied on in the drafting of the CVAs, Defendant Lindsay stated "none." [Id.].

Judge Leslie entered an order on December 13, 2017, that held the CVA invalid and not enforceable or binding and stated that Plaintiff Hogan had custody of H.H. [Id.]. Plaintiff Hogan regained custody of H.H. immediately thereafter. [Doc. 59-3 at 25].

---

[4] The Defendants object to the consideration of the affidavits of Darryl Brown, Monica Leslie, and Laurel Smith. The Defendants argue that the affidavits should not be considered because they are part of the record in a different case. Nothing in Federal Rule of Civil Procedure Rule 56 indicates that affidavits prepared in connection with another case cannot be used to support a motion for summary judgment. To the extent that either party has submitted evidence to the Court that is inadmissible, it has been excluded.

[5] The Defendants argue that this is hearsay and inadmissible. Under the Federal Rules of Evidence, however, a statement of a party opponent is not hearsay. Fed. R. Evid. 801(d)(2).

On December 20, 2017, the North Carolina Department of Health and Human Services, Division of Social Services, Child Welfare Services sent out an urgent memorandum regarding private custody agreements. The letter stated that it had come to their attention that:

> [C]hild welfare staff in some County Departments of Social Services may be facilitating the completion of private custody agreements between the parent(s) of children involved in Child Protective Services and other family members or other individuals, without the oversight of the Court . . . . This letter is a reminder that <u>facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy</u>."

[Doc. 1-1 at 68] (emphasis in original). On May 18, 2020, a North Carolina Grand Jury indicted Defendant Palmer for two counts of felony obstruction of justice, two counts of contributing to the delinquency of a minor, one count of willful failure to discharge duties, and one count of perjury based, in part, on her activities as director of DSS in using CVA agreements. [Doc. 61-12 at 1].

Cherokee County DSS used CVAs in multiple cases, since at least 2009. [Tamela Shook Dep., Doc. 61-6 at 34–36 (sealed document); Doc. 8-1]. Defendant Lindsay authored some of these documents directly; eventually, a fill-in-the-blank copy was developed for DSS workers to use. [Courtney Myers Dep., Doc. 61-5 at 12–13; Doc. 8-1; Doc. 61-1].

Defendant Palmer was present in at least two meetings in which the use of CVAs was discussed. [Courtney Myers Dep., Doc. 59-4 at 8; Laurel Smith Aff., Doc. 61-4; see Palmer Dep. Doc. 61-11 at 38].

## IV.  DISCUSSION

### A.  Individual Capacity Section 1983 Claims

#### 1.  Equal Protection Claim Asserted against Defendant Lindsay in His Individual Capacity

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States.  42 U.S.C. § 1983. To prevail on a Section 1983 claim, the plaintiff has the burden of establishing (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law.  Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999). By its terms, § 1983 "creates no substantive rights; it merely provides remedies for deprivation of rights established elsewhere."  City of Okla. City v. Tuttle, 471 U.S. 808, 816  (1985) (citation omitted).

To prove a Section 1983 claim for an equal protection violation, a plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the

result of intentional or purposeful discrimination." <u>Fauconier v. Clarke</u>, 966 F.3d 265, 277 (4th Cir. 2020) (internal quotation marks omitted).

Here, the Plaintiffs have not presented a forecast of evidence from which a jury could reasonably find that the Plaintiffs were treated differently or unequally from others with whom they were similarly situated. Accordingly, the Court will grant summary judgment to Defendant Lindsay as to the Plaintiffs' Section 1983 equal protection claims against him in his individual capacity, and such claims are dismissed.[6]

### 2. Personal Involvement of Defendants Palmer and Lindsay in Due Process Violations

Defendants Palmer and Lindsay move for summary judgment with regard to the Section 1983 due process claims asserted against them individually on the grounds that they were not personally involved in the creation of the CVA used in this case. As such, both Defendants contend that they cannot be held individually liable for any due process violations stemming from the use of that agreement.

---

[6] Defendant Palmer has not moved for summary judgment with respect to the Plaintiffs' § 1983 claims for equal protection violations asserted against her in her individual capacity, nor has she asserted qualified immunity with respect to these claims. As such, the Plaintiffs' § 1983 equal protection claims against Defendant Palmer in her individual capacity shall proceed.

To hold a government official individually liable under Section 1983, a plaintiff must "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights." Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). To establish personal involvement by an individual defendant, it is sufficient for a plaintiff to demonstrate the defendant had "personal knowledge of and involvement in the alleged deprivation" of the plaintiff's rights. Wright, 766 F.2d at 850 (4th Cir. 1985). While "mere knowledge of such a deprivation does not suffice," Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018), "if the evidence showed that conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the individual defendant] was responsible," the defendant could be liable. Fisher v. Wash. Metro. Area Transit Auth., 690 F.2d 1133, 1143 (4th Cir. 1982).

Here, it is undisputed that Defendant Palmer was the Director of Social Services for Cherokee County at the time that Plaintiff Hogan signed the CVA at issue. The Plaintiffs have presented a forecast of evidence that during Palmer's tenure as Director, CVAs were used in numerous other cases handled by Cherokee County DSS. [Doc. 61-6 at 35–36; Doc. 61-9 at 19-24, 38]. The Plaintiffs also have presented a forecast of evidence that Defendant Palmer was present at staff meetings where CVAs were

14

discussed, and that she specifically advised social workers under her supervisions that CVAs could be used. [Doc. 59-4 at 8; see also Doc. 61-4 at 1]. Based on this forecast of evidence alone, a jury could reasonably conclude that Defendant Palmer was personally responsible for effectuating the very policy that resulted in the alleged deprivation of the Plaintiffs' rights.

With respect to Defendant Lindsay, the Plaintiffs have presented a forecast of evidence that Defendant Lindsay originally created the CVAs, and that when the CVAs became a form that would be filled out by the social workers, those forms would be sent back to Defendant Lindsay for review. [Doc. 59-4 at 10; Doc. 61-4; Doc. 61-5 at 12]. The Plaintiffs have also presented evidence that Lindsay approved each CVA, including the CVA in this case, before it was signed. [Doc. 61-4]. From this forecast of evidence, a reasonable jury could find that Defendant Lindsay acted personally in the deprivation of the Plaintiffs' due process rights.

