UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:18-96 MR- DLH

| | |
|---|---|
| BRIAN HOGAN, both on his own behalf and as representative of all unnamed class members who are similarly situated; BRIAN HOGAN, as parent and next friend of H.H., both her own behalf and as representative of all unnamed class members who are similarly situated,<br><br>               Plaintiffs,<br><br>     vs.<br><br>CHEROKEE COUNTY; CHEROKEE COUNTY DEPARTMENT OF SOCIAL SERVICES; SCOTT LINDSAY both in his individual capacity and official capacity as attorney for Cherokee County Department of Social Services; CINDY PALMER, in both her individual capacity and her official capacity as Director of Cherokee County Department of Social Services; DSS SUPERVISOR DOE #1, et al.,<br><br>               Defendants. | **DEFENDANTS' TRIAL BRIEF** |

I.     <u>**INTRODUCTION**</u>

     This is a Complaint brought under 42 U.S.C. §1983, along with supplemental

state claims, by Brian Hogan ("Brian") and his daughter, H.H, alleging that their

constitutional rights were violated by Cherokee County, former Cherokee County Department of Social Services ("DSS") director Cindy Palmer, and former DSS attorney Scott Lindsay, as a result of unlawful custody and visitation agreements ("CVA"), utilized by DSS that removed minor children from custodial parents without proper court supervision.

After the Court's ruling on summary judgment and the stipulation of dismissal, the only federal claims remaining are section 1983 procedural and substantive due process claims against Palmer and Lindsay in their individual capacity, and a section 1983 *Monell* claim against Cherokee County alleging failure to train and adoption of an unconstitutional policy and practice of using CVAs. The following state tort claims remain against Palmer and Lindsay in their individual capacities: gross negligence and obstruction of justice. Palmer is also being sued for negligence in her individual capacity.

## II.   <u>FACTS EXPECTED TO BE PRESENTED AT TRIAL</u>

Brian is the biological father of H.H. Brian lived with his wife, Amanda Edmondson, and H.H. On September 14, 2015, DSS received a report of neglect involving Brian, H.H, and Edmondson. After conducting an investigation into the report, DSS filed a juvenile petition alleging abuse, neglect, and dependency of H.H. On April 1, 2016, a court placed H.H in Brian's custody ("April 1, 2016 Order").

At some point after the April 1, 2016 Order, Brian's wife, Amanda, had a heart attack and was hospitalized in Asheville. Brian stayed with Amanda at the hospital, and left H.H. with his neighbors. H.H stayed with the neighbors for about a week or two before H.H's school called DSS, and made a report that H.H came to school smelling like cat feces. Brian voluntarily agreed to place H.H. with his father, Warren Hogan.

After Amanda was released from the hospital, she and Brian moved back to Murphy. On November 21, 2016, according to Brian, DSS worker Laurel Smith called Brian and told him that he had "24 hours to be back in Murphy" due to the report of H.H. smelling like cat feces at school. Brian asked his father, Warren Hogan, if Warren could take care of H.H. and Warren agreed. Brian went to the DSS office the next day, and met Smith, DSS supervisor David Hughes, and another woman. Neither Palmer nor Lindsay were involved with him when he signed the CVA.

Brian signed the CVA which gave custody of H.H. to Warren. Although contradicted, according to Brian, DSS "didn't read nothing to me. They didn't explain nothing."

When Brian left Asheville and came back to Cherokee County, he saw H.H. three to four times at Warren's house. According to Hannah, she saw her parents almost every week. On December 4, 2017, Brian attempted to "lawfully obtain"

H.H, and was subsequently denied his right to pick up H.H from school. Brian contacted his attorney and on December 7, 2017, she filed a motion to enforce the April 1, 2016 Order. The district court held that the CVA was not a valid document, and ordered that legal custody of H.H be returned to Brian. On December 20, 2017, DHHS advised DSS that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy."

III. **ARGUMENT**

The Plaintiffs contend that Lindsey and Palmer violated their substantive and procedural due process rights based upon Brian's signing the CVA on November 21, 2016. The Defendants expect to show that Brian voluntarily signed the CVA, and asking Brian to sign the CVA did not "shock the conscience" as required to establish a substantive due process claim.

Further, it is undisputed that neither Lindsay nor Palmer had any personal involvement with the Hogan case or the signing of the CVA. Brian has admitted that neither Defendant was involved with his signing the CVA.

