IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE NO.: 1:18-CV-96

| | |
|---|---|
| BRIAN HOGAN, et al., ) | |
| ) | |
| Plaintiffs, ) | **PLAINTIFFS' TRIAL BRIEF** |
| ) | |
| v. ) | |
| ) | |
| CHEROKEE COUNTY, et al ) | |
| ) | |
| Defendants, ) | |

NOW COME the Plaintiffs and present their trial brief addressing issues of law Plaintiffs reasonably believe may arise in trial of this action.

## STATEMENT OF THE CASE

This action arises out of the Defendants' use of an out-of-court agreement that resulted in the removal of Plaintiff H.H. from the custody of her father, Plaintiff Brian Hogan, without a court order. [Doc. 1-1 at 5]. Following a ruling on a partial motion to dismiss [Doc. 22], the Court's ruling on summary judgment [Doc. 91], and the stipulation of dismissal as to certain claims [Doc. 103], the following claims remain for trial:

o Claims against Cindy Palmer for violation of Plaintiffs' substantive and procedural due process right.

- 1 -

- Claims against Scott Lindsay for violation of Plaintiffs' substantive and procedural due process rights.

- Claims against Cherokee County under *Monell*.

- Claims against Cherokee County for deprivation of constitutional rights for failure to train (under *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989) deliberate indifference to inadequacy of training)

- State law claims against Scott Lindsay for gross negligence and obstruction of justice.

- State law claims against Cindy Palmer for negligence, gross negligence, and obstruction of justice.

## STATEMENT OF FACTS

H.H., who is Brian Hogan's minor child, was improperly taken from Hogan and placed in the care of Hogan's father by the Cherokee County Department of Social Services ("DSS") using an invalid Custody and Visitation Agreement ("CVA"). Such CVAs are not a permissible legal method for establishing custody placement and, as Defendants knew, had no legal basis. Defendants acted in deliberate indifference to the proper legal procedures and to the rights of Plaintiffs Hogan and H.H.

Defendant Cherokee County operates a constituent Department of Social Services, and as such, owed a duty to its residents and citizens to ensure that its agents and employees acted pursuant to applicable constitutional and statutory mandates.

Defendant Palmer, the Director of DSS, is the final policy maker for Cherokee County. Palmer had duties, to which she was deliberately indifferent, to ensure that she established policies and procedures for Cherokee County DSS that protected the constitutional rights of juveniles and parents, and to supervise the social workers, supervisors, attorney, and other employees of Cherokee County DDS to ensure that their actions did not violate the constitutional rights of juveniles and parents.

On January 14, 2016, North Carolina District Court Judge Tessa Sellers entered an Order in file number 15-JA-73, placing H.H. into Brian Hogan's permanent custody following a hearing in which Lindsay, Palmer, and Darryl Brown (guardian ad litem attorney advocate) participated.

In the Spring of 2016, DSS received a report from H.H.'s school that prompted it to open another investigation into H.H. When DSS decided to use a Custody and Visitation Agreement to conclude its investigation without court involvement, DSS employee Laurel Smith called Hogan, and told him that he had to sign papers (a CVA) about H.H.  Hogan was not represented by counsel, and H.H. had no guardian *ad litem*. DSS presented him with a CVA, drawn from a form and following a

- 3 -

procedure created by Lindsay, the DSS attorney as well as the County Attorney. The CVA placed H.H. with Brian Hogan's father, Warren Hogan.

Following the signing of this CVA before a notary on November 21, 2016, H.H. lived with Warren Hogan until December 13, 2017. On December 7, 2017, Hogan, though counsel, filed a motion with the district court of Cherokee County to enforce the April 1, 2016 Order that gave him custody of H.H. That motion was heard on December 13, 2017 before District Court Judge Monica Leslie. Lindsay represented Cherokee County DSS at that hearing, and Darryl Brown was guardian *ad litem* attorney advocate.

During an in-chambers discussion among counsel, Lindsay stated that he had knowledge of at least 20 CVAs like the one signed by Hogan. When Judge Leslie asked Lindsay what statutory or legal authority he relied upon in drafting the CVAs, he admitted that there was, "None."

