UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:18-cv-96

| | |
|---|---|
| BRIAN HOGAN, both on his own behalf and as representative of all unnamed class members who are similarly situated; BRIAN HOGAN, as parent and next friend of H.H., both her own behalf and as representative of all unnamed class members who are similarly situated,<br>　　　　　　　Plaintiffs,<br>　　vs.<br>CHEROKEE COUNTY; CHEROKEE COUNTY DEPARTMENT OF SOCIAL SERVICES; SCOTT LINDSAY both in his individual capacity and official capacity as attorney for Cherokee County Department of Social Services; CINDY PALMER, in both her individual capacity and her official capacity as Director of Cherokee County Department of Social Services; DSS SUPERVISOR DOE #1, et al.,<br>　　　　　　　Defendants. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL NISI REMITTITUR ; DECLARATION OF SEAN F. PERRIN IN SUPPORT OF MEMORANDUM** |

## I. INTRODUCTION

On May 13, 2021, after four days of testimony, a jury awarded Brian Hogan 1.5 million dollars, and his daughter, H.H., 3.1 million dollars for damages arising from Cherokee County Department of Social Services' use of a child visitation agreement to remove H.H. from Brian from October 21, 2016, until December 13, 2017. This Court entered judgment on the jury verdict on June 21, 2021. [Document 147].

The Defendants now move this Honorable Court for a new trial nisi remittitur pursuant to Rule 59 (a) of the Federal Rules of Civil Procedure because the damages awarded to both Brian and H.H. were excessive as a matter of law.

## II. ARGUMENT

### A. A COURT MAY ORDER A NEW TRIAL NISI REMITTITUR IF THE DAMAGES ARE EXCESSIVE

Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may order a new trial nisi remittitur if it "concludes that a jury award of compensatory damages is excessive," *Sloane v. Equifax Info. Servs*., LLC, 510 F.3d 495, 502 (4th Cir. 2007), or will result in a miscarriage of justice. *Bennett v. Fairfax Cty*., 432 F. Supp. 2d 596, 599–600 (E.D. Va. 2006). Remittitur is a process whereby a "trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury

2

award." *Atlas Food Systems & Services., Inc. v. Crane Nat. Vendors, Inc*., 99 F.3d 587, 593 (4th Cir. 1996). If the court were to remit the jury's award, a plaintiff would be required to either accept the reduced award or start over with a new trial if they refused the reduction. *Cline v. Wal-Mart Stores, Inc*., 144 F.3d 294, 305 (4th Cir. 1998).

A reviewing court must compare "the factual record and the verdict to determine their compatibility." *Atlas Food Sys. & Servs., Inc*, 99 F.3d at 594 (4th Cir. 1996)). Whether damages are excessive is a decision "entrusted to the sound discretion of the district court." *Robles v. Prince George's Cty*., 302 F.3d 262, 271 (4th Cir. 2002); *see also Fontenot v. Taser Int'l, Inc*., 736 F.3d 318, 334 (4th Cir. 2013). Unlike a motion under Rule 50, when considering a motion for a new trial under Rule 59, "a trial judge may weigh the evidence and consider the credibility of the witnesses." *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989); *see also McCollum v. McDaniel*, 136 F. Supp. 2d 472, 475 (D. Md. 2001).

### B. <u>COMPENSATORY DAMAGES ARE EXCESSIVE WHEN THEY ARE AGAINST THE CLEAR WEIGHT OF THE EVIDENCE OR BASED UPON EVIDENCE WHICH IS FALSE</u>

Damages under section 1983 are intended to compensate for actual injuries caused by constitutional violations. *Knussman v. Maryland*, 272 F.3d. 625, 639 (4th Cir. 2001) A jury's award of substantial compensatory damages must be proportional to the actual injury incurred. *Piver v. Pender County Bd. Of*

*Education*, 835 F.2d. 1076, 1082 (4th Cir. 1987).  While compensatory damages for emotional injuries are recoverable under section 1983, *Memphis Community. School. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543 (1986), a plaintiff must adduce sufficient evidence "that such distress did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes."  *Price v. City of Charlotte, North Carolina*, 93 F.3d 1241, 1250 (4th Cir. 1996).

