UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:18-cv-96

BRIAN HOGAN, both on his own
behalf and as representative of all
unnamed class members who are
similarly situated; BRIAN HOGAN, as
parent and next friend of H.H., both
her own behalf and as representative of
all unnamed class members who are
similarly situated,

        Plaintiffs,

vs.

CHEROKEE COUNTY; CHEROKEE
COUNTY DEPARTMENT OF
SOCIAL SERVICES; SCOTT
LINDSAY both in his individual
capacity and official capacity as
attorney for Cherokee County
Department of Social Services;
CINDY PALMER, in both her
individual capacity and her official
capacity as Director of Cherokee
County Department of Social Services;
DSS SUPERVISOR DOE #1, et al.,
        Defendants.

**DECLARATION OF SEAN
PERRIN**

Sean F. Perrin, being duly sworn, deposes, and states:

1. I am counsel of record for Cherokee County in this action.

2. Attached to this Declaration are true and correct copies of excerpts of the transcript from the trial in this case which took place May 10, 2021 until May 13, 2021.

Dated: July 19, 2021.

_____

SEAN F. PERRIN

1  Q.      What do you remember about them coming to get you?

2  A.      I just remember them coming to the school and then

3  dropping me off at DSS and then him taking me home, like,

4  to his house.

5  Q.      Okay.  Did you get to bring any of your stuff over

6  there?

7  A.      My school stuff.

8  Q.      What type of relationship had you had with -- let

9  me ask.

10        Do you have a nickname that you call your grandpa

11  or something you call him?

12  A.      Papaw.

13  Q.      Papaw?  Okay.

14        Prior to living with him, where were you attending

15  school?

16  A.      Peachtree Elementary.

17  Q.      When you went to live with him did you change

18  schools?

19  A.      In 6th grade.

20  Q.      Where did you go?

21  A.      In 5th grade I went to Marble.

22  Q.      Okay.  I don't want to put words in your mouth so

23  correct me.

24        Did you finish up 4th grade Peachtree, then you

25  went to go live with your grandpa and attended Marble in

1  5th?

2  A.      Yeah.

3  Q.      Okay.  Did you have a lot of friends at Peachtree?

4  A.      One or two.

5  Q.      When -- was it hard to change schools or was it

6  okay?

7  A.      It didn't really bother me.

8  Q.      Did you like your new school at Marble?

9  A.      Yeah.

10  Q.      And, before going to live with Warren, what type

11  -- with your papaw, what type of relationship had you had

12  with him?

13  A.      We'd see him, like, every now and then but, when

14  we did, he'd take us swimming or something like that.

15  Q.      But you liked him.

16  A.      Yeah.

17  Q.      So you go to live there in the 4th grade,

18  beginning of 5th grade.

19          What was that like for you?

20  A.      At the beginning, it was fine.

21  Q.      At the beginning, it was fine?

22          What does that mean?

23  A.      He just had really bad anger issues.

24  Q.      And different -- you know, different people can

25  interpret that differently.

**H. H. - DIRECT**

1      Like, what does that mean to you?

2      What are bad anger issues?

3   A.    Like he would yell at me.  I mean, like, he --

4   everyone yells but, like, he would get up in my face in

5   the morning and yell at me.

6   Q.    And you said you liked living there in the

7   beginning.

8      Did something change?

9   A.    He was just nicer in the beginning.

10  Q.    What type of house did Warren live in?

11  A.    A two bedroom, one bath.

12  Q.    And did you have your own room?

13  A.    Yeah.

14  Q.    Who else lived there?

15  A.    Terry.

16  Q.    Where was that home located?

17     Do you remember?

18  A.    Marble.

19  Q.    Before you moved to live with Warren did you

20  attend church?

21  A.    Yeah.

22  Q.    And how long have you been attending church before

23  you went to live with Warren?

24  A.    Since I was four.

25  Q.    Who'd you go to church with?

## H. H. - DIRECT

1  A.    Yeah, I think so.

2  Q.    Did Terry actually live in the other house or did

3  she live in the other house that's in front of you?

4  A.    She lived in this house but she said that she

5  lived in that house.

6  Q.    Okay.  When you first moved in with Warren what

7  kind of stuff would you do?

8  A.    When I first moved in, we went to the park.  And

9  then when I just -- like, when it got later in to living

10 there, we didn't really do anything.

11 Q.    Was he pretty strict?

12 A.    Yeah.

13 Q.    Were you allowed to see your friends?

14 A.    No.  Only one.

15 Q.    Why is that?

16       Do you know?

17 A.    Well Amber's parents didn't like him, and he

18 didn't like Amber's parents.  And then Page was because

19 -- Page was allowed to come over.

20 Q.    When you first started living with Warren did you

21 get to see your mom and dad?

22 A.    Every now and then.

23 Q.    When you saw them, under what circumstances would

24 it be?

25 A.    Terry would have to sit and watch in the car.

H. H. - DIRECT

1  Q.      Where would you see them?

2  A.      At the Marble Elementary School.

3  Q.      Was that sort of like a park-ish area?

4  A.      Yes, ma'am.  Yeah, there's a playground.

5  Q.      Would that be outside?

6  A.      Yeah.

7  Q.      And how long would you get to see them?

8  A.      About 30 minutes to an hour.

9  Q.      Okay.  And there was always somebody there

10  watching you?

11  A.      Yeah.

12  Q.      How did that make you feel?

13  A.      Uncomfortable, kind of.

14  Q.      Did you miss your mom and dad?

15  A.      Yeah.

16  Q.      Did you get to talk to your mom and dad on the

17  phone when you were living with Warren?

18  A.      Sometimes.

19  Q.      Tell me about that.

20  A.      He would choose when I got to talk to them.

21  Q.      And how often would that be?  Do you know?

22  A.      Well my dad would try and call me every day after

23  school, but, then, when he didn't want me to talk to them

24  he just wouldn't let me them talk to me.

25  Q.      But your dad was trying to talk to you?

H. H. - DIRECT

1   A.      Yeah.

2   Q.      When you were living with Warren would your mom

3   and dad do stuff for you?

4   A.      They brought me money every week but he didn't

5   tell me that.  He kept the money.

