# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:18-cv-00096-MR-WCM

| | | |
|---|---|---|
| BRIAN HOGAN, both on his own behalf and as representative of all unnamed class members who are similarly situated; BRIAN HOGAN, as parent and next friend of H.H., both on her own behalf and as representative of all unnamed class members who are similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **O R D E R** |
| CHEROKEE COUNTY; CHEROKEE COUNTY DEPARTMENT OF SOCIAL SERVICES; SCOTT LINDSAY, both in his individual capacity and official capacity as attorney for Cherokee County Department of Social Services; CINDY PALMER, in both her individual capacity and her official capacity as Director of Cherokee County Department of Social Services; DSS SUPERVISOR DOE #1; and DSS SOCIAL WORKER DOE #1, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for New

Trial *Nisi Remittitur* [Doc. 157].

## I.  BACKGROUND

This action arises out of the Defendants' use of an extra-judicial custody agreement that resulted in the wrongful removal of Plaintiff H.H. from the custody of her father, Plaintiff Brian Hogan.  The Plaintiffs asserted claims pursuant to 42 U.S.C. § 1983 for the deprivation of their procedural and substantive due process rights, as well as various state law claims. Following a four-day trial, a jury determined that the Defendants Scott Lindsay and Cindy Palmer violated the Plaintiffs' substantive and procedural due process rights through the employment of an unlawful Custody and Visitation Agreement (CVA); that an official policy, practice, or custom of Cherokee County was the moving force behind these violations; and that Cherokee County failed to adequately train its employees, which resulted in the violation of the Plaintiffs' constitutional rights.  [See Doc. 140].  The jury further found that Defendants Lindsay and Palmer acted in a grossly negligent manner, thereby causing the Plaintiffs' injury, and that Defendants Lindsay and Palmer both obstructed justice with respect to both Plaintiffs. [Id.].  The jury awarded Brian Hogan $1.5 million and H.H. $3.1 million in compensatory damages.  [Id.].  Based on the jury's factual findings, the Court entered a Judgment in favor of the Plaintiffs on June 21, 2021.  [Doc. 147].

The Defendants now move pursuant to Rule 59(a) of the Federal Rules of Civil Procedure for a new trial *nisi remittitur* on the grounds that the compensatory damages awards are against the weight of the evidence and excessive as a matter of law. [Doc. 157]. The Plaintiffs oppose the Defendants' motion. [Doc. 161].

## II.    STANDARD OF REVIEW

Under Rule 59 of the Federal Rules of Civil Procedure, the Court may set aside a verdict and grant a new trial if the Court is of the opinion that a verdict (1) "is against the clear weight of the evidence"; (2) "is based upon evidence which is false"; or (3) "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996) (quoting Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir. 1941)); Fed. R. Civ. P. 59(a)(1) (stating that court may set aside jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court"). When a damages award is challenged as excessive, the Court reviews the award under the first two prongs of the Rule 59 standard: "whether the jury's verdict is against the weight of the evidence or based on evidence which is false." Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001) (citation omitted).

3

This review requires the Court to compare "the factual record and the verdict to determine their compatibility." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998). If the Court determines that a jury's damages award is excessive, "it is the court's duty to require a remittitur or order a new trial." Eshelman v. Puma Biotech., Inc., 2 F. 4th 276, 285 (4th Cir 2021) (quoting Cline, 144 F.3d at 305).

In reviewing a motion for new trial, the Court is permitted to weigh the evidence and consider the credibility of the witnesses. Cline, 144 F.3d at 301. The decision to grant or deny a new trial is a matter within the Court's sound discretion. See id.

## III.  FACTUAL BACKGROUND

On September 14, 2015, the Cherokee County Department of Social Services (DSS) filed a petition in the District Court of Cherokee County alleging that H.H.—who was nine years old at the time—was a juvenile within the jurisdiction of that court and was abused, neglected, or dependent. [Doc. 121: Joint Stipulations at ¶ 16; Trial Tr. Vol. II at 449]. As a result, H.H. was taken temporarily into DSS custody. [Trial Tr. Vol. I at 134]. On January 14, 2016, following a DSS investigation, the Honorable Tessa Sellers, North Carolina District Court Judge, entered an order placing H.H. in the custody of her father, Brian Hogan (Brian). [Doc. 121: Joint Stipulations at ¶ 17]. A

4

final written order to that effect was entered by Judge Sellers on April 1, 2016. [Id. at ¶ 18].