In addition to this forecast of evidence, the Plaintiffs argue that an adverse inference may be drawn from the Defendants' invocations of their Fifth Amendment rights. In their respective depositions, both Palmer and Lindsay asserted their Fifth Amendment right against self-incrimination and refused to testify regarding their involvement in the Hogan CVA. In a civil case, the invocation of a Fifth Amendment privilege can give rise to an

15

adverse inference.  See ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) ("In a civil proceeding, a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self incrimination.").

Based on the forecast of evidence presented by the Plaintiffs, as well as the adverse inferences that can be drawn from the Defendants' invocation of their Fifth Amendment rights, the Court must reject the Defendants' argument that the individual capacity Section 1983 claims should be dismissed because of their lack of personal involvement in the CVA at issue.

### 3.    Waiver of Procedural Due Process Claim

Next, the Defendants contend that Plaintiff Brian Hogan's procedural due process claim should be dismissed because he waived any such rights by voluntarily signing the CVA.[7]  [Doc. 59 at 9-10; Doc. 63 at 7-9].

The Fourteenth Amendment's due process clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV.   To establish a procedural due process violation under Section 1983, a plaintiff must show (1) that he has been deprived of a cognizable liberty interest and (2) that such deprivation

---

[7] The Defendants do not assert waiver as a defense to the procedural due process claim asserted by H.H.

16

occurred without adequate procedural protections. Swarthout v. Cooke, 562 U.S. 216, 219 (2011). At a minimum, procedural due process requires "fair notice" of impending governmental action and "an opportunity to be heard." Snider Int'l Corp. v. Town of Forest Heights, 739 F.3d 140, 146 (4th Cir. 2014). Such procedural safeguards may be considered waived, however, when a plaintiff consents to the governmental action. Thus, if a parent "voluntarily surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation." Weller v. Dep't of Soc. Servs. for City of Baltimore, 901 F.2d 387, 393 (4th Cir. 1990) (citing Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 172–73 (4th Cir. 1988)); Smith v. Williams-Ash, 520 F.3d 596, 600 (6th Cir. 2008) (stating that where a parent voluntarily consents to a custody plan, "no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent") (quoting Dupuy v. Samuels, 465 F.3d 757, 761-62 (7th Cir. 2006)).

To be valid, a waiver of a constitutional right must be voluntary, knowing, and intelligent. Iowa v. Tovar, 541 U.S. 77, 81 (2004) (noting the standard for criminal constitutional rights); Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty., N.C., 149 F.3d 277, 280 (4th Cir. 1998) ("The contractual waiver of a constitutional right must be a knowing waiver, must

17

be voluntarily given, and must not undermine the relevant public interest in order to be enforceable."). Additionally, the waiver must be established by a "high standard[ ] of proof." Miranda v. Arizona, 384 U.S. 436, 475 (1966); Lake James Cmty. Volunteer Fire Dep't, 149 F.3d at 280 (imposing a heightened review standard on contracts that purport to include a waiver of constitutional rights "because the law does not presume the waiver of constitutional rights").

Here, the Plaintiffs have presented a forecast of evidence from which a reasonable jury could conclude that Hogan did not knowingly, voluntarily, and intentionally waive his due process rights and that, therefore, he was deprived of procedural due process in violation of the Fourteenth Amendment. The forecast of evidence, viewed in the light most favorable to the Plaintiffs, demonstrates that Hogan was given only 24 hours' notice before he signed the CVA and was given only a moment's notice to read the agreement itself. Hogan was not represented by counsel when he signed the CVA agreement, nor was any opportunity to confer with counsel offered to him. Further, the Plaintiffs have presented a forecast of evidence that the social worker who presented the CVA to Hogan threatened that H.H. would be placed in foster care and that Hogan would never see her again unless

he signed the agreement.[8]  For these reasons, the Court concludes that the Defendants are not entitled to summary judgment on Plaintiff Hogan's procedural due process claim on the basis of waiver.

### 4. **Parratt-Hudson** Doctrine

The Defendants further argue that the Plaintiffs' procedural due process claims are barred by the <u>Parratt</u>-<u>Hudson</u> doctrine. <u>See</u> <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) <u>overruled in part on other grounds by</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 330 (1986); <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984).

Under the <u>Parratt</u>-<u>Hudson</u> doctrine, a state actor's random and unauthorized deprivation of a protected due process interest cannot be challenged under Section 1983 if the state provides an adequate post-deprivation remedy. <u>See</u> <u>Parratt</u>, 451 U.S. at 543-44; <u>Hudson</u>, 468 U.S. at 533.  The Defendants argue that because the Plaintiffs had meaningful post-deprivation remedies available to them, including the multiple state tort claims asserted in this action, their procedural due process claims should be dismissed.  [Doc. 59 at 11; Doc. 63 at 12-13].

---

[8] This forecast of evidence, when viewed in the light most favorable to the Plaintiffs, also demonstrates a deprivation of H.H.'s procedural due process rights in violation of the Fourteenth Amendment.  The Defendants, however, only assert the defense of waiver with respect to Plaintiff Hogan's procedural rights.

19

The Parratt-Hudson doctrine, however, does not apply to deprivations that are a "result of some established state procedure," see Logan v. Zimmerman Brush Co., 455 U.S. 422, 435–36 (1982), or the result of a municipal officer acting pursuant to a municipal policy or custom, Alvarez v. Lassiter, No. 1:18-cv-00116-MR, 2020 WL 3642709, at *2 (W.D.N.C. July 3, 2020) (Reidinger, J.) (citing Woodard v. Andrus, 419 F.3d 348, 353 (5th Cir. 2005); Matthias v. Bingley, 906 F.2d 1047, 1055–56 (5th Cir. 1990)) ("A plaintiff can show that he was deprived under an 'established state procedure' where the official acted pursuant to municipal custom or policy."). Here, for the reasons discussed in further detail below, the Plaintiffs have presented a forecast of evidence from which a reasonable jury could conclude that they were deprived of their procedural due process rights through the enforcement of a municipal policy or custom. As such, regardless of the adequacy of any post-deprivation remedies available to the Plaintiffs, the Court concludes that the Parratt-Hudson doctrine does not bar their claims. The Defendants' Motion for Summary Judgment on this issue is denied.

### 5. Substantive Due Process Claims

Next, the Defendants move for summary judgment with respect to the Plaintiffs' substantive due process claims. Specifically, the Defendants

argue that the Plaintiffs have failed to demonstrate the "intent to harm" necessary to prove a substantive due process violation pursuant to the Fourteenth Amendment. [Doc. 59 at 11-16; Doc. 63 at 9-12].