A. **PROCEDURAL DUE PROCESS CLAIM**

To establish a procedural due process violation under Section 1983, a plaintiff must show (1) that they have been deprived of a cognizable liberty interest, and (2) that such deprivation occurred without adequate procedural protections. *Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S.Ct. 859, 861 (2011). The Plaintiffs contend that

4

their procedural due process rights were violated by the failure of the Defendants to have the CVA reviewed by a judge. It is well-established, however, that "consent extinguishes constitutional procedural safeguards." *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008). That is because "hearings are required for deprivations taken over objection, not for steps authorized by consent." *Id*. (*quoting Dupuy v. Samuels*, 465 F.3d 757, 761-62 (7th Cir. 2006). In this case, Brian admitted that his signing the CVA simply memorialized his voluntarily placement of H.H. with Warren.

Brian candidly admitted that his placement of H. H. was voluntary. When asked about why he signed the CVA, he stated that he was not able to take care of H.H, and that the placement was voluntary. This is not a case where Brian was unfamiliar with the North Carolina child protective services system. He admitted that he understood how the DSS process worked. He had previously been involved with DSS between five to ten times before he signed the CVA, and had been involved in a DSS proceeding six months before signing the CVA.

In *Weller v. Dep't of Soc. Servs for City of Baltimore*, 901 F.2d 387, 393(4th Cir. 1990), the Fourth Circuit held that an allegedly abusive father complaining about losing custody of his son failed to state a claim for a procedural due process violation because the father had voluntarily surrendered his son to a social services agency. The court reasoned that in those circumstances the state did not deprive the

father of his liberty interest inherent in family integrity because "[i]f one voluntarily surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation." *Id*. at 393 (internal citations omitted). *See also Pfoltzer v. County of Fairfax*, 775 F.Supp. 874, 882 (E.D.VA. 1991) (no procedural due process violation where Plaintiff voluntarily surrendered child); *see also Estate of Keenan v. Hoffman-Rosenfeld*, 2019 WL 3416374 at * 9 (E.D.NY. 2019) (unpublished) ("a parent's consent to the removal of a child or children "vitiates any due process or Fourth Amendment claims' as a waiver of that right.").

Last, while the Plaintiffs may argue that the CVA violated North Carolina law, it is well-established that violations of state law cannot provide the basis for a federal due process claim. *See Weller v. Dept. of Soc. Serv. for Baltimore*, 901 F.2d 387, 392 (4th Cir. 1990); *Clark v. Link*, 855 F.2d 156, 161–63 (4th Cir. 1988).

## B. <u>SUBSTANTIVE DUE PROCESS CLAIM</u>

While the Supreme Court has affirmed that the "interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized," *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060 (2000), this fundamental right is not absolute. *Susan Virginia Parker v. Hendry and William Evans Home for Children*, 762 Fed. Appx. 147, 156 (4th Cir. 2019)

6

(unpublished). When officials remove a child from the parents' custody for the child's protection, only an "abuse of power which 'shocks the conscience' creates a substantive due process violation." *Wolf v. Fauquier Cty. Bd. of Supervisors*, 555 F.3d 311, 322 (4th Cir. 2009) (*quoting Collins v. City of Harker Heights*, 503 U.S. 115, 129, 112 S.Ct. 1061, 1071) (1992).

To prevail on a substantive due process claim, the Plaintiffs must show that the conduct of the defendants "was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean v. McKinney*, -- F.3d.--, 2020 WL 5849052 at * 3 (4th Cir. 2020) (internal citations omitted). The Due Process Clause is not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663 (1986).

As the Fourth Circuit stated, "[s]ubstantive due process does not categorically bar the government from altering parental custody rights." *Weller*, 901 F.2d. at 392. In cases involving the warrantless removal of children, the emergency removal does not shock the conscience when it is "based upon some evidence of child abuse." *Id.* at 391–92. In *Weller*, the Fourth Circuit held squarely that "[i]t does not shock the conscience to hear that defendants removed a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse." *Id.* at 391.

Given the specific facts of this case, the Plaintiffs cannot demonstrate an intent to harm. CVAs were used in "stuck" DSS cases, which former DSS social worker Courtney Myers described as cases where children were "not safe to go home because nothing that was of concern has been corrected and we're running out of time." The ultimate goal of having parents signing a CVA was to keep children safe.