That same day, Judge Leslie entered an order finding the "CVA signed between Warren Hogan and Brian Hogan on the 21st day of November is not a valid legal document and is not enforceable or binding and is hereby null and void," and held that Hogan had lawful custody of H.H. Hogan regained custody of H.H. immediately thereafter.

On December 20, 2017, the North Carolina Department of Health and Human Services, Division of Social Services, Child Welfare Services sent out an urgent

memorandum regarding private custody agreements stating:

> [C]hild welfare staff in some County Departments of Social Services may be facilitating the completion of private custody agreements between the parent(s) of children involved in Child Protective Services and other family members or other individuals, without the oversight of the Court . . . . This letter is a reminder that facilitating such private custody agreements without the oversight of the Court falls outside of both law and policy.

CVAs were an established procedure for Cherokee County DSS. They were used in other cases besides Hogan's. Lindsay would sometimes exchange drafts of CVAs with social workers. Despite knowing that no legal authority existed for their use, the Defendants used the CVAs to violate the rights of the parents and children for the purposes of convenience. The CVAs were used to avoid the procedures and constitutional protections required in filing a petition, including appointing a guardian *ad litem* for the best interests of the child, having attorneys for the parents, and having a hearing before an impartial judge of the district court.

As a result of Defendants' actions, Plaintiffs suffered the interference with the parent-child relationship and the indignity of having been forced apart through a governmental plan, custom, and scheme without legal process or justification. They suffered emotional distress and the loss of enjoyment of life.

## ISSUES WHICH MAY ARISE

### I. EXEMPLIFICATION OF STATE COURT JUDGMENTS AND JUDICIAL NOTICE

The Plaintiffs will be offering documents filed with the Cherokee County District Court into evidence during this action. The Rule of Evidence governing the admissibility of state court documents in federal proceedings is 28 U.S.C. § 1738. *See First of Denver Mortg. Inv'rs v. Riggs*, 564 F. Supp. 1513, 1516-17 (D. Colo. 1983) ("The rule is a rule of evidence rather than a ground for jurisdiction.") (quoting *California ex rel McColgan v. Bruce*, 129 F.2d 421, 424 (9th Cir. 1942), 147 ALR 782, *reh. denied*, 317 U.S. 710, 63 S. Ct. 255, 87 L. Ed. 566 (1942)).

In this action, Plaintiffs are offering (among others) the final custody order regarding H.H., signed April 1, 2016 by the Honorable Tessa Sellers. The Plaintiffs will present a copy of the Court file, numbered 15-JA-73 from Cherokee County, captioned *In re H[.] H[.]*, which includes several of Plaintiffs' exhibits. Those exhibits drawn from the exemplified copy of the state court file are admissible as evidence in this action.

Plaintiffs further will be asking the Court to take judicial notice of several North Carolina statutes. Judicial notice is governed by Fed. R. Civ. P. 201. "When there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible." *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (citing Fed. R. Evid. 201(b), 1 J. Weinstein, *Weinstein's Evidence: United*

*States Rules* paras. 200[01], [03], at 200-2 to 200-5, 200-14 to 200-19; and J. Moore, 10 *Moore's Federal Practice* § 201.20.).

Under federal law, the court is entitled to take judicial notice of the existence of state statutes because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

## II.   FIFTH AMENDMENT ISSUES

The Plaintiffs have designated the deposition testimony of Cindy Palmer and Scott Lindsay for use as substantive evidence. During their depositions, both invoked their Fifth Amendment Privilege against self-incrimination. They are now bound by their invocation, and the Plaintiffs are entitled to an instruction on adverse inferences.

The United States Constitution does not guarantee that the exercise of Fifth Amendment rights will be without cost in the civil arena, and a *party* or a *witness* who chooses to assert the privilege against self-incrimination in a civil case must live with the consequences. *In re Anderson*, 349 B.R. 448 (E.D. Va. 2006). *See also Cascade Capital, LLC v. DRS Processing LLC,* No. 317CV00470RJCDSC, 2019 WL 5468635, at *4 (W.D.N.C. Oct. 23, 2019) ("Plaintiffs are entitled to all adverse inferences which may be drawn by Defendant and Miller's invocation of the Fifth Amendment…."). *See generally United States ex rel. DRC, Inc. v. Custer Battles,*

- 7 -

*LLC,* 415 F.Supp.2d 628, 632–33 (E.D. Va. 2006); *In re Phillips, Beckwith & Hall,* 896 F.Supp. 553, 559–560 (E.D. Va. 1995).