Compensatory damages are deemed excessive when they are 1) against the clear weight of the evidence, or 2) based upon evidence which is false, or 3) will result in a miscarriage of justice. *Cline*, 144 F.3d at 305.  On an excessiveness challenge like this one, the Court reviews the jury's determination under the first two prongs of Rule 59. *Id*. A court may review the following factors to determine whether damages for emotional distress for a constitutional violation are excessive, including:

> Medical attention resulting from the emotional distress; psychiatric or psychological treatment; the degree of such mental distress; the factual context in which the emotional distress developed; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; mitigating circumstances, if any; physical injuries suffered as a result of emotional distress; and loss of income, if any.

*Knussman*, 272 F.3d at 640.

Against this legal backdrop, it is clear that the Plaintiffs' damages are excessive because they are against the weight of the evidence and should be reduced.

### C. THE DAMAGES AWARDED TO BRIAN HOGAN WERE EXCESSIVE

The award of 1.5 million dollars to Brian Hogan was clearly excessive because it was against the weight of evidence. At trial, the sole evidence of Brian's damages from being apart from H.H. for thirteen months came from him, and Plaintiffs' retained expert, Dr. Matthew Gaskins. Dr. Gaskins did not treat Brian, but assessed him as a paid expert. No other witnesses, like Brian's wife or friends, corroborated Brian's claims of emotional distress.

The CVA was signed in either October or November 21, 2016. (T 881: 14-25; 882: 1-2.)[1] H.H. was returned to Brian's custody on December 13, 2017. [Document 1-1, p. 15, ¶¶, 69-77]. During this thirteen month period when H.H. was living at Warren Hogan's home, Brian was able to call H.H. every day and sometimes Warren would let Brian talk to H.H. (T 618: 3-25.) Brian infrequently saw H.H., and the most time he spent with her while she was at Warren's home was for an hour at a local pool. (T 621: 7-19).

---

[1] "T" refers to the transcript of the trial, followed by reference to page and line numbers, true copies of which are attached to the Declaration of Sean F. Perrin, Exhibit 1 to this Memorandum.

As a result of not being able to regain custody of H.H. for thirteen months, Brian felt "worthless and..no good." (T 634: 16-22.) Brian testified that his nights were stressful, he could not sleep and quit eating, and had feelings of guilt. (T 636: 8-17). When he got H.H. back, his guilt disappeared and "I was a happy father. I was tickled to death. I was so happy that I got my daughter back." (T 637: 4-8). However, even after getting H.H. back, Brian still feels sadness and feels like he failed his family. (T 637: 13-23).

The only other witness to testify about Brian's emotional distress was Dr. Matthew Gaskins, Plaintiffs' expert psychiatrist. Dr. Gaskins opined that Brian had "profound sadness, tearfulness, self-blame, guilt" that were depressive but did not meet the criteria for "Major Depressive Disorder." (T 675: 13-17; 685: 23-25; 686: 1-3.) Dr. Gaskins characterized Mr. Hogan's symptoms as "adjustment order with depressed mood." (T 691: 24-25; 692: 1-3) According to Dr. Gaskins, Mr. Hogan experienced psychological distress including intense sadness, fear of not seeing H.H. again, and profound guilt. (T 702: 18-25). Most of these symptoms, except the feeling of guilt, abated when H.H. returned to Brian's custody, but the feelings of guilt impact his relationship with H.H. (T 703: 15-18). Dr. Gaskins also opined that Mr. Hogan and his family would benefit from intensive family services to assist with reunification. (T 703: 19-20). Dr. Gaskins, however, did

not opine about either how long this therapy should occur or the costs of this therapy.