6   Q.      Did your mom bring you clothes?

7   A.      Yeah.

8   Q.      How often?

9   A.      Every time she saw me.

10  Q.      Did they give you gifts on your birthday?

11  A.      Yeah.

12  Q.      Did they give you gifts on holidays?

13  A.      Yeah.

14  Q.      What kind of gifts would they give you?

15  A.      Stuffed animals, movies, clothes, blankets.

16  Q.      Okay.  And, when you were talking about these

17  visits where you would see your mom and dad, how would

18  they act?

19  A.      They would cry a lot.

20  Q.      Do you like it when people cry?

21  A.      No.

22  Q.      How's that make you feel?

23  A.      Uncomfortable.

24  Q.      Now I know that you said earlier that you got to

25  see your siblings one time prior when you were living

1  A.     No.

2  Q.     Did you ever get any type of counseling?

3  A.     No.

4  Q.     What was -- when you were living with Warren, you

5  know, that's a big change to move there.

6         How did you feel?

7         Did you feel mentally okay?

8         Did you feel confused?

9  A.     I was confused.

10 Q.     How long were you at Warren's, total?

11        Do you remember?

12 A.     Two years.

13 Q.     Did you like living there?

14 A.     In the beginning.

15 Q.     And, so, you said in the beginning, and then

16 something happened and you didn't like living there.

17        Tell me some of the reasons you didn't like living

18 there anymore.

19 A.     He -- like, he was short-tempered with everything.

20 Like, if I did anything wrong, he'd get mad.  And I'd go

21 to school crying, basically, every day.

22 Q.     Was there anything about personal hygiene?

23 A.     Yeah.

24 Q.     Tell me about that.

25 A.     I mean, like, I know how to shower, obviously, but

**H. H. - DIRECT**

1  I didn't know what puberty was, and they didn't teach me
2  what that was.
3  Q.    And what happened?
4  A.    I had to wear long sleeves and jeans every day.
5  Q.    Why?
6  A.    Because I wasn't allowed to shave.
7  Q.    Okay.  And would he let you shave your underarms?
8  A.    No.
9  Q.    And was that embarrassing to go to school like
10 that?
11 A.    Yeah.
12 Q.    Did anybody explain to you about starting a period
13 or anything like that?
14 A.    No.
15 Q.    Is that something that happened while you were
16 living there?
17 A.    Yeah.
18 Q.    And your mom wasn't there?
19 A.    My mom wasn't there.
20 Q.    Okay.  Was that confusing when that happened?
21 A.    Yeah.
22 Q.    What did you think was going on?
23 A.    I thought I was dying.
24 Q.    Did you talk to anybody about it?
25 A.    No.  I was too scared.

1  Q.     How'd that make you feel?

2  A.     I cried.

3  Q.     So, at some point, you were with Warren for about

4  two years.

5         At some point, did you go back to live with your

6  dad?

7  A.     Yeah.

8  Q.     Do you know when that was?

9  A.     At the end of 6th grade.

10  Q.     Does, maybe, around Christmas of 2017 sound right?

11  A.     Yeah.

12  Q.     And when you went back to live with your parents,

13  or your dad, how was that?

14  A.     I liked it.  It was like -- I was kind of nervous

15  because new house and everything, but I was happy.

16  Q.     Did you want to live with your parents?

17  A.     Yeah.

18  Q.     When you went back to live with your parents how

19  were things?

20         Did you have your own bedroom?

21  A.     Yeah.

22  Q.     Did you have clothes?

23  A.     Yeah.

24  Q.     Did you have a warm bed every night?

25  A.     Yeah.

## H. H. - DIRECT

1  live?

2  A.      My parents.

3  Q.      Is it fair to say that it took you some time to

4  adjust when you went back to live with your mom and dad?

5  A.      Yeah.

6  Q.      Was 6th grade a hard year?

7  A.      Yeah.

8  Q.      And some of this stuff is uncomfortable to talk

9  about, I know, and I'm sorry.

10        Was there some time in 6th grade where you were

11  doing what's commonly referred to as some "self-harm,"

12  maybe, where you were cut yourself?

13  A.      Yeah.

14  Q.      Tell me about that.

15  A.      I had, like, just moved back in with them and,

16  like, no one really paid attention to me at my

17  grandparents house.  So I just -- I was like, why were

18  they here?  And everything was -- like, school, and

19  moving was stressful.  So I just did that.

20  Q.      Where did you do that?  Like what part of your

21  body?

22  A.      My arm.

23  Q.      What would you use?

24  A.      A razor blade.

25  Q.      Was it razor blade.

**H. H. - DIRECT**

| | |
|---|---|
| 1 | Q. Did you make deep cuts? |
| 2 | Would they bleed a lot? |
| 3 | Were they superficial cuts? |
| 4 | Tell me about that. |
| 5 | A. I would just get mad and just go crazy, I guess. |
| 6 | Q. Okay. And have you stopped doing that? |
| 7 | A. Yeah. |
| 8 | Q. Did something help you stop doing that? |
| 9 | How did that happen? |
| 10 | A. I guess they -- when they were threatening me with |
| 11 | therapy that kind of scared me. |
| 12 | Q. Okay. And you didn't want to go to therapy? |
| 13 | A. No. |
| 14 | Q. Do you think therapy maybe would have helped? |
| 15 | A. Maybe now. |
| 16 | Q. Do you think moving back and forth was hard for |
| 17 | you? |
| 18 | A. Yeah. |
| 19 | Q. Are you aware of whether or not DSS ever offered |
| 20 | you any services, counseling, stuff like that? |
| 21 | A. I don't think so. |
| 22 | Q. Do you remember going with your dad to meet with a |
| 23 | doctor named Dr. Raley? |
| 24 | A. Yeah. |
| 25 | Q. And did you talk to Dr. Raley? |

1  Q.    All right.  So he would call a flip phone.

2        And he'd give it to you, and you could talk to him

3  when he had minutes; right?

4  A.    Yeah.

5  Q.    You said that your grandpa was strict with you;

6  right?

7        He wanted to make sure you were doing your school

8  work and getting to school every day; right?

9  A.    Yeah.

10 Q.    In fact, he took you to school every day, didn't

11 he?

12       Do you remember telling me that a couple of months

13 ago?

14 A.    It was across the road.

15 Q.    Still, he took you there and made sure you went to

16 school; right?

17 A.    Yeah.

18 Q.    And he picked you up after; right?

19 A.    Yeah.

20 Q.    And, then, when you went to 6th grade it wasn't

21 right across the street every day, but he still took you

22 to school every morning and brought you home?