In the spring of 2016, Amanda Edmondson (Amanda), the biological mother of H.H.,[1] developed a severe heart problem and had to be hospitalized for an extended period of time in Asheville, North Carolina. [Id. at ¶19]. Brian went to be with Amanda while she was hospitalized. [Id. at ¶ 20]. Brian arranged to leave H.H. with neighbors because he could not care for H.H. while he was in Asheville with Amanda. [Id. at ¶ 21].

While H.H. was staying with neighbors, her school made a report to DSS about a concern with H.H.'s care. [Id. at ¶ 22]. This report ultimately prompted DSS to open an investigation into whether H.H. was an abused, neglected, or dependent juvenile. [Id. at ¶ 25]. Social Worker Katie Johnson (also known as Katie Brown) of Cherokee County DSS was initially the social worker assigned to this investigation. [Id. at ¶ 26]. Later, Cherokee County social worker Laurel Smith was assigned to the investigation. [Id. at ¶ 27].

In November 2016, Brian was contacted by Smith and was told about the complaints that DSS had received from school. Smith told Brian that he

---

[1] Although Amanda is H.H.'s biological mother, she is not a plaintiff in this case. Brian was awarded full custody of H.H. in 2016 because Amanda was having significant substance abuse issues at that time. She was not even permitted to visit H.H. unless she had negative drug screens. [Trial Tr. Vol. II at 253].

needed to find a family member to put her with and that if he did not do so, DSS was "going to give her to the state and [he would] probably never see [his] daughter again." [Trial Tr. Vol. III at 616]. Brian decided to call his father, Warren Hogan (Warren). [Id.]. He explained that he did not want to call his father, given their history,[2] but he had no other relatives that he could call. [Id.]. Brian stated that he chose Warren because he "didn't have nobody else to choose. And that wasn't the one I really wanted to choose but I didn't have no choice." [Id. at 616]. Thereafter, DSS faxed Brian a document to sign. [Id. at 617]. Brian cannot read well but signed it anyway, explaining, "I was trying to do the best for my daughter that I know to do." [Id.]. Brian later appeared at the DSS office in Murphy and signed the Custody and Visitation Agreement (CVA). [Id. at 626]. However, he was not able to read its contents and no one explained the document to him. [Id.]. Based on what the social workers told him, Brian understood that the transfer of custody provided by the CVA was temporary. [Id. at 626-27]. The CVA,

---

[2] Brian testified that during his childhood, his father Warren was an alcoholic and was physically abusive. [Trial Tr. Vol. II at 578]. They did not have a good relationship. [Id.]. Brian lived with his mother and father until they divorced when he was ten years old. [Id. at 577]. Thereafter, he went to live with his grandparents. [Id.]. When he was sixteen years old, Brian left his grandparents' home, dropped out of school, and got a job to support himself. [Id. at 577-78].

6

however, actually provided for the permanent transfer of custody to Warren until H.H. reached the age of majority or was emancipated. [Id. at 627].

Following the signing of the CVA, H.H. went to live with Warren and his girlfriend, Terry. [Doc. 121: Joint Stipulations at ¶ 29; Trial Tr. Vol. II at 462]. H.H. testified that at first, living with her grandfather was fine, but that he "had really bad anger issues" and would yell at her. [Trial Tr. Vol. II at 461, 462]. She recalled that if she did anything wrong, he would get mad with her. [Id. at 470]. She stated that she went "to school crying, basically, every day." [Id.]. H.H. stated that Warren was very strict with her and would allow her to see only one of her friends. [Id. at 465]. Warren allowed her to see her mom and dad "every now and then" at a playground for 30 minutes to an hour while Warren or his girlfriend supervised, which made H.H. uncomfortable. [Id. at 465-66]. H.H. missed her parents. [Id. at 466]. Brian Hogan would try to call her every day after school, but Warren often would not let her speak with her father. [Id.]. When H.H. was able to speak to Brian, Warren would be in the background, telling her to hang up and yelling and cussing at Brian. [Trial Tr. Vol. III at 618].

Brian and Amanda would bring H.H. money every week, but Warren did not tell H.H. about this and kept the money himself. [Trial Tr. Vol. II at 467]. Amanda would bring H.H. clothes every time she saw her. [Id.]. H.H.