Substantive due process protects fundamental rights from government action, irrespective of the constitutional sufficiency of the processes afforded, unless the action is necessary and animated by a compelling purpose. See Mathews v. Eldridge, 424 U.S. 319, 333-34 (1976); Daniels v. Williams, 474 U.S. 327, 331 (1986).

The Supreme Court has recognized that the "interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized." Troxel v. Granville, 530 U.S. 57, 65 (2000). Indeed, "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994); Santosky v. Kramer, 455 U.S. 745, 753 (1982). Thus, both Plaintiff Hogan and H.H. have recognized liberty interests in maintaining the integrity of their family unit. See Weller v. Dep't of Social Servs. for City of Baltimore, 901 F.2d 387, 395 (4th Cir. 1990) ("It is clear that the private, fundamental liberty interest in retaining the custody of one's child and the integrity of one's family is of the greatest importance.").

21

These fundamental interests, however, are "neither absolute nor unqualified, and may be outweighed by a legitimate governmental" interest, including curtailing child abuse and neglect. Hodge, 31 F.3d at 163; see Weller, 901 F.2d at 392 (noting that parents' fundamental right in the custody, care, and control of their children "does not categorically bar the government from altering parental custody rights"). Instead, when the government removes a child from a parent's custody for the child's protection, only an "abuse of power which 'shocks the conscience' creates a substantive due process violation." Wolf v. Fauquier Cty. Bd. of Supervisors, 555 F.3d 311, 322 (4th Cir. 2009) (citing Collins v. City of Harker Heights, 503 U.S. 115, 129 (1992)); see Weller, 901 F.2d at 391-92.

The Court must first determine what evidentiary standard the Plaintiffs must meet in order for the jury to consider the Defendants' conduct to be "conscience shocking" in this case. See Dean v. McKinney, 976 F.3d 407, at 414 (4th Cir. 2020) (citing County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)). The Defendants argue that the standard of culpability is "intent to harm" [Doc. 59 at 12; Doc. 63 at 10], while the Plaintiffs argue that the appropriate standard is "deliberate indifference" [Doc. 84 at 11]. Though the Fourth Circuit has not given clear guidance on what "shocks the conscience" in cases involving the removal of children without a judicial order, it has held

22

that emergency removal "based upon some evidence of child abuse" does not shock the conscience. Weller, 901 F.2d at 391–92; Wolf, 555 F.3d at 323 (finding no substantive due process violation actions when there was a complaint to DSS "suggesting the possibility of serious harm" and DSS acted "to assure the safety of children that might have been in danger").

In Dean v. McKinney, the Fourth Circuit considered this question in the very different context of a case in which a deputy sheriff caused a collision while driving a police vehicle "too fast for conditions." Dean, 976 F.3d at 412-414. In such a situation where "an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency," the Court determined that the "deliberate indifference" standard is appropriate. Id. at 415. Therefore, it follows that "deliberate indifference" is also the appropriate standard when the state removes a child from her parents in a non-emergency situation, such as is present in this case. See Dean, 967 F.3d at 414-16; Weller, 901 F.2d at 391-92.

In this case, the forecasts of evidence—when viewed in the light most favorable to the Plaintiffs—indicate that there was no emergency which required the immediate removal of H.H. from Hogan's custody. Hogan had left H.H. with neighbors temporarily while his wife was hospitalized in Asheville. [Doc. 59-3 at 6, 13]. Even though DSS believed that arrangement

23

to be inadequate, they left H.H. with those neighbors for at least another 24 hours. [Id. at 13, 15]. The report of possible neglect that DSS had received related to an issue of H.H.'s hygiene rather than to any concerns of any physical abuse or other life-threatening emergency. [Doc. 66-1 (sealed)]. When Hogan was contacted about the situation, he returned to Cherokee County the next day to meet with DSS workers. [Doc. 59-3 at 10-15]. None of these facts indicate that anyone at DSS considered that emergency action needed to be taken in order to protect H.H. Given the non-emergent nature of the situation, the Court concludes that the Plaintiffs need only show that the Defendants were deliberately indifferent to their protected liberty interests in order to prove an abuse of power that shocks the conscience.

Here, the parties' forecast of evidence, when viewed in the light most favorable to the Plaintiffs, shows that the Defendants removed H.H. without a valid court order, without any evidence of emergency or physical abuse, and without her custodial parent's voluntary consent. From that, a reasonable jury could find that the Defendants acted with deliberate indifference to the Plaintiffs' fundamental right to be free from government interference in their family relationship. See Hodge, 31 F.3d at 163. The Defendants' motions for summary judgment with respect to the Plaintiffs' substantive due process claims are therefore denied.

24

## 6.    Qualified Immunity for Defendant Lindsay

Defendant Lindsay moves for summary judgment with respect to all the Plaintiffs' Section 1983 claims on the grounds that he is entitled to qualified immunity.[9]

Qualified immunity "takes cognizance of human imperfections," West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014), by protecting government officials from liability with respect to "bad guesses in gray areas." Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011) (quotations and citation omitted). "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (quotation marks and citation omitted).  In evaluating whether a defendant is entitled to qualified immunity, the Court must determine "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  Raub,

---

[9] In their Motion for Summary Judgment, the County Defendants do not assert qualified immunity with respect to the Plaintiffs' Section 1983 claims against Defendant Palmer in her individual capacity, and the Court declines to address that issue *sua sponte*. See Buffington v. Baltimore Cty., 913 F.2d 113, 120-22 (4th Cir. 1990) (declining to address qualified immunity *sua sponte* on appeal).

785 F.3d at 881. The order in which to decide these issues is left to the Court's discretion. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, it is undisputed that Defendant Lindsay held a statutorily created position as Cherokee County Attorney and as such was someone granted discretion to provide legal advice to the County. See N.C. Gen. Stat. § 153A-114 ("The board of commissioners shall appoint a county attorney to serve at its pleasure and to be its legal adviser."). Therefore, Defendant Lindsay was serving as a "public official." Further, it is undisputed that Defendant Lindsay was performing discretionary functions at the time he prepared and reviewed the CVAs. Thus, Defendant Lindsay is shielded by qualified immunity, unless the Plaintiffs have presented a forecast of evidence as to both elements outlined above.

With respect to the first element, for the reasons discussed above regarding the Plaintiffs' procedural due process claims and the Defendants' assertion of the defense of waiver thereto, and the Plaintiffs' substantive due process claims, the Court concludes that the Plaintiffs have set forth a forecast of evidence that the Defendants violated their procedural and substantive due process rights under the Fourteenth Amendment.