Indeed, the facts in this case demonstrate that requesting that Brian sign a CVA giving custody to his father was done to protect H.H. This is certainly not a case where H.H. was ripped out of Brian's hands for no reason. Brian had no complaint with giving H.H. to Warren, and agreed that it was voluntary. Rather, his complaint was that the placement was supposed to be a "temporary guardianship or something." It also cannot be argued that H.H. was better off with neighbors, whose last names Brian didn't know, than with her grandfather.

Moreover, Brian admitted that the factual predicates for the imposition of the CVA were accurate. The CVA stated that "Brian Hogan is not able to provide H.H. an adequate home." When asked whether he was able to take care of H.H. when he signed the CVA, Brian stated "At the time, no, I couldn't. My wife was in in the hospital." When asked whether, as the CVA stated, Warren was able to "provide a loving and stable home environment" and "provide for the support and maintenance" of H.H., Brian replied "Yes."

Indeed, the lack of intent to harm by H.H.'s placement with Warren can also be inferred by a comparison of H.H's living conditions with Warren compared to Brian, the requirements placed upon Brian, and upon H.H.'s behavior after being removed from Warren's care.

According to Myers, Warren's house was "appropriate," Warren was "taking care of [H.H.]", and Warren was "doing what you would do as a caregiver." When asked if Warren was a more suitable caretaker than Brian and Amanda, Myers replied "Yes."

Next, the requirements DSS placed on Brian to have H.H. returned make it clear that their actions were not done to harm Brian or H.H, and did not "shock the conscience." According to Brian, before he could get H.H. back, DSS wanted him to get a stable job, stable home, power, food, and water. DSS told Brian that he would have H.H. back if he got stable, and "there wouldn't be any issues."

The lack of "intent to harm" is also underscored by what happened after H.H. was placed back with Brian, and also supports Myers' statement that H.H. was better off with Warren. H.H. regularly went to school when living with Warren, and missed school when she was living with Brian. Warren also had electricity at his house, and, at times, there was no electricity at Brian's house. After H.H. moved back with him, DSS was called several times including H.H's drug use, sexual activity, and "running wild." In fact, a little more than a month after H.H. went back

to Brian's home, Andrews Middle School made a report that H.H. was unclean, smelled of smoke, wore dirty clothes, and that her mother picked her up impaired. A school official also noted that H.H. was doing well with her grandfather, but struggling when she was placed with her father.

The lack of intent to harm is also demonstrated by the initial report itself- that H.H. smelled like cat feces. A parent's substantive due process claim "can only be sustained if the removal of the child would have been prohibited by the Constitution even had the parent [ ] been given all the procedural protections to which [he] w[as] entitled." *Southerland v. City of New York*, 680 F.3d 127, 142 (2nd Civ. 2012) (internal citations omitted). Smelling like cat excrement at school may lead to a finding of abuse, neglect, or dependency. *In re F.T*, 2012 WL 131009, 721 S.E. 2nd 410 at *23 (2012) (unpublished) (affirming trial court's finding that juvenile was dependent based, in part, on juvenile being in home smelling like urine and cat feces).

## C. LINDSAY AND PALMER, IN THEIR INDIVIDUAL CAPACITIES, ARE ENTITLED TO QUALIFIED IMMUNITY FOR PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS.

Qualified immunity shields government officials from personal liability under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toomer v. Garrett*, 155 N.C. App. 462, 473, 574 S.E.2d 76, 86 (2002). Qualified immunity

protects law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions. *Raub v. Campbell*, 785 F.3d 876, 880-81 (4th Cir. 2015) (citation omitted). To defeat qualified immunity, a plaintiff must show not only that the official violated a clearly established right at the time the challenged actions were taken, but also that a reasonable person would have understood he was violating that right. *Anderson v. Creighton*, 483 U.S. 635 (1987). This inquiry is a pure question of law. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Siegert v. Gilley,* 500 U.S. 226, 231, 232 (1991); *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Dunbar v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990), and "gives ample room for mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Here, Scott Lindsay was a public official as his position as Cherokee County Attorney was created by statute. *See* N.C. Gen. Stat. § 153A-114 ("The board of commissioners shall appoint a county attorney to serve at its pleasure and to be its legal adviser."); *see also City of Winston-Salem v. Yarbrough*, 117 N.C. App. 340, 349, 451 S.E.2d 358, 364 (1994) (finding a city attorney is a public officer as his position was created by statute allowing for a municipality to a "appoint a city attorney to serve at its pleasure and to be its legal adviser." N.C. Gen. Stat § 160A-173 (1987)).  In the absence of statutory language, the court has read-in the exercise

of discretion in the job of the city attorney by holding "[the] rendering of legal opinions, involves the exercise of personal deliberation, decision and judgment." *City of Winston-Salem v. Yarbrough*, 117 N.C. App. 340, 349, 451 S.E.2d 358, 364.