A. <u>Adverse Inferences</u>

The Supreme Court, in *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), reiterated that:

> The prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a civil cause.

*Id; see also Morley v. Cohen*, 888 F.2d 1006, 1012 (4th Cir. 1989); *see, e.g., Richardson v. Cabarrus Cty. Bd. of Educ.*, 151 F.3d 1030 (4th Cir. 1998), 1998 U.S. App. LEXIS 12106, at *8 (4th Cir. June 9, 1998) ("To the extent that the district court relied on Richardson's refusal to testify as evidence of his involvement in the letter writing, such reliance is proper.") (unpublished). *In re Estate of Trogdon*, 330 N.C. 143, 152, 409 S.E.2d 897, 902 (1991) (When the privilege is invoked in a civil case, "the finder of fact in a civil cause may use a witness' invocation of his fifth amendment privilege against self-incrimination to infer that his truthful testimony would have been unfavorable to him."). The rule is particularly apposite to these Defendants because the North Carolina appellate courts have clearly established the applicability of the negative inference arising from the assertion of the Fifth Amendment in civil cases arising under Chapter 7B of the North Carolina

- 8 -

General Statutes. *In the Matter of L.C.*, 253 N.C. App. 67, 72–73, 800 S.E.2d 82, 87 (2017) (citing *Estate of Trogdon*, 330 N.C. at 152, 409 S.E.2d at 902).

The United States Court of Appeals for the Fourth Circuit has affirmatively recognized the "prevailing rule that 'the fifth amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" *In re Grand Jury Subpoena*, 836 F.2d 1468, 1472 (4th Cir. 1988) (quoting *Baxter v. Palmigiano*, 425 U.S. at 318). Accordingly, federal courts in North Carolina have noted that when "a defendant asserts a Fifth Amendment privilege against self-incrimination in a civil case, that assertion may ultimately result in a conclusion at trial or on a motion for summary judgment that the plaintiff's evidence is unrebutted and that defendant is unable to establish any genuine issue of material fact." *Arminius Schleifmittel GmbH v. Design Indus., Inc*., No. 1:06CV00644, 2008 WL 819032, at *2 (M.D.N.C. Mar. 20, 2008); *see also Cascade Capital, LLC v. DRS Processing LLC*, No. 3:17-cv-00470-RJC-DSC, 2019 WL 5468635, at *4 (W.D.N.C. Oct. 23, 2019) ("Plaintiffs are entitled to all adverse inferences which may be drawn by Defendant and Miller's invocation of the Fifth Amendment at the deposition. The Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Evans v. Capps*, No. 7:15-CV-252-BO, 2018 WL 5291864, at *5 (E.D.N.C. Aug. 3, 2018), *report*

- 9 -

*and recommendation adopted,* No. 7:15-CV-252-BO, 2018 WL 4635025 (E.D.N.C. Sept. 27, 2018), *aff'd,* 765 Fed. Appx. 44 (4th Cir. 2019) (holding that in the civil context, a party's invocation of the Fifth Amendment privilege may be used against him, "even if that silence is an exercise of his constitutional privilege against self-incrimination," striking summary judgment declaration, and granting summary judgment).

As the federal courts have articulated the rule, parties who choose to assert the privilege against self-incrimination in a civil case must accept the consequences, and "[i]f this be seen as a 'price' on the assertion of the privilege, so be it." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); *see also United States v. Rylander*, 460 U.S. 752, 758-59 (1983); *In re Grand Jury Subpoena (Under Seal)*, 836 F.2d 1468, 1472 & n. 4 (4th Cir.), *cert. denied*, 487 U.S. 1240 (1988). The rule also extends, in case specific circumstances, in which a witness asserts the privilege. *See RAD Servs.*, 808 F.2d at 277 (permitting the jury to draw an adverse inference when the record was "replete with circumstantial evidence of" the witnesses' "involvement with the alleged plan").