The jury instructions in this case properly informed the jury that they could "not…base damages on some abstract value or importance of a constitutional right. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate the plaintiff for the injuries that he or she has sustained." (T 1117: 24-25; 1118: 1-4). However, the jury's verdict for Brian clearly provided more damages than those that would fairly compensate him. There was no evidence that Brian received medical treatment as a result of the Defendants' actions, suffered any physical injuries, was prescribed medication to deal with issues caused the Defendants, lost any income, or suffered any monetary damages. *Knussman*, 272 F.3d. at 640. In fact, the only evidence at trial about income was that in the past two years, Brian made between $ 17-18,000 thousand dollars per year, whereas he was only sporadically employed when the CVA was signed. (T 583: 25; 584: 1-8; 658: 2-19)

The Fourth Circuit has addressed several cases with similar damages and granted Defendants' motions for remitter. In *Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir. 1996), a Title VII and § 1983 sex and national origin discrimination case, a jury found that Hetzel's superior retaliated against Hetzel for

7

engaging in protected speech and awarded compensatory damages of $750,000 for emotional distress, which the district court remitted to $500,000. *Id*. at 170. Hetzel's evidence of her emotional distress "consisted almost exclusively of [her] own, brief conclusory statements." *Id*. at 171. She merely recited that she had "headaches, stress, trouble reading to her daughter, and problems with her family life as a result of [her employers'] actions." *Id*. In reversing and remanding the award of compensatory damages, the Fourth Circuit explained that while Hetzel's evidence of emotional distress entitled her to "minimal damages," there was "insufficient evidence" to support an award of $500,000. *Id*. at 172. The Fourth Circuit observed that "Hetzel presented no evidence corroborating the existence of any of her supposed specific harms," "remain [ed] ... in good standing with the police department," displayed "no observable injuries or physical ailments," and had "never once seen a doctor, therapist, or other professional, or even sought the counsel of a friend, to help her deal with her what is supposedly an enormous problem overshadowing all aspects of her life." *Id*. at 171. *See also Sloane*, 510 F.3d at 507 (finding a $245,000 award for emotional distress excessive and reducing damages to $150,000 and granting a new trial nisi remittitur at plaintiff's option); *Cline*, 144 F.3d at 306 (reducing an award of $117,500 to $10,000 and granting a new trial nisi remittitur); *Price*, (holding that compensatory damages cannot stand where there was no evidence of a need for medicine, no counseling,

8

no loss of income, or "any corroboration of their emotional distress or any manifestation it may have assumed.").

Other circuits have also addressed similar issues. In *Ramsey v. American Air Filter Co. Inc.*, 772 F.3d 1303 (7th Cir. 1985), the Seventh Circuit addressed the issue of demonstrable evidence of injury in the context of an excessive compensatory damages award. A jury awarded Ramsey $75,000 in compensatory damages for emotional distress in a racial discrimination claim based upon testimony from him, a former colleague, and Ramsey's physician. According to Ramsey and his friend, Ramsey felt humiliated, insulted, and disgusted, as a result of his being singled out for disparate discipline ostensibly based on Ramsey's race. *Id* at 1313. Ramsey's doctor testified that Ramsey was concerned about finding a job, and that Ramsey's unemployment preyed on him psychologically because he doesn't like [the] position his unemployment has put him in." *Id*. The doctor, however, never treated Ramsey for depression or prescribed any drugs for emotional distress. After observing the "paucity of references to any emotional harm that [Ramsey] suffered as a result of defendant's discrimination" and "the absence of any evidence that [Ramsey] was treated for emotional harm or that he became depressed for any sustained period of time," the court concluded that the $75,000 compensatory damages award was excessive compensation and vacated

9

and remanded the damages award, conditional on Ramsey's accepting remittitur of $35,000 for his emotional distress. *Id*. at 1314.