23 A.    No.  I rode the bus.

24 Q.    You rode the bus.

25       Did he make sure you got on the bus?

H. H. - CROSS

1  A.      I would stand outside.  Like, I mean, on the first
2  day he made sure I got on the bus.  Other than that I
3  just stood outside.
4  Q.      So then you would ride the bus home?
5  A.      Yeah.
6  Q.      And when you got home Terry and your grandfather
7  would be there.
8  A.      Yeah.
9  Q.      And you said that your grandfather had some -- I
10  think you said mood swings or a temper.  You told me a
11  couple months ago that on occasion he would ground you,
12  and it would be something like when you didn't put like
13  -- Terry would do your laundry; right?
14  A.      Yeah.
15  Q.      She would clean all your clothes.  And it would be
16  something like when you didn't put your clothes away, and
17  he might ground you for that; right?
18  A.      Yeah.
19  Q.      He never hit you; right?
20  A.      No.
21  Q.      Never did anything like that.
22  A.      No.
23  Q.      When you lived with Warren and Terry did you --
24  did you still eat breakfast at school?  Do you remember?
25  A.      Yeah.

1  Q.      And then you told me that things got better

2  because you got over yourself.

3  A.      Huh?

4  Q.      Things got better because you got over yourself.

5          Do you remember telling me that?

6  A.      Yeah.

7  Q.      Okay.  Now you were able to finish 6th grade;

8  right?

9  A.      Yeah.

10  Q.      And you went on to 7th and 8th, moved around a

11  little bit, and then you went in to 9th grade.

12          And you didn't do so well in 9th grade, the first

13  part of 9th grade; right?

14  A.      No.

15  Q.      You just didn't like the school.

16  A.      I didn't like it at all.

17  Q.      You had about 45 absences that fall semester, the

18  first semester, at that school; right?

19  A.      Yeah.

20  Q.      And then you weren't allowed to come back to that

21  school.

22          And now you're in a different school and you're

23  doing better; right?

24  A.      Yeah.

25  Q.      That's all the questions I have at this time, Your

RALEY - DIRECT

1  A.      Yes.

2  Q.      And what is that opinion?

3  A.      So if you'll look at my report on page 8.  That

4  second section, second paragraph, is where it starts.

5  But the bottom line is yes.  In my opinion, H. H. was

6  impacted by these moves.  That she suffered from

7  depression and anxiety.  Again, I believe that the

8  self-harm, the suicidal thoughts, that those were

9  secondary to these moves.

10      I believe that she was blaming herself, and that

11  that was driving some of these symptoms as well.  I

12  believe that she was having difficulty with sleep.  And,

13  then, to a large degree, she described that being, well,

14  sometimes it's because I want to stay up late and I'm not

15  getting enough sleep, and sometimes I can't sleep.

16      My experience, working with individuals that have

17  anxiety or depression, is that sometimes avoiding going

18  to sleep is because the rest of the world gets quiet

19  around you, and you're left alone with your thoughts.

20  And your anxiety your depression, the things that are

21  stressors, can run wild.  And I believe that sleep was

22  another impact on this.

23      The other part that we haven't touched on yet that

24  she described was ongoing specific anxiety about her

25  father's paychecks.  She described that I know my dad

1  gets paid twice a month.  And she knew when it was

2  getting close to time for him to receive a check.  And

3  having anxiety about, what if they don't have enough

4  money to pay the bills?  Because that means I'm going to

5  just have to move again.  In her mind, that was very tied

6  to that as well.  So that was another specific type of

7  anxiety, in my opinion, that related to these moves.

8  Q.      Did she associate those things with being taken?

9  A.      Yes.  In my opinion, yes.  That she associated

10 that -- that she would be taken and told that she had to

11 go live somewhere else.

12 Q.      And, Doctor, have you formed an opinion to a

13 reasonable degree of medical certainty as to whether or

14 not those moves still continued to have an impact on

15 H. H.?

16 A.      As of the time that I interviewed her in June of

17 2020, yes.

18 Q.      And what is that opinion?

19 A.      So the first thing that I would say is that, in my

20 opinion, the most severe time for her was that spring of

21 20- -- I guess it would be 2018, the spring of 2018, the

22 months -- the last part of 6th grade, just after moving

23 back, when she was cutting, she had suicidal thoughts,

24 depression, anxiety.  I believe that that was the worst

25 period of time, the greatest severity.  But I also

1 believe and have the opinion that she continued to have

2 anxiety and mood-related symptoms. Even though she

3 described the suicidal thoughts and cutting had resolved,

4 there was still anxiety about this, is this all going to

5 come to an end? Am I just going to get shuffled

6 somewhere else or told I have to move? And there's

7 anxiety about anything that could relate to that.

8       I believe that there was -- based on the parents'

9 description, I believe more likely than not being

10 accurate that she had anxiety about meeting with anybody

11 that she deemed to be official that, you know, this is

12 something -- somebody that could make me change what I'm

13 doing in my life, and that that could be -- that that was

14 anxiety provoking. So I believe that she did continue to

15 have anxiety and depressive symptoms, especially anxiety,

16 as well as based on her descriptions of ongoing sleep

17 issues.

18 Q.    And, Doctor, as a result of your evaluation and

19 the opinions that you've formed, did you make any

20 recommendations?

21 A.    I did, yes.

22 Q.    I'm going to draw your attention to page 9 of your

23 report. And, if you could, Doctor -- I know that they're

24 a bit lengthy, but if you could tell me what those

25 recommendations are.

**RALEY - DIRECT**

1 A.      Okay.  So recommendation one is that I have the
2 opinion that if H. H. could engage with a skilled
3 psychotherapist counselor and work with that person on a
4 regular basis to work on coping skills and symptoms, that
5 she could substantially benefit from that.

6       The other things that I outline in that
7 recommendation, though, are that with any teenager, with
8 any kid, building rapport or that relationship is so, so
9 important, and I believe that it's especially important
10 for H. H.  And that's one of the things that I included
11 to say that not only does she need therapy, she needs
12 regular therapy.  Not just because of the nuts and bolts
13 of what goes on in therapy but, if nothing else, to build
14 a relationship, a comfort, so she can build a
15 relationship with a therapist.  Even more so than
16 average, I believe that that is a critical piece.  So
17 psychotherapy was one of the recommendations.  And then I
18 talk, again, about building rapport with a therapist
19 being really important as a part of that.