7

received gifts, such as stuffed animals, movies, clothes and blankets, from her parents on her birthday and holidays.  [Id.].  H.H. recalled that when she saw her parents, "[t]hey would cry a lot," which made her uncomfortable.  [Id.].  H.H. would get to see her three half-siblings only about three times per month.  [Id. at 467-68].

H.H. began to go through puberty at the time that she was living with Warren.  [Id. at 470-71].  H.H. did not understand what puberty was, and Warren and his girlfriend did not provide her any guidance.  [Id. at 471].  Warren did not allow her to shave her legs or underarms, which embarrassed her.  [Id.].  When H.H. began menstruating, she thought she was dying.  [Id.].  She was too scared and confused to talk to anyone.  [Id. at 471-72].

Warren expressed concerned about H.H.'s weight and restricted her eating to certain times of the day.  [Id. at 472].  He also bought her exercise equipment, which H.H. stated "probably didn't make me feel good about myself."  [Id. at 472-73].

H.H. recalled feeling very confused about the change in her living arrangements.  [Id. at 470].  During the 13 months she lived with her grandfather, H.H. was not provided any counseling or visited by social workers.  [Id. at 469-70].  Warren told H.H. that her parents were "terrible

8

people." [Id. at 473]. He also told her that "if they wanted [her] they would have . . . tried harder." [Id.]. This made H.H. cry. [Id. at 474].

Throughout the 13-month period that H.H. lived with Warren, Brian repeatedly contacted DSS social workers in an effort to get his daughter back. [Trial Tr. Vol. III at 622, 625]. Brian maintained his job and obtained a suitable apartment, as instructed by the social workers. [Id.]. Despite complying with all the social workers' directives, Brian was told that they could not return his daughter to him and that he would have to take DSS and his father to court in order to obtain custody. [Id. at 622-23, 625]. Brian was also told that DSS was going to give full custody of H.H. to Warren. [Id. at 625].

On one occasion, Brian attempted to pick H.H. up at school. When Brian showed school officials the 2016 custody order signed by Judge Sellers, he was told that the order was "useless" and that he was not permitted to pick up his child. [Id. at 630-31]. Brian subsequently contacted Melissa Jackson, the attorney who had represented him in the 2016 custody proceeding. [Id. at 631]. On December 7, 2017, Ms. Jackson filed a motion on Brian's behalf with the District Court of Cherokee County to enforce the April 1, 2016 order that gave custody of H.H. to Brian Hogan. [Doc. 121: Joint Stipulations at ¶ 30]. That motion was heard on December 13, 2017,

9

before the Honorable Monica Leslie, North Carolina District Court Judge.  [Id. at ¶ 31]. Judge Leslie entered an order on December 13, 2017, declaring that the Custody and Visitation Agreement (CVA) was invalid and not enforceable or binding, and that Brian Hogan had custody of H.H.  [Id. at ¶ 32].  Brian Hogan regained custody of H.H. immediately thereafter.  [Id. at ¶ 33].

Brian testified about how losing his daughter made him feel:

> They made me feel like I was worthless and I was no good. That I just didn't care about her, and I did with all my heart. My baby's my everything, and I try and tried to do everything the right way, everything they asked me to do. And I just -- I couldn't gain no ground.  I couldn't get above water.

[Trial Tr. Vol. III at 634].  Brian further testified as follows:

Q.	Tell us what your nights were like thinking about your child and not having her live with you.

A.	My nights was [sic] real stressful. I didn't sleep much. I quit eating. All I could think about was how can I get my daughter back? How can I get her? And I just drove myself crazy thinking about it, worrying about it, and doing everything I could to get her back.

Q.	Brian, did you have feelings of failure or guilt or anything?

A.	Yeah, I did. They made me feel like I was a failure, that I was no good, because they made me feel like that they drove it -- put it in my head so much. Because I did everything they asked me to do and I

10

still couldn't get my daughter back. And I just -- I felt useless; just no good.

Q.    What about after you got H.H. back when Melissa got her back for you the second time? Have you had -- what type of feelings had you had since then? Have you still felt guilty?

A.    When I got her back?

Q.    Yeah, after you got her back. After she came back to live with you.

A.    No, sir. All that went away. I was a happy father. I was tickled to death. I was so happy that I got my daughter back.