As for the second element, in order to show that a particular right was clearly established, "the exact conduct at issue need not have been held

unlawful" but "the existing authority must be such that the unlawfulness of the conduct is manifest." Norwood v. Bain, 166 F.3d 243, 252 (4th Cir. 1998); see Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining "officials can be on notice that their conduct violates established law even in novel factual situations"). Here, it was clearly established at the time that Hogan's CVA was drafted and executed that the Plaintiffs had protectible liberty interests in the continued care and custody of H.H. by Hogan and in the preservation of their family unit. See Troxel, 530 U.S. at 65; Hodge, 31 F.3d at 163; Weller, 901 F.2d at 395. And while the courts recognized that these interests could be outweighed by a legitimate governmental interest, such as protecting the child from abuse or neglect, it was clearly established that parents generally have a right of due process before removal of children by the state in a non-emergent situation. Weller, 901 F.2d at 398; Jordan, 15 F.3d at 343. Thus, the Defendant's facilitation of a custody agreement, arranged without any court supervision or approval and entirely bypassing a parent's due process rights, violated clearly established law.

For these reasons, the Court concludes that Defendant Lindsay's motion for summary judgment based on qualified immunity must be denied.

**B.    Official Capacity Section 1983 Claims**

**1.    Section 1983 Claims against Defendants Lindsay and Palmer in Their Official Capacities**

Before turning to the remaining Section 1983 claims against Defendant Cherokee County, the Court next addresses the Section 1983 claims asserted against Defendant Lindsay and Palmer in their official capacities. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)); see also Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 (1978) (noting official capacity claims "represent only another way of pleading an action against an entity of which an officer is an agent").  Here, the Plaintiffs' Section 1983 claims against the County render the Section 1983 claims against Defendants Lindsay and Palmer in their official capacities redundant.  See Ramsey v. Schauble, 141 F. Supp. 2d 584, 591 (W.D.N.C. 2001).  Accordingly, the Plaintiffs' Section 1983 claims against Defendants Lindsay and Palmer in their official capacities are dismissed.

## 2. Section 1983 Claims against the County

The County moves for summary judgment with respect to the Plaintiffs' Section 1983 claims, arguing that the Plaintiffs have failed to present a forecast of evidence that would meet the standard of Monell v. Department of Social Services, 436 U.S. 658 (1978). Specifically, the County argues that that the Plaintiffs have failed to show the existence of any substantive or procedural due process violation; that to the extent that the Plaintiffs have established a due process violation by Defendant Lindsay or Defendant Palmer, such actions are not attributable to the County; and that the Plaintiffs have failed to show that the County was deliberately indifferent to training DSS personnel or that such training was inadequate in any respect. [Doc. 59 at 16-23]. The Court will address each of these arguments in turn.

### a. Due Process Violations

The County correctly asserts that there can be no municipal liability without the establishment of an underlying violation of the Plaintiffs' rights. [Doc. 59 at 8]. However, as discussed above, viewing the forecast of evidence in the light most favorable to the Plaintiffs, a jury could conclude that the Plaintiffs were deprived of both their procedural and substantive due process rights by the use of the CVA to remove H.H. from Hogan's custody. Accordingly, this first argument is without merit.

29

### b. Palmer's Actions Attributable to the County

The County appears to concede that Defendant Palmer, as the Director of Cherokee County DSS, had final policymaking authority for the County on issues related to the protection of juveniles pursuant to N.C. Gen. Stat. § 7B-300.  [See Doc. 59 at 19].  The County contends, however, in her capacity as DSS Director, Defendant Palmer "had no authority to enter into CVAs," and that this lack of authority is demonstrated by the fact that she has been charged with a number of criminal offenses, including obstruction of justice, for entering into those agreements.  [Id. at 19, 20].  Thus, the County argues, to the extent that there is evidence that Defendant Palmer was involved in the drafting or creating the CVAs, any such actions are not attributable to the County.  [Id. at 19-21].

"Under Monell, municipalities are not liable pursuant to respondeat superior principles for all constitutional violations of their employees simply because of the employment relationship."  Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).  Municipalities only have liability "when execution of a government's policy or custom, whether made by its law makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694. A custom, policy, or practice can be attributed to a county in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). "Because municipal liability results only when the municipality itself can be directly charged with fault for a constitutional violation, it results only when policy or custom as above defined is (1) fairly attributable to the municipality as its 'own,' and is (2) the 'moving force' behind the particular constitutional violation." Spell v. McDaniel, 824 F.2d 1380, 1386-87 (4th Cir. 1987) (citations omitted and footnote omitted).

Here, the Plaintiffs have presented a forecast of evidence from which a reasonable jury could conclude that Defendant Palmer, through her decisions as the final policymaker for the County regarding DSS and child custody, implemented an unconstitutional and illegal policy of using CVAs to deprive parents of the custody of their children without a court order, and that this policy resulted in the violation of the Plaintiffs' rights. A reasonable jury could conclude that the County was the "moving force" behind that violation

because Palmer had the authority to establish social services policies on behalf of the County. The fact that the policy was illegal does not protect the County from liability.

The Defendants cite to cases from outside this Circuit for the proposition that criminal activity can prevent a policymaker's actions from being imputed to the municipality. In Doe v. City of Waterbury, 453 F. Supp. 2d 537, 546 (D. Conn. 2006), the court determined that the mayor in that case, although the official policymaker, did not subject the municipality to liability for the sexual assault of minors in his office, home, and a police vehicle because he did not have the authority "to make final policy for Waterbury by engaging in personal acts of sexual abuse." Id. Similarly, in Danielson v. Huether, 355 F. Supp. 3d 849, 873 (D.S.D. 2018), the mayor assaulted a citizen and the court found the assault was outside of his authority as a policymaker. Id. Finally, in Miller v. City of E. Orange, 509 F. Supp. 2d 452, 458–49 (D. N.J. Sept. 18, 2007), the court found that there was no municipal liability based on a police chief's perjury when the Plaintiff had not alleged that he had created a policy of committing perjury to obtain indictments. Id.

These cases, however, have no application to the present situation. In each of these cases, the officials in question may have been serving in

positions whereby they had policymaking authority, but they were not promulgating governmental policy when they engaged in criminal conduct. When these officials committed these criminal acts of assaults, perjury, and the like, they were undertaking purely personal acts. No governmental *policy* was involved. In the present case, however, the Plaintiffs have presented a forecast of evidence that Defendant Palmer's wrongful acts pertained to how she directed DSS employees to discharge their governmental responsibilities on behalf of the County.