At the time Brian Hogan signed the CVA, Lindsay was not aware of any statute, judicial decision, or common law precept that prevented parents from entering into agreements regarding the custody of their minor children. Further, DSS was not advised until December 20, 2017 (after the Hogan CVA), that "facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy."

As such, it was not clearly established at the time of the Hogan CVA, that the CVA was illegal or violated any rights of the plaintiffs, and Lindsay, in his individual capacity, is entitled to qualified immunity. Plaintiffs' § 1983 individual capacity claim against him should be dismissed.

Similarly, Palmer is a public official as the Director of the Cherokee County DSS. *Crocker v. Griffin*, 204 N.C. App 210, 694 S.E. 2d 523 (2010); *Hobbs ex rel. Winner v. N. Carolina Dep't of Hum. Res*., 135 N.C. App. 412, 421, 520 S.E.2d 595, 602 (1999) (N.C. Gen.Stat. § 108A–14 recognizes the position of "county director of social services"). For her part, Palmer was merely following the advice of the County Attorney and should not be held to the standard of understanding the legality of the CVAs, when her attorney had prepared many of the CVAs (although

not Hogan's). Therefore, by extension, Palmer was not aware of any statute, judicial decision, or common law precept that prevented parents from entering into agreements regarding the custody of their minor children. Palmer's reliance on the advice of DSS and County counsel was reasonable under the circumstance and, at worst, mistaken judgment. As such, Plaintiffs' § 1983 individual capacity claim against her should be dismissed. *See generally Anderson*, 483 U.S. 635; *Hunter,* 502 U.S. 224, 229.

## D. SECTION 1983 CLAIM AGAINST CHEROKEE COUNTY

Liability only attaches to Cherokee County if the deprivation of Plaintiffs' constitutional rights was caused by an official policy or custom. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-2036 (1978); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir.1999). The Plaintiff also must demonstrate that the policies or customs were the "moving force" behind the violation of the Plaintiffs' constitutional rights. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037-38.

A policy or custom under *Monell* may arise in four ways:

(1) through an express policy, such as a written ordinance or regulation;
(2) through the decisions of a person with final policymaking authority;
(3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (*quoting Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999).

The Plaintiffs allege that Cherokee County is subject to liability under section 1983 by "maintain(ing) a policy, custom, or pattern of practice of promoting, facilitating, and condoning the improper, illegal, and unconstitutional techniques" through use of CVAs and similar agreements. The Plaintiffs also contend that Cherokee County is liable on a failure to train theory by failing to train employees not to "fabricate documents" and to "follow the procedures in N.C. Gen. Stat. § 7B-100 *et. seq.*"

The Supreme Court has made it abundantly clear that a plaintiff seeking to impose *Monell* liability bears a heavy burden:

> "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. [citation]."

*Bd. of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1389 (1997). The Fourth Circuit has confirmed that "[t]he substantive requirements for proof of municipal liability are stringent." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). For the foregoing reasons, the Plaintiffs will be unable to meet this heavy burden at trial.

## 1. **A POLICYMAKER FOR CHEROKEE COUNTY DID NOT CREATE THE CVA**

Only those municipal officials who have final "policy-making authority" may subject the municipality to § 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924 (1988). Plaintiffs seek to hold the County liable under a *Monell* theory based upon the decisions made by Lindsay. Under North Carolina law, however, Lindsay's actions cannot bind the County because Lindsay is not a policymaker for Cherokee County in child protective services cases. *See Waters v. City of Chicago*, 580 F.3d. 575, 581 (7th Cir. 2009) (state law determines whether a person has policymaking authority for purposes of section 1983).

A DSS director is responsible for "assess[ing] reports of child abuse and neglect and to take appropriate action to protect such children pursuant to the Child Abuse Reporting Law, Article 3 of Chapter 7B of the General Statutes." N.C.G.S. § 108A-14 (11). The director can delegate authority to staff to act as the director's representative. N.C.G.S. § 108A-14(b).