> In determining whether a district court may permit adverse inferences, [where a witness has asserted the privilege against self incrimination, Courts] engage in a case-specific analysis. *See Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir. 1987). Courts generally follow the factors set forth by the Second Circuit in *LiButti*: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of

interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *LiButti*, 107 F.3d at 123–24.

*United States v. Mallory*, 988 F.3d 730, 740 (4th Cir. 2021)

B. <u>Impermissible Attempted Withdrawal of Prior Invocation</u>

The clear "weight of authority" establishes that, once invoked as a shield, the Fifth Amendment privilege against self-incrimination cannot be withdrawn or cast aside to allow the invoking witness to testify differently at trial. *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 559 (E.D. Va. 2005). To permit such a deponent or witness to "testify to issues which she refused to testify to during her deposition based on privilege would allow the Defendants to use the attorney-client privilege as both a shield and a sword. Thus, [the invoking deponent] may only testify at trial within the scope of her deposition."" *Id. See, accord*, *Qurneh v. Colie*, 122 N.C. App. 553, 558, 471 S.E.2d 433, 436 (1996) ("The privilege against self-incrimination is intended to be a shield and not a sword.") (citing *Christenson v. Christenson*, 281 Minn. 507, 162 N.W.2d 194, 200 (1968)).

The parties or the witnesses invoking the privilege cannot now attempt to avoid the privilege in part and attempt to defend this suit so impermissibly. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002) (principal's assertion of her Fifth Amendment privilege against self-incrimination supported adverse inference against her to establish that principal engaged in the claimed illicit conduct); *S.E.C. v. Smart*,

- 11 -

678 F.3d 850, 855 (10th Cir. 2012) (impermissible for party who has asserted Fifth Amendment privilege in discovery to attempt to withdraw it to the extent that the party seeks to make affirmative declarations) (citing *United States v. Certain Real Prop.,* 55 F.3d 78, 84 (2d Cir. 1995) (collecting cases). *See also United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) ("In other words, a 'party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence,' and the claim of privilege will not prevent an adverse finding or even summary judgment . . . ." (quoting United States v. Taylor, 975 F.2d 402, 404 (7th Cir. 1992)).

As early as 1991, the Fourth Circuit held that the Fifth Amendment privilege could not be invoked as a shield to oppose depositions and then discarded for the limited purpose of making statements even to support a summary judgment motion. *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991). In that case, the declarant had selectively asserted his Fifth Amendment privilege to submit an affidavit supporting his summary judgment motion, after having invoked it to oppose depositions. The court held it was proper for the trial court to refuse to consider the debtor's affidavit when addressing the summary judgment motion. *See also Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 576–77 (1st Cir. 1989) defendant who had invoked the Fifth Amendment and refused to answer questions about a shooting during a deposition could not later testify at trial about the shooting); *Rubenstein v. Kleven*,

150 F.Supp. 47, 48 (D. Mass. 1957), *aff'd on other grounds*, 261 F.2d 921 (1st Cir. 1958) (defendant's claim of privilege during deposition precluded his testimony as to certain evidence at trial); *Costanza v. Costanza*, 328 A.2d 230, 232 (N.J. 1974); *Bramble v. Kleindienst*, 357 F.Supp. 1028, 1035 (D. Colo. 1973) (applying same sanction to a plaintiff), *aff'd*, 498 F.2d 968 (10th Cir. 1974), 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2018, at 149 (1970) ("[I]f a party is free to shield himself with the privilege during discovery, while having the full benefit of his testimony at trial, the whole process of discovery could be seriously hampered.").

Accordingly, here, the parties or witnesses who have invoked the privilege against self-incrimination, may not expand the scope of their testimony and use the privilege as a sword rather than a shield.