By referencing these employment cases, the Defendants are by no means comparing the loss of a job to the temporary loss of a child. These cases, however, are instructive because other than his own testimony, and that of a paid expert who never treated him, there is no evidence that Brian suffered compensatory damages in the amount of $1.5 million dollars.

### D. THE DAMAGES AWARDED TO H.H. WERE ALSO EXCESSIVE

The 3.1 million dollar damages award to H.H. was also excessive because it was against the weight of evidence.

At trial, H.H. testified that when she went to live with her grandfather, she had to change school but that "didn't really bother" her. (T 460: 17-25; 461: 1-7.) H.H. liked living with Warren at first, but Warren had anger issues which included yelling at her, but never hitting her. (T 461: 21-23; 462: 1-5.) Warren was also strict and only allowed H.H. to see one friend. (T 465: 11-14; 498: 19-22.) He also made sure H.H. did her schoolwork and went to school. (T 497: 5-9.) H.H. felt "confused" when living with Warren because, among other things, she was not allowed to shave her underarms, and nobody explained the beginning of her menstrual cycle to her. (T 470: 4-7; 471: 1-25.)

While living with Warren, H.H. was also able to see her mom and dad "[e]very now and then." (T 465: 20-22.) During these visits, Brian and his wife Amanda would cry a lot which made H.H. feel uncomfortable. (T 467: 16-23.) It made H.H. uncomfortable that she had to visit with her mom and dad with Warren's girlfriend, Terry, watching and she missed her mom and dad. (T 465: 25; 466: 1-15.) H.H. was able to talk with Brian on the phone, but Warren sometimes wouldn't let H.H. talk with him. (T 466: 16-24.) H.H was also able to see her siblings when with Warren. (T 468: 2-14.)

When H.H. moved back with her parents in December 2017, she was nervous and happy. (T 474: 10-17.) When she went back to live with her parents, she engaged in self-harm behaviors, but stopped doing it after the school threatened her with therapy. (T 478: 10-25; 479: 1-13.)

Dr. Jesse Raley, the Plaintiffs' expert psychiatrist (T 516:24-25; 517: 1-2), testified that H.H. suffered from depression and anxiety as a result of the moves resulting from the CVA. (T 547: 5-7.) He also opined that her self-harm and suicidal thoughts were "secondary to those moves." (T 547: 7-9.) Part of her anxiety, Dr. Raley testified, was due to uncertainty about her father's paychecks. (T 547: 23-25.) Dr. Raley opined that H.H. continued to have anxiety and mood related symptoms after she moved back to her father's house. (T 548: 25; 549: 1-2.)

Dr. Raley also testified about future expenses related to treatment for H.H. He testified that H.H. would benefit from 1) a psychotherapist counselor and therapist; 2) intensive family services; and 3) a child and adolescent psychiatrist. (T 550: 1-25; 551: 15-23.) Dr. Raley estimated that the costs of the psychotherapist counselor would be between $ 150-250 for an initial appointment, and $ 125-250 for follow up appointments. (T 552: 4-12.) He opined that this individual therapy should occur weekly for the next 1-3 years. (T 552: 17-22.) He also testified that H.H. might need therapy for twice a month for one to two years after the initial therapy. (T 553: 8-10.) Dr. Raley was unable to provide an estimate for his second recommendation, intensive family services. (T 553: 18—22.) For his third recommendation, a psychiatrist, Dr. Raley estimated that this would cost $ 350-500 for the initial assessment, and then between $ 180-225 for follow up appointments. (T 554: 10-17.)

Taking the outer limits of Raley's testimony, and assuming that the cost for an initial appointment and follow up appointments were $ 250, and therapy occurred weekly for three years, the costs for H.H.'s psychotherapist counseling for this time would be $ 39, 250. The cost for the follow up therapy- assuming sessions occurred twice a month for two years- would be $ 12, 000.

Using the outer limits of Raley's testimony for H.H. psychiatric services, $ 500 for an initial appointment, and $ 225 for follow-up appointments per week for

12

3 years, that cost would be $ 35, 600.  Raley was unable to give an estimate for intensive family services, but assuming that the costs were similar to the psychotherapist counseling, all of H.H's medical expenses- at the outer end- would cost $ 126, 100.