20       The second recommendation is that I have the
21 opinion that intensive family services to work with the
22 parents and with H. H., you know, to work on their
23 communication, managing stress in the family, and just in
24 reinforcing the parents even to parent -- be even better
25 parents for her.  That I believe that an intensive family

1   service -- and I put "intensive family service" because

2   there are several different types of therapy that are

3   listed in the literature, MST or multi-system therapies,

4   one of them. But they are all things that come in to the

5   home. They meet the patient where they are in the

6   community.

7          So it's not just, you know, show up in the

8   doctor's office, sit on my couch, and tell me about your

9   week. This is, no, going and seeing what it looks like

10  where you live in your neighborhood, what your school

11  looks like, what it looks like when your parents are

12  engaging and been being very, very hands-on. And I have

13  the opinion that that would benefit H. H. to have that

14  type of service. That's the second one.

15         The third one is that I have the opinion that she

16  should engage in treatment with a child and adolescent

17  psychiatrist. I believe that she could benefit from

18  medication as a part of her treatment process,

19  potentially, and I believe that a psychiatrist would play

20  the role of continually working with -- alongside the

21  other treatments to continually assess H. H. for

22  breakthrough symptoms that, with medication, could add

23  any added benefit to the overall treatment regimen.

24         So those are the three recommendations.

25  Q.     And, Doctor, just to outline those. In regards to

1  number one a psychotherapist counselor.

2      Are you familiar with what the costs of a -- of

3  something like that is?

4  A.    I can tell you what it is in Columbia, South

5  Carolina.  In Columbia, South Carolina, typically an

6  initial assessment -- for out-of-pocket services, initial

7  assessment would probably be in the range of $150 to $200

8  for initial appointment.  Followup therapy sessions may

9  range from $125 to -- I guess it could be as high as

10  $250.  So I guess even the initial assessment could go

11  beyond $200.  Typically, it would be between $125 to

12  $200, although it could be as high as $250.

13  Q.    Not that you can predict this but, long-term, what

14  type of therapy do you think H. H. needs?

15  A.    What type or --

16  Q.    No.  I'm sorry.

17      What length of time do you think that H. H. would

18  need psychotherapy counseling?

19  A.    So as I outlined in the report there, you know, I

20  put that I believe that individual therapy should

21  probably occur, you know, approximately weekly for the

22  next one to three years.  That is a longer stretch than I

23  would typically recommend but the reason, again, is

24  building the rapport.  Because it's going to take several

25  sessions -- several sessions for her to engage.

1    So I believe that she needs to have really regular

2  therapy for the first one to three years.  Now, is it

3  going to be one year or three years, or two-and-a-half

4  years?  That is going to largely hinge on how well she

5  builds that rapport and that relationship with the

6  therapist.  So I have to give a range there, so the one

7  to three year range.

8    And then once it's established, I think that it

9  would become more like twice a month for one to two years

10  to follow that.  And that's under the assumption that

11  she's engaged really well in therapy and she's really

12  making progress.  And I don't have a crystal ball.  I

13  can't say if it's going to be longer or shorter or what,

14  but I believe that these are, to a reasonable degree of

15  medical certainty, or more likely than not, I believe

16  that this is a reasonable range of what I would expect

17  and anticipate for her.

18  Q.    And in regards to your recommendation number two,

19  the intensive family services.

20    Is that something that you could estimate what a

21  cost on that would be?

22  A.    No.  I can't.

23  Q.    Why is that?

24  A.    The literature that follows most of these -- that

25  kind of service, when they are done, they're usually done

## RALEY - DIRECT

1  within state agencies. So I personally have never seen a
2  private practice or private company come in and do that.
3  It's been wrapped into the Department of Mental Health or
4  some -- or some other services when I've seen it. So I
5  have never seen it in a private practice setting to have
6  any idea what the cost would be.
7  Q.     When you say "state agencies," would that be
8  something similar to a Department of Social Services?
9  A.     Yes, I believe so.
10 Q.     Now moving on to recommendation number three,
11 medication. Tell me about what the initial evaluation
12 assessment would be on that.
13 A.     Again, in Columbia, South Carolina, out-of-pocket
14 expense for an initial assessment would probably range
15 from $350 to $500 for the first appointment, for the
16 initial evaluation. Subsequent appointments would be in
17 the range of $180 to $225 for followup appointments.
18 Q.     Dr. Raley, can you tell me if you have an opinion
19 to a reasonable degree of medical certainty as to whether
20 or not if -- whether or not, if services would have been
21 provided to H. H. during these moves, that she would be
22 in a better place?
23 A.     Yes. Yes. I believe that had the services been
24 provided through the course of these moves, more likely
25 than not she would have been in a better place. I can't

1  can fix it.

2  Q.    Did you go to school for that?

3  A.    No, sir, I didn't.

4  Q.    How did you learn that?

5  A.    Common sense.

6  Q.    Did other people help teach you?

7  A.    No, sir.  Take it apart, put it back together

8  myself.

9  Q.    Where do you work right now?

10  A.    I work for Vic Payne in Brasstown, North Carolina.

11  Q.    What do you do?

12  A.    I mow, weed-eat, landscape, and build airplanes.

13  Q.    Tell the ladies and gentlemen of the jury about

14  building airplanes.

15  A.    It's fun.  I like it.  It's a little two-seater.

16  You can pull it up on YouTube.  It's called Just

17  Aircraft.  And they -- once a year they have a fly-in in

18  Brasstown, North Carolina.  And I made it on you YouTube

19  this year for the fly-in.  It's got me putting up a big

20  tent for the fly-in.  It's very interesting.

21  Q.    How long have you been building airplanes?

22  A.    About a year-and-a-half.

23  Q.    Okay.  And what do you make an hour at that job?

24  A.    At this job?  $10 a hour.

25  Q.    And you showed me a tax return you filed this past

1  year that had your last two years of income.

2      Do you remember when we talked about it what the

3  amounts were on those?

4  A.    It's between seventeen and $18,000-something.  I

5  don't know exactly.

6  Q.    One year was seventeen; one year was basically

7  eighteen the last two years?

8  A.    Yes, sir.

9  Q.    You ever been on unemployment?

10  A.    No, sir, I haven't.

11  Q.    You've always worked.

12  A.    I always worked, yes.

13  Q.    Except when you got hurt?

14  A.    Yep.

15  Q.    Tell the ladies and gentlemen about that, about

16  when you got hurt.