Q.    But you don't ever think about it at night: How did I let that happen?

A.    Do I think about it? Yes, it still bothers me till today.

Q.    That's what I'm saying. Do you still have sadness about that, even now?

A.    Yes, I do. It still bothers me now.

Q.    Tell the jury.

A.    Until this day. And I still lay there and think about it, and sometimes I have dreams about it, because it was that bad, emotionally, to me because I can't read or write, and they took advantage of me.

Q.    Does it make you feel like you have failed your family?

A.    Yes, it did.

11

[Id. at 636-37].

At trial, the Plaintiffs presented the testimony of Dr. Matthew Gaskins, a psychiatrist who performed a forensic evaluation of Brian. Dr. Gaskins opined that Brian exhibited signs of "profound sadness, tearfulness, self-blame, [and] guilt" that were depressive but that did not meet the criteria for "Major Depressive Disorder." [Trial Tr. Vol. III at 685-86]. Dr. Gaskins characterized Brian's symptoms as "adjustment order with depressed mood." [Id. at 691-92]. According to Dr. Gaskins, Brian experienced psychological distress including intense sadness, fear of not seeing H.H. again, and profound guilt as a result of the separation from his daughter. [Id. at 702]. While most of these symptoms abated when H.H. returned to Brian's custody, Dr. Gaskins noted that Brian's feelings of guilt remain present and continue to impact his relationship with H.H. [Id. at 703]. Dr. Gaskins opined that Brian and his family would benefit from intensive family services to assist with reunification. [Id. at 703-04].

Although H.H. was happy to return to living with her parents, moving between her parents and her grandfather was hard on her. [Trial Tr. Vol. II at 476]. She had trouble focusing while in school, and she found school to be stressful. [Id.]. She began engaging in self-harm, cutting her arm with a

razor blade.  [Id. at 478].  She stopped engaging in that behavior when she was told she would have to go to therapy.  [Id. at 479].

H.H. does not see Warren any longer.  [Id. at 480].  She had visited him once at Christmas after she returned to her parents.  [Id.].  H.H. had dyed her hair, and Warren "went crazy and told [her] to never step on his property ever again; that he didn't want to see [her] anymore."  [Id.].

Jesse Andrewe Raley, Ph.D., conducted a psychiatric evaluation of H.H.  He noted that H.H. perceived that the moves—first, living with her grandfather and then living again with her parents—were her fault and that she was hurting the adults in her life.  [Id. at 541].  Dr. Raley noted that H.H. reported feeling unstable and having suicidal thoughts; having difficulty with the deterioration of her relationship with her grandfather after she returned to living with her parents; and having significant body image issues.  [Id. at 542-43].  In Dr. Raley's opinion, H.H. was adversely affected by these moves in that she suffered from depression, anxiety, sleeplessness, and suicidal thoughts.  [Id. at 547].  Dr. Raley further opined that H.H. continued to have anxiety and depressive symptoms, even two years after her return to her parents.  [Id. at 549].  Dr. Raley recommended weekly psychotherapy for at least one to three years; intensive family services from social service agencies; and treatment by a child and adolescent psychiatrist.  [Id. at 550].

The Plaintiffs presented evidence at trial that Cherokee County DSS utilized CVAs in order to close "stuck cases," that is, cases where social workers felt like they did not have enough evidence to go to court and seek removal of a child but there was enough concern about the child's well-being that they did not wish to leave the child in his or her current situation. [Trial Tr. Vol. I at 160, 226, 227]. Once a parent's signature was obtained on a CVA, DSS would close the case and would not provide any follow-up services with regard to the child. [See id. at 162-64].

## IV. DISCUSSION

The United States Supreme Court has noted that "42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (citation and internal quotation marks omitted). "Damages under § 1983 are intended to compensate for actual injuries caused by constitutional violations…." Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001). "To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." Memphis Comm. School Dist., 477 U.S. at 307 (citation and internal

14

quotation marks omitted).  A jury may not award compensatory damages for the abstract value of a constitutional right.  See Carey v. Piphus, 435 U.S. 247, 264 (1978).  Rather, "an award of substantial compensatory damages must be proportional to the actual injury incurred" and "must focus on the real injury sustained."  Hetzel v. County of Prince William, 89 F.3d 169, 173 (4th Cir. 1996) (citation and internal quotation marks omitted).