The County's argument that Defendant Palmer's actions with respect to the creation and use of CVAs are not attributable to the County is without merit.

### c.  Lindsay's Actions Attributable to the County

Next, the County argues that it cannot be held liable for any wrongdoing committed by Defendant Lindsay in creating and reviewing the CVAs because he was not a final policymaker for the County.  [Doc. 59 at 16-20].

A county can be held liable for the actions of someone other than a final policymaker under certain circumstances.  For example, "[i]f the authorized policymakers approve a subordinate's decision and the basis for

it, their ratification would be chargeable to the municipality because their decision is final." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

Here, the Plaintiffs have presented a forecast of evidence that Defendant Lindsay, as the appointed County Attorney and DSS Attorney, created the template for the CVAs and that Defendant Palmer, in her capacity as an authorized policymaker for the County, adopted a policy approving the use of such agreements. Viewing the evidence in the light most favorable to the Plaintiffs, this forecast of evidence shows that Defendant Palmer ratified Defendant Lindsay's action, and as such, his actions may be attributable to the County. See Praprotnik, 485 U.S. at 127. The County's argument that it cannot be held liable for the actions of Defendant Lindsay is therefore rejected.

### d. Failure to Train

The County further moves for the dismissal of the Plaintiffs' Section 1983 claim based on the County's alleged failure to train, arguing that the Plaintiffs have failed to show that the County was deliberately indifferent or that the training of DSS employees was inadequate in any respect. [Doc. 59 at 21-22].

Under Monell, a municipality's failure to train its employees only rises to a constitutional violation when the failure "reflects 'deliberate indifference'

34

to the rights of its citizens." <u>Doe v. Broderick</u>, 225 F.3d 440, 456 (4th Cir. 2000) (quoting <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011).

As addressed previously, the Plaintiffs have presented a forecast of evidence from which a jury could conclude that the Defendants were deliberately indifferent to the protectible interests of the Plaintiffs. By adopting an official county policy that was unconstitutional, and then training and directing county employees to follow that policy, the County manifests such deliberate indifference. As such, the Court will deny the County's motion for summary judgment as to this claim as well.

### C.    State Law Claims

As noted previously, the Plaintiffs asserts numerous state law claims against the Defendants, including claims of negligence and gross negligence against Defendants Lindsay and Palmer in their official and individual capacities (Counts I, II, and III); claims of negligent misrepresentation against Defendants Lindsay and Palmer in their official and individual capacities (Count IV); claims of negligent and grossly negligent hiring and retention against the County (Counts V and VI); claims of negligent and grossly negligent supervision against Defendant Palmer in her official and individual capacities (Counts VII and VIII); claims of actual fraud against Defendants Lindsay and Palmer in their official and individual capacities

(Count IX); claims of constructive fraud against Defendants Lindsay and Palmer in their individual capacities (Count X); claims against the County for multiple actions of the County's employees under a theory of respondeat superior (Count XIV); claims for civil obstruction of justice against all the Defendants (Count XV); claims for violations of the North Carolina Constitution against Defendants Palmer and Lindsay in their individual capacities (Count XVI); and claims for punitive damages against Defendants Palmer and Lindsay in their individual capacities (Count XVII).

The County and Defendants Palmer and Lindsey in their official capacities move to dismiss these state law claims on the grounds of sovereign immunity. [Doc. 59 at 23-25]. Defendant Lindsay in his individual capacity moves for summary judgment with respect to all of the state law claims asserted against him.[10] [Doc. 63 at 16-23].

---

[10] Defendant Palmer has not moved for summary judgment with respect to any of the state law claims asserted against her in her individual capacity, nor has she asserted public official immunity with respect to any of these claims. As such, all of the Plaintiffs' state law claims against Defendant Palmer in her individual capacity shall proceed, including the Plaintiffs' claims for negligence, gross negligence, negligent misrepresentation, negligent and grossly negligent supervision, actual fraud, constructive fraud, civil obstruction of justice, violations of the North Carolina Constitution, and punitive damages.

### 1. Sovereign Immunity

Under North Carolina law, the doctrine of sovereign or governmental immunity bars actions against municipalities and public officials sued in their official capacity. Herring v. Winston-Salem/Forsyth County Bd. of Educ., 137 N.C. App. 680, 683, 529 S.E.2d 458, 461 (2000). Counties and public officials are immune from liability for the torts committed by public officials and their employees while they are performing a governmental function, absent a waiver of immunity. Clayton v. Branson, 153 N.C. App. 488, 492–93, 570 S.E.2d 253, 256–57 (2002).

"A county may waive its immunity by purchasing liability insurance covering a particular risk." Ballard v. Shelley, 257 N.C. App. 561, 565, 811 S.E.2d 603, 606 (2018) (citing N.C. Gen. Stat. § 153A-435(a)). Such a waiver "may not be lightly inferred" and "must be strictly construed." Patrick v. Wake Cnty. Dep't of Human Servs., 188 N.C. App. 592, 596, 655 S.E.2d 920, 923 (2008) (citations omitted). A county's immunity is not waived if the action is explicitly excluded from coverage by the terms of the insurance policy. Id.

The insurance policy purchased by the County provides coverage for "any Damages the Covered Person becomes legally obligated to pay because of an Occurrence that occurs during the Contract Period." [Doc. 59-10 at 2]. This portion of the policy, however, also contains a specific

provision that sets forth the intentions of the parties not to waive the County's entitlement to sovereign immunity:

> [T]he Contract does not cover claims against a Covered Person against which the Covered Person may assert sovereign and/or governmental immunity in accordance with North Carolina law. It is the express intentions of the parties to this Contract that the coverage provided in this Section of the contract does not waive the entitlement of a Covered Person to assert sovereign immunity and/or governmental immunity.

[Id. at 6].   The Public Official Liability ("POL") coverage of the policy similarly provides coverage for "any Damages the Covered Person becomes legally obligated to pay because of a Public Officials Wrongful Act that occurs during the Contract Period."   [Doc. 59-11 at 2].   This portion of the policy also contains an exclusion of coverage for claims where the "covered person" is entitled to rely on sovereign immunity as a defense:

> The parties to this Contract intend for no coverage to exist under Section V (Public Officials Liability Coverage) as to any claim for which the Covered Person is protected by sovereign immunity and/or governmental immunity under North Carolina law. It is the express intention of the parties to this Contract that none of the coverage set out herein be construed as waiving in any respect the entitlement of the Covered Person to sovereign immunity and/or governmental immunity.