As part of the director's responsibility for assessing reports of child abuse, the director "shall establish protective services for juveniles alleged to be abused, neglected, or dependent." N.C.G.S. § 7B-300. Under N.C.G.S. § 7B-302(a), directors specifically have decision making authority over child abuse investigations and assessments:

When a report of abuse, neglect, or dependency is received, the director of the department of social services shall make a prompt and thorough assessment, using either a family assessment response or an investigative assessment response, in order to ascertain the facts of the case, the extent of the abuse or neglect, and the risk of harm to the juvenile, in order to determine whether protective services should be provided or the complaint filed as a petition.

Under North Carolina law, then, final policy-making authority rests with the DSS Director, not the DSS attorney. *See e.g. Robinson v. Balog*, 160 F.3d 183, 190 (4th Cir. 1998).

There will be no evidence that Palmer, the only DSS policymaker, created the CVA in this case.

### 2. FAILURE TO TRAIN

A municipality may be liable for the failure to train its employees only where such failure "reflects 'deliberate indifference' to the rights of its citizens." *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir.2000) (*quoting City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Deliberate indifference may be found where "'in light of the duties assigned to specific officers or employees, the need for more or different training is ... obvious, and the [failure to train is] likely to result in the violation of constitutional rights.'" *Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir.1994) (*quoting City of Canton*, supra, at 390, 109 S.Ct. 1197). The Supreme Court has held that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs v. Brown*,

520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Under a § 1983 claim, a plaintiff must also show that the failure to train reflects a policy or custom of, or a conscious decision by, the municipality. *Id*. Mere negligence in the failure to train will not suffice to impose § 1983 liability. *Id*. Plaintiff must also show the deficiency in training to be the cause-in-fact of the deprivation of rights alleged. *Id*. The Plaintiff must show "a specific deficiency and not a generalized ineffectiveness of the training" and a "direct causal connection between specific deficiencies and a specific injury." *Id*.

The evidence in this case will be that DSS workers were trained by the North Carolina Department of Health and Human Services, and also in-house by DSS. A Plaintiff asserting a failure to train claim bears the burden of proving that the challenged training program is inadequate with respect to the specific tasks performed. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The Plaintiffs will be unable to meet this burden.

### E.     PALMER IS ENTITLED TO PUBLIC OFFICIALS IMMUNITY AS TO PLAINTIFFS' NEGLIGENCE CLAIM.

Public official immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties. Public official immunity, a derivative of governmental immunity, is afforded to public officials "whose position is created by the constitution or statutes of the sovereign." *Meyer v. Walls*, 347 N.C. 97, 113, 489 S.E.2d 880, 889 (1997) (citing

*State v. Hord*, 264 N.C. 149, 155, 141 S.E.2d 241, 245 (1965)). The public officials'

immunity doctrine generally insulates a public official from claims of mere

negligence made against them in their individual capacity. *Epps v. Duke University,*

*Inc.*, 116 N.C. App. 305, 309, 447 S.E.2d 444, 447 (1994). This is grounded in policy

reasons because it is recognized that public officials must often exercise discretion

and judgment by virtue of their office. *See Collins v. North Carolina Parole*

*Comm'n*, 344 N.C. 179, 183, 473 S.E.2d, 1, 3 (2008).

Discretionary acts are "those requiring personal deliberation, decision, and

judgment." *Isenhour v. Hutto*, 350 N.C. 601, 610, 517 S.E.2d 121, 150 (1999).

Importantly,

> [A]bsent evidence to the contrary, it will always be presumed that
> public officials will discharge their duties in good faith and exercise
> their powers in accord with the spirit and purpose of the law.  This
> presumption places a heavy burden on the party challenging the validity
> of public officials' actions to overcome this presumption by competent
> and substantial evidence.

*Strickland v. Hedrick*, 194 N.C. App. 1, 10, 669 S.E.2d 61, 68 (2008) (citation

omitted).  "[A]n official may not be held liable unless it be alleged and proved that

his act, or failure to act, was corrupt or malicious, or that he acted outside of and

beyond the scope of his duties." *Meyer*, 347 N.C. at 112, 489 S.E.2d at 888.

As argued above, Palmer is a public official and is entitled to the protection

of public official's immunity.  All of her acts were discretionary and protected by

public official immunity.  Moreover, Palmer's acts were not corrupt, malicious, or

beyond the scope of statutory authority as Director of DSS. *See* N.C. Gen. Stat. §

108A–14(a)(12). Therefore, the negligence claim should be dismissed.