## III.   STANDARD FOR WAIVER OF CONSTITUTIONAL RIGHTS

Although Hogan admits that he signed the CVA, he signed it under circumstances that, as a matter of law, cannot be deemed voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) ("if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then…the [Supreme Court has found the] consent invalid.").  As a result of the unlawful procedure and the duress he suffered, Hogan's purported "consent was not his own 'essentially free and unconstrained choice' because his 'will ha[d] been . . .

- 13 -

overborne and his capacity for self-determination critically impaired.'" *United States v. Watson*, 423 U.S. 411, 411–12 (1976) (quoting *Schneckloth*, 412 U.S. at 225). Hogan was given no information about his right to a hearing under Chapter 7B or other social services available to his family. He had only two choices – sign the CVA or DSS would take H.H. from him immediately.

This case is analogous to the "police command" decisions that stand for the principle that a citizen, who is neither informed nor aware of the right to refuse consent, cannot be held to have given consent merely by complying with an instruction or order of a government official because that compliance is simply an acquiescence to the apparently lawful authority to act. This principle, of course, presupposes that the acquiescing person is not afforded counsel or informed of the right to resist a search. Indeed, the presence of an asserted authority to search by a law enforcement official is tantamount to an assertion that "the occupant has no right to resist the search." *Bumper v. North Carolina,* 391 U.S. 543, 550 (1968). Here, at best for the Defendants, the threats resulted in "'[o]rderly submission to [officials] who, in effect, represented … that they had the authority to [do what they claimed the right to do], against his will if necessary, was not such consent as constituted an understanding, intentional, and voluntary waiver by the [Plaintiff] of his fundamental rights under the … Constitution.'" *Bumper*, 391 U.S. 543, 550 n.14 (quoting *United States v. Elliott*, 210 F.Supp. 357, 360 (D. Mass. 1962)).

- 14 -

Defendants have pleaded waiver and estoppel as affirmative defenses in this action. As this Court correctly noted in its summary judgment order:

> [Due process] procedural safeguards may be considered waived, however, when a plaintiff consents to the governmental action. Thus, if a parent "voluntarily surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation." *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 393 (4th Cir. 1990) (citing *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 172–73 (4th Cir. 1988)); *Smith v. Williams-Ash,* 520 F.3d 596, 600(6th Cir. 2008) (stating that where a parent voluntarily consents to a custody plan, "no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent") (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761-62 (7th Cir. 2006)).
>
> To be valid, a waiver of a constitutional right must be voluntary, knowing, and intelligent. *Iowa v. Tovar*, 541 U.S. 77, 81 (2004) (noting the standard for criminal constitutional rights); *Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty., N.C.*, 149 F.3d 277, 280 (4th Cir. 1998) ("The contractual waiver of a constitutional right must be a knowing waiver, must be voluntarily given, and must not undermine the relevant public interest in order to be enforceable."). Additionally, the waiver must be established by a "high standard[ ] of proof." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966); *Lake James Cmty. Volunteer Fire Dep't*, 149 F.3d at 280 (imposing a heightened review standard on contracts that purport to include a waiver of constitutional rights "because the law does not presume the waiver of constitutional rights").

[Doc 91]

While, admittedly, procedural due process rights may be waived, the waiver must be analyzed under the framework of Supreme Court jurisprudence, particularly, in the seminal case, *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972). In

- 15 -

*Overmyer*, the Court was examining a transaction between two corporations, negotiating at arms-length. *Overmyer* involved a complex corporate entity that renegotiated existing debt into a new interest-bearing note held by a second corporation. *See id.* at 178-82. One of the conditions required by the corporation that was extending additional credit (Frick) was that Overmyer agree to a provision in the contract that permitted Frick to file a confession of judgment in state court if Overmyer defaulted. *Id.* This confession of judgment could then be executed without Overmyer receiving notice and an opportunity to be heard. *Id.* Overmyer challenged this waiver of its procedural due process rights after default and entry of judgment.

Ultimately, the Court held that the waiver of procedural due process rights in the contract was permissible because "the hearing required by due process is subject to waiver." *Id.* at 185 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971)). However, the Court was quick to note that its "holding, of course, is not controlling precedent for other facts of other cases. **For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the [waiving party] receives nothing . . . other legal consequences may ensue**." *Id.* at 188 (emphasis added).