The Court instructed the jury that "[i]n determining the amount…to be awarded to the plaintiff H.H. for actual damages you should consider the reasonable value of the medical and psychological care and supplies that she will reasonably need and actual---and were actually obtained, and the present value of such care and supplies that H.H. is reasonably certain to need in the future." (T 1117: 7-13)  The jury verdict of 3.1 million dollars is twenty four times the outer reach of the damages testified to by Raley.

Like Brian, H.H. did not undergo counseling for being away from her dad, was not prescribed any medicine, and did not suffer any physical injuries.  H.H. was offered counseling by the Cherokee County School District, and Brian Hogan refused to allow her to get treatment. (T 933:12-25) While the Defendants are not minimizing H.H. being away from her father, it is clear, as Dr. Raley testified, that part of H.H.'s depression was not due to actions by the Defendants; instead if was anxiety about her father's paychecks. (T 547: 23-25).  See *Hetzel*, 89 F.3d. at 171-172 (concluding compensatory damages award on retaliation claim under 42

13

Case 1:18-cv-00096-MR-WCM   Document 158   Filed 07/19/21   Page 13 of 17

3 years, that cost would be $ 35, 600.  Raley was unable to give an estimate for intensive family services, but assuming that the costs were similar to the psychotherapist counseling, all of H.H's medical expenses- at the outer end- would cost $ 126, 100.

The Court instructed the jury that "[i]n determining the amount…to be awarded to the plaintiff H.H. for actual damages you should consider the reasonable value of the medical and psychological care and supplies that she will reasonably need and actual---and were actually obtained, and the present value of such care and supplies that H.H. is reasonably certain to need in the future." (T 1117: 7-13)  The jury verdict of 3.1 million dollars is twenty four times the outer reach of the damages testified to by Raley.

Like Brian, H.H. did not undergo counseling for being away from her dad, was not prescribed any medicine, and did not suffer any physical injuries.  H.H. was offered counseling by the Cherokee County School District, and Brian Hogan refused to allow her to get treatment. (T 933:12-25) While the Defendants are not minimizing H.H. being away from her father, it is clear, as Dr. Raley testified, that part of H.H.'s depression was not due to actions by the Defendants; instead if was anxiety about her father's paychecks. (T 547: 23-25).  See *Hetzel*, 89 F.3d. at 171-172 (concluding compensatory damages award on retaliation claim under 42

13

Case 1:18-cv-00096-MR-WCM   Document 158   Filed 07/19/21   Page 13 of 17

3 years, that cost would be $ 35, 600.  Raley was unable to give an estimate for intensive family services, but assuming that the costs were similar to the psychotherapist counseling, all of H.H's medical expenses- at the outer end- would cost $ 126, 100.

The Court instructed the jury that "[i]n determining the amount…to be awarded to the plaintiff H.H. for actual damages you should consider the reasonable value of the medical and psychological care and supplies that she will reasonably need and actual---and were actually obtained, and the present value of such care and supplies that H.H. is reasonably certain to need in the future." (T 1117: 7-13)  The jury verdict of 3.1 million dollars is twenty four times the outer reach of the damages testified to by Raley.

Like Brian, H.H. did not undergo counseling for being away from her dad, was not prescribed any medicine, and did not suffer any physical injuries.  H.H. was offered counseling by the Cherokee County School District, and Brian Hogan refused to allow her to get treatment. (T 933:12-25) While the Defendants are not minimizing H.H. being away from her father, it is clear, as Dr. Raley testified, that part of H.H.'s depression was not due to actions by the Defendants; instead if was anxiety about her father's paychecks. (T 547: 23-25).  See *Hetzel*, 89 F.3d. at 171-172 (concluding compensatory damages award on retaliation claim under 42

U.S.C. § 1983 was excessive because "only a part of Hetzel's harms [were] properly attributed to appellants' retaliatory actions.")