17  A.    Well I worked at a scrap yard for five years.  I

18  run a skid-steer, if you-all know what a skid-steer is.

19  I crushed my hand with the main boom on it.  And it was

20  $17,000 of damage to my wrist.  I went to work a week

21  later to provide for my family.  It started hurting and

22  getting real infected.  I went back to the doctor, and

23  before I could even say anything to the doctor he knowed

24  I had been working.  He said, Brian, if you don't quit

25  working you're going to lose your hand.  And I never told

1    Do you remember the dates at all?

2  A.    No, sir, I didn't.

3  Q.    But after she went to live with Warren did you

4  have contact with H. H.?

5  A.    Yes, I did.

6  Q.    Tell the ladies and gentlemen about that.

7  A.    I called H. H. every day.  Every day I called

8  H. H..  I called H. H. and my father was in the

9  background hollering and cussing:  Get off that damn

10 phone.  You don't need to talk to that sorry son of a

11 bitch.  He ain't no father.  Just hang it up.

12    I told my daughter, I said, H. H., I'm not going

13 to make you have to hear him talk like that about me and

14 your mama.  I said I'll call you back later.  I'll call

15 you tomorrow or another day.  I said you don't have to

16 hear that, baby.  I love you, and I will call you back.

17 Q.    So did you call her later, or another time, some

18 more?

19 A.    Yes, sir, I did.  I called her the next day.  It

20 was the same thing.  Me and my father's never had a

21 relationship at all, none, whatsoever.  And he would

22 start again.  And I would talk to her ten, 15 minutes,

23 try the best I could, but she shouldn't have to hear him

24 cussing, you know, talking about me and her mama like he

25 did.

1  cutting trees for a living.  And I called them back, told
2  them I had a job; it's on file that I called them.  And
3  they wouldn't help me.  Wouldn't help me at all.
4  Q.     So what happened to that apartment?
5  A.     Lost it.  I couldn't get no help getting the
6  power.  Just -- I just had just got a job the next day.
7  Q.     So when you got back after January -- July the
8  1st, were you able to visit any with H. H.?
9  A.     I got to see H. H.  It wasn't very often I got to
10 see her.  It was just for a brief minute.  I didn't get
11 to see her more than 15 minutes at a time, and I had to
12 meet my father's girlfriend at the park by his house.  He
13 made his girlfriend supervise us.  I couldn't -- we
14 couldn't talk alone.  She had to be right there with us,
15 and that ain't --
16 Q.     Were you able to get H. H. and take her anywhere?
17 A.     I took her one time to the pool, the local pool,
18 but I couldn't keep her no more than a hour that day.
19 That was the most I ever got to spend with her.
20 Q.     All right.  And what did you tell H. H. about
21 trying to get in a situation where she could come back
22 and live with you?
23 A.     I told H. H., I said, H. H., Daddy's going to get
24 you back.  I will do everything in my power to get you
25 back, because I love my family.  You know, I'm a family

## HOGAN - DIRECT

1 pursuant to the Court's rules, therefore, that needs to

2 be kept private.  Therefore, her name is blacked out

3 except enough for you to understand that it's being refer

4 -- it's referring to a person whose initials are H. H.

5 Those are the reasons for the redactions, and they are

6 there because of what the court has ordered.

7      BY MR.  MOORE:

8 Q.    Brian, your daughter, H. H.  -- her initials are

9 H. H., aren't they?

10 A.    Yes, sir.

11 Q.    Brian, after you signed the CVA, from then until

12 such time as Melissa was able to get the court to order

13 -- give you a court order so you could get her back -- a

14 second court order saying the first one was valid.

15 A.    Yeah.

16 Q.    Tell the ladies and gentlemen of the jury about

17 your thoughts or your sorrow, or whatever, for not being

18 able to be with your child other than what little

19 visitation you've described that Warren gave you.

20 A.    They made me feel like I was worthless and I was

21 no good.  That I just didn't care about her, and I did

22 with all my heart.  My baby's my everything, and I try

23 and tried to do everything the right way, everything they

24 asked me to do.  And I just -- I couldn't gain no ground.

25 I couldn't get above water.

1  Ms. Jackson got the court order saying your first court

2  order was valid still, had been --

3  A.      Mm-hmm.  ("Yes.")

4  Q.      -- did you pay Ms. Jackson then?

5  A.      No, sir.

6  Q.      You didn't have any money?

7  A.      No, sir.

8  Q.      Tell us what your nights were like thinking about

9  your child and not having her live with you.

10 A.      My nights was real stressful.  I didn't sleep

11 much.  I quit eating.  All I could think about was how

12 can I get my daughter back?  How can I get her?  And I

13 just drove myself crazy thinking about it, worrying about

14 it, and doing everything I could to get her back.

15 Q.      Brian, did you have feelings of failure or guilt

16 or anything?

17 A.      Yeah, I did.  They made me feel like I was a

18 failure, that I was no good, because they made me feel

19 like that they drove it -- put it in my head so much.

20 Because I did everything they asked me to do and I still

21 couldn't get my daughter back.  And I just -- I felt

22 useless; just no good.

23 Q.      What about after you got H. H. back when Melissa

24 got her back for you the second time?

25         Have you had -- what type of feelings had you had

**HOGAN - DIRECT**

1   since then?

2        Have you still felt guilty?

3   A.    When I got her back?

4   Q.    Yeah, after you got her back.  After she came back

5   to live with you,

6   A.    No, sir.  All that went away.  I was a happy

7   father.  I was tickled to death.  I was so happy that I

8   got my daughter back.

9   Q.    But you don't ever think about it at night:  How

10  did I let that happen?

11  A.    Do I think about it?  Yes, it still bothers me

12  till today.

13  Q.    That's what I'm saying.

14        Do you still have sadness about that, even now?

15  A.    Yes, I do.  It still bothers me now.

16  Q.    Tell the jury.

17  A.    Until this day.  And I still lay there and think

18  about it, and sometimes I have dreams about it, because

19  it was that bad, emotionally, to me because I can't read

20  or write, and they took advantage of me.

21  Q.    Does it make you feel like you have failed your

22  family?

23  A.    Yes, it did.

24  Q.    And how do you and H. H. get along now?

25  A.    Oh, like two peas in a pod.  Awesome.  She's my --

1  trying to do your best.

2       My question was:  At that time, you did not have a

3  stable home; is that correct?