Here, the Plaintiffs' claim for compensatory damages is rooted in the pain and suffering that both Plaintiffs suffered during the approximately 13 months that they were separated as a result of the unlawful CVA and the treatment they experienced during that period.  Specifically, the Plaintiffs alleged that as a proximate result of the Defendants' constitutional violations and other wrongful conduct, the Plaintiffs suffered sadness, pain, and emotional distress in that: (1) Brian was denied the opportunity to provide care, love, and affection to H.H.; (2) H.H. lost the services, care, protection, and assistance of Brian; and (3) both Brian and H.H. lost the society, companionship, comfort, guidance, kindly offices, and advice of each other. [See Doc. 1-1: Complaint at 15-16].

"[A] § 1983 plaintiff alleging emotional distress must demonstrate that the emotional duress resulted from the constitutional violation itself." Knussman, 272 F.3d at 639.  Specifically, a plaintiff must demonstrate "that

15

such distress did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes." Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1996). "The testimony cannot rely on conclusory statements that the plaintiff suffered emotional distress or the mere fact that that the plaintiff was wronged. Rather, it must indicate with specificity how the plaintiff's alleged distress manifested itself." Bryant v. Aiken Reg. Med. Ctrs. Inc., 333 F.3d 536, 547 (4th Cir. 2003) (internal citations and quotation marks omitted); see also Price, 93 F.3d at 1254 ("the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated"). The Fourth Circuit has recognized that "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." Bryant, 333 F.3d at 546.

Here, the Plaintiffs presented ample evidence of the specific mental and emotional distress that they both suffered as a proximate result of the Defendants' actions. H.H. testified extensively about the confusion, guilt, fear, anxiety, and sadness that she experienced after being placed in her grandfather's care. Specifically, H.H. testified that her grandfather had anger issues and would often yell at her; that he was very strict and allowed her to see only one of her friends; that he often would not let her speak with her father and that when such calls were allowed, her grandfather would be in

16

the background, telling her to hang up and yelling and cussing at Brian; that her grandfather restricted her visitation with her half-siblings; that, while living with her grandfather, H.H. was not given any guidance about puberty or menstruation, which was embarrassing and confusing to her; that her grandfather restricted her eating and bought her exercise equipment, which caused her to have significant body image issues; and that her grandfather often told her that her parents were worthless and did not want her.

While certainly any child would experience difficult emotions in these circumstances, H.H.'s situation undoubtedly was exacerbated by the use of the CVA. As multiple witnesses testified, Cherokee County DSS utilized CVAs in order to close "stuck cases," cases where there was not enough evidence for DSS to seek an order for the removal of a child but there was still concern about the child's well-being. By utilizing this extra-judicial process, DSS was able to place H.H., for the duration of her minority, in the care of a family member without the burden of proving to a court (1) that the transfer of custody was warranted by the circumstances and (2) that the designated family member was a suitable and appropriate custodian for the child. Further, by implementing the CVA, DSS was able to close H.H.'s case and cease to provide her with any services. As a result, H.H. was not provided any counseling, and she was not contacted by any social workers

17

after she was transferred to her grandfather's custody. The contact that she had with her father during this time was strictly limited by her grandfather; she was not able to speak freely with her father on the phone, and any in-person visits were supervised and of an extremely short duration. Thus, as a result of the Defendants' conduct, H.H. was essentially left to handle these difficult circumstances on her own.

H.H.'s mental and emotional distress unfortunately continued after she was reunited with her father. As Dr. Raley testified, H.H. felt that the disruptions in her living arrangements were her fault and that she was hurting the adults in her life; she also reported continued feelings of instability, suicidal thoughts, negative body images, depression, anxiety, and sleeplessness. While a lot of this distress was alleviated upon returning to her father, H.H. continued to suffer from anxiety and depression two years after her return. Dr. Raley opined that H.H. would continue to need psychotherapy, intensive family services, and possibly medication as prescribed by an adolescent psychiatrist.

As for Brian, there is also ample evidence of mental and emotional distress as a proximate result of the Defendants' actions. Brian was contacted by DSS when he was staying at his wife's bedside in intensive care. He was told that he needed to find a family member to place H.H. with

and that if he did not do so, she would likely go into state custody and he would never see her again. The only family member that Brian could call upon was his father, Warren, who had physically abused him as a child and with whom he did not have a good relationship. DSS presented Brian with documents to sign, telling him that he would be agreeing to only a temporary transfer of custody of Warren. Brian, however, is functionally illiterate and could not read the documents, and no one accurately explained its contents. The agreement that Brian signed actually provided for the permanent transfer of custody of H.H. to Warren. Brian only later found this out when he was told by social workers that H.H. could not be returned to his care.