[Id. at 4].

38

In examining almost identical exclusionary provisions, the North Carolina Court of Appeals has held that such provisions do not waive a municipality's entitlement to sovereign immunity. See, e.g., Owen v. Haywood County, 205 N.C. App. 456, 460-61, 697 S.E.2d 357, 360 (2010); Estate of Earley v. Haywood Cty. Dep't of Soc. Servs., 204 N.C. App. 338, 342, 694 S.E.2d 405, 409 (2010) (finding immunity was not waived by a policy identical to the POL coverage in this case); Patrick, 188 N.C. App. at 596, 655 S.E.2d at 923 (finding no waiver by a policy that states it "is not intended by the insured to waive its governmental immunity").

The Plaintiffs argue that construing the policy to exclude coverage would "render the policy meaningless," citing to Fulford v. Jenkins, 195 N.C. App. 402, 672 S.E.2d 759 (2009). [Doc. 84 at 25]. Indeed, the Court of Appeals has recognized the circular nature of its own reasoning:

> We acknowledge the arguably circular nature of the logic employed in Patrick. The facts are that the legislature explicitly provided that governmental immunity is waived to the extent of insurance coverage, but the subject insurance contract eliminates any potential waiver by excluding from coverage claims that would be barred by sovereign immunity. Thus, the logic in Patrick boils down to: Defendant retains immunity because the policy doesn't cover his actions and the policy doesn't cover his actions because he explicitly retains immunity.

> Nonetheless in this case, as in <u>Patrick</u>, where the language of both the applicable statute and the exclusion clause in the insurance contract are clear, we must decline Plaintiff's invitation to implement "policy" in this matter. Any such policy implementation is best left to the wisdom of our legislature.

<u>Estate of Earley</u>, 204 N. C. App. at 343, 694 S.E.2d at 409-10; <u>Owen</u>, 205 N.C. App. 456, 461, 697 S.E.2d at 360.

The insurance policy provisions at issue in this case are materially indistinguishable from insurance policies that the North Carolina Court of Appeals has found to preserve immunity. In light of the clear precedent established by the North Carolina Court of Appeals, the Court concludes that the exclusionary provisions in the County's insurance policy are affective to defeat an argument of waiver. <u>See</u> <u>Wright v. Gaston Cnty.</u>, 205, N.C. App. 600, 608, 698 S.E.2d 83, 89–90 (2010).

For all these reasons, the Court concludes that the County has not waived its governmental immunity from suit for the state tort claims. Accordingly, the Plaintiffs' state law claims against the County and Defendants Palmer and Lindsay in their official capacities will be dismissed.

40

### 2. State Law Claims Asserted against Defendant Lindsay in His Individual Capacity

The remaining claims against Defendant Lindsay in his individual capacity are for negligence (Count I); gross negligence (Count III); negligent misrepresentation (Count IV); actual fraud (Count IX); constructive fraud (Count X); civil obstruction of justice (Count XV); and punitive damages (XVII). [Doc. 1-1 at 24-61; Doc. 22 at 7-8].

#### a. Negligence Claims

Defendant Lindsay argues that he is entitled to summary judgment with respect to the Plaintiffs' claims for negligence, gross negligence, and negligent misrepresentation because there is "not adequate evidence showing Lindsay was involved with Hogan's CVA." [Doc. 63 at 16]. As discussed above, however, the Plaintiffs have presented a forecast of evidence that Defendant Lindsay created the standard CVA form and reviewed every CVA before it was signed by the parent, including the CVA at issue in this case. [Doc. 61-5 at 12; Doc. 59-4 at 10; Doc. 61-4]. From this forecast of evidence, a reasonable jury could conclude that Lindsay was "involved with Hogan's CVA" such that Lindsay could be held liable for the Plaintiffs' injuries.

Lindsay argues that he is nevertheless entitled to public official immunity as to these claims. [Doc. 63 at 18-19]. Under North Carolina law, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984); see also Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. Accordingly, public officers' immunity "is unavailable to officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would have known to be contrary to his duty.'" Bailey, 349 F.3d at 742 (quoting Grad, 321 S.E.2d at 890). The "man of reasonable intelligence standard is "functionally identical" to the

federal "clearly established" standard; therefore, much of the analysis is the same. Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013).

The Plaintiffs have presented a forecast of evidence from which a jury could reasonably find that Defendant Lindsay knew he did not have the authority to create the CVA at issue in this case or in any case and thus acted with malice, violated a clearly established right, and acted contrary to his duty. Cooper, 735 F.3d at 160. Accordingly, the Court concludes that while Defendant Lindsay is entitled to public official immunity with respect to the Plaintiffs' claims for negligence and negligent misrepresentation, Defendant Lindsay's motion for summary judgment will be denied with respect to the Plaintiffs' claims for gross negligence.

### b. Fraud and Constructive Fraud Claims

Defendant Lindsay moves for summary judgment on the Plaintiffs' claims of fraud and constructive fraud, arguing that there was no confidential or fiduciary relationship between himself and the Plaintiffs and that there is no evidence of a false representation or concealment of fact. [Doc. 63 at 19-20]. In response to Defendant Lindsay's motion, the Plaintiffs state that they do not wish to be heard on this issue. [Doc. 85 at 16].

To prove actual fraud, the Plaintiffs must establish five elements: "'(1) [a f]alse representation or concealment of a material fact, (2) reasonably

calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" Head v. Gould Killian CPA Grp., P.A., 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting Watts v. Cumberland Cty. Hosp. Sys., Inc., 317 N.C. 110, 116-17, 343 S.E.2d 879, 884 (1986)). By contrast, a claim for constructive fraud "arises where a confidential or fiduciary relationship exists, and its proof is less exacting than that required for actual fraud." Watts, 317 N.C. at 115-16, 343 S.E.2d at 884 (quotations omitted). To prove constructive fraud, the plaintiff must establish a relationship of trust and confidence, leading to a transaction in which the defendant abuses his position of trust to the detriment of the plaintiff. Head, 371 N.C. at 9, 812 S.E.2d at 837.

Here, the Plaintiffs have failed to present a forecast of evidence tending to show the existence of a confidential or fiduciary relationship between Defendant Lindsay and the Plaintiffs or to show that Defendant Lindsay made a false representation or omission. Absent these elements, the Court concludes that Defendant Lindsay is entitled to summary judgment with respect to the Plaintiffs' claims of fraud and constructive fraud.