### F. PLAINTIFF'S CLAIMS FOR GROSS NEGLIGENCE AND OBSTRUCTION OF JUSTICE SHOULD BE DISMISSED.

As indicated above, there is no evidence that Lindsay or Palmer were

personally involved with the Hogan CVA, breached any duty to Hogan, or provided

guidance or even talked to Hogan regarding the CVA. There is simply no evidence

to support the requisite elements of gross negligence and this claim should be

dismissed. Further, there is no evidence that Lindsay or Palmer took "Any action

intentionally undertaken by the defendant for the purpose of obstructing, impeding,

or hindering the plaintiff's ability *to seek and obtain a legal remedy will suffice to

support a claim for common law obstruction of justice." Braswell v. Medina*, 805

S.E.2d 498, 509 (N.C. Ct. App. 2017) (citation omitted); *See also Grant v. High

Point Regional Health System*, 184 N.C. App. 250, 645 S.E.2d 851 (2007) (holding

allegations that the defendant destroyed the medical records of the decedent so as to

effectively preclude the plaintiff from obtaining the required Rule 9(j) certification

and to prevent the plaintiff from being able to successfully prosecute a medical

malpractice action against the defendant and others was sufficient to state claim for

obstruction of justice.); *Broughton v. McClatchy Newspapers, Inc*., 161 N.C. App.

20, 33, 588 S.E.2d 20, 30 (2003) (summary judgment for obstruction of justice claim

against a newspaper for publishing an article about the plaintiff's ongoing divorce

proceeding granted because there was no evidence that plaintiff's divorce case was "in some way judicially prevented, obstructed, impeded, or hindered by the acts" of the newspaper.);

There are only a few reported North Carolina appellate decisions that even mention obstruction of justice as a civil action.[1] Most of the cases addressing this cause of action involve a defendant destroying or altering evidence. *See Earp v. Quinlan*, 2010 WL 3001521, 698 S.E.2d 556 (N.C. Ct. App. 2010) (defendant employer altering or deleting electronic data); *Jones v. City of Durham*, 183 N.C. App. 57, 58, 643 S.E.2d 631, 633 (2007) (defendant police officers destroying a videotape recording of an accident); *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984) (defendant doctors destroying medical records or creating false medical records).

Here, there is no evidence that Lindsay or Palmer provided any guidance or advice to Hogan regarding the CVA that Hogan executed. Further, there is no evidence in the record that Lindsay or Palmer destroyed any evidence related to this matter. There is no evidence that Lindsay or Palmer acted in any way to prevent, obstruct, impede, or hinder Plaintiffs' ability to seek and obtain a legal remedy and Plaintiffs' claim for obstruction of justice claim should be dismissed.

---

[1] Obstruction of justice is ordinarily thought of as a crime and is a criminal offense under Article 30 of Chapter 14.

## IV.   ANTICIPATED LEGAL ISSUES

The Defendants have filed a motion in limine regarding the Plaintiffs' witnesses characterizing the CVA in this case as unlawful. In addition, the Defendants filed a motion in limine objecting to any reference to an SBI investigation or criminal charges being brought against Palmer and Lindsay.

Given the individuals identified as being subpoenaed by the Plaintiffs, the Defendants anticipate making additional legal arguments concerning relevance and admissibility of evidence at trial.  For instance, the Plaintiffs subpoenaed Tamela Shook, a contract worker for DHHS, who did well-checks on various children who were the subject of CVAs, but was not involved in the *Hogan* case.  The Plaintiffs have also subpoenaed other DHHS employees, including Brian Vogl and Lisa Cauley, who became involved with DSS after the CVA at issue in this case.  Vogl and Cauley were involved when NCDHHS took over the day to day operations of DSS for several months, but were not involved in the underlying incidents giving rise to the CVA.  Such evidence is not relevant under F.R.E. 401, and if so, unduly prejudicial given the tenuous relevance, under F.R.E. 403.

In addition, the Plaintiffs have subpoenaed Darryl Brown, the Cherokee County attorney, and the Defendants expect the Plaintiffs to ask Brown what remedial measures were taken or considered after the CVAs were discovered. Such information is clearly not admissible under F.R.E. 407.

21

Respectfully submitted, this the 29th day of April, 2021.

s/Sean F. Perrin
*Attorney for Defendants Cherokee County, Cherokee County Department of Social Services, Scott Lindsay in his official capacity and Cindy Palmer in her official capacity*

s/John Kubis
*Attorney for Defendant Cindy Palmer in her individual capacity*

s/Patrick H. Flanagan
*Attorney for Defendant Scott Lindsay in his individual capacity*