Justice Douglas concurred with Justice Marshall, who noted that he and "I agree that the heavy burden against the waiver of constitutional rights, which applies

even in civil matters, has been effectively rebutted by the evidence presented in this record. Whatever procedural hardship the Ohio confession-of-judgment scheme worked upon the petitioners was voluntarily and understandingly self-inflicted through the arm's-length bargaining of these corporate parties." *Id.* at 188-89 (Douglas, J., concurring) (citing *Ohio Bell Tel. Co*. v. *Public Utilities Comm'n*, 301 U.S. 292, 307 (1937); *Aetna Ins. Co*. v. *Kennedy*, 301 U.S. 389, 393 (1937)).

Applying all these precedents, to adequately evaluate whether either Plaintiff validly waived their constitutional right to procedural due process, the law requires the Court to evaluate with particularity, whether counsel was provided, whether the plaintiff was notified of his or her right to counsel, whether the minor child had a guardian appointed to consider her best interests in effectuating a waiver, the relative bargaining positions of the parties, whether the CVA at issue was a contract of adhesion, and whether either Plaintiff received something of value in exchange for the waiver. Moreover, the burden is on the Defendants to prove that the waiver was valid by a high standard of proof. Defendants cannot meet this burden, and they are not entitled to assert the defense of waiver.

## IV. DAMAGES IN SECTION 1983 ACTION

### A. Compensatory Damages

The primary purpose of a § 1983 damages award is to compensate persons for injuries caused by the deprivation of their constitutional rights. *See Carey v. Piphus*,

435 U.S. 247, 254 (1978) (collecting cases). Damages are not limited to the out-of-the-pocket pecuniary loss the plaintiff suffers, and may be awarded for, among other things, "impairment of reputation ... [and] personal humiliation." *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Glasson v. City of Louisville*, 518 F.2d 899, 912 (6th Cir. 1975) (holding that where protestor's right to free expression was violated by police officers who tore up her protest sign, protestor could recover not only for out-of-pocket expenses but also for emotional and mental distress); *Dejesus v. Village of Pelham Manor*, 282 F.Supp.2d 162, 177 (S.D.N.Y. 2003) (noting that "shock, anxiety, fear and humiliation alone have been determined to be sufficient to establish compensatory damages in civil rights cases") (citing, *inter alia, Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995) (testimony concerning plaintiffs' shock, discomfort and distress sufficient to warrant damages for emotional distress)).

Recovery, therefore, is appropriate in a § 1983 action for violation of his or her civil rights and each plaintiff is entitled to damages for humiliation, personal indignity, and loss of security, companionship, and relationship.

> Emotions are intangible but they are nonetheless perceptible. The hurt done to feelings and to reputation by an invasion of constitutional rights is no less real and no less compensable than the cost of repairing a broken windowpane or damaged lock. Wounded psyche and soul are to be salved by damages as much as the property that can be replaced at the local hardware store.

*Baskin v. Parker*, 602 F.2d 1205, 1209 (5th Cir. 1979).

Courts have recognized, in the § 1983 context, that a "plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation." *Price v. City of Charlotte, North Carolina*, 93 F.3d 1241, 1254 (4th Cir. 1996). Such evidence must, however, "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages." *Id*. Here, the plaintiffs suffered the interference with the parent-child relationship and the indignity of having been forced apart by a governmental plan, custom, and scheme without legal process or justification. They suffered emotional distress as a consequence of the removal of custody and the loss of having anyone to protect their interests.

### B.  Susceptibility to Injury

Here, the Plaintiffs' physical, emotional and mental conditions made them particularly susceptible to the techniques, policies and conduct of the Defendants and to suffering injury from such conduct, in effect, the "eggshell" plaintiff. Accordingly, the wrongdoer takes his victim as he finds him and is liable for the exacerbation of a pre-existing condition. *Dunn v. Denk*, 54 F.3d 248, 250-51 (5th Cir. 1995).