The fact that the damages awarded to H.H. were excessive is also underscored by two of the jury's questions. First, the jury asked whether damages would be paid to expert witnesses or lawyers, and second, whether "[m]ay we designate any compensation toward any cause, eg., college tuition." (T 1127: 25; 1128: 1-2). The jury's question about college tuition indicates that their verdict was based not on actual damages, but upon sympathy. It is entirely speculative whether H.H. was planning on going to college. At the time of the trial, she was in ninth grade and had to leave her school after the first semester due to excessive absences. (T 509:12-23; 665:18-25; 666:1-2). Second, the jury's question about attorney fees and costs indicates that their verdict considered the assumption that her attorney fees and costs would be taken out of any verdict. Juries, of course, should not consider costs and attorneys' fees in determining the amount of damages to award a plaintiff. *Brooks v. Cook*, 938 F.2d. 1048, 1051 (9th Cir. 1991)

The undersigned has reviewed verdicts in similar cases, and unfortunately, only a few of these cases proceed to trial. The most analogous case to this one, *Akey v. Placer County*, JVR 1908160039, 2019 WL 3883592 (E.D. Cal) is instructive in demonstrating that the jury's verdict was excessive. Rachael Akey and her 3-year-old son, N.D., sued over violation of their civil rights when a social

14

worker placed N.D. in the temporary custody of his father while they investigated an allegation that Akey's husband, N.D.'s stepfather, choked and threatened N.D. in Akey's presence. Pursuant to an oral safety plan, the defendants told N.D.'s father to pick up N.D. from school on a day that he was supposed to be in Akey's custody. Akey contended the defendants told her they would be placing N.D. in his father's custody pending an investigation, and when she did not agree, they attempted to coerce her into consenting to the oral safety plan by threatening her with the removal of her other children. She also alleged that Placer County had a practice of removing children based on oral safety plans when written plans were feasible, and that this practice resulted in the deprivation of constitutional rights. N.D. was in his father's sole custody from September 12, 2013 until March 20, 2014. See 2017 WL 1113124, *Akey v. Placer County* (Fourth Amended Complaint, § 22)

At trial, the defendants contended Akey consented to the oral safety arrangement, and they denied coercing her into consenting to the plan. The jury awarded Akey $145,000 in compensatory damages against Placer County, $1 in nominal damages against a social worker, and $500 in compensatory damages against another social worker. The jury awarded N.D. $50,000 in compensatory damages and $500,000 in punitive damages against Placer County, and $500 in compensatory damages against a social worker.

For this six-month separation on vary similar facts, the jury awarded $195,000 in compensatory damages. The *Akey* case is instructive because other than generalized expression of feeling uncomfortable at Warren's house and that of a paid expert who never treated her, there is no evidence that H.H. suffered compensatory damages in the amount of $3.1 million dollars.

## III.  CONCLUSION

By this motion, the Defendants are not attempting to minimize the bond established between father and child- there is a bond and damages should result from unconstitutionally breaking that bond. However, under the specific facts of this case, the awards to both Brian and H.H. are excessive and against the weight of evidence.

As a result, the Defendants respectfully request that this Court look at "the outermost award that could be sustained" with the evidence adduced at trial and require a remittitur or order a new trial. *Eshelman v. Puma Biotechnology Company, Inc.* F.3d.-, 2021 WL 2557794 at * 7(4th Cir. 2021).

Respectfully submitted, this the 19h day of July, 2021.

s/Sean F. Perrin
*Attorney for Defendants Cherokee County, Cherokee County Department of Social Services, Scott Lindsay in his official capacity and Cindy Palmer in her official capacity*


s/Mary Euler
*Attorney for Defendant Cindy Palmer in her individual capacity*

s/ Pat Flanagan
*Attorney for Defendant Scott Lindsay in his official capacity*

17