4  A.    I just answered that question.  No, I didn't, but

5  I was trying my best for my family.

6  Q.    It's also fair to say, Mr.  Hogan, that you did

7  not have a stable job during that point?

8  A.    I had what?

9  Q.    It's also fair to say you did not have a stable

10  job?

11  A.    I had a stable job.  I worked every day.  Yes, I

12  did.

13  Q.    Was that out of town, Mr.  Hogan?

14  A.    Not all of it, no.  I worked around town.  Local.

15  Q.    That was the scrap yard?

16  A.    County to county.

17  Q.    I'm sorry?

18  A.    When we first got back it was local:  Cutting

19  trees.

20  Q.    Okay.  At some point during that time period,

21  Mr.  Hogan, from July 1st 2016 to November 21st 2016, did

22  Laurel Smith ever express concern to you that H. H. was

23  being unsupervised with Amanda?

24  A.    Unsupervised?

25  Q.    Yes, sir.

1  A.     No, I wasn't aware.

2  Q.     Okay.  And you would agree that at least for that

3  time period, from November 21st '16 until December of

4  '17, that, as it relates to school, H. H. was better off

5  with Warren -- doing better in school -- than she was

6  prior to or after she got back with you.

7  A.     Not better off, no.

8  Q.     And --

9  A.     Not at all.

10 Q.     I was actually just referring to school.  In other

11 words, school-wise, she was doing better with Warren than

12 with you and Amanda, or even after you got custody of her

13 back; right?

14 A.     No.  I wouldn't say better-better, no.

15 Q.     Okay.  She goes -- she went to school more when

16 she lived with Warren; right?

17 A.     She went to school when she lived with me as well.

18 Q.     Well she had 45 days absences this year, right, in

19 the first quarter -- first half of 9th grade?

20 A.     This year, yes.  This year was rough.

21 Q.     I'm sorry.  Go ahead.

22 A.     This year was rough trying to get her in school.

23 Q.     Yes, sir.  With COVID, I understand.  But, I mean,

24 she -- it's accurate to say she did have 45 absences this

25 year; correct?

## HOGAN - CROSS

1  A.     Mm-hmm.  ("Yes.")  And my wife went to jail for it
2  too.
3  Q.     It's also fair to say that in 7th grade she was in
4  your custody; correct?  She being H. H.
5  A.     In 7th grade?  Yes, she was.
6  Q.     And she had attendance issues in 7th grade; right?
7  A.     She had what?
8  Q.     Attendance issues in 7th grade?
9  A.     In 7th grade?
10 Q.     Yes, sir.
11 A.     Yes.
12 Q.     And you had her in 8th grade, as well, Mr.  Hogan?
13 A.     Yes.
14 Q.     It's also fair to say that she had attendance
15 issues in 8th grade?
16 A.     Everybody has attendance issues at one point.  So
17 it wasn't that bad.
18 Q.     Okay.  I was more talking -- I agree with you.
19 Everyone does.  I was more talking about excessive
20 absences in 7th grade and 8th grade.
21 A.     What do you mean by excessive? I don't understand
22 -- I don't know them big words.  I don't know what you're
23 saying.
24 Q.     In 7th grade she had a lot of absences; correct?
25 A.     A lot?  I wouldn't say a lot, no.

1       (Witness duly sworn at 10:28 a.m.)

2       THE COURT:  During your testimony, you need to

3  remove your mask.

4       THE WITNESS:  Yes, sir.

5       THE COURT:  You may proceed, Mr.  Moore.

6                    **DIRECT EXAMINATION**

7       BY MR.  MOORE:

8  Q.     Good morning.

9  A.     Good morning.

10 Q.     Would you state your name for the ladies and

11 gentlemen of the jury?

12 A.     My name is Matthew English Gaskins.

13 Q.     How are you employed, sir?

14        What is your vocation?

15 A.     I'm a forensic psychiatrist.

16 Q.     You're also a doctor?

17 A.     Yes.  It means I'm a physician.

18 Q.     And how long have you been a forensic

19 psychiatrist?

20 A.     So I completed my doctorate in medicine from the

21 University of South Carolina in 2010.  Afterwards, I

22 completed a four-year program in general psychiatry

23 through Palmetto Health in Columbia, South Carolina, the

24 last year of which I served as the Chief Resident.  Upon

25 completing that, I did a one year additional training in

1   A.      Sure.  So I did the forensic evaluation of Brian

2   Hogan, which is a typical psychiatric interview:  Where

3   did you grow up?  What medical problems do you have?

4   Have you ever been treated for any kind of mental health

5   problems before?

6          Got all that doing a mental status examination.

7   Basically, seeing how they're thinking and concentrating

8   during the interview.  Then, at the end of that, we

9   basically go through what we call the index event, or

10  what I call the index event, and in this case it's

11  related to the removal of the minor child.

12  Q.      And what information did you glean from Brian

13  Hogan that was relevant?

14  A.      Well one of the big things was that there was no

15  previous mental health or psychiatric treatment.  So he

16  never had anything before that at least that I could find

17  or that he reported.  Then we spent most of the time

18  discussing the impact of the removal of the child.  And

19  he described the events that I'm sure have been poured

20  over but, essentially, removal for 18 months and the

21  process of which he eventually got the child returned to

22  him.

23          And we focused on what it was like during those, I

24  think, approximately 18 months or so they were separated.

25  And most of it was profound sadness, tearfulness,

1  self-blame, guilt, symptoms that were depressive but not
2  meeting the criteria of Major Depressive Disorder but
3  mostly chronic sadness and guilt.
4  Q.    Did he express any sentiment that he had failed
5  his family or his child?
6  A.    That was a big part of it.  Mr. Hogan prided
7  himself on being just a good family man, a good worker,
8  as best as he could do is kind of how he described
9  himself.  And whenever I met with him, of course, the
10  child had already been returned.  And it's his belief
11  that it -- that she shouldn't have been removed in the
12  first place.
13       And he blamed himself for not being able to
14  recognize that the steps that led to her removal were not
15  necessarily what should have happened; or he could have
16  stopped them if he was -- in his words, if he was smarter
17  he would have been able to stop them.  So he blamed
18  himself for the pain of the separation from the family.
19  Q.    Mr. Hogan is not one to cry.
20       Did he cry when you met with him?
21  A.    He did.  Not excessively.  It was more just kind
22  of a couple tears coming down his face.  He did not sob;
23  he did not draw attention to it.  He kept it together for
24  the majority of the interview.  However, when we talked
25  about his inability to protect his family in his mind,

1  read.