Throughout the 13-month period that H.H. lived with Warren, Brian repeatedly contacted DSS social workers in an effort to get his daughter back. Brian maintained his job and obtained a suitable apartment, as instructed by the social workers. Despite complying with all the social workers' directives, Brian was told that they could not return custody to him and that he would have to take DSS and his father to court in order to obtain custody.

Brian testified that losing his daughter made him feel "worthless" and "no good." [Trial Tr. Vol. III at 634]. Brian further testified that he was unable to sleep or eat and that he "drove [himself] crazy" doing everything he could

to get her back.  [Id. at 636].  He reported feeling like a failure and continuing to have feelings of guilt until this day.  Dr. Gaskins confirmed Brian's feelings of profound sadness and guilt and noted that Brian's feelings of guilt continue to impact his relationship with H.H.  Dr. Gaskins opined that Brian and his family would benefit from intensive family services to assist with reunification.

Based on the evidence adduced at trial, the Court concludes that the Plaintiffs satisfied their burden of proving actual and specific injuries resulting from the    Defendants' constitutional violations.    The evidence of the humiliation, mental anguish, and suffering that the Plaintiffs endured—and continue to endure—as a result of the Defendants' conduct more than adequately supports the jury's award.

The Defendants cite a number of cases in which plaintiffs were awarded "similar damages," but such awards were reduced as excessive.  In each of the cited cases, however, the plaintiffs were seeking compensatory damages caused by emotional distress incurred either by acts of employment discrimination or by consumer credit reporting violations.  See Hetzel v. County of Prince William, 89 F.3d 169 (4th Cir. 1996) (Title VII and § 1983 sex and national origin discrimination in employment); Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495 (4th Cir. 2007) (violations of Fair Credit Reporting Act); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294 (4th Cir.

20

1998) (Family and Medical Leave Act and Americans with Disabilities Act violations with respect to employment); Price v. City of Charlotte, 93 F.3d 1241 (4th Cir. 1996) (§ 1983 racial discrimination in employment); Ramsey v. Am. Air Filter Co., 772 F.2d 1303 (7th Cir. 1985) (§ 1981 employment discrimination). The emotional distress suffered as a result of a damaged credit report or the loss of a job is in no way comparable to the devastation caused by the loss suffered when a parent and child are wrongfully separated for over a year. These cases, therefore, are inapposite.

The Defendants also cite to the case of Akey v. Placer County, 2:14CV02402, 2019 WL 5102241 (E.D. Cal. Oct. 11, 2019) as "instructive in demonstrating that the jury's verdict [in the present case] was excessive." [Doc. 158 at 14]. In Akey, the plaintiff and her three-year-old child, N.D., sued for violation of their civil rights when a social worker implemented an "oral safety plan" placing N.D. in the temporary custody of his father while Social Services investigated an allegation that Akey's husband (N.D.'s stepfather) choked and threatened N.D. in Akey's presence. Id. at *1. At trial, the jury found in the Plaintiffs' favor and awarded Akey $145,000 in compensatory damages against Placer County, $1 in nominal damages against a social worker, and $500 in compensatory damages against another social worker. The jury awarded N.D. $50,000 in compensatory damages

and $500,000 in punitive damages against Placer County, and $500 in compensatory damages against a social worker.  Id. at *2.

Akey, however, is readily distinguishable from the present case.  First, in Akey, the case workers implemented an oral safety plan after substantiating a report that N.D. had been physically abused by his stepfather.  Id. at *1.  By contrast, in the present case, Cherokee County DSS workers did not have any information suggesting that H.H. was in immediate physical danger at the time that Brian was asked to sign the CVA.  Moreover, there is no evidence that Brian in any way abused H.H., only that Brian had left H.H. in the care of a neighbor because Brian was attending to Amanda in the ICU some two hours away.  Second, in Akey, N.D.'s father filed an ex parte application in family court within days of the oral safety plan being implemented in order to obtain sole temporary custody of N.D. pending the investigation, which the court granted.  Id.  By contrast, no one in the present case sought to have the transfer of custody of H.H. approved by a court, despite the existence of a valid and lawful order awarding full custody to Brian.  Third, there is no indication in Akey that N.D. was mistreated while in his father's care, while in the present case, there was evidence that much of H.H.'s distress arose from her poor treatment at the hands of her custodian/grandfather.  Finally, the mother in Akey had her child returned to

22

her within a matter of five months.  Id.  Here, H.H. was not returned to Brian's custody until more than 13 months later, and only after he brought an action to enforce the 2016 custody order.  In light of these distinguishing facts, the Court does not find Akey particularly instructive on the issue of whether the verdict in this case was excessive.