### c. Civil Obstruction of Justice

Next, Defendant Lindsay moves for summary judgment with respect to the Plaintiffs' claims for civil obstruction of justice. [Doc. 63 at 21-22].

In North Carolina, civil obstruction of justice is a common law offense consisting of "any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy." Blackburn v. Carbone, 208 N.C. App. 519, 527, 703 S.E.2d 788, 795 (2010). "The common law offense of obstructing public justice may take a variety of forms." Blackburn, 208 N.C. App. at 526, 703 S.E.2d at 795 (citation and quotations omitted). Nevertheless, in order to prevail on a claim of obstruction of justice, a plaintiff must provide some "evidence as to the disposition of that action or any showing that [defendant's conduct] adversely impacted" the plaintiff's ability to seek and obtain a legal remedy. See Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (N.C. Ct. App 2003) (finding the plaintiff had not established civil obstruction of justice because there was no evidence that the plaintiff's case was "in some was judicially prevented, obstructed, impeded or hindered by the acts of defendants"). A plaintiff can also establish "a legally sufficient claim where the defendant attempted to prevent, obstruct, impede, or hinder justice." Reed v. Buckeye Fire Equip., 241 F. App'x 917, 928 (4th Cir. 2007) (collecting North Carolina cases); In re Kivett, 309 N.C. 635, 670, 309 S.E.2d 442 (1983).

Here, the Plaintiffs have presented a forecast of evidence by which a reasonable jury could find that Defendant Lindsay, as the legal advisor for DSS, was aware of the statutory requirements involved in the removal of a child from the custody of her parent. There is also a forecast of evidence that Lindsay was specifically aware of the 2016 Custody Order granting Plaintiff Hogan custody because Lindsay represented DSS in that proceeding. Despite this knowledge, Defendant Lindsay created the CVA at issue, which hindered the Plaintiffs' ability to enforce the 2016 Custody Order. Thus, viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that a reasonable jury could find that Defendant Lindsay obstructed justice in this case. Accordingly, the Defendant's motion for summary judgment is denied with respect to this claim.

### d.    North Carolina Constitutional Claims

Defendant Lindsay moves for summary judgment as to each of the Plaintiffs' claims for violations of the North Carolina Constitution. [Doc. 63 at 22–23].

The Court previously addressed the state constitutional claims asserted by the Plaintiffs in ruling on the motion to dismiss filed by the County and Defendants Palmer and Lindsay in their official capacities. [Doc. 22 at 7]. "Claims brought under the North Carolina Constitution may be asserted

46

only against state officials acting in their official capacities." <u>Love-Lane v. Martin</u>, 355 F.3d 766, 789 (4th Cir. 2004) (citing <u>DeWitt v. Mecklenburg County</u>, 73 F. Supp. 2d 589, 605-06 (W.D.N.C. 1999)). A plaintiff may pursue an action directly under the North Carolina Constitution only where the plaintiff lacks an adequate remedy under state law to redress the alleged violation. <u>Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.</u>, 363 N.C. 334, 338, 678 S.E.2d 351, 354 (2009); <u>Corum v. Univ. of N.C.</u>, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). The North Carolina Supreme Court's definition of an adequate state remedy "is twofold: (1) that the remedy addresses the alleged constitutional injury, and (2) that the remedy provides the plaintiff an opportunity to enter the courthouse doors." <u>Taylor v. Wake Cty.</u>, 252 N.C. App. 178, 185, 811 S.E.2d 648, 654 (2018) (internal citations and quotations omitted); <u>Copper ex rel. Copper v. Denlinger</u>, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010) ("[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim.") (quoting <u>Craig ex rel. Craig</u>, 363 N.C. at 339-40, 678 S.E.2d at 355).

The Plaintiffs argue that the application of immunity in this case prevents the statutory claims from being adequate in redressing the constitutional wrongs. While the Plaintiffs' claims against the Defendants

47

Palmer and Lindsay in their official capacities have previously been dismissed, and some of the individual capacity claims against Defendant Lindsay will be dismissed,[11] other state law claims against these Defendants in their individual capacities remain viable. Therefore, the inability to pursue certain claims that are barred by immunity does not deprive the Plaintiffs of an adequate remedy pursuant to state law for redressing their alleged injuries. See Glenn-Robinson v. Acker, 140 N.C. App. 606, 631–32, 538 S.E.2d 601, 619 (2000) (finding an adequate remedy pursuant to state law with the presence of state law claims against an officer in his individual capacity).[12] Accordingly, the Court will grant Defendant Lindsay's motion for summary judgment with respect to the Plaintiffs' claims of state constitutional violations, and these claims will be dismissed.

### e. Punitive Damages

In North Carolina, punitive damages are available to plaintiffs to punish defendants for egregiously wrongful acts and to deter the commission of

---

[11] To the extent that the claims are unavailable because the Plaintiffs have not established the elements in order to survive summary judgment, "a plaintiff's inability to adequately plead the elements of a common law tort claim does not render a remedy unavailable." Barrett v. Bd. of Educ., 13 F. Supp. 3d 502, 514 n.3 (E.D.N.C. 2014).

[12] While the Court questions the wisdom of the rule stated in Glenn-Robinson and its progeny, the Court also recognizes that it is bound by the North Carolina courts' holdings with regard to this issue of state law.

similar wrongful acts.  N.C. Gen. Stat. § 1D-1. Public officers can be held liable for punitive damages under state law only "if the claimant proves that the defendant is liable for compensatory damages" and also proves either fraud, malice, or willful or wanton conduct by clear and convincing evidence. See id. § 1D-15.

"'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." Id. § 1D-5(7). An act is wanton when it is done with a "wicked purpose" or done "needlessly, manifesting a reckless indifference to the rights of others." Benton v. Hillcrest Foods, Inc., 136 N.C. App. 42, 51, 524 S.E.2d 53, 60 (1999).  "An act is willful when there is a deliberate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the safety of the person or property of another." Id.

In his motion for summary judgment, Defendant Lindsay summarily asserts that "a question of fact clearly does not exist as to whether the Defendant Lindsay engaged in willful, wanton, or grossly negligent conduct." [Doc. 63 at 23]. The Plaintiffs respond that they are entitled to punitive damages because Defendant "Lindsay acted wantonly and maliciously in using the CVAs to avoid court involvement while being in reckless disregard

49

for the rights of Hogan, H.H. and all the other victims of his CVAs." [Doc. 85 at 22]. For the reasons stated above, several of the Plaintiffs' tort claims survive summary judgment based upon a forecast of evidence tending to show malice or willful, wanton conduct by Defendant Lindsay.  As such, Defendant Lindsay's motion for summary judgment with respect to the Plaintiffs' claims for punitive damages claims is denied.