- 19 -

If the jury finds that any of the Defendants injured any of the Plaintiffs, it must find Defendants liable for the full extent of the injuries that each Plaintiff suffered as a result of their wrongful conduct, even though a Plaintiff may have had a pre-existing condition that made the consequences of the wrongful conduct more severe than they would have been for a normal victim. *Maurer v. United States*, 668 F.2d 98, 99 (2d Cir. 1981). *Cf. Tudor v. Harrison,* 195 Fed. Appx. 160, 161 (4th Cir. 2006) (fact that plaintiff more susceptible to injury or discomfort properly "weighed heavily in the decision of the district court.") (unlublished). In other words, if the jury finds the Defendants liable at all, it must hold them liable for the full extent of their conduct, even if, had it not been for a peculiar susceptibility, the consequences might have been much less injurious. *Niehaus v. Liberio*, 973 F.2d 526 (7th Cir. 1992).

## V.   APPLICABLE NORTH CAROLINA LAW

Subchapter I of Chapter 7B of the North Carolina General statues lies at the heart of Plaintiffs' claims. This law

> … shall be interpreted and construed so as to implement the following purposes and policies:
>
> (1) To provide procedures for the hearing of juvenile cases that assure fairness and equity and that ***protect the constitutional rights of juveniles and parents***;

- 20 -

(2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family.

(3) To provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence; and

(4) To provide standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents.

. . . .

N.C. Gen. Stat. § 7B-100 (emphasis added); *also see* 7B-302(d) ("If immediate removal seems necessary for the protection of the juvenile or other juveniles in the home, the director ***shall*** sign a petition that alleges the applicable facts to invoke the jurisdiction of the court.") (emphasis added).

A. <u>Applicable N.C. Juvenile Law</u>

Chapter 7B grants the District Court Division of the North Carolina General Court of Justice the original and exclusive jurisdiction over "any case involving a juvenile who is alleged to be abused, neglected, or dependent." N.C. Gen. Stat. § 7B-200(a). The Court also has the exclusive and original jurisdiction over proceedings to terminate parental rights, N.C. Gen. Stat. § 7B-200(a)(4); proceedings to review the placement of a juvenile in foster care pursuant to an agreement between the juvenile's parents or guardian and a county department of social services, N.C. Gen. Stat. § 7B-200(a)(5); and proceedings to review the

placement of a young adult in foster care pursuant to N.C. Gen. Stat. § 108A-48 and N.C. Gen. Stat. §. 7B-910.1, N.C. Gen. Stat. § 7B-200(a)(5a).

"When a report of abuse, neglect, or dependency is received, the director of the department of social services shall make a prompt and thorough assessment… in order to determine whether protective services should be provided or the complaint filed as a petition." N.C. Gen. Stat. § 7B-302(a). The petition then initiates a Court proceeding to determine whether a juvenile is abused, neglected, or dependent, and if so, what disposition is appropriate to protect the juvenile in the future. *See* N.C. Gen. Stat. §§ 7B-401; -405; and -903.

During the Court proceeding, an indigent parent of a juvenile is entitled to the assistance of court-appointed counsel, which is automatically and provisionally appointed upon the filing of a petition. N.C. Gen. Stat. § 7B-602(a). "A parent qualifying for appointed counsel **may be permitted to proceed *without*** the assistance of ***counsel only after the court* examines the parent and makes findings of fact sufficient to show that the waiver is knowing and voluntary**." N.C. Gen. Stat. § 7B-602(a1) (emphasis added). The juvenile is also entitled to the appointment of a guardian ad litem to ensure that the juvenile's interests are independently represented. N.C. Gen. Stat. § 7B-601.

The Court must find by clear, cogent, and convincing evidence that the juvenile is abused, neglected, or dependent in order to make this adjudication. N.C.

- 22 -

Gen. Stat. § 7B-807. If, after an adjudication, the Court actually removes a juvenile from her parents' custody, the law requires DSS to make reasonable efforts at reunifying the juvenile and her parents. N.C. Gen. Stat. § 7B-901(c). Only upon a termination of parental rights (or other statutorily appropriate findings) can reunification efforts cease. *See* N.C. Gen. Stat. §§ 7B-906.2; -1102; -1103; -1111.