2  A.    Yes.

3  Q.    Now let's finish with your initial report and then

4  we'll talk about the addendum part of it.  You list in

5  your initial report you had received the complaint and

6  your interview; some information had been provided by

7  Keith Loven who had actually taken notes and had done a

8  pre-interview, if you will, just so you would have the

9  basic information of name, date, address, birth date,

10 things like that, and a few questions here and there.

11 Isn't that right?

12 A.    Yes.  That should be on page one, I believe.

13 Q.    Yes.  So you had that information initially.

14       What was your diagnosis with your initial visit

15 with Warren? I'm sorry.  With Brian.

16 A.    It was -- the diagnosis probably is most

17 accurately described as an adjustment disorder because he

18 had depressive symptoms following an identifiable

19 stressor, and then he continued to have the depressive

20 symptoms going forward.  As I said before, just because

21 you have depressive symptoms it doesn't mean you meet the

22 criteria for what we professionally Major Depressive

23 Disorder.  That's the official clinical depression

24 diagnosis.  He didn't quite meet the criteria for Major

25 Depressive Disorder.  But his depressive symptoms,

 1  because they followed an identifiable stressor, would

 2  most accurately be described as an adjustment disorder

 3  with depressed mood.

 4  Q.    And did he tell you that he lost everything he had

 5  during the time his wife was in the hospital?  Did he

 6  tell you about that?

 7  A.    He did.  So we look at not only the clinical

 8  symptoms -- clinical symptoms are what you report.  I

 9  feel sad.  I have low energy.  I'm -- that's what I'm

10  reporting.

11        Clinical signs are what you observe.  This person

12  might look sad.  This person looks like they have low

13  energy.  But in psychiatry we also focus a lot on

14  psychosocial stressors.  Meaning other things that are

15  going on in your life.  Trouble with work, trouble in

16  your home life, trouble with these types of things.

17        Brian cited that during the separation, for a

18  while there, it was a really traumatic time for him

19  because his wife was sick at the time; and, because he

20  needed to care for her, he ended up losing his job and

21  his house too.  So he describes it as I lost -- he used

22  the words I lost everything.  And the significant

23  financial stress continued for several months after the

24  separation started.

25  Q.    And did he talk to you about how he's being

1   better than him.

2   Q.    All right.  And, again, you have conclusions, and

3   you include the IQ stuff.  So if we could go to your

4   conclusions.

5         Judge, this is 30A.  I'd move admission.  I may

6   have neglected to do that.

7         THE COURT:  You're offering 30A at this time?

8         MR.  MOORE:  Yes, sir.  That's the addendum.

9         THE COURT:  Any objection?

10        MR.  FLANAGAN:  No objection.

11        THE COURT:  Let it be admitted.

12             (Plaintiffs' Exhibit 30A is admitted.)

13        BY MR.  MOORE:

14  Q.    And your conclusions that you made.  Are these to

15  a degree of reasonable medical certainty?

16  A.    Yes.  They all -- they all are to a reasonable

17  degree of medical certainty.

18  Q.    Would you go through that for the ladies and

19  gentlemen of the jury, please?

20  A.    Yes.  So the first one, reading it, says:

21  Mr. Hogan experienced psychological distress as a direct

22  result of the separation from his daughter.  Specific

23  symptoms experienced during the separation included

24  intense sadness, fear of not seeing her again, and

25  profound guilt.

1  Q.    Let me stop you for just a moment.

2       Judge, I'd ask to display this page to the jury,

3  if we could, and let them follow along.  Page 4.

4       THE COURT:  You may.

5       BY MR.  MOORE:

6  Q.    All right.  I'm sorry, Dr. Gaskins, to interrupt

7  you.  I didn't realize they didn't that have that.

8  A.    That's okay.  I'm on the last line of that first

9  bullet point.

10 Q.    If you could start over.

11 A.    I will.  Mr.  Hogan experienced psychological

12 distress as a direct result of separation from his

13 daughter.  The specific symptoms experienced during the

14 separation included intense sadness, fear of not seeing

15 her again, and profound guilt.  While most of his

16 symptoms have abated, the feelings of guilt remain

17 present and continue to impact his relationship with his

18 daughter.

19      The next one:  The family would benefit from

20 intensive family services assisting with reunification.

21 There are multiple treatment modalities which can

22 accomplish this goal, but the primary objective for

23 treatment would be focusing on establishing appropriate

24 communication, and insuring a stable family structure.

25 Additionally, Mr.  Hogan and his family would benefit

1  cannot quit doing certain things that would make the

2  child stay safe with them. And then I would have spoken

3  with attorney Scott Lindsay, who would have then had the

4  paperwork drawn up. So it was several -- it was staffed

5  several times. It was not like a one-person rogue

6  decision or anything. And then -- go ahead. I'm sorry.

7  Q.    Go ahead. I didn't mean to interrupt.

8  A.    Go ahead.

9  Q.    Do you recall what day -- dates, rather, after

10 that Brian and Warren came in to sign the CVA?

11 A.    I know that I called them. I discussed it. We

12 arranged a meeting, and Warren brought Brian up to the

13 office. And the 21st was when they came to the office.

14 Q.    What I can tell you, ma'am, is Plaintiffs' Exhibit

15 1 actually reflects the date of November 21st 2016. Your

16 staffing notes reflect a date of October 2nd -- October

17 21st, a month earlier.

18        Do you know which date is accurate?

19 A.    Say that one more time. I'm so sorry.

20 Q.    Sure. My question is, there is conflicting dates.

21 Plaintiffs' Exhibit 21, the CVA itself, has a date of

22 November 21st. Your staffing notes indicate October

23 21st. My question to you is, do you know which date it

24 was?

25 A.    No, I do not. But I would believe it was probably

1  the more -- the earlier one in October --

2  Q.     Okay.

3  A.     -- because it goes along with the -- with

4  everything that had happened with -- if you go through

5  all the notes and stuff.

6  Q.     Okay.  Tell me -- tell me, Ms. Smith, what

7  happened when Warren and Brian got to the DSS office to

8  sign the CVA.

9  A.     They met with me.  I don't recall but, possibly,

10 my supervisor would have been in there, and then the lady

11 that notarized the paper would have been in there.  The

12 paper was the paper that attorney Scott Lindsay would

13 have written up that was the CVA.

14 Q.     Right.

15 A.     And then we would have sat down.  I would have

16 discussed it with them and explained everything, read the

17 paper through, talked to them about everything that was

18 going on, made sure that both Brian and Warren understood

19 and wanted to go forward with this.

20 Q.     You didn't make him read it himself, did you?

21 A.     No.  I discussed it with them and I told them

22 everything.  I read it with them.  I explained everything

23 on it.

24 Q.     Did Mr. Brian Hogan have any questions?

25 A.     Not that I recall.

1  A.      Well she was -- she was very upset.  And she said
2  she had started to self-harm and cut herself, and she
3  showed me some cuts on her arms.  And then that usually
4  leads into a conversation in counseling about, like, what
5  are we thinking when we do these things.  Do we feel like
6  we want to take this harm further?  And she expressed
7  that she did, and that she had suicidal thoughts often
8  and thought about it multiple times a day.
9  Q.      As a result of the conversation with H. H. did you
10 speak with her father, Brian?
11 A.      I did.
12 Q.      And tell me about that conversation.  Tell the
13 jury about that conversation.
14 A.      I called him and I told him what had happened, and
15 I said I need to call mobile crisis.  And that's normally
16 what we do when we have a kid -- they're professionals,
17 and they come to the school, and they do formal suicidal
18 assessments on whether that kid needs to be IVC'd, which
19 is involuntarily committed to a hospital, and then
20 receive treatment at a facility.
21      When I told him about that and -- normally, we ask
22 the parent for permission because we can get mobile
23 crisis to come to the school and do it.  And he refused
24 and said no, that he didn't want that, and that he'd have
25 to speak to his lawyer before that happened.

 1  issue the burden of proof is on the plaintiffs.  This
 2  means that the plaintiffs must prove by the greater
 3  weight of the evidence the amount of actual damages that
 4  will reasonably and fairly compensate the plaintiff under
 5  consideration for the wrongful acts of the defendant or
 6  defendants.
 7       In determining the amount, if any, to be awarded
 8  to the plaintiff H. H. for actual damages you should
 9  consider the reasonable value of the medical and
10  psychological care and supplies that she will reasonably
11  need and actual -- and were actually obtained, and the
12  present value of such care and supplies that H. H. is
13  reasonably certain to need in the future.
14       Further, in determining the amount, if any, to be
15  awarded each plaintiff for actual damages, you should
16  consider the evidence that you have heard as to the
17  emotional and mental distress personal humiliation, and
18  pain and suffering.  Damages are not restricted to the
19  actual loss of money.  They include the mental aspects of
20  injury even if they are not easy to measure.
21       No evidence of the dollar value of mental or
22  emotional pain or suffering has been or needs to be
23  introduced to you.
24       Do not, however, base damages on some abstract
25  value or importance of a constitutional right.  There is

no exact standard for setting the damages to be awarded
on account of these factors.  You are to determine an
amount that will fairly compensate the plaintiff for the
injuries that he or she has sustained.

The fact that I have instructed you on the proper
measure of damages should not be considered by you as an
indication as to what your verdict should be as to any of
the issues in this case.  Therefore, ladies and gentlemen
of the jury, I charge you that if you find by the greater
weight of the evidence that the amount of damages
proximately caused to the plaintiff under consideration
by the actions of the defendants, then it would be your
duty to write that amount in the blank space provided for
you for that particular plaintiff on the verdict sheet.
If, on the other hand, you fail to find that the
plaintiff under consideration is entitled to any actual
damages then it would be your duty to write the nominal
sum, such as $1, in the blank space provided for that
plaintiff.

Ladies and gentlemen of the jury, you have heard
all of the evidence in this case and all of the arguments
of the attorneys for the parties.  As jurors, it is your
duty to remember the evidence and to take your own
recollection of what the evidence was in this case.  It
is your duty also to consider all of the contentions and

 1  Honor, but I'm trying to get turned to it so I can see.

 2      MS. JACKSON:  It is 75, the duties and

 3  responsibilities of the director.

 4      MR. CHRISTIAN:  I don't have to go anywhere for

 5  this one, Your Honor.

 6      THE COURT:  Have you shown it to Mr. Perrin and

 7  Mr. Flanagan?

 8      MR. PERRIN:  Yes, sir, he has.

 9      THE COURT:  You all agree this is the document?

10      MR. PERRIN:  Yes.

11      MR. CHRISTIAN:  We're all hopeful this is the

12  document.  It's the only one that makes sense, I think.

13      THE COURT:  Marshal, if you would please deliver

14  to the jury in the jury room Plaintiffs' Exhibit 75.

15      Marshal, have you delivered Plaintiffs' 75 to the

16  jury in the jury room?

17      THE BAILIFF:  Yes, sir, I have.

18      THE COURT:  We will be at ease until we hear

19  further from the jury.

20                  (Off the record at 3:26 p.m.)

21                  (On the record at 4:20 p.m.)

22      THE COURT:  I have received a note from the jury

23  that reads as follows:

24      What percentage of damages allotted will be going

25  to Brian and H. H.?  Will any of the money allotted be

1  paid to expert witnesses and lawyers?  May we designate

2  any compensation toward any cause, e.g., college tuition?

3      What do you-all say I should do in response to

4  this inquiry?  Yeah.  Don't all jump up at once.  Let me

5  tell you what I --

6      MR.  CHRISTIAN:  Your Honor, I mean, as Ms.

7  Jackson just pointed out, I think it's accurate -- an

8  accurate statement of law that any award to H. H. would

9  have -- to H. H. would have to go into a trust to be

10 administered to her benefit rather than going to her

11 directly.

12     As for the rest of it, I mean --

13     THE COURT:  Well but -- I mean that isn't anything

14 that is even the jury is instructed.  They are instructed

15 to --

16     MR.  CHRISTIAN:  Compensate.

17     THE COURT:  -- to figure out a quantity that

18 adequately compensates, and they're not supposed to worry

19 about any bit of this.

20     MR.  CHRISTIAN:  I agree, Your Honor.

21     THE COURT:  Mr. Perrin.

22     MR.  PERRIN:  We would ask Your Honor to either

23 reread the instruction to them on damages or tell them

24 that they need to rely upon your instruction on damages.

25     THE COURT:  Well what about instructing them, in