The Defendants further contend that the excessiveness of the jury's award is evidenced by two of the questions posed by the jury to the Court during deliberations.  First, the jury asked whether any of the award would be paid to expert witnesses or lawyers, and second, whether they were allowed to "designate any compensation toward any cause, e.g., college tuition."  [Trial Tr. Vol. IV at 1127-28].  The Defendants argue that the jury's question about college tuition indicates that their verdict was based not on actual damages, but upon sympathy.  The Defendants further argue that the jury's question about attorney fees and costs indicates that in reaching their verdict the jury assumed that any attorney fees and costs would be taken out of the award.

On the issue of compensatory damages, the jury was initially instructed as follows:

> In determining the amount, if any, to award the Plaintiff H.H. for actual damages you should consider the reasonable value of the medical and

psychological care and supplies that she will reasonably need and [that] were actually obtained, and the present value of such care and supplies that H.H. is reasonably certain to need in the future.

Further, in determining the amount, if any, to award each plaintiff for actual damages, you should consider the evidence you have heard as to emotional and mental distress, personal humiliation, and pain and suffering. Damages are not restricted to the actual loss of money. They include the mental aspects of injury, even if they are not easy to measure.

No evidence of the dollar value of mental and emotional pain and suffering has been or needs to be introduced to you.

Do not, however, base any damages on some abstract value or importance of a constitutional right. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate each plaintiff for the injuries that he or she has sustained.

[Id. at 1117-18].

In the concluding instructions, the Court instructed the jury, in pertinent part, as follows:

Before I have the marshal take you back to the jury room to begin your deliberations I want to remind you of something I told you earlier. The oath that you have taken as a member of this jury is to return a true verdict. A true verdict is not based on empathy or emotion or bias. A true verdict is the product of an

24

analytical process based on the evidence you have heard in this trial, applying the principles of law I have just given you to determine whether the party with the burden of proof on any particular issue has satisfied that burden of proof.

[Id. at 1119].

When the Court received the questions from the jury, the Court brought

the jury back to the courtroom and instructed them as follows:

THE COURT: As to these issues, the instructions that I gave you earlier, both orally and in writing regarding the calculation of damages, was for—in the event that you reached these two issues on damages for you to determine the amount addressed in a dollar figure that is sufficient to compensate each of the plaintiffs for the damages that have been caused.

It is my instruction that you are—you need to be following those instructions as they were given to you both orally and in writing. You are not to be concerned with these collateral issues that you have raised in this note, particularly with regard to designating any portion of the compensation to various causes. That is not what you have been asked to do. That goes beyond the scope of what you are to determine as members of this jury.

So, with that, I'm going to have the marshal take you back into the jury room so that you may continue with your deliberations in this matter.

[Id. at 1129-30].

As is evidenced by these instructions, the Court properly instructed the

jury on the law applicable to awarding compensatory damages. The jury was

specifically warned not to base any award on any bias or sympathy. "A jury is presumed to follow the instructions of the court." <u>Stamathis v. Flying J, Inc.</u>, 389 F.3d 429, 442 (4th Cir. 2004). The Defendants' contentions regarding what assumptions the jury may or may not have made during their deliberations is simply speculative and does not support a finding that the jury's award was excessive.

## V.    CONCLUSION

In sum, the Court concludes that the evidence presented at trial is more than adequate to support an award of damages for the mental and emotional distress incurred by the Plaintiffs over the course of their 13 months of separation. The Court further concludes that the $1.5 million awarded to Brian and the $3.1 million awarded to H.H. is not an excessive amount of compensation for their injuries. Accordingly, the Defendants' Motion for New Trial *Nisi Remittitur* is denied.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for New Trial *Nisi Remittitur* [Doc. 157] is **DENIED**.

26

**IT IS SO ORDERED.** Signed: February 23, 2022

Martin Reidinger
Chief United States District Judge

27