### D.     Plaintiffs' Motion for Partial Summary Judgment

The Plaintiffs move for partial summary judgment on the issue of liability for the deprivation of rights claim under Section 1983. [Doc. 61 (sealed)].  For the reasons discussed above, the Court finds that there are genuine disputes of material fact presented by the forecasts of evidence which preclude the grant of summary judgment to the Plaintiffs at this time. Accordingly, the Plaintiffs' Motion for Partial Summary Judgment is denied.

### E.     Doe Defendants

Finally, the Court addresses the two other defendants, DSS Supervisor Doe #1 and DSS Social Worker Doe #1 (hereinafter "the Doe Defendants"), who were named in the original Complaint but who have not yet been identified or served in this action.  The Court previously entered an Order directing the Plaintiffs to show cause for their failure to effect service on the Doe Defendants.  [Doc. 24].  The Plaintiffs responded to the Court's Order

50

by advising that the Doe Defendants had been identified and requesting an opportunity to file an Amended Complaint. [Doc. 25]. Thereafter, the Court entered another Order giving the Plaintiffs thirty (30) days to file an Amended Complaint identifying the Doe Defendants. [Doc. 26]. The Plaintiffs subsequently filed a motion to file an amended complaint. Specifically, the Plaintiffs proposed substituting former Directors of the Cherokee County Social Services for the Doe Defendants. [Doc. 27 at 3]. The Plaintiffs also proposed, among other changes, adding four additional parents and five additional children as named plaintiffs in the action. [Id.]. The Defendants opposed the Plaintiffs' motion to amend on several grounds. [Doc. 28]. After requesting additional briefing from the parties [Doc. 30], the Magistrate Judge denied the Plaintiffs' motion to amend. [Doc. 33]. Specifically with respect to the substitution of the Doe Defendants, the Magistrate Judge concluded that the proposed amendment would be futile because the identified Supervisors had served in that capacity prior to the execution of the Hogan CVA, and thus, the Plaintiffs had not asserted any allegations implicating these former DSS Supervisors in the constitutional violations alleged. [Id. at 5]. The Plaintiffs did not renew their motion to amend, nor have they identified any other individuals as the Doe Defendants.

Accordingly, the Court concludes that the Plaintiffs' claims against the Doe Defendants should be dismissed without prejudice.

## V. CONCLUSION

For the reasons stated herein, the Defendants' Motions for Summary Judgment are granted in part and denied in part; the Plaintiffs' Motion for Partial Summary Judgment is denied; and the Plaintiffs' claims against the Doe Defendants are dismissed without prejudice

In light of the foregoing, the following claims remain for trial:

(1)   Plaintiffs' § 1983 claims against Defendants Lindsay and Palmer in their individual capacities for substantive and procedural due process violations;

(2)   Plaintiffs' § 1983 claims against Defendant Palmer in her individual capacity for equal protection violations;

(3)   Plaintiffs' § 1983 Monell claims against Cherokee County for unlawful custom/policy and failure to train;

(4)   Plaintiffs' state law claims against Defendant Lindsay in his individual capacity for gross negligence, obstruction of justice, and punitive damages; and

(5)   Plaintiffs' state law claims against Defendant Palmer in her individual capacity for negligence, gross negligence, negligent

52

misrepresentation, negligent supervision, grossly negligent supervision, fraud, constructive fraud, obstruction of justice, violations of the North Carolina Constitution, and punitive damages.

## **O R D E R**

**IT IS, THEREFORE, ORDERED,** that the Motion for Summary Judgment filed by the Defendants Cherokee County, Scott Lindsay in His Official Capacity, and Cindy Palmer in Her Official and Individual Capacities [Doc. 56] is **GRANTED IN PART and DENIED IN PART** as follows:

(1)    The Motion is **GRANTED** with respect to the Section 1983 deprivation of rights claims asserted against Defendants Lindsay and Palmer in their official capacities, and such claims are **DISMISSED WITH PREJUDICE**;

(2)    The Motion is **GRANTED** with respect to the state law claims of negligent and grossly negligent hiring and retention, respondeat superior, and civil obstruction of justice against the County, and these claims are **DISMISSED WITH PREJUDICE;**

(3)    The Motion is **GRANTED** with respect to the claims of negligence, gross negligence, negligent misrepresentation, fraud, and

53

civil obstruction of justice against Defendants Palmer and Lindsay in their official capacities, and the claims of negligent and grossly negligent supervision against Defendant Palmer in her official capacity, and these claims are **DISMISSED WITH PREJUDICE**;

(4)   The Motion is **DENIED** with respect to the Section 1983 claims for substantive and procedural due process violations against Defendant Palmer in her individual capacity; and

(5)   The Motion is **DENIED** with respect to the Section 1983 Monell claims against the County.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment by Defendant Lindsay in his Individual Capacity [Doc. 62] is **GRANTED IN PART and DENIED IN PART** as follows:

(1)   The Motion is **GRANTED** with respect to the Section 1983 claims for violations of equal protection asserted against Defendant Lindsay in his individual capacity, and these claims are **DISMISSED WITH PREJUDICE**;

(2)   The Motion is **GRANTED** with respect to the state law claims of negligence, negligent misrepresentation, actual fraud, and constructive fraud against Defendant Lindsay in his individual capacity, and these claims are **DISMISSED WITH PREJUDICE**;

(3)     The Motion is **GRANTED** with respect to the claims for violation of the North Carolina Constitution against Defendant Lindsay in his individual capacity, and such claims are **DISMISSED WITH PREJUDICE**;

(4)     The Motion is **DENIED** as to the Section 1983 claims for substantive and procedure due process violations against Defendant Lindsay in his individual capacity; and

(5)     The Motion is **DENIED** as to the state law claims for gross negligence, civil obstruction of justice, and punitive damages claims against Defendant Lindsay in his individual capacity.

**IT IS FURTHER ORDERED** that the Plaintiffs' Motion for Partial Summary Judgment [Doc. 60] is **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiffs' claims against DSS Supervisor Doe #1 and DSS Social Worker Doe #1 are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

Signed: February 12, 2021

Martin Reidinger
Chief United States District Judge

55