When considering procedural due process claims, such as the Plaintiffs' here, "the existence of state remedies is relevant in a special sense." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990). In procedural due process claims, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Id.* "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.* at 126.

As described above, the State of North Carolina has promulgated extensive procedures for use by county departments of social services when taking children from their parents. These procedures as set forth in Chapter 7B provide due process of law to ensure that the constitutional rights of parents and children are protected. Chapter 7B contains all of the hallmarks of adequate due process, *e.g.*, a neutral fact-finder, standards of proof, right to counsel, discovery, and other standards described in Chapter 7B. These are constitutionally adequate to provide due process of law.

Section 1983 provides a federal remedy when, as here, the state procedure, though adequate in theory, was not available in practice. *Zimmerman*, 494 U.S. at 124. Hogan and H.H. were entitled under North Carolina law to all of the due process protections embodied in Chapter 7B to ensure the protection of their constitutional rights.

### B. N.C. Negligence and Gross Negligence Law

Negligence refers to a person's failure to follow a duty of conduct imposed by law. Every person is under a duty to use ordinary care to protect himself and others from injury or damage. Ordinary care means that degree of care which a reasonable and prudent person would use under the same or similar circumstances to protect himself and others from injury or damage. *Pinyan v. Settle*, 263 N.C. 578, 582, 139 S.E.2d 863, 866 (1965). A person's failure to use ordinary care is negligence. *Williamson v. Clay*, 243 N.C. 337, 343, 90 S.E.2d 727, 731 (1956).

Gross negligence requires that the Defendants acted wantonly, with conscious or reckless disregard for the rights and safety of others. *Parish v. Hill*, 350 N.C. 231, 239, 513 S.E.2d 547, 551 (1999) "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others. *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001). An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard

- 24 -

of the safety of others. *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012). Plaintiffs respectfully submit that this is equivalent to deliberate indifference.

      C. <u>State Law Obstruction of Justice</u>

The Court has already appropriately described the state of the law in regard to common law civil obstruction of justice. *See* Doc. 91 at 45.

**VI.**     **<u>42 U.S.C. § 1983</u>**

Plaintiffs respectfully incorporate and adopt by reference their arguments raised during summary judgment regarding procedural due process [Docs. 61-13 at 6-13; 75 at 6-10; and 80 at 7-8], substantive due process [Docs 61-13 at 6-13 and 75 at 11-13], and *Monell* liability [Docs 61-13 at 13-24; 75 at 15-22; and 80 at 9-10].

Plaintiffs further respectfully suggest that the Court's analysis discussing these topics in its ruling on the parties' various motions for summary judgment is an accurate statement of the law. Doc. 91 at 14-19 (procedural due process); 20-24 (substantive due process); and 30-35 (*Monell*).

Respectfully submitted, this the 29th day of April, 2021.

BY:

<u>/s/ David A. Wijewickrama</u>      <u>/s/ Ronald L. Moore</u>
David A. Wijewickrama         Ronald L. Moore
N.C. State Bar No.: 30694        N.C. State Bar No.: 9619
95 Depot Street               Post Office Box 18402

Waynesville, NC 28786
Phone: 828-452-5801
Fax:   828-454-1990
*Attorney for Brian Hogan*

<u>/s/ Melissa Jackson</u>
Melissa Jackson
N.C. State Bar No.: 34013
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801
*Attorney for Brian Hogan*

Asheville, NC 28814
Phone: (828) 777-1812
Fax: (828) 253-2717
*Attorney for H.H.*

<u>/s/ D. Brandon Christian</u>
D. Brandon Christian
N.C. State Bar No.: 39579
3344 Presson Road
Monroe, NC 28112
Phone :(910) 750-2265
*Attorney for H.H.*

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on April 29, 2021, a copy of the PLAINTIFFS' TRIAL BRIEF was served on all counsel having made appearances in the case via the CM/ECF system

<u>/s/ D. Brandon Christian</u>
D. Brandon Christian
N.C. Bar No.: 39579
3344 Presson Road
Monroe, NC 28112
Phone: (910) 750-2265
*Attorney for